**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Dan Wang, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  1:21-cv-01664 |
| v. | ) | |
| | ) | |
| The Partnerships and Unincorporated | ) | |
| Associations Identified on Schedule "A", | ) | |
| | ) | |
| Defendants. | ) | |

**Unreported Opinions Cited in Support of Plaintiff's Memorandum in Support of Plaintiff's Ex Parte Motion for Entry of a Temporary Restraining Order, Including a Temporary Injunction, Temporary Asset Restraint, and Expedited Discovery**

Aevoe Corp. v. AE Tech. Co., Ltd., Not Reported in F.Supp.2d (2012)

2012 WL 760692

2012 WL 760692
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

AEVOE CORP., Plaintiff,

v.

AE TECH. CO., LTD., Defendant.

No. 2:12–cv–0053–GMN–RJJ.
|
March 7, 2012.

**Attorneys and Law Firms**

Jeffrey A. Silvestri, Josephine Binetti Mcpeak, Mcdonald Carano Wilson, Las Vegas, NV, David S. Bloch, Winston & Strawn LLP, San Francisco, CA, for Plaintiff.

Steve L. Morris, JP Hendricks, Morris Peterson, Las Vegas, NV, Lynn J. Alstadt, Buchanan Ingersoll & Rooney P.C., Pittsburg, PA, for Defendant.

**ORDER**

GLORIA M. NAVARRO, District Judge.

### INTRODUCTION

 *1 Before the Court is Defendant AE Tech's Motion to Reconsider and Vacate the Preliminary Injunction entered in this case on January 24, 2012 (ECF No. 25). Plaintiff Aevoe Corp. filed a Response on February 14, 2012 (ECF No. 32) and Defendants filed a Reply on February 17, 2011 (ECF No. 34). A hearing was held on the matter before the Court on February 24, 2011.

### FACTS AND BACKGROUND

Plaintiff Aevoe Corp. ("Aevoe") is the owner of Patent No. 8,044,942 ("'942 Patent."). (Compl. ¶¶ 6–7, ECF No. 1.) The patent covers an invention for a touch screen protector for handheld devices such as phones and tablets. (Leonhard Decl., Ex. 1 attached to Motion for TRO ¶ 1, ECF No. 3–1.) The touch screen protectors are marketed under the brand name MOSH I. (Id.) The protector includes a slightly raised outer perimeter, so that the transparent portion covering a device's touch screen is suspended just slightly above the screen itself, forming an enclosed air space and preserving touch screen functionality while avoiding the bubbles that plague fully adhesive prior art touch screen protectors. (Id . at ¶ 2.) Aevoe is a small and growing company. (Id. at ¶ 6.)

The International Consumer Electronics Show ("CES") is held in Las Vegas. CES attracts major players in the technology industry from over a hundred companies. Aevoe was a participant in the 2012 show. (Id. Decl. at ¶ 6.) While they were at CES, Aevoe learned that AE Tech had imported and was marketing products at CES that allegedly infringe upon the '942 Patent. (Compl. at ¶ 13.) Prior to CES, Aevoe had sued AE Tech in the United States District Court for the Northern District of California, No. 11–cv–0664, for infringing its '942 Patent. (Id. at ¶ 11.)

Aevoe filed the instant suit alleging patent infringement. (See Compl .) Aevoe also petitioned this Court for a Temporary Restraining Order to prevent AE Tech from continuing to sell or market the allegedly infringing items as well as a Seizure Order to collect products that appear to be infringing items. (TRO Motion, ECF No. 3.) This Court granted both requests. AE Tech did not respond to the Court's Order to Show Cause Hearing why a Preliminary Injunction should not be issued or attend the hearing held on January 23, 2012. Accordingly, pursuant to Local Rule 7–2(d), the Court granted Aevoe's motion for a preliminary injunction.[1] The Preliminary Injunction Order was entered on January 24, 2012. (PI Order, ECF No. 16). AE Tech then filed the instant motion to Reconsider and Vacate the Preliminary Injunction Order on February 7, 2012. (Mtn. to Vacate, ECF No. 25.)

### DISCUSSION

**A. Legal Standard**

Under Fed.R.Civ.P. 54(b), a district court can modify an interlocutory order "at any time" before entry of a final judgment. In the Ninth Circuit, it is a "well-established rule that a district judge always has the power to modify or to overturn an interlocutory order or decision while it remains interlocutory." Credit Suisse First Boston Corp. v. Grunwald, 400 F.3d 1119, 1124 (9th Cir.2005). Fed.R.Civ.P 59(e) applies to any motion seeking "to alter or amend a judgment," and under Rule 54(a), a judgment is defined to include "any order from which an appeal lies ." A preliminary injunction order is a "judgment" and is therefore subject to Rule 59(e)'s 28–day time limit on motions for reconsideration. See 28 U.S.C.

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 3 of 73 PageID #:99

Aevoe Corp. v. AE Tech. Co., Ltd., Not Reported in F.Supp.2d (2012)

2012 WL 760692

§ 1292(a)(1); *Credit Suisse,* 400 F.3d at 1124 n. 6. Thus, under the Federal Rules, a motion for "reconsideration" of a preliminary injunction order is subject to Rule 59(e)'s 28–day time limit, while there is no time limit on a motion to "vacate or dissolve" a preliminary injunction. *Id.* at 1124.

 **\*2** In determining whether a motion requesting the district court to reconsider its preliminary injunction should be treated as a motion for reconsideration under Rule 59 or a motion for dissolution or modification under Rule 54, the district court " 'must look beyond the motion's caption to its substance.' " *Id.* (citing *Favia v. Ind. Univ. of Pa.,* 7 F.3d 332, 337 (3d Cir.1993). "While the purpose of a motion to reconsider under Fed.R.Civ.P. 59(e) is to relitigate the 'original issue,' a motion to modify a preliminary injunction is meant only to relieve inequities that arise after the original order." *Id.* (internal citations omitted.)

AE Tech captioned its motion as a motion to "reconsider" and motion to "vacate the preliminary injunction." AE Tech's motion presents arguments that are in substance a request to relitigate the 'original issue' before the Court. AE Tech does not discuss any new circumstances that have arisen after the original order that would justify the Court's consideration to vacate the order. Accordingly, the Court will apply the motion for reconsideration standard under Rule 59(e) to the instant motion to determine whether or not to vacate or deny the preliminary injunction. However, one aspect of the motion is a request to modify the order and the Court addresses that request pursuant to Rule 54.

**B. Motion to Reconsider**

"Under Rule 59(e), a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *389 Orange St. Partners v. Arnold,* 179 F.3d 656, 665 (9th Cir.1999). A motion to reconsider is not a vehicle for parties to make new arguments and present new evidence that could have been included in their original briefs. Thus, "a [motion for reconsideration] may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enterprises, Inc. v. Estate of Bishop,* 229 F.3d 877 (9th Cir.2000) (citation omitted). *See also Carroll v. Nakatani,* 342 F.3d 934, 945 (9th Cir.2003) (citation omitted) ("A [motion to reconsider] may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation.");

*Zimmerman v. City of Oakland,* 255 F.3d 734, 740 (9th Cir.2001) (citations omitted) ("A district court does not abuse its discretion when it disregards legal arguments made for the first time on a motion to amend [judgment] ..., and a party that fails to introduce facts in a motion or opposition cannot introduce them later in a motion to amend by claiming that they constitute 'newly discovered evidence' unless they were previously unavailable.")

AE Tech argues that it has newly discovered evidence to present to the Court that goes to the validity of the '942 Patent. The newly discovered evidence consists of examples of prior art and evidence of internet sales of the patented product. The Court finds that this evidence could have reasonably been discovered and raised at the time of the original motion. AE Tech admits the evidence was found online during a routine search.

 **\*3** AE Tech additionally claims that it was not able to obtain counsel in the United States before the January 23, 2012 hearing, which is why it could not respond to the motion for preliminary injunction. However, Aevoe presents evidence that AE Tech has responded to Aevoe via its counsel as early as January 4, 2012. AE Tech concedes in its Reply that there were communications between AE Tech's counsel in Taiwan and Aevoe's lawyer before the hearing, but that these communications were related to an attempt at an amicable solution to the allegations. AE Tech also admits that it was first made aware of the Nevada lawsuit on January 12, 2012 but that it did not prepare for litigation since there might be a possible solution as they were discussing a licensing agreement. AE Tech claims that it wasn't until January 16 when it was "ultimately clear" that Aevoe would not license the '942 Patent and that at that point the hearing was "just seven days away." However, with the hearing only 12 days away, AE Tech did not try to reach out to Aevoe for an extension of time to file a Response nor did it ask the Court for an extension of the TRO and a continuance of the PI hearing. Instead, AE Tech elected not to respond or appear at the hearing and now faces a higher burden given its decision to waste judicial resources and force the Court to hear this matter twice.

The Court now reviews its original decision to determine if it has committed clear error since it has found there is no newly discovered evidence and AE Tech does not argue that there is an intervening change in the controlling law.

**C. Preliminary Injunction**

Aevoe Corp. v. AE Tech. Co., Ltd., Not Reported in F.Supp.2d (2012)

2012 WL 760692

**1. Legal Standard**

Under Fed.R.Civ.P. 65(b), the court can issue a preliminary injunction pending a trial on the merits. The Ninth Circuit in the past set forth two separate sets of criteria for determining whether to grant preliminary injunctive relief:

> Under the traditional test, a plaintiff must show: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). The alternative test requires that a plaintiff demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

*Taylor v. Westly,* 488 F.3d 1197, 1200 (9th Cir.2007). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.*

The Supreme Court brought into question the Ninth Circuit's sliding scale test and reiterated that a plaintiff seeking an injunction must demonstrate that irreparable harm is "*likely,*" not just possible. *Winter v. NRDC,* 129 S.Ct. 365, 374–76 (2008). The Supreme Court has made clear that a movant must show both "that he is *likely* to succeed on the merits [and] that he is *likely* to suffer irreparable harm in the absence of preliminary relief...." *Winter,* 129 S.Ct. at 374 (citing *Munaf v. Geren,* 128 S.Ct. 2207, 2218–19 (2008); *Amoco Prod. Co. v. Gambell,* 480 U.S. 531, 542 (1987); *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311–12 (1982)) (emphases added).

 *\*4* A recent Ninth Circuit decision has clarified whether the slide scale approach is still a valid test under *Winter.* In *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, (9th Cir.2011), the court held that the "serious questions" prong of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter.* "[T]he 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test. That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest ." *Id.* at 1135.

**2. Success on the Merits**

A patent infringement claim has two elements: the existence of a valid U.S. patent, and proof of infringement of the patent's claims by the accused device, either literally or via equivalents. 35 U.S.C. § 271. In order to establish a likelihood of success on the merits for its claim of patent infringement, Aevoe must show it is likely that a trier of fact would find the '942 Patent is valid and infringed. *See Gillette Co. v. Energizer Holdings, Inc.,* 405 F.3d 1367, 1370 (Fed.Cir.2005). An issued patent is presumed valid. 35 U.S.C. § 282; *Medical Instrumentation & Diagnostics Corp. v. Elekta AB,* 344 F.3d 1205, 1220 (Fed.Cir.2003).

**a. Patent Validity**

At the preliminary injunction stage, the Court considers the evidence in light of the presumptions and burdens that will apply at trial. *Titan Tire Corp. v. Case New Holland, Inc.,* 566 F.3d 1372, 1376 (Fed.Ci r.2009). At trial, Aevoe will bear the burden of proving that AE Tech's devices do infringe its patent and that it can defend against a challenge of invalidity. However, this does not change the fact that at the preliminary injunction phase the patent is presumed valid. The initial burden is on AE Tech to produce evidence of invalidity. *Id.* If evidence is provided that questions the validity of a patent then the court must weigh the evidence both for and against validity that is available at the preliminary injunction stage. *Id.* at 1379. "If the [court] concludes there is a 'substantial question' concerning the validity of the patent, meaning that the alleged infringer has presented an invalidity defense that the patentee has not shown lacks substantial merit, it necessarily follows that the patentee has not succeeded in showing it is likely to succeed at trial on the merits of the validity issue." *Id.* (citing *New England Braiding Co., Inc. v. A.W. Chesterton Company,* 970 F.2d 878, 883 (Fed.Cir.1992)).

AE Tech did not challenge the validity of the patent at the motion stage. The only evidence before the Court was that '942 Patent was issued and therefore presumed valid. Patent infringement will be found when a product contains each element of one of the patent's claims. *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.,* 346 F.3d 1075, 1080 (Fed.Cir.2003). The Court examined AE Tech's allegedly infringing products at the hearing and determined that each element of claim 1 of the '942 Patent was present on the AE Tech products.

**3. Irreparable Harm**

Aevoe Corp. v. AE Tech. Co., Ltd., Not Reported in F.Supp.2d (2012)

2012 WL 760692

**\*5** AE Tech argues that the Court's finding of irreparable harm was clearly erroneous because Aevoe has not demonstrated irreparable harm. The PI states:

> The making, use, importation, offer for sale, and/or sale of the infringing goods will result in the immediate and irreparable injury to A voe in the form of loss of income, loss of goodwill, dilution and lessening of the value of the ′942 Patent, and interference with Aevoe's ability to exploit its ′ 942 Patent and exclude others from using its patented technology, if AE Tech is not preliminary enjoined from practicing, making, using, importing, offering for sale, and/ or selling, the invention described in the ′942 Patent or any reproduction, counterfeit, copy or colorable imitation concerning the same (including, without limitation, the A Pl us Shield Anti-Glare products) pending a trial on the merits. AE Tech is a direct competitor of Aevoe's, which alone suffices to establish irreparable harm. *See Abbott Laboratories v. Sandoz, Inc.,* 544 F .3d 1341, 1361–1362 (Fed.Cir.2008), rehearing en banc denied; *see also Acumed LLC v. Stryker Corp.,* 551 F.3d 1323, 1329 (Fed.Cir.2008). Particularly in light of AE Tech's status as a Taiwan corporation and its apparent lack of substantial U.S. Assets, monetary damages will be inadequate to compensate Aevoe for its losses in the absence of preliminary injunctive relief.

(*See* PI Order, ECF No. 16.)

AE Tech argues that claims of loss income are insufficient to prove irreparable harm citing *Automated Merch. Sys., Inc. v. Crane Co., 357 Fed. Appx.* 297, 300–01 (Fed. 27 Cir.2009). ("First, lost sales standing alone are insufficient to prove irreparable harm if they were, irreparable harm would be found in every case involving a manufacturer/patentee, regardless of circumstances. Lost sales (without more) are presumed to be compensable through damages, so they do not require injunctive relief.") (citing *Abbott Labs. v. Andrx Pharms., Inc.,* 452 F.3d 1331, 1348 (Fed.Cir.2006). AE Tech next takes issue with the fact that goodwill and dilution are concepts associated with trademarks, not patents and should not be used to show loss. *See Apple, Inc. v. Samsung Elecs. Co., Ltd.,* 2011 WL 7036077, \*19 (N.D.Cal. December 2, 2011); *see also Apple Computer, Inc. v. Formula Int'l Inc.,* 725 F.2d 521, 526 (9th Cir.1984). AE Tech also argues that the absence of an injunction against AE Tech will not prevent Aevoe from excluding others. AE Tech argues the cases cited in the preliminary injunction order that state that direct competition alone establishes irreparable harm is wrong. Instead those cases stand for the proposition that competition is a factor that supports a finding of irreparable harm.

This Court is not persuaded by AE Tech's arguments and finds that they are not meritorious. The Court's finding of irreparable harm was not clearly erroneous because it also found that since AE Tech is a foreign corporation, money damages would be insufficient. *See Bushnell, Inc. v. Brunton Co.,* 673 F.Supp.2d 1241, 1263 (D.Kan.2009) (granting preliminary injunction; "the prospect of collecting money damages from a foreign defendant with few to no assets in the United States tips in favor of a finding of irreparable harm"); *Canon Inc. v. GCC Int'l Ltd.,* 450 F.Supp.2d 243, 255–56 (S.D.N.Y.2006) (granting preliminary injunction where defendant was largely based abroad); *O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co., Ltd.,* No.2011–1054, 2011 WL 5601460, \* 10 (Fed.Cir. Nov. 18, 2011) (the likely availability of those monetary payments helps define when harm can be offset by monetary payments); *Robert Bosch,* 659 F.3d 1142, 1155–1156 (Fed.Cir.2011) (reversing denial of permanent injunction where the likely availability of monetary damages was in question, citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* No. 2:04–cv–0032, 2007 WL 869576, at \*2 (E.D.Tex. Mar. 21, 2007), *vacated and remanded on other grounds,* 521 F.3d 1351 (Fed.Cir.2008) where " 'all three defendants are foreign corporations and that there is little assurance that [plaintiff] could collect monetary damages' "). Thus it was not just direct competition, but all of these factors in conjunction that supported a finding of irreparable harm.

### 4. Balance of Hardships and Public Interest

**\*6** AE Tech does not argue at all how the balance of hardships is in its favor. Accordingly, the Court finds that its decision that the balance of hardships tipped in favor of Aevoe was not incorrect.

AE Tech instead argues that because it has provided substantial evidence that the ′942 Patent is invalid that the public interest favors denial for a preliminary injunction because the public interest lies in "only enforcing those patents which are likely to be valid. *See Abbott Labs. v. Andrx Pharms., Inc.,* 452 F.3d 1331, 1348 (Fed.Cir.2006). However, since the Court does not consider the untimely evidence, the Court's finding that the public interest weighs in favor of granting relief in that the patent system spends in large measure "directly on the right to exclude" was not in clear error. *Sanofi–Synthelabo v. Apotex, Inc.,* 470 F .3d 1368 (Fed.Cir.2006).

**D. Preliminary Injunction is Overbroad**

AE Tech argues that the preliminary injunction is overbroad because it enjoins AE Tech from "practicing, making, manufacturing, importing, offering for sale, selling, and/or otherwise using U.S. Patent No. 8,044,942, or any reproduction, counterfeit, copy, or colorable imitation of the same, and from transferring, moving, returning, destroying, or otherwise disposing of any Infringing Goods, including but not limited to ACase A Pl us Shield Anti–Glare products." (PI Order at 3:25–4:4).

AE Tech argues that works like counterfeit and colorable imitation are appropriate for enforcing trademark rights, they are not proper in an injunction to prevent patent infringement. AE Tech suggests that the Order should read that the prohibited conduct is limited to making, using, offering to sell, selling or importing a screen protector that is within any claim of the '942 Patent. *See Int'l Olympic Comm'n v. San Francisco Arts & Athletics,* 781 F.2d 733, 738 (9th Cir.1986) (an injunction is proper only where it tracks the statute that provides a claim for the prohibited activity).

AE Tech is correct and Aevoe does not oppose the request to limit the injunction to the language covered by the patent statue, 35 U.S.C. § 271. Accordingly, the Court will modify the Order as stated below.

**CONCLUSION**

**IT IS HEREBY ORDERED** that Defendant AE Tech's Motion to Reconsider and Vacate the Preliminary Injunction entered in this case on January 24, 2012 (ECF No. 25) is **DENIED in part and GRANTED in part.**

The Court will not vacate the Preliminary Injunction Order but does order that it be modified as follows. The language on page 3, line 25 through page 4, line 4 of the Preliminary Injunction Order (ECF No. 16) is replaced with the following language:

**IT IS HEREBY ORDERED THAT** AE Tech, its agents, servants, employees, confederates, attorneys, and any person acting in concert or participation with them, or having knowledge of this Order by personal service or otherwise be, and hereby are preliminary enjoyed from making, using, manufacturing, importing, offering for sale, selling, and/or otherwise using U.S. Patent No. 8,044,942, and from transferring, moving, returning, destroying, or otherwise disposing of any Infringing Goods, including but not limited to ACase APlus Shield Anti–Glare products pending a trial on the merits.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 760692

Footnotes

1    Local Rule 7–2(d) states that "[t]he failure of an opposing party to file points and authorities in response to any motion shall constitute a consent to the granting of the motion.

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 7 of 73 PageID #:103

Charter National Bank and Trust v. Charter One Financial, Inc., Not Reported in...

2001 WL 527404

2001 WL 527404
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

CHARTER NATIONAL
BANK AND TRUST, Plaintiff,

v.

CHARTER ONE FINANCIAL, INC.,
Charter One Bank, FSB and St. Paul
Federal Bank for Savings, Defendants.

No. 01 C 0905.
|
May 15, 2001.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.

**\*1** This case is before the Court on the Motion for a Temporary Restraining Order brought by plaintiff Charter National Bank and Trust. Charter National seeks to restrain Charter One Financial, Inc ., Charter One Bank, FSB and St. Paul Federal Bank for Savings from operating any location in the Chicago metropolitan area using the mark "charter." For the following reasons, Charter National's motion is granted in part and denied in part.

*ALLEGED FACTS*

Northwest Bankcorp acquired a bank in Hanover Park and renamed it Charter Bank and Trust of Illinois on October 1, 1987. In 1993, two more locations were added, one in Schaumburg and one in Hoffman Estates. Charter Bank and Trust of Illinois changed its name to Charter Bank and Trust, N.A. and then to Charter National Bank and Trust ("Charter National"). Since 1987, the entity now known as Charter National has continuously operated the Hanover Park facility and has displayed a large sign out front with the words "Charter Bank". Since 1993, the Hoffman Estates and Schaumburg branches have displayed large signs with the words "Charter Bank".

Charter One did not do business in the State of Illinois until it acquired St. Paul Federal Bank for Savings in 1999. Until January of 2001 it operated St. Paul's fifty-eight Chicago metropolitan locations under the trade name and trademark "St. Paul". In January of 2001, St. Paul announced that it was changing its name to Charter One Bank. On February 6, 2001, counsel for Charter National faxed a letter to Charter One informing Charter One of its contention that Charter National was the senior common law user in Chicago and that the name change was already causing customer confusion.

After Charter One did not stop converting branches from the mark "St. Paul" to "Charter One", Charter National filed the instant lawsuit. The issues have been extensively briefed and we have conducted an evidentiary hearing. While this court has reviewed the motion for a temporary restraining order, defendants have agreed to refrain from displaying the name "Charter One" in the geographic area surrounding Charter National's three branches.

*DISCUSSION*

The purpose of preliminary injunctive relief is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortgage Corp. v. Platinum Financial Group Inc., 149 F.3d 722, 726 (7th Cir.1998).* The standards for a temporary restraining order and the standards for a preliminary injunction are identical. *Atkins v. Arson Pirie Scott & Co., Inc., 1999 WL 1249342* at \*1 (N.D.Ill.Dec. 13, 1999). Therefore, a TRO is warranted if the party seeking the injunction can make a threshold showing that: (1) the case has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm if the injunction is not granted; (4) the balance of hardships is in favor of the moving party; and (5) the preliminary injunction will not harm the public interest. *Rust Environment & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1213 (7th Cir.1997).

**\*2** "Trademark law aims to aid consumers in identifying the source of goods by allowing producers the exclusive right to particular identifying words or symbols which they may attach to their products as a designator of source." *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 657 (7th Cir.1995).

Charter National has shown a reasonable likelihood of success on the merits. In order to show a reasonable likelihood of success on the merits in a trademark infringement claim,

Charter National Bank and Trust v. Charter One Financial, Inc., Not Reported in...

2001 WL 527404

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 8 of 73 PageID #:104

the plaintiff must demonstrate: (1) the validity of its trademark and (2) the infringement of that mark. *Echo Travel, Inc. v. Travel Associates, Inc.,* 870 F.2d 1264, 1266 (7th Cir.1989). The validity of a mark is established by showing that a "word, term, name, symbol or device" is entitled to protection because that mark specifically identifies and distinguished one company's goods from those of its competitors. *Platinum,* 149 F.3d at 726. Charter National is the senior user of the mark in the Chicago metropolitan area. Although Charter One has registered its mark at the U.S. Patent and Trademark Office, that trademark only allows it to use its mark if no other senior user, who has been continuously using the mark, has priority. 15 U.S.C. § 1065. A trademark application is always subject to previously established common law rights of another party. *The Money Store v. Harriscorp Fin.,* 689 F.2d 666, 672 (7.<sup>th</sup> Cir1982). Therefore, if "Charter National Bank" is protectable under common law trademark law, Charter National has a reasonable likelihood of success on the merits.

Charter National contends that its mark is protectable because the term "charter" is more than a generic term, such as bank. Charter One argues that the mark is not protectable because it simply signifies that the bank has been certified, or chartered, by the state or federal government. We disagree. "Charter National Bank" is entitled to protection.

The determination of whether a party has established a protectable right in a trademark is made on a case by case basis, considering the totality of the circumstances. *New West Corp. v. NYM Co. of Cal., Inc.,* 595 F.2d 1194, 1200 (9th Cir.1979). A party may acquire a protectable right simply through the use of the mark in connection with goods or services. *Zazu Designs v. L'Oreal,* S.A., 979 F.2d 499, 503 (7th Cir.1992). We find that Charter National has shown a reasonable likelihood of success in its claim to have acquired a protectable right in "Charter National" through its evidentiary submissions of advertising brochures, ads, and pictures of signs, as well as its evidence of actual confusion. Later in the course of this case, Charter National will have to present more substantial evidence of confusion, but at this point the evidence it has presented is sufficient to convince this court that there is a reasonable likelihood of success in showing that its name has acquired a secondary meaning in the minds of customers and, therefore, deserves protection.

**\*3** In a trademark infringement case, damages are by "their very nature irreparable and not susceptible of adequate measurement for remedy at law." *International Kennel Club*

*of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 (7th Cir.1988). Charter National has shown a reasonable likelihood of success on the merits because of customer confusion and frustration. Furthermore, the fact that it is virtually impossible to calculate the financial impact of these damages shows that there is no adequate remedy at law.

Balancing of the hardships and the public's interest presents the closest question here. Defendants operate over seventy locations in the entire Chicago metropolitan region and forcing them to cover all of their signs on all banks is a hardship. However, they knew of this potential conflict before they changed the names of their banking operations from St. Paul to Charter One.

We have considered different geographical parameters for a temporary restraining order. Eighty percent of Charter National's deposit customers are clustered within three miles around its branches. Therefore, we have entertained the option of structuring a TRO to include that geographic area. In response, Charter National argued that it makes a profit only by virtue of the loans that it makes and, since its loan customers live in a much broader geographic area than its deposit customers, its damages will not by redressed unless we totally enjoin Charter One from any use of the mark "charter" in the entire Chicago metropolitan area. In the event that we determine that a preliminary injunction is justified, we might require that Charter One stop using the mark "charter" in the entire Chicago metropolitan area. However, given the balancing of the hardships at this stage in the litigation and the inconvenience to Charter One's hundreds of thousands of customers in the Chicago area, we will not order Charter One to stop using the mark "charter" in the entire metropolitan area.

We have fashioned a remedy which balances the public interests and the hardships, but still recognizes Charter National's likelihood of succeeding on the ultimate merits. We will restrain Charter One entities from operating any type of bank facility using the word "charter" on any outdoor sign within the geographic area between Lake Cook Road, on the north, I 290/I355/Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west. Furthermore, we will enjoin Charter One from opening any new locations, in the above geographic area, which use the mark "charter" in any way or is identified as "Charter One". This solution balances the strength of Charter National's mark in a smaller geographic area against the hardship of Charter One changing

Charter National Bank and Trust v. Charter One Financial, Inc., Not Reported in...

2001 WL 527404

all of the signs on all of its facilities in the Chicago area on a temporary basis.

*CONCLUSION*

Charter National Bank & Trust's motion for a temporary restraining order is granted in part and denied in part. Charter One Financial, Inc., Charter One Bank, FSB and St. Paul Federal Bank for Savings are enjoined from operating any type of bank facility using the word "charter" on any outdoor signs within the geographic area between Lake Cook Road, on the north, I 290/I355/Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west. Furthermore, Charter One is enjoined from opening any new locations in that geographic area that use the mark "charter" in any way or is identified as "Charter One". Charter National's request for a temporary restraining order prohibiting Charter One from using the mark "charter" throughout the entire Chicago metropolitan area is denied.

**\*4** It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 527404

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

CHRISTIAN DIOR COUTURE, S.A.,    )
                )
        **Plaintiff,**      )
                )
        **v.**          )     **No. 15 C 6324**
                )
**LEI LIU, et al.,**           )
                )
        **Defendants.**   )

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Omfeng (Omfeng) and Defendant Wholesale 925 Silvery Jewelry's (Silvery) motions to dismiss. For the reasons stated below, the motions to dismiss are denied.

## BACKGROUND

Plaintiff Christian Dior Couture, S.A. (Dior) allegedly engages in the manufacture, sale, and distribution of luxury merchandise worldwide. Dior's merchandise is allegedly labeled with federally-registered trademarks and sold to consumers by authorized retailers throughout the United States. Omfeng and Silvery allegedly operate as commercial internet stores on the website AliExpress.com (AliExpress) and sell products to buyers in the United States. The owners of

1

Omfeng and Silvery allegedly reside in the People's Republic of China. Dior contends that until the court granted its request for injunctive relief, Defendants were offering counterfeit Dior products for sale on their internet stores on AliExpress. Dior's amended complaint includes claims brought pursuant to 15 U.S.C. 1501, *et seq*. of the Lanham Act (Lanham Act) for trademark infringement and counterfeiting (Count I), false designation of origin claims (Count II), cybersquatting claims (Count III), and claims brought pursuant to the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, *et seq*. (Count IV). Dior filed a motion for a temporary restraining order (TRO) to stop the alleged counterfeit sales, which the court granted. At a subsequent preliminary injunction hearing, Dior presented evidence that Defendants targeted their internet stores towards consumers in the United States, including Illinois. Defendants, at that time, argued that the court lacked personal jurisdiction over them since they were located in China and had no sales in Illinois. The court found that it had personal jurisdiction over the Defendants since Dior had sufficiently established, at that stage in the proceedings, that Defendants were directly targeting their business activities toward consumers in the United States, including Illinois. The court then entered the preliminary injunction order. Defendants now move to dismiss the instant action pursuant to Federal Rule of Civil Procedure 12(b)(2), again arguing that this court lacks personal jurisdiction over them.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a party can move to dismiss claims for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). The plaintiff bears the burden of demonstrating the existence of personal jurisdiction. *Steel Warehouse of Wisconsin, Inc. v. Leach*, 154 F.3d 712, 715 (7th Cir. 1998); *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). When the court adjudicates a motion to dismiss brought pursuant to Rule 12(b)(2) based on written materials submitted to the court, "the plaintiff need only make out a *prima facie* case of personal jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)(internal quotations omitted). In determining whether the plaintiff has met his burden, the "court accepts all well-pleaded allegations in the complaint as true." *Hyatt Int'l. Corp. v. Coco*, 302 F.3d 707, 712-13 (7th Cir. 2002). In addition, "the plaintiff is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Purdue Research Found.*, 338 F.3d at 782; *see also Leong v. SAP America, Inc.*, 901 F.Supp. 2d 1058, 1061-62 (N.D. Ill. 2012)(explaining that "when the defendant challenges by declaration a fact alleged in the plaintiff's complaint, the plaintiff has an obligation to go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction").

## DISCUSSION

Defendants contend that this court lacks personal jurisdiction over them and that all claims brought against them should thus be dismissed. Personal jurisdiction

3

involves consideration of both federal and state law. *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 756-57 (7th Cir. 2010)(stating that the Court was "still unable to discern an operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction")(internal quotations omitted)(quoting *Hyatt Int'l Corp.*, 302 F.3d at 715). A court has general personal jurisdiction over a defendant if the defendant has "continuous and systematic" contacts with the forum that are "sufficiently extensive and pervasive to approximate physical presence." *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010). The court has specific personal jurisdiction over a defendant if "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Id.* at 702 (citation omitted). Dior argues that Defendants are subject to the jurisdiction of this court based on specific personal jurisdiction. (Resp. O 7-10; Resp. S 6-10).

I.  Contacts with Illinois

Defendants argue that they lack sufficient contacts with Illinois to be subject to personal jurisdiction.

A.  Omfeng

Omfeng contends that it is not subject to personal jurisdiction, arguing that it did not have any intentional contacts with Illinois consumers. (O Mot. 2-6); (O Reply 1-2). Omfeng claims that it is not based in Illinois and its owners and

4

employees reside in China.  (O Mot 1-3).  Omfeng argues that its owner, FenFen

Zeng, is a citizen and resident of the People's Republic of China and has never

visited Illinois.  However, the record shows that Omfeng regularly sells to consumers

in the United States and recently offered to sell jewelry to an Illinois consumer.

(Resp. O 4-5).  Omfeng's Illinois offer occurred on AliExpress this year and

involved jewelry that infringed on Dior's product line.  (Resp. O 4-5).  The Seventh

Circuit has also found that when a company indicates to consumers an ability to ship

to a certain state, that such an offer to consumers is pertinent in assessing whether

that company is subject to personal jurisdiction.  *Illinois v. Hemi Grp. LLC*, 622 F.3d

754, 758 (7th Cir. 2010).  The record shows that Omfeng operates on AliExpress,

which prices products in U.S. dollars and the consumers that purchase Omfeng's

products are informed that Omfeng will ship the products to the United States,

including Illinois.  Dior has shown that Omfeng sells products to consumers in the

United States and has offered to sell and ship jewelry to Illinois.  By both operating

on AliExpress and actually offering to sell a product to an Illinois consumer, Omfeng

has intentionally directed its activities at Illinois and purposefully availed itself of the

privilege of conducting business in Illinois.  *Dworkin*, 601 F.3d at 701.  Further, the

alleged injury in this case arises directly out of Omfeng's offer to sell jewelry to an

Illinois consumer.  *Id*.  Omfeng also argues that the jewelry it offered for sale in

Illinois was never actually sold to the Illinois buyer in question.  (O Reply 1-4).

However, Omfeng has pointed to no controlling precedent that would require a

completed sale in order to be subject to personal jurisdiction.  If Omfeng made

efforts to extend offers to Illinois consumers, Omfeng purposefully availed itself of

the privilege of conducting business in Illinois, whether or not the deals were finalized. In addition, whether the jewelry in question was actually sold is not pertinent to Omfeng's liability since a mere offer to sell infringed merchandise is sufficient to establish liability under the Lanham Act. 15 U.S.C. § 1114.

Omfeng further argues that the jewelry in question did not infringe on Dior's product line. This court was provided with evidence at the TRO and preliminary injunction stage. In evaluating the merits of Dior's claims, this court found sufficient evidence of infringing conduct by Omfeng. Dior has also provided additional evidence in response to the instant motion. Dior is not required to prove its case at this juncture. *Purdue Research Found.*, 338 F.3d at 782. Although Omfeng contends that the jewelry in question is not infringing, there is no indication that Omfeng has made the actual product in question available to Dior. Nor has Dior yet been given the opportunity to conduct discovery in this case. Dior has provided sufficient evidence to show that the product in question was an infringing product. Therefore, Dior has presented sufficient evidence to establish a *prima facie* case as to Omfeng's contacts with Illinois to show that it is subject to personal jurisdiction.

B.  Silvery

Silvery contends that it is not subject to personal jurisdiction, arguing that it did not purposefully direct its activities at residents of Illinois.  (S Mot. 4); (S Reply 1-2).  Silvery argues personal jurisdiction cannot exist since the offer was "made from within China. . . ."  (S Mot. 4); (S Reply 4-5).  However, Silvery points to no controlling precedent that would insulate a seller from being subject to personal

jurisdiction simply because the seller was physically located in another jurisdiction. Courts have found, for example, that reaching out via telephone or mail to a state is sufficient to form minimum contacts with a state. *See Heritage House Restaurants, Inc. v. Cont'l Funding Grp., Inc.*, 906 F.2d 276, 281 (7th Cir. 1990)(stating that "[t]he physical presence of a defendant in Illinois during the transaction is not necessary to obtain jurisdiction under the long-arm statute" and that "[w]here a relationship is naturally based on telephone and mail contacts, these contacts can justify jurisdiction over a defendant").

Silvery acknowledges that its owners are YunBo Yue, GaoWen Wu and Qi Huang, and that they use aliases such as Shuai Liu and Tony Lee. (S Mot. 2). Although Silvery is vague as to the citizenship of all such persons, Silvery does argue that GaoWen Wu is a citizen and resident of the People's Republic of China and has never visited Illinois. The record shows that Silvery recently offered to sell jewelry to an Illinois consumer, that Silvery's Illinois offer occurred on AliExpress this year, and that the offer involved jewelry that infringed on Dior's product line. (S Resp. 4-5). Silvery operates on AliExpress, which prices products in U.S. dollars. Consumers who purchase Silvery's products are informed that Silvery will ship the products to the United States, including Illinois. By operating on AliExpress and selling and offering to sell products to Illinois consumers, Silvery has intentionally directed its activities at Illinois and purposefully availed itself of the privilege of conducting business in Illinois. *Dworkin*, 601 F.3d at 701. Further, the alleged injury in this case arises directly out of Silvery's offer to sell jewelry to an Illinois consumer. Therefore, Dior has presented sufficient evidence to establish a *prima*

*facie* case as to Silvery's contacts with Illinois to show that it is subject to personal jurisdiction.

II.  Fair Play

Defendants argue that they are merely sellers in a global market place and that consumers who choose to reach out to them for products should understand that they will have no legal recourse in the consumers' home forums.  Defendants also argue that companies such as Dior who are bringing Lanham Act claims such as this should not be able bring suit in United States courts.

In the instant action, it is true that Dior is not a company based in the United States.  The Supreme Court has explained, however, that "[t]he Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers."  *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985)(stating that '[b]ecause trademarks desirably promote competition and the maintenance of product quality, Congress determined that sound public policy requires that trademarks should receive nationally the greatest protection that can be given them").  Dior, in bringing the Lanham Act claims, is pursuing the interests of United States consumers and acting in accordance with public policy of the United States and the will of Congress.

The court notes that Defendants rely heavily upon the Seventh Circuit decision in *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014).  In that case, the Seventh Circuit cautioned that merely shipping

an item to a state does not automatically create personal jurisdiction, explaining that, there is not a "de facto universal jurisdiction" simply because a seller operates a website and ships an item to a state. *Id.* at 801-02. The Seventh Circuit further explained that merely operating an interactive website that is accessed by a consumer within a state may not be sufficient to form minimum contacts. *Id.* at 802-03; *see also Monster Energy Co. v. Wensheng*, 2015 WL 5732050, at *4 (N.D. Ill. 2015)(holding that "[d]isplaying photos of an item for sale and inviting potential purchasers to place an order and buy the product through an Internet store is an offer for sale"); *Coach, Inc. v. Di Da Imp. & Exp., Inc.*, 2015 WL 832410, at *2 (N.D. Ill. 2015)(indicating that personal jurisdiction existed based upon internet sales). Although Dior has offered sufficient evidence at this juncture to establish the necessary contacts with Illinois by Defendants, there is one important distinction between the instant action and *Advanced*. In *Advanced*, the seller was located in California. *Id.* at 798. Thus, although the seller may not have been found to be subject to suit in all fifty states, the seller presumably would have been subject to suit in California. Any consumer or aggrieved seller could at least presumably seek legal relief in a federal court in California.

In this case, Defendants are not physically present and operating in the United States. Apparently, Defendants indicate that injured parties have one option, that is, that they can go to China and try and work their way through the Chinese legal system and try and get relief. Defendants indicate that "jurisdiction would be appropriate outside of the United States only." (S Reply 14). Defendants do not suggest any alternative forum in the United States, or acknowledge that any of their

9

contacts would subject them to personal jurisdiction in the United States in states
other than Illinois. Defendants also argue that a transfer of this case to China will not
be possible, contending that "this court does not have the capability of transferring a
case internationally." (S Reply 14). If the court accepts Defendants' arguments, the
United States consumers, and parties like Dior, who claim to be harmed by
Defendants' acts, will have no access to the federal courts in the United States, and
the protections of the Lanham Act, will not be available. The record shows that
Defendants have significant sales within the United States. The Supreme Court has
explained that a court can exercise personal jurisdiction over a defendant if that
defendant has "minimum contacts with [the forum state] such that the maintenance of
the suit does not offend traditional notions of fair play and substantial justice."
*Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 912-13 (7th Cir. 2015)(quoting
*Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326
U.S. 310 (1945) and *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Requiring
Defendants such as this who reap significant profits from sales to consumers such as
those in Illinois, to come to court and defend their actions certainly does not offend
traditional notions of fair play and substantial justice, particularly as in this case
where specific contacts have allegedly harmed Illinois consumers. Fair play means
that if you decide to sell to consumers in the United States you must come to the
United States and stand accountable for conduct relating to such sales. Dior has
shown that Defendants have had more than minimum contacts with Illinois, and also
contacts with others in the United States as well. *See, e.g.,* Fed. R. Civ. P. 4 (stating
that "serving a summons or filing a waiver of service establishes personal

jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws").  Fair play means that if a company accuses you of profiting by illegally using a mark that you do not own, that you appear and answer that accusation.  The Seventh Circuit has also explained that "[d]ue process requires that potential defendants should have some control over and certainly should not be surprised by the jurisdictional consequences of their actions." *Hemi Grp. LLC*, 622 F.3d at 758 (internal quotations omitted)(quoting *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997)).  In this instance, as the Defendants continued to sell to United States consumers and the United States dollars continued to flow back to Defendants, they should not have been surprised to learn that they are subject to the jurisdiction of United States courts in regard to  their transactions.  It may be a global market place as Defendants claim, but they cannot insulate themselves from any harm that they cause simply by locating themselves within the borders of China or any other country outside the United States.  Dior has shown that Defendants attempted to sell a product to Illinois consumers and ship at least one product to Illinois.  In fairness, Defendants should be required to defend themselves in a court in Illinois.

The court is not making any determinations as to the ultimate merits of Dior's claims.  The court is merely holding that Defendants must come to this court and defend themselves.  They will be provided with all of the protections accorded to every defendant in United States courts and will be given an opportunity to prepare a complete defense to all the claims alleged against them in this action.  Based on the

above, Defendants' motions to dismiss are denied.

## CONCLUSION

Based on the foregoing analysis, Defendants' motions to dismiss are denied.


Samuel Der-Yeghiayan
United States District Court Judge


Dated:   November 17, 2015

*RB*

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Deckers Outdoor Corporation )
                                     )   Case No: 15 C 3249

v.                                )
                                       )   Chief Judge Ruben Castillo

The Partnerships and Unincorporated )
Associations Identified on Schedule "A" )

## ORDER

Motion hearing held on 4/21/2015. Counsel for the Plaintiff appeared. Plaintiff's motion to exceed page limitation [11] is granted. Plaintiff's motion for leave to file under seal (1) Plaintiff's amended complaint, (2) Schedule A attached to the Amended Complaint, and (3) Exhibits 22 and 23 to the Declaration of Graham Thatcher [12] is granted. Plaintiff's ex parte motion for entry of a temporary restraining order, including a temporary injunction, a temporary transfer of the defendant domain names, a temporary asset restraint, expedited discovery, and service of process by email and/or electronic publication [10] are all granted. The Temporary Restraining Order will also be filed under seal until further Court order. All defendants are to answer or otherwise plead to the complaint within fourteen days of service. The Court will hold a status hearing in open court on 5/6/2015 at 10:00 a.m.

Date:   April 21, 2015                  /s/  Chief Judge Ruben Castillo

Dental Arts Laboratory, Inc. v. Studio 360 The Dental Lab, LLC, Not Reported in...

2010 WL 4877708

2010 WL 4877708
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

DENTAL ARTS
LABORATORY, INC., Plaintiff,
v.
STUDIO 360 THE DENTAL
LAB, LLC, Defendant.

No. 10–CV–4535.
|
Nov. 23, 2010.

**Attorneys and Law Firms**

Linda A. Kuczma, Bradley F. Rademaker, Louis Disanto,
Banner & Witcoff, Ltd., Chicago, IL, for Plaintiff.

Edward K. Grasse, Todd W. Hunnewell, Busse, Busse &
Grasse, P.C., Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER**

ROBERT M. DOW, JR., District Judge.

 **\*1** This matter is before the Court on the motion to dismiss
of Defendant Studio 360 The Dental Lab, LLC ("Studio 360"
or "Defendant") [18]. Defendant seeks to dismiss Plaintiff's
complaint for lack of personal jurisdiction, inappropriate
venue, and failure to plead jurisdictional facts sufficient to
state a cause of action pursuant to Federal Rules of Civil
Procedure 12(b) (2), 12(b)(3), and 12(b)(6), respectively.
Having carefully reviewed the complaint and the briefs
and their associated materials, the Court respectfully denies
Defendant's motion.

**I. Background**[1]

Plaintiff Dental Arts Laboratory, Inc. ("Dental Arts" or
"Plaintiff"), a resident and citizen of Peoria, Illinois, initiated
this action under the Lanham Act, 15 U.S.C. § 1051 et seq.,
and under Illinois and Nevada state law, against Defendant,
a Nevada citizen and resident. The complaint lays out
four causes of action against Defendant: (i) service mark

infringement, pursuant to 15 U.S.C. § 1114; (ii) federal unfair
competition, pursuant to 15 U.S.C. § 1125(a); (iii) unfair
business practices, pursuant to the relevant codes in Illinois
and Nevada (the Illinois Consumer Fraud and Deceptive
Business Practices Act, 815 ILCS 505/1 et seq., and the
Nevada Deceptive Trade Practices Act, NRS 598.0903 et seq.,
respectively); and (iv) deceptive trade practices, pursuant to
the relevant Illinois and Nevada codes (the Illinois Uniform
Deceptive Trade Practices Act, 815 ILCS 510/1 et seq., and
the Nevada Deceptive Trade Practices Act, NRS 598.0903 et
seq.).[2]

Plaintiff began using the name "360 Dental Laboratories" for
its dental laboratory services in June 2005 and has continually
used the mark since. Plaintiff registered the mark "360 Dental
Laboratories" as a service mark in commerce for dental
laboratory services on July 24, 2007 with the United States
Patent and Trademark Office.

Defendant Studio 360, a limited liability company founded
in 2009, is "engaged in the business of selling products such
as crowns, bridges, dentures and partials to dentists across
the country." (Def. Mem. [19] at 8). Defendant maintains
a website, www.studio360dentallab.com, which displays the
"Studio 360 The Dental Lab" mark. The website also contains
order forms for its products, which also display the "Studio
360 The Dental Lab" mark. See Exhibit B to complaint.
In an affidavit filed along with its motion to dismiss, Scott
Braverman, Defendant's vice president, avers that at the time
Plaintiff filed the complaint, Defendant was actively selling
products to four dentists in Illinois and that it has served 16
Illinois dentists since the company's inception. (Braverman
Aff. [19] at 2). Over the entire existence of he company, only
1.2% of Defendant's gross revenue has been from Illinois
customers. *Id.*

In its complaint, Plaintiff alleges that on June 9, 2010, counsel
for Plaintiff sent a cease and desist letter to Defendant, giving
Defendant notice of Plaintiff's federal service mark rights and
informing Defendant that its use of the "Studio 360" name
constituted service mark infringement and unfair competition.
Having received no response, counsel for Plaintiff sent a
follow-up letter on June 25, 2010. Since then, Defendant's
owner has spoken with Plaintiff's president about Defendant's
use of the "Studio 360 The Dental Lab" name; Defendant's
owner indicated that Defendant would not stop using its name,
and that "Plaintiff should be prepared to spend a lot of money
because [Defendant's owner] was putting up '100 grand
right now,' " presumably in anticipation of litigation costs.

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 24 of 73 PageID #:120

Dental Arts Laboratory, Inc. v. Studio 360 The Dental Lab, LLC, Not Reported in...

2010 WL 4877708

(Cmplt. at ¶ 14). Plaintiff alleges that Defendant's activities "are detrimental to the good will and business reputation symbolized by [Plaintiff's registered service mark]." (*Id.* at ¶ 16).

**\*2** On September 2, 2010, Defendant filed the instant motion to dismiss. Defendant argues that "[t]his court lacks personal jurisdiction over this defendant as this defendant is not subject to the general jurisdiction of the Illinois courts under the state's long arm statute," that "[t]his court further lacks personal jurisdiction over this defendant as requiring this defendant to defend itself in an Illinois federal district court would violate this defendant's Constitutional rights to due process of law," and, finally, that "the plaintiff's complaint fails to state a cause of action as it does not plead facts sufficient to support a finding of personal jurisdiction over this defendant." (Def. Mot. at ¶¶ 7–9).

## II. Legal Standard

An action against a party over whom the Court lacks personal jurisdiction must be dismissed. See *Fed.R.Civ.P. 12(b)(2)*. At this early stage of the litigation, and without the benefit of an evidentiary hearing, Plaintiff has the burden of establishing only a *prima facie* case of personal jurisdiction. See *uBID, Inc. v. GoDaddy Group, Inc.,* 623 F.3d 421, 2010 WL 3768075, \*1 (7th Cir. Sept.29, 2010). When determining whether a plaintiff has met his burden, jurisdictional allegations pleaded in the complaint are accepted as true unless proved otherwise by defendants' affidavits or exhibits. See *Purdue Research Foundation v. Sanofi–Sythelabo, S.A.,* 338 F.3d 773, 782 (7th Cir.2003); *Travelers Cas. & Sur. Co. v. Interclaim (Bermuda) Ltd.,* 304 F.Supp.2d 1018, 1021 (N.D.Ill.2004).

In federal question cases, personal jurisdiction analysis has both a constitutional and statutory element. The Court must determine that (1) haling the defendant into court accords with the Due Process Clause of the Fifth Amendment; and (2) the defendant is amenable to service of process from the court. *Lifeway Foods, Inc. v. Fresh Made, Inc.,* 940 F.Supp. 1316, 1318 (N.D.Ill.1996) (citing *United States v. De Ortiz,* 910 F.2d 376, 381–382 (7th Cir.1990); *Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 104, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987)). Due process in federal question cases requires that each party have sufficient contacts with the United States as a whole rather than any particular state. See *ISI Int'l, Inc. v. Borden Ladner Gervais LLP,* 256 F.3d 548, 551 (7th Cir.2001).

If the defendant is exposed to the jurisdiction of the United States, as Studio 360 clearly is in this case, the question becomes whether the federal court has been authorized to exert the full power of the nation. *ISI Int'l, Inc.,* 256 F.3d at 552. To answer this question, the court looks to the applicable federal statute—in this case, the Lanham Act. See *Omni Capital Int'l,* 484 U.S. at 104. The Lanham Act does not provide for nationwide service of process. See, *e.g., ISI Int'l, Inc.,* 256 F.3d at 550. When the federal statute at issue does not provide for nationwide service, the statutory basis for jurisdiction generally is provided by Rule 4(k)(1)(A) which ties jurisdiction to the forum state's long-arm statute. See *Janmark v. Reidy,* 132 F.3d 1200, 1201 (7th Cir.1997); see also *Digisound–WIE, Inc. v. Bestar Techs., Inc.,* 2008 WL 2096505, \*2 (N.D.Ill. May 16, 2008).

**\*3** Under Illinois law, a court may exercise personal jurisdiction over a non-resident through operation of its long-arm statute. See *735 ILCS § 5/2–209*. That statute extends personal jurisdiction over claims that arise out of a number of enumerated actions and activities, including transacting any business or committing a tort in Illinois. See *735 ILCS § 5/2–209*(a)(l–2). In addition, personal jurisdiction is proper over any corporation "doing business" within Illinois. *735 ILCS § 5/2–209*(b). Finally, the long-arm statute's "catch-all" provision authorizes courts to exercise jurisdiction on any basis permitted by the Illinois or federal Constitutions. *735 ILCS § 5/2–209*(c). Because the Illinois long-arm statute authorizes personal jurisdiction to the fullest constitutional limits, the three inquiries above "collapse into two constitutional inquiries—one state and one federal." *RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1276 (7th Cir.1997). Moreover, the Seventh Circuit has opined that "there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction." *Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 715 (7th Cir.2003).[3]

The federal test for personal jurisdiction under the Due Process Clause of the Fourteenth Amendment authorizes a court to exercise jurisdiction over a non-resident defendant only if the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1940) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 25 of 73 PageID #:121

Dental Arts Laboratory, Inc. v. Studio 360 The Dental Lab, LLC, Not Reported in...

2010 WL 4877708

conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). This "purposeful availment" requirement of the minimum contacts standard ensures that a non-resident defendant will not be forced to litigate in a jurisdiction as a result of random contacts with the forum or the unilateral activity of the plaintiff. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

In addition, the Supreme Court has distinguished two types of personal jurisdiction: general and specific. *Helicopteros Nacionales de Columbia v. Hall,* 466 U.S. 408, 414–416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); see also *Hyatt Int'l,* 302 F.3d at 713. General jurisdiction exists where the defendant has "continuous and systematic" contacts with the forum state. *Helicopteros,* 466 U.S. at 416; *Hyatt Int'l,* 302 F.3d at 713. If such contacts exist, "the court may exercise personal jurisdiction over the defendant even in cases that do not arise out of and are not related to the defendant's forum contacts." *Hyatt Int'l,* 302 F.3d at 713. On the other hand, specific jurisdiction is more limited and a plaintiff in such circumstances must show that the alleged controversy between the parties "arise [s] out of" or "relate[s] to" the defendant's forum contacts in addition to establishing that minimum contacts exist. *Id.*

**\*4** Finally, even if a court finds that the minimum contacts standard and the specific jurisdiction requirement have been met, a court's due process inquiry does not end. The court also must consider whether the exercise of personal jurisdiction comports with "fair play and substantial justice." *Burger King,* 471 U.S. at 476 (quoting *Int'l Shoe,* 326 U.S. at 320). "Thus, courts in 'appropriate cases' may evaluate 'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the interstate judicial system's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and 'the shared interest of the several States in furthering fundamental substantive social policies.' " *Burger King,* 471 U.S. at 477 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). These considerations are sometimes used to establish the reasonableness of jurisdiction in lieu of a strong showing of minimum contacts. *Burger King,* 471 U.S. at 477 (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 780, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)).

## III. Analysis

### A. Specific Jurisdiction

Here, Plaintiff does not allege that Defendant has had "continuous and systematic contacts" with Illinois sufficient to justify general jurisdiction, nor would the relevant facts support such a contention. See *Hyatt Int'l,* 302 F.3d at 713 (explaining that where a defendant's contacts with the forum state are more limited, the plaintiff's only option is to establish specific jurisdiction). Therefore, if jurisdiction is to be found, it will be on the basis of specific jurisdiction, such that the harm to Plaintiff must have arisen out of Defendant's contacts with Illinois.

At issue here is whether Defendant's use of allegedly infringing marks on its web site and order forms and Defendant's sales of goods to Illinois dentists under the allegedly-infringing mark subject it to personal jurisdiction in Illinois. Defendant argues that the number and dollar volume of its sales to Illinois are insufficient, that is has not specifically targeted Illinois consumers, and that the exercise of jurisdiction in Illinois would not comport with fair play and substantial justice. Plaintiff counters that, while Defendant's sales to Illinois may be a small percentage of its business, Defendant's contacts with Illinois constitute the direct tortious conduct at issue.

The Court finds that it has specific jurisdiction over Defendant because Defendant's admitted contacts with Illinois (selling of its products to Illinois dentists under an allegedly-confusing name) are the very tortious acts of which Plaintiff complains. Under the Illinois long-arm statute, torts that are committed in Illinois authorize the exercise of jurisdiction here. 735 ILCS 5/2–209(a)(2). By selling its goods to dentists in Illinois under the allegedly infringing name, Defendant has established the requisite minimum contacts with Illinois to support a finding of personal jurisdiction. See, *e.g. International Star Registry of Illinois v. Bowman Haight Ventures, Inc.,* 1999 WL 300285, at \*6 (N.D.Ill. May 6, 1999) (citing *North American Philips Corp. v. American Vending Sales, Inc.,* 35 F.3d 1576, 1579 (Fed.Cir.1994)) ("To sell an infringing article to a buyer in Illinois is to commit a tort in Illinois sufficient to confer jurisdiction under the tort provision of the long-arm statute. Intellectual property infringement takes place in the state of the infringing sales * * * for purposes of tort provisions of the Illinois long arm-statute.") (internal citation omitted); *Ty, Inc. v. Baby Me, Inc.,* 2001 WL 34043540, \*5–6 (N.D.Ill. Apr.20, 2001) (sale of infringing products in Illinois sufficient

2010 WL 4877708

to confer specific jurisdiction in Illinois); *Chase Intern., Inc. v. Link and Pan of Texas,* 1995 WL 506056, *2 (N.D.Ill. Aug.17, 1995)* (same); *cf. Lifeway Foods, Inc. v. Fresh Made, Inc.,* 940 F.Supp. 1316, 1320 (N.D.Ill.1996) (alleged trademark infringer's contacts with state did not subject it to personal jurisdiction under doing business clause of Illinois long arm statute where plaintiff failed to show that defendant made sales directly to Illinois customers).

**\*5** In response to Plaintiff's argument that Defendant has committed a tort in Illinois, Defendant argues that "[t]he plaintiff's argument fails to recognize that none of the products being sold by this defendant are alleged to be of an infringing nature. (Def. Mem. at 7 ("Because the plaintiff's cause of action is grounded in the alleged infringement of its service mark and not the sale of defendant's products, the alleged tortious action is the choice and use of the name."). Defendant argues that the relevant conduct—the "choice of its name"—took place in Nevada and was not calculated to affect an Illinois interest. *Id.* Thus, Defendant maintains that the Court's analysis should not focus on Defendant's sales in Illinois. But Defendant's own affidavit shows that as recently as July 2010, Defendant was "actively serving" four dentists in Illinois. Defendant does not explain how it could somehow serve dentists and sell its products in Illinois without using its allegedly-infringing name "Studio 360 The Dental Lab" during the transactions. In fact, Defendant's website and the order forms that customers use to obtain Defendant's products contain the allegedly infringing mark. Defendant thus has "made sales of goods under an allegedly infringing mark in Illinois," which courts in this circuit have determined may subject a defendant to personal jurisdiction in this state. *International Star Registry of Illinois,* 1999 WL 300285, at *6–7; Ty, Inc.,* 2001 WL 34043540, at *5–6.* The distinction between Defendant's choice of name and the sale of its products is one without a difference.

The Court will briefly consider each of Defendant's arguments as to why it is not subject to personal jurisdiction. Defendant contends that jurisdiction is lacking because Defendant never "targeted dentists in the State of Illinois specifically." (Def. Reply [25] at 1). But defendants need not "specifically target" consumers in a certain state in order to submit themselves to jurisdiction there.

A recent Seventh Circuit opinion explained that a company selling its products across the country may be subject to personal jurisdiction in Illinois if it has sold those products to customers in Illinois. See *Illinois v. Hemi Group LLC,*

*622 F.3d 754, 2010 WL 3547647 (7th Cir. Sept.14, 2010).* In *Hemi,* the defendant, based out of New Mexico, sold discount cigarettes through its websites. Other than a clear warning on its websites that it would not sell to customers in New York, it did not "single out Illinois residents," or residents of any other state, for that matter. *Id.* at *1. The State of Illinois sued Hemi in Illinois state court for violating several laws in selling cigarettes to Illinois consumers through its website. Hemi removed and moved to dismiss for lack of personal jurisdiction. The district court denied Hemi's motion, and the Seventh Circuit affirmed. In finding that Hemi's contacts with Illinois were sufficient to satisfy due process, the court of appeals noted that Hemi "knowingly did do business with Illinois residents. In light of this, Hemi's argument that it did not purposefully avail itself of doing business in Illinois rings particularly hollow." *Id.* at *3. Moreover, in creating "several commercial, interactive websites though which customers could purchase cigarettes from Hemi[,] Hemi held itself out as open to do business with every state (including Illinois) except New York ." *Id.* at *4. The court also stated that by shipping its cigarettes to Illinois customers, "[i]t is Hemi reaching out to Illinois, and not the residents reaching back, that creates the sufficient minimum contacts with Illinois that justify exercising personal jurisdiction over Hemi in Illinois." *Id.;* see also *Ty, Inc.,* 2001 WL 34043540, at *5–6* (defendant's sale of infringing products in Illinois via website aimed at U.S. consumers generally sufficient to establish personal jurisdiction).

**\*6** On its website, Studio 360 held itself out as open to sell its wares to residents of any state in the nation—a fact that Studio 360 itself admits when it notes that it sought business from dentists nationwide. (See Def. Reply at 1–2). That Studio 360 maintains a phone number with the area code 866 also bespeaks its intent to make itself available to customers across the country, including in Illinois. That Defendant made its products available to Illinois consumers and did in fact sell to Illinois consumers shows that Defendant has purposefully availed itself of the privilege of conducting activities in Illinois and has invoked the benefits and protections of its laws. *Hanson,* 357 U.S. at 253.

In arguing that it should not be subject to personal jurisdiction in Illinois, Defendant relies heavily on *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Associates of Houston Metroplex,* 623 F.3d 440, 2010 WL 3811319 (7th Cir. Oct.1, 2010), in which the court of appeals recently affirmed a district court's dismissal for lack of personal jurisdiction. Defendant cites *Mobile Anesthesiologists*

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 27 of 73 PageID #:123

Dental Arts Laboratory, Inc. v. Studio 360 The Dental Lab, LLC; Not Reported in...

2010 WL 4877708

the proposition that "a defendant's intentional tort creates the requisite minimum contacts with a state only when the defendant expressly aims its actions at the state with the knowledge that they would cause harm to the plaintiff there." *Id.* at *5 (discussing *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Janmark, Inc. v. Reidy,* 132 F.3d 1200 (7th Cir.1997); and *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. P'ship,* 34 F.3d 410, 411–12 (7th Cir.1994)). Defendant argues that jurisdiction is lacking because it did not expressly aim its conduct at Illinois consumers.

However, the Court finds the language cited above inapposite to the present circumstances. In *Mobile Anesthesiologists,* the court was discussing a theory of specific jurisdiction known as the *Calder* "express aiming test" (formerly known as the "effects test"), see *Mobile Anesthesiologists,* 623 F.3d 440, 2010 WL 3811319, *6 n. 1, pursuant to which conduct aimed at a forum state can serve as a proxy for Actual entry into or contacts with that state. See *id.* at *4 (citing *Calder,* 465 U.S. at 789–90) (1984)). In *Mobile Anesthesiologists,* the plaintiff relied on this line of cases because the defendant had "formed no contracts in Illinois and has had no physical presence there." *Id.* at 3. There, the plaintiff, a Chicago-based company that contracts with medical offices to provide on-site anesthesia services, sued the defendant in federal court in Illinois, claiming that it had violated the federal anti-cybersquatting statute by registering a domain name confusingly similar to plaintiff's registered trademark. *Id.* at *1. The defendant's website in *Mobile Anesthesiologists,* although accessible in Illinois, was aimed solely at the Houston market, and again, the defendant had "formed no contracts in Illinois and has had no physical presence there." *Id.* at *1–*3. However here, the Court's finding of personal jurisdiction over Defendant does not rest on the *Calder* "express aiming test." In contrast to the situation in *Mobile Anesthesiologists,* Defendant here did hold itself out as open for business to Illinois consumers and *did in fact* affirmatively conduct business in Illinois. Those are the critical facts on which the Court's exercise of personal jurisdiction is based in this case.[4]

 *7 Defendant also argues that its sales in Illinois are *de minimus:* Defendant has derived only 1.2% of its gross revenue from Illinois dentists, and was only deriving 0.5% of its gross revenue from Illinois dentists at the time that the complaint was filed. That Defendant's sales in Illinois form a relatively small part of its business is irrelevant to the personal jurisdiction analysis under these circumstances. Each time

that Defendant used its allegedly-confusing name in Illinois a tortious act allegedly was committed. As long as one tortious act is committed in Illinois, the courts of the state, and thus this Court, may exercise personal jurisdiction over Defendant. As explained by the district court in *Ingram v. Page:*

> Defendants' conduct subjects them to the reach of the long arm statute primarily because Plaintiff claims his intellectual property interests were damaged here. * * * [T]orts which involved damage to intellectual property generally 'occur' where the damage occurs. * * * The alleged torts, therefore, occurred in Illinois, bringing the Defendants' allegedly tortious conduct within the reach of the Illinois Long Arm Statute. *A single tortious act committed in Illinois, no matter how minimal, brings the alleged tortfeasors within the scope of the long arm statute.* 1999 WL 569565, at *1 (N.D.Ill. July 28, 1999) (internal citations omitted) (emphasis added). See also *International Star,* 1999 WL 300285 at *7 ("Granted defendant's contacts [with Illinois] were minimal, however, it is the quality of the contacts, not their number that determine whether they amount to purposeful availment for jurisdictional purposes."); *Store Décor Division of Jas International, Inc. v. Stylex Worldwide Industries, Ltd.,* 767 F.Supp. 181, 184 n. 3 (N.D.Ill.1991) ("the commission of a single tortious act in Illinois brings a defendant within the scope of § 2–209(a)(2) even if the defendant has no other contact with Illinois and has never been to Illinois.").

Defendant's assertion that it did not know about Plaintiff's business and its protected name also is irrelevant to the personal jurisdiction analysis. The Lanham Act specifically provides that registration of a trademark "shall be constructive notice of the registrant's claim of ownership thereof." 15 U.S.C. § 1072. As the Seventh Circuit recently affirmed in *Mobile Anesthesiologists,* the purpose of § 1072 is to "protect against users of the registrant's trademark who might otherwise raise a defense of innocent misappropriation." *Mobile Anesthesiologists,* 623 F.3d 440, 2010 WL 3811319 at *6. Thus, Defendant's insistence that "[w]hen this defendant chose the name 'Studio 360 The Dental Lab' it did so without knowledge of even the existence of the plaintiff in the State of Illinois," (Def. Reply at 6) does not change the analysis or the result.

### B. Fairness Analysis

Although the Court has found that the minimum contacts have been established to exercise personal jurisdiction over Defendant in Illinois, it must still determine whether exercise

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 28 of 73 PageID #:124

Dental Arts Laboratory, Inc. v. Studio 360 The Dental Lab, LLC, Not Reported in...

2010 WL 4877708

of personal jurisdiction comports with "fair place and substantial justice." *Burger King,* 471 U.S. at 476 (quoting *Int'l Shoe,* 326 U.S. at 320). In doing so, the Court will consider:

> **\*8** [T]he burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of [the underlying dispute], and the shared interest of the several States in furthering fundamental substantive social policies.

*Purdue,* 338 F.3d at 781 (internal quotation marks omitted). "[T]he weaker the defendant's contacts with the forum state are, the less likely it is that exercising jurisdiction over that defendant is appropriate." *Hemi,* 622 F.3d 754, 2010 WL 3547647 at *6.

The Court determines that exercising jurisdiction over Studio 360 in Illinois is fair. It is true that defending a lawsuit in Illinois may be burdensome to Studio 360, whose physical business operations are located entirely in Nevada. However, Illinois has an interest in "providing a forum in which its residents can seek to protect their intellectual property rights." *Ty, Inc.,* 2001 WL 34043540 at *6. And "while a defendant's burden in litigating in the forum state is relevant, inconvenience alone is not enough to defeat personal jurisdiction." *Id.* at *7. The dispute here involves both an Illinois company and Illinois consumers (the dentists who bought the products being sold under an allegedly infringing mark); these factors weigh in favor of exercising personal jurisdiction over Studio 360. See, e.g., *Wound Care Education Institute v. Thomas,* 2008 WL 2446686, at *4 (N.D.Ill. June 17, 2008) (holding that exercise of personal jurisdiction met due process requirements because infringing product was sold to Illinois customers).

## C. Venue

In addition to moving to dismiss for lack of personal jurisdiction under Federal Rule 12(b)(2), Defendant's motion also argues improper venue under Rule 12(b)(3).

Rule 12(b)(3) provides that a party may move to dismiss a case not filed in a proper venue. Fed.R.Civ.P. 12(b)(3). Where jurisdiction is not founded solely on diversity of citizenship, venue is properly established in:

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district

in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b).

Defendant's arguments regarding venue track its arguments regarding personal jurisdiction; indeed, it cannot be said that Studio 360 makes any argument in this regard other than restating that "venue is improper in the State of Illinois if the court does not have personal jurisdiction." (Def. Mem. at 14– 15).

In considering a motion to dismiss for improper venue, the plaintiff bears the burden of establishing proper venue. See *Bell v. Woodward Governor Co.,* 2004 WL 1498145, at *1 (N.D.Ill. July 2, 2004) (citing *Grantham v. Challenge–Cook Bros., Inc. et al.,* 420 F.2d 1182, 1184 (7th Cir.1969)). The burden is met by making a prima facie showing that venue is proper. *Id.* The Court will resolve all factual disputes in Plaintiff's favor. See *Nelson v. Park Indus., Inc.,* 717 F.2d 1120, 1123 (7th Cir.1983).

**\*9** Plaintiff asserts that venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2). Under 28 U.S.C. § 1391(b)(1), venue in cases such as this one, where jurisdiction is not founded solely on diversity of citizenship, may be brought in a judicial district where "any defendant resides," and under (b)(2), venue is proper in a judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S .C. § 1391(b)(1) and (2). Plaintiff is correct to note that pursuant to section § 1391(c)(1), Defendant, a corporation, is "deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c)(1). See *Signode v. Sigma Technologies Int'l., LLC,* 2010 WL 1251448, at *4 (N.D.Ill. March 24, 2010) (citing a string of cases that state that LLCs are considered "corporations" for the purposes of 28 U.S.C. § 1391(c)); *Advocate Fin., L.L.C. v. Parker Interests, L.L.C,* 2008 WL 2773650 at * 1 (M.D.La. July 16, 2008) (pointing out that "it is generally accepted that unincorporated business associations such as partnerships and limited liability companies are analogous to corporations for venue purposes"). Because Illinois has more than one judicial district, Defendant is "deemed to reside in any district in [Illinois] within which its contacts would be

Dental Arts Laboratory, Inc. v. Studio 360 The Dental Lab, LLC, Not Reported in...
2010 WL 4877708

sufficient to subject it to personal jurisdiction if that district were a separate State." 28 U.S.C. § 1391(c)(1).

For the reasons discussed above, personal jurisdiction is appropriate in Illinois. Furthermore, in its complaint Plaintiff stated that venue is appropriate in this District because, "[u]pon information and belief, at all times material to this complaint, Defendant has committed one or more of the acts complained of herein within the United States and caused injury within this State and District." (Cmplt. at ¶ 6). Defendant offers no evidence to contradict this statement—for example, that the dentists that it serviced in Illinois did not reside in this District. At this early stage in the proceedings, and because no evidentiary hearing has been held on this matter, Plaintiff is responsible only for making a *prima facie* showing of why venue is appropriate in this District: "[W]hen the district court rules on a defendant's motion to dismiss based on the submission of written materials, without the

benefit of an evidentiary hearing, ... the plaintiff need only make out a *prima facie* case of personal jurisdiction." *Richter v. INSTAR Enterprises International, Inc.,* 594 F.Supp.2d 1000, 1005 (N.D.Ill.2009) (citing Purdue, 338 F.3d at 782 (internal quotation marks omitted)).[5] The Court finds that Plaintiff has met this lenient standard with its pleadings, and thus that venue is proper in the Northern District of Illinois.[6]

### IV. Conclusion

For the reasons stated above, Defendant's motion to dismiss for lack of personal jurisdiction, improper venue, and failure to state a claim upon which relief may be granted [18] is denied.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 4877708

### Footnotes

1    For purposes of Defendant's motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the complaint. See, *e.g., Killingsworth v. HSBC Bank Nevada, NA.,* 507 F.3d 614, 618 (7th Cir.2007). Unless otherwise specified, the source of all information in this section is Plaintiff's complaint [1].

2    This court has subject matter jurisdiction over the first two counts. See 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. Plaintiff alleges that this Court has supplemental jurisdiction over the two state law claims pursuant to 15 U.S.C. § 1367.

3    In Hyatt, the court discussed a cautionary pronouncement in a 1990 Illinois Supreme Court decision suggesting that the state and federal standards may not be co-extensive. See *id.* (citing *Rollins v. Elwood,* 141 Ill.2d 244, 152 Ill.Dec. 384, 565 N.E.2d 1302 (Ill.1990) (acknowledging *Rollins,* but noting that even if hypothetically the Illinois state and federal due process standards might diverge, no basis for such a divergence existed in the case before it). In light of the Seventh Circuit's assessment in *Hyatt* and the absence of post-*Rollins* guidance from the Illinois courts as to how Illinois and federal law may differ as a practical matter in regard to personal jurisdiction, a single due process inquiry will suffice. *Id.;* see also *Illinois v. Hemi Group LLC,* 622 F.3d 754, 2010 WL 3547647, *2 (7th Cir. Sept.14, 2010) (reiterating that the court was not aware of any "meaningful difference" between Illinois and federal due process requirements).

4    Another case on which Defendant relies, *Hyperquest, Inc. v. NuGen I.T., Inc.,* 627 F.Supp.2d 884 (N.D.Ill.2008), is not on point for many of the same reasons that *Mobile Anesthesiologists* is not. In *Hyperquest,* as in *Mobile Anesthesiologists,* the Defendant had "no customers or sales in Illinois * * * [and] there is no evidence that the Defendants contacted anyone in Illinois, traveled to Illinois or sold their infringing product in Illinois." *Id.* at 894.

5    In *Richter,* the Court was discussing a motion to dismiss for lack of personal jurisdiction, in addition to a motion to dismiss for improper venue. But because "[i]n ruling on a motion to dismiss for improper venue, the Court follows the same standard as for a Rule 12(b)(2) dismissal," the analogy between Richter and the case at hand still holds true. *Wendt v. Handler, Thayer & Duggan, LLC,* 613 F.Supp.2d 1021, 1027 (N.D.Ill.2009).

6    Defendant's claim pursuant to Federal Rule 12(b)(6) is that "the plaintiff has not plead jurisdictional facts sufficient to state a cause of action." (Def. Motion [18] at 1). This argument appears to be duplicate of Defendant's Rule 12(b)(2) argument for lack of personal jurisdiction. The Court already has found that the facts and allegations in the complaint and in the materials submitted by Defendant are sufficient to establish jurisdiction over the Defendant.

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 3115892

2005 WL 3115892
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

LORILLARD TOBACCO COMPANY,
a Delaware Corporation, Plaintiff,
v.
MONTROSE WHOLESALE CANDIES
and Sundries, Inc., et al., Defendants.

Nos. 03 C 4844, 03 C 5311.
|
Nov. 8, 2005.

**Attorneys and Law Firms**

John S. Pacocha, Cameron Matthew Nelson, Jeffrey G. Mote,
Kevin D. Finger, Greenberg Traurig, LLP, Chicago, IL, for
Plaintiff.

Robert A. Egan, Robert A. Egan P.C., Robert A. Hobib,
Chicago, IL, for Defendants.

*REPORT AND RECOMMENDATION*

MARVIN E. ASPEN, Judge.

 *1 Plaintiff, Lorillard Tobacco Company ("Lorillard"),
moves to freeze the assets of defendants Reza and
Sandra Hazemi This matter originally came before me
as a motion to freeze the assets of the Hazemis
and Montrose Wholesale Candies and Sundries, Inc.
("Montrose")(collectively, "Montrose defendants"). Judge
Aspen had referred that motion to Magistrate Judge Keys, and
the referral was subsequently transferred to me. Accordingly,
the court addresses Lorillard's motion for an order freezing the
Hazemis' assets in this Report and Recommendation pursuant
to 28 U.S.C. § 636(b)(1)(B).[1]

## I. BACKGROUND

Lorillard is one of the largest cigarette manufacturers in
the United States and its brand, Newport, is the best-selling

menthol cigarette in the country. Lorillard has registered
the trademark, Newport, with the United States Patent
and Trademark Office, giving it the exclusive right to
manufacture, distribute, advertise, and sell Newport cigarettes
in the United States. Lorillard distributes its cigarettes through
a network of wholesalers and retailers, subject to a wide range
of state and federal regulations. Over the past several years,
the federal government and many states have substantially
increased taxes on cigarettes and other tobacco products,
which has made it profitable for "bootleggers" to sell
counterfeit tobacco products, as well as import and distribute
tobacco products in a manner designed to avoid paying the
taxes, thereby reaping a handsome, but ill-gotten reward.

In July of 2003, one of Lorillard's division managers paid
a call on the Montrose store in Chicago, Illinois, and
purchased a carton of what he suspected to be counterfeit
Newport cigarettes, and sent it for inspection to Lorillard's
offices in Greensboro, North Carolina. There, a quality
assurance inspection convinced Lorillard that the cigarettes
were counterfeit and it filed this suit against Montrose on July
14, 2003, alleging trademark violations under the Lanham Act
15 U.S.C. § 1051, *et seq.,* as well as various Illinois statutory
violations and common law offenses. On July 15, 2003,
Judge Marvin Aspen granted Lorillard's application for an ex
parte seizure order allowing Lorillard to seize any counterfeit
cigarettes, as well as records documenting the manufacture,
importation, purchase, sale, distribution, or receipt of any
merchandise bearing any Lorillard marks. The United States
Marshals Service returned service on the seizure of four
cartons of "counterfeit cigarettes and documents" on July 16,
2003. Montrose's owners, Reza and Sandra Hazemi, have
since been added as defendants.

After enduring a maddening course of fruitless attempts
at garnering any meaningful discovery from Montrose and
the Hazemis, and becoming understandably suspicious that
the Hazemis were looting Montrose's assets, Lorillard filed
a motion to compel discovery and to freeze the assets of
Montrose and the Hazemis, supporting it with over 1200
pages of documents detailing what Lorillard has learned, and
has had to endure, over a year-and-a-half.[2] In the interim,
however, and less than a week after being informed that the
court was preparing to rule on Lorillard's motions, Montrose
filed a Chapter 11 bankruptcy petition in the Bankruptcy
Court for the Northern District of Illinois on September
7, 2005. This stayed the proceedings as to the corporate
defendant.[3] On September 9, 2005, the Hazemis filed a
motion before me to stay these proceedings as to them, which

Lorillard Tobacco Co. v. Montrose Wholesale Candies, Not Reported in F.Supp.2d (2005)

2005 WL 3115892

I denied on the grounds that I did not have the authority to rule on the motion and that it should have been filed before Judge Aspen. To date, the Hazemis have not filed an appropriate motion before Judge Aspen.

**\*2** On October 31, 2005, Lorillard filed an emergency motion to freeze the assets of the individual defendants Ray and Sandra Hazemi. Lorillard's motion was prompted by its discovery that the Hazemis own certain property at 3019 N. Rose St. in Franklin Park, Illinois, despite the Hazemis' repeated denials, under oath, to the contrary. As it happens, this is merely the most recent installment in a continuing saga of deception, obfuscation, shuffling of assets, and corporate looting. While the evidence demonstrates that this has long been the Hazemi's pattern of doing business, it most recently has been calculated to place the Hazemi's assets beyond the reach of Lorillard. This most recent revelation regarding the property at 3019 N. Rose St. demonstrates that Mr. Hazemi has not only given what appears to be perjured deposition testimony, but made bald misrepresentations to the court regarding their ownership of the property. When examined in insolation, this episode alone would be sufficient to support an order freezing their assets. But when examined in context of what has gone on before, there can be no question that such an order is warranted.

**A**

**The Hazemis' Misrepresentations Regarding Their Ownership of the Property at 3019 N. Rose St.**

During its long and arduous discovery experience in this case, Lorillard has brought several motions to obtain compliance with subpoenas served on various third parties, including a business located at 3019 N. Rose Street in Franklin Park, Illinois (the "3019 N. Rose St. Property") doing business as "Franklin Cigarette Depot." Through the discovery it was able to gain, Lorillard learned that defendant Sandra Hazemi had owned the 3019 N. Rose St. Property and transferred it to a Janesville, Wisconsin wholesale supplier named Chambers & Owens in or about June 2003 as part of a settlement in a lawsuit between Chambers & Owens and defendant Montrose Wholesale. During Mrs. Hazemi's deposition she indicated that she was an "owner" in name only[4] and that the details concerning the purchase and transfer of the 3019 N. Rose Street Property, among others, were entirely controlled by Ray Hazemi. (*Plaintiff's Emergency Motion to Freeze Assets,*

Ex. A, Sandra Hazemi Dep. of 7/26/05 at 359-65). During his deposition on July 21, 2005, Ray Hazemi testified that the Hazemis transferred the 3019 N. Rose Street Property to Chambers & Owens in 2003 and that Chambers & Owens still owned the property on the day of the deposition. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. B, Ray Hazemi Dep. of 7/21/05 at 94). Mr. Hazemi further testified that he and his wife were attempting to get the property back from Chambers & Owens. (*Id.*).

Ray Hazemi's deposition continued on August 3, 2005. Once again, plaintiff asked whether Chambers & Owens still owned the 3019 N. Rose St. property and Mr. Hazemi states "[t]hat's correct." (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. C, Ray Hazemi Dep. of 8/3/05, at 350). When Mr. Hazemi was asked whether he has had discussions with Chambers & Owens about the return of the 3019 N. Rose St. property, he answered: "[n]o, nothing." (*Id.* at 535). But he added that he and his wife were trying to work out a plan by which the property could be returned to them. (*Id.* at 535-36).

**\*3** The subject of the 3019 N. Rose St. property also came up in court. The parties' counsel appeared before me on July 25 and August 1, 2005, in connection with plaintiff's motion for rule to show cause why Franklin Cigarette Depot should not be held in contempt for failing to respond to a duly served subpoena. (*Plaintiff's Emergency Motion to Freeze Assets,* Exs. D and E, Hearing Transcript Excerpts for the 7/25/05 and 8/1/05 hearings, respectively). These particular hearings concerned the Hazemis' ownership of Franklin Cigarette Depot and the property associated with it located at 3019 N. Rose St. During the July 25, 2005 hearing, the Hazemis' counsel, Robert A. Habib, stated that Ray Hazemi had admitted during his July 21, 2005 deposition that he had an ownership interest in Franklin Cigarette Depot, but that he did not own the real property because it had been turned over to Chambers & Owens. Mr. Habib stated unequivocally that Ray Hazemi testified that the 3019 N. Rose Street Property was no longer owned by the Hazemis, stating "the real estate is gone." (Ex. D at pp. 5-6). Similarly, during the August 1st hearing, Mr. Habib stated that "[t]he property at 3019 North Rose Street they don't own anymore." (Ex. E, pp. 10-11).

As it happens, the Hazemis misrepresented the facts surrounding the Hazemi's ownership of the 3019 N. Rose St. property at their depositions and in open court.[5] During a Rule 341 Meeting of Creditors (the "341 Meeting") on September 24, 2005, in connection with Montrose's Chapter

11 Bankruptcy case, Chambers & Owens' counsel Scott Shadel informed plaintiffs counsel that Chambers & Owens had transferred the 3019 N. Rose Street Property back to the Hazemis in 2003. Mr. Shadel also indicated he believed the Hazemis had purchased the property back from Chambers & Owens for about $250,000. On October 21, 2005, Mr. Shadel faxed a copy of the Warranty Deed prepared by Chambers & Owens to transfer the 3019 N. Rose St. property to Sandra Hazemi on September 2, 2003. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. F).

When these serious circumstances came to light by way of Lorillard's emergency motion, I allowed the Hazemis and their attorney a week to file whatever they felt might be an adequate response to being caught in a lie. After what one must assume was a complete and thorough consultation among clients and counsel, Mr. Hazemi offers an explanation by way of a rather sketchy, five-paragraph affidavit.[6] He states that the transfer of the 3019 N. Rose St. property was made to stop Chambers & Owens from collecting on the judgment from Mr. Hazemi only. When he sold another parcel of property for $250,000, he applied those assets to the judgment as against him. Mr. Hazemi asserts that Mr. Phil Jackson of Chambers & Owens then "handed [him] a piece of paper and stated that no longer we owe Chambers, but that the debt as to Montrose remained pending." (Reza Hazemi Aff., ¶ 4). The piece of paper, according to Mr. Hazemi, turned out to be the warranty deed, but he swears he did not look at it at the time or know what it was. Instead, he simply put it in his safe, where it languished uninspected until Lorillard filed this motion. (Reza Hazemi Aff. ¶ 4). Similarly, Mrs. Hazemi also swears that she never saw the warranty deed. (Sandra Hazemi Aff.).

**\*4** According to Mr. Hazemi, he regarded the mysterious piece of paper as proof that his personal debt to Chambers & Owens had been discharged by payment of $250,000. (Reza Hazemi Aff., ¶ 4). Having never looked at the document-that is what he claims-it is curious how he can be so sure that it amounted to such proof. As Mr. Hazemi tells the tale, the paper might have been anything at all. Why he was confident that it proved he had paid Chambers & Owen $250,000 is unexplained. Having handed over a quarter-million dollars to satisfy a debt, one might expect even the least sophisticated of businessmen to inspect the note received in return. But Mr. Hazemi is by no means an unsophisticated businessman. He has a masters degree in accounting, and counsel has represented that he has practiced as a CPA in the past. He owns or has owned several businesses with millions of dollars

of revenue running through them. The Hazemi's explanation that they were simply unaware that they owned the 3019 N. Rose St. property strains credulity past the breaking point.

The 3019 N. Rose St. property, then, has been in the possession of the Hazemis all along, a hidden asset during this litigation. To ensure that it remained hidden, the Hazemis committed what appears to be perjury at their depositions, then lied to me in an inherently incredible affidavit. Given the history of the Hazemis' conduct in this litigation, and the manner in which they operated their business, however, none of this is surprising. It is just the latest in a long line of underhandedness and deception, as the following discussion will make clear.

**B**

**The Organization and Structure of the Montrose Corporation**

**1**

**The Hazemis' Acquisition of the Corporation**

Shortly after filing suit, Lorillard served Montrose with its first set of interrogatories and document requests, which regarded, in part, Montrose's corporate structure, organization, and financial condition. ((Substitute)Declaration of Jeffrey G. Mote, ("Mote Decl."), Ex. A). In what would become a disheartening pattern for Lorillard, Montrose and the Hazemis initially thwarted Lorillard's discovery efforts. Montrose did, however, produce income tax records for the years 1997 through 2003, which revealed its ownership structure during that period:

> 1997 Tarek Al-Mikhi (50%); Sandra Semler Hazemi (25%); Jack Shoushtari (25%)

> 1998 Sandra Semler Hazemi (50%); Jack Shoushtari (50%)

> 1999 Mr. Hazemi (50%); Jack Shoushtari (50%)

> 2000 Mr. Hazemi (50%); Jack Shoushtari (50%)

> 2001 Mr. Hazemi (100%)

> 2002 Mr. Hazemi (100%)

> 2003 Mr. Hazemi (50%); Sandra Semler Hazemi (50%)

Lorillard Tobacco Co. v. Montrose Wholesale Candies, Not Reported in F.Supp.2d (2005)
2005 WL 3115892

(Mote Decl., ¶ 7; Ex. I). Finally, on March 8, 2005, after more than a year-and-a-half of awaiting the twice-promised production, Lorillard filed a motion to compel discovery.

At least with respect to the corporate records, the motion did the trick: Montrose produced the documents, however unapologetically, in time to take credit for its "compliance" in its response to Lorillard's motion on April 11, 2005. Significantly, in support of the Montrose defendants' response to Lorillard's motion, Mr. Hazemi's wife, Sandra Semler Hazemi, filed an affidavit in which she swore that she had never been a shareholder, officer or director of Montrose and had never authorized anyone to say she was shareholder, officer or director of Montrose, directly contradicting Montrose's tax returns. (*Def.Resp.,* Ex. 8). The first of many such contradictions.

**\*5** The tardily-produced records reveal that Tarek Al-Mikhi originally formed Montrose on or about March 28, 1997. (Second Declaration of Jeffrey Mote ("2nd Decl."), Ex.DD, Articles of Incorporation and related corporate records, RN 48-82). The company issued 1200 shares to its three shareholders and directors: Tarek Al-Mikhi (President) received 600 shares, Mr. Hazemi (Vice-President) received 300 shares, and Jack Shoushtari (Secretary/Treasurer) received 300 shares. (Ex. DD, at RN 53). On or about February 6, 1998, the Montrose owners entered into an agreement whereby Tarek Al-Mikhi sold all of his shares in Montrose, transferring 300 each to Mr. Hazemi and Jack Shoushtari. (Ex. DD, at RN 6044-6048). Under the transfer agreement, Mr. Al-Mikhi was paid $89,000 at closing and was to receive another $26,250 on the earlier of January 2, 2000, the date Montrose exercised its option to purchase the property housing Montrose at 4417-4425 W. Montrose Avenue in Chicago Illinois, or the date it sold or otherwise transferred this option. (Ex. DD, at 6045). Shortly thereafter, however, the three became entangled in litigation over the transaction. On or about January 2, 2001, Mr. Shoushtari and Mr. Hazemi entered into a "Stock Sales Agreement", whereby Mr. Hazemi immediately acquired 300 shares of Mr. Shoushtari's original Montrose Stock. (Ex. DD, at RN 279-288).[7]

2

### The Hazemis' Convoluted Acquisition of the Site of Montrose's Operations

At or near the time Montrose was formed in 1997, it entered into a lease agreement with a Joseph Cholewa, dated March 27, 1997, for the property at 4417-4425 W. Montrose Ave. (Ex. JJ, at RN 84-86). A few days later, on April 3, 1997, Montrose and Mr. Cholewa agreed to a supplemental "Rider" amending the lease agreement by granting, *inter alia,* Montrose an option to buy the property at 4417-4425 W. Montrose for $710,000, to which $7,500 of the $10,500 monthly rent would be credited towards the purchase price of the property. (Ex. JJ, at RN 87-96). In exchange for this purchase option, Montrose paid Mr. Cholewa $60,000, which was to be credited to the eventual purchase price if Montrose exercised its option to purchase. (*Id.*) If Montrose decided not to exercise its option, the "Rider" provided that it was entitled to a "rebate" of two-thirds of the $60,000 option and two-thirds of the $7,500 rent that was to have been allocated towards the purchase price. (*Id.*). Rather than exercising the option outright, Mr. Hazemi and Mr. Shoushtari concocted a scheme whereby they would acquire control of the at 4417-4425 W. Montrose property without appearing to exercise the option, thereby hiding the property as an asset of Montrose and avoiding the need to pay Mr. Al-Mikhi the remaining $26,000 under the stock purchase agreement previously discussed. (Ex. DD, at RN 6045). Once Mr. Cholewa lost his interest in the property sometime between entering into the lease agreement in 1997, and June of 1998, pursuant to a foreclosure proceeding initiated by Parkway Bank & Trust. (Ex. JJ, at GN 187-194), the scheme went into effect.

**\*6** The convoluted process began in June of 1998, when Antonia Shoushtari-Montrose owner Jack Shoushtari's wife-and Bahar Azari-Mr. Hazemi's niece and a then-employee of Montrose-acquired the 4417-4425 W. Montrose property via a Trustee's Deed from Parkway Bank and Trust Company dated June 12, 1998. (Ex. JJ, at SH 65-67). It would appear from the documents that the two purchased the property for $523,000, taking out a $418,400 loan from Labe Bank. (Ex. JJ, at SH 57). They purportedly managed the property under the name "AB Venture," and the loan was paid off over an 84-month period.[8] Next, Antonia Shoushtari transferred her entire interest in the property at 4417-4425 W. Montrose property to Bahar Azari through a quitclaim deed dated January 2, 2001. The transfer between Antonia and Bahar was made for *no* consideration. (Ex. JJ, at GN 184-186). On

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

February 20, 2003, Bahar Azari transferred her entire interest in the 4417-4425 W. Montrose property for *no* consideration via a quitclaim deed to a company called 6201 S. Champlain LLC, which was formed by Mike Kakvand, who will be discussed later. Interestingly, the company listed 4417 W. Montrose, the location of the Montrose store, as its address. (Ex. JJ, at GN 36-38). The very next day, on February 21, 2003, Mr. Kakvand's company executed a resolution purporting to authorize the transfer of the 4417-4425 W. Montrose property (Ex. JJ. at GN 138), and transferred the property to Sandra Hazemi via a warranty deed. (Ex. JJ, at GN 28-35).

### 3

### Montrose's Shakey Corporate Standing

Despite the Montrose defendants' recalcitrance throughout discovery, Lorillard has been able to uncover some information regarding Montrose's corporate status, which suggests that Montrose has had some difficulty with the Secretary of State for the State of Illinois. The State of Illinois administratively dissolved Montrose on August 1, 1998. On August 10, 2000, Montrose submitted a change of registered agent (changing from Ganders P. Caponize to its counsel in this suit, Robert Egan) to the Illinois Secretary of State as well as an Application for Reinstatement signed by Jack Shoushtari as Montrose' Secretary and Sandra Hazemi as Montrose Vice President. (Ex. DD, at RN 97-101). Mrs. Hazemi's signature in that capacity is rather curious, given the fact that she has sworn that she has never been an officer or director with Montrose. (*Def.Resp.,* Ex. E).

In any event, the State issued a formal Certificate of Reinstatement on August 10, 2000. (Ex. DD, at RN 100). The State administratively dissolved Montrose again a year later on August 1, 2001, and subsequently reinstated it on March 18, 2002. (Ex. DD, at RN 114-116). Continuing the pattern, Montrose was administratively dissolved on August 1, 2003, for failure to file its annual report and pay its annual franchise tax, but was subsequently reinstated on October 3, 2003. (Ex. DD, at RN 117-120). The Montrose defendants claim that Montrose closed its operations as of October 31, 2003 (*Def.Resp.,* at 2, 8), but, as of February 19, 2005, the Illinois Secretary of State's Real Time Corporate/LLC database identified Montrose's status as "Goodstanding." (Ex. K). In the interim, according to Mr. Mote's Second Declaration, Sean Semler, Sandra Hazemi's brother, incorporated Montrose

Wholesale Food Co. at Mr. Hazemi's request; it was administratively dissolved on November 1, 2004. (2nd Decl., ¶ 37; Ex. FF). As of May 12, 2005, the database listed Montrose as "Not Good Standing." (Ex. FF).

 **\*7** It is telling, that the Montrose defendants never produced any records relating to these changes in the corporation's status. Moreover, the Montrose defendants have never disclosed that Montrose is no longer operating in any of their discovery responses; not in Montrose's original October 15, 2003, initial disclosures (Ex. T), or in the Montrose defendants' initial disclosures from on March 1, 2005 (Ex. U). Timely disclosure of this information would have been required under Fed.R.Civ.P. 26(e). Purchase records that Lorillard has obtained through third parties indicate that Montrose continued doing business at least through September of 2004. (2nd Mote Decl., Ex. HH). Similarly, Montrose answered Lorillard's Second Amended Complaint in February 2005, long after it purportedly stopped doing business. That the corporation seems to be an apparition, appearing from time to time, may be no accident, and it is certainly in keeping with the manner in which its financial records were, and are, "kept."

### C

### The Hazemis' Questionable Business Practices

### 1

### Cigarette Purchases

After a long and fruitless pursuit of Montrose's financial records and accounting information, Lorillard appears to be resigned to the fate that business records one might ordinarily expect to exist in an operation with the sales of Montrose simply do not. (*Plaintiff's Reply,* at 9-11). Among these would appear to be records of cigarette purchases. Initially, in its August 2003 responses, Montrose promised to make 10 to 12 boxes of cigarette purchase invoices available for inspection. (Mote Decl., Ex A2, Resp. 3). Montrose's counsel also wrote Lorillard's counsel a letter dated July 25, 2003, indicating the same thing. (*Def.Resp.;* Ex. 3). But Lorillard was still seeking these records at the time of Mr. Hazemi's first deposition on February 2, 2004. (Mote Decl., Ex. C, at 160). That day, Mr. Hazemi explained that records of his purchases were loosely kept in 5 or 6 boxes at the Montrose

Lorillard Tobacco Co. v. Montrose Wholesale Candies, Not Reported in F.Supp.2d (2005)

2005 WL 3115892

facility, and Montrose's counsel again stated that Lorillard could inspect the documents. (Mote Decl., Ex. C, at 160-62). Nevertheless, Lorillard had to request these records again when it served discovery requests on Mr. Hazemi. At that time Mr. Hazemi declared that Montrose had already produced them. (Mote Decl., Ex. B1, Resp. 2, 4). By the time of his second deposition, however, he was not as certain.

At Mr. Hazemi's second deposition on December 14, 2004, the topic of these boxes, be there 5 or 6, or 10 or 12, came up once again.

    Q: Now, where are these 10 to 12 boxes maintained?

    A: I will try to tell you guys. I think you guys took it. You guys say no, but I think you guys took it.

    Q: ... [L]ong after the date of the seizure, [you said] you had 10 to 12 boxes ... and you would make them available to us to come to inspect.

    I'm asking you, where are those 10 to 12 boxes of documents presently stored?

    A: I don't know. I don't know.

* * *

    **\*8**  Q: So is it possible that you've destroyed or discarded the 10 to 12 boxes?

    A: Not whatsoever.

* * *

    A: They're someplace in my basement or someplace. I have to find them.

* * *

    Q: Is it possible that they might still be at Montrose Wholesale?

    A: No.

    Q: ... Is there a place other than your house where they might have been taken?

    A: No. I take everything to my house.

(Mote Decl., Ex. D, at 231-33).

Later in his deposition, Mr. Hazemi added further confusion to the question of the whereabouts of the cigarette purchase invoices. He testified that when Montrose purchased Newport cigarettes from distributors, he "dumped" the invoices in a cabinet. (Mote Decl., Ex. D, at 209). He did not maintain these purchase invoices, however, but discarded them. (Ex. D, at 210). Shockingly, he testified that he did this even after Lorillard filed suit, seemingly admitting to spoliation of evidence. (Ex. D, at 210). According to Mr. Hazemi, he did not feel the need to keep such records because MSA"[9] kept track of these things. (Ex. D, at 210-11).

Along similar lines, Mr. Hazemi described his bookkeeping:

> There's no accounting book. It's very, very simple. Either money comes or money goes. Money goes to the bank. Money comes and then turns around and goes to the bank. Then you purchase. There is no accounting. There is no booking.

(Ex. D, at 188, 194). Mr. Hazemi did allow, however, that he could contact the suppliers that sold him Newport cigarettes-Costco and City Sales-for copies of Montrose's purchase invoices. (Ex. D, at 209-10, 212). He later admitted that he also bought Newport cigarettes from other suppliers as well: McClain, Chambers & Owen, and Flemming. (Ex. D, at 229). Lorillard's counsel specifically asked him about one more distributor, Peter Karfias, and Mr. Hazemi testified that Montrose purchased only "fourth tier" cigarettes from him, never Newports. (Ex. D, at 91-93). In fact, invoices from Mr. Karfias indicate that Montrose had actually purchased more than $60,000 worth of Newport cigarettes from him between August 12, 2003, and November 18, 2004. (2nd Decl., Ex. QQ).

Mr. Hazemi testified that he paid for these cigarettes by check on Montrose's account at Labe Bank, and kept the cancelled checks in a drawer. (Ex. D, at 213). He thought Lorillard had obtained these in the seizure. (Ex. D, at 213). On other occasions, Mubeen Hussain purchased cigarettes for Montrose and paid for them with his personal credit card; Mr. Hazemi would reimburse him with cash. (Ex. D, at 214). Mr. Hazemi testified that he had no receipts for these purchases. (Ex. D, at 216).

In the time since Mr. Hazemi's second deposition, the Montrose defendants have decided that he does not take everything to his house or discard invoices after "dumping them in a cabinet. In its response to Lorillard's previous motion, Montrose and the Hazemis maintain the Lorillard obtained the boxes of documents at the seizure. (*Def.Resp.,* at 3). Unfortunately for the Montrose defendants, the seizure

occurred on July 16, 2003. Some two weeks later, on August 1, 2003, Montrose offered to produce the 10 to 12 boxes of invoices in response to Lorillard's discovery requests. (Ex. A2, Resp.3). This, despite the fact that the offer to allow the boxes to be inspected came after the cigarette and document seizure occurred on July 16, 2003. In addition, in a letter dated April 18, 2005, Montrose's counsel informed Lorillard that he had three boxes of Montrose documents including "bank statements, delivery sheets, orders, purchase invoices, and other business documents." (Second Declaration of Jeffrey Mote ("2nd Mote Decl."), Ex. BB). Montrose's purchase orders and invoices, then, seem to be a target forever in motion, if they exist at all.

## 2

### Cigarette Sales

 *9 Lorillard also sought sales records that purportedly existed on Montrose's computer's hard drive which it used for cigarette sales reporting. (*Combined Motion and Memorandum to Compel Discovery and Freeze Assets* ("*Pl.Mem.* "), at 3). This was necessary in order to explain PDF images on a compact disc that Montrose had produced as evidence of cigarette sales it reported to MSA in 2003. (2nd Mote Decl., ¶ 30). After repeated requests for the hard drive went unfulfilled, Lorillard subpoenaed a backup file of Montrose's computer records from Montrose's computer consultant, Osama Mouhsen, on January 12, 2005. (*Pl.Mem.,* at 3). Mr. Mouhsen had two overlapping data bases from Montrose, one covering November of 2003 through February of 2005, and one covering December of 2001 through March of 2004. (2nd Decl., Ex. II, at 78-79). At his deposition on March 21, 2005, Mr. Mouhsen explained that Mr. Hazemi had asked him to switch data bases in March of 2004, and to create a new one that covered the period beginning in November of 2003. (Ex. II, at 78-79). He also indicated that he offered to sell Mr. Hazemi a scanning device and program for incoming inventory, but Mr. Hazemi was not interested. (Ex. II, at 80). Mr. Hazemi did, at least, use a UPC scanner dedicated to the sales of cigarettes. (Mote Decl., Ex. D, at 202-04). Once Montrose became aware of the subpoena, it agreed to produce the hard drive for inspection, and Lorillard engaged a forensics firm to image it. (*Pl.Mem.,* at 3). All this to secure discovery of sales records that one would ordinarily expect to be much easier to obtain.

According to Mr. Hazemi, he did not bother to track inventory at Montrose, he would simply looked at the shelves and take a rough guess. (Mote Decl., Ex. D, at 205-06). At any given time, Mr. Hazemi said, there were 6000 cartons of cigarettes at Montrose, 15 to 20% of which were Newport cigarettes. (Mote Decl., Ex. D, at 206). After the seizure, Mr. Hazemi said that figure was closer to 3 to 5%. (Mote Decl., Ex. D, at 207). Mr. Hazemi testified that those inventory levels would also reflect the percentages of Newport sales. (Mote Decl., Ex. D, at 207). For a more specific answer, Mr. Hazemi referred Lorillard's counsel to MSA. (Mote Decl., Ex. D, at 207-08).

## 3

### Other Discovery Efforts

Given the paucity of Montrose's records, Lorillard consulted the MSA records as Mr. Hazemi had repeatedly encouraged it to do. Those records for the year 2003 detailing inbound and outbound shipments reveal Montrose had sales of promotional Newport cigarettes that far exceed its purchases. (Ex. O). This information is certainly suspicious and, as Lorillard points out, seems to suggest that Montrose was acquiring significant volumes of Newport cigarettes from illegitimate, non-reporting sources and/or providing its retail customers with fraudulent invoices to obtain higher rebate payments from Lorillard.

Montrose still refuses to produce financial or accounting records, even for the very recent past, claiming that it does not keep even the most basic records, such as balance sheets, income statements, or cash flow statements. (*Pl.Mem.,* at 3-4). According to the Montrose defendants, this is because the Hazemis work long hours and have little time for paperwork, relying instead on deposits and expenditures for income and expenses. (*Def.Resp.,* at 1). Nevertheless, it is strange-to say the least-that Mr. Hazemi, who has a masters degree in accounting from Roosevelt University (Mote Decl., Ex C. at 30), would cavalierly eschew even the simplest of business practices. Strange, unless there turns out to be an underhanded explanation for it.

### D

Lorillard Tobacco Co. v. Montrose Wholesale Candies, Not Reported in F.Supp.2d (2005)

2005 WL 3115892

**Creative Tax Returns**

 **\*10** At his first deposition in February 2004, Mr. Hazemi testified that he had not filed a return for Montrose or himself since 1999. (Ex. C, at 133-34). He explained that he had asked for extensions every year. (Ex. C, at 134). The returns produced, then, were apparently merely drafts. On February 22, 2005, Montrose made a supplemental production of purported income tax returns for the years 1997 through1999. The 1997 return is the only one signed by an officer of Montrose; again, it would appear that the others were never filed. (Exs.I1-I7). Once again, Lorillard was left to its own devices to assemble some kind of picture of Montrose's finances.

Lorillard deposed Montrose's tax preparer, John Cherachi, on February 2, 2005. According to Mr. Cherachi, the Montrose returns for the years 2000-2003 were "draft" tax returns that had not been filed. (Ex. G, at 195, 199-200, 231). Mr. Cherachi also produced income tax return records for the Hazemis for the years 2000, 2002, and 2003 (the 2001 return was missing). (Exs.H1-H4). He prepared returns for the years 2001 through 2003 all at the same time, in May or June of 2004. (Ex. G. at 149-50). Mr. Cherachi testified that he had prepared tax returns for the Hazemis since the early 1990s, but could not recall a single instance in which the Hazemis had not required an extension from the IRS because their records were always incomplete. (Ex. G, at 231-35). And he did not know if the Hazemis had ever actually filed these returns. (Ex. G, at 151).

During his deposition, Mr. Cherachi testified that he met with Mr. Hazemi in approximately June of 2004, and prepared summary spreadsheets (Ex. J) for Montrose's 2001-2003 income tax returns. (Ex. G, at 154-55). At that time, however, Mr. Hazemi did not provide Mr. Cherachi with any financial records or documents to prepare these spreadsheets. Instead, he sat next to him at a computer in his home and orally told him, reading from notes, what numbers to insert in the spreadsheets. (Ex. G, at 150-154). Tellingly, Mr. Cherachi testified that Mr. Hazemi requested he prepare Montrose's 2003 return as a "final" return and that he zero out the books for Montrose Wholesale on the balance sheets included in that return. (Ex. G, at 179; Ex. I7). This, as already noted, directly conflicts with evidence elsewhere in the record.

At various times since at least January 2, 2001, Montrose's principals have represented to others that Montrose was insolvent, beginning with, as already noted, the Stock Purchase Agreement. (Ex. DD, at RN 279). In February 2002, the Montrose defendants' counsel in this lawsuit, Robert Egan, represented to plaintiff's counsel in another lawsuit involving a supplier, Chambers & Owens, that both Montrose and Ray Hazemi were financially insolvent. (Ex. GG). Montrose's income tax returns from 1997 through 2003, show purported losses of more than $2,889,350 during that period. (Exs.I1-I7). Nearly all of those losses-$2,771,756- were reported after the Hazemis took full control of Montrose. Mr. Cherachi confirmed that the losses reported in Montrose's 2001-2003 tax returns were based on numbers Mr. Hazemi dictated to him as he sat at his computer; he never saw any corroborating financial records. (See Exs. I5-I7; Ex. G at 150-157). That is certainly not surprising, given Mr. Hazemi's "bookkeeping" or lack thereof.

**E**

**The Hazemis' Banking Records and Use of Corporate Funds**

 **\*11** Throughout this litigation, bank records-even the mere existence of accounts-have, like records of every other type, been a matter of some secrecy for the Hazemis and the Montrose corporation. At his second deposition, Mr. Hazemi testified that Montrose maintained its only bank account-a checking account-at Labe Bank. (Mote Decl., Ex. D, at 188, 194). He also stated that he had no personal bank account of any kind. (Mote Decl., Ex. D, at 188, 190). His wife, however, maintained an account with Citibank. (Mote Decl., Ex. D, at 189). Although Mr. Hazemi testified that the funding for that account comes from Montrose (Mote Decl., Ex. D, at 192), his wife swore in her affidavit that she has never received any money from Montrose. (*Def.Resp.,* Ex. 8). As for his lack of any type of banking or checking account, Mr. Hazemi explained that he simply paid cash to cover his day-to-day expenses, using money from Montrose.[10] (Mote Decl., Ex. D, at 190). The Hazemis used Sandra Hazemi's account to pay the mortgage, the utilities, grocery bills, and clothing expenses. (Mote Decl., Ex. D, at 191).

When Montrose refused to voluntarily produce its bank records, Lorillard began to subpoena its banks including Labe Federal Bank and Village Bank and Trust. Records from Labe Federal Bank reveal that between February 2, 2002 and June 13, 2003, Mr. Hazemi wrote more than

2005 WL 3115892

$8,779,000 in checks to "Montrose Wholesale," purportedly for cash drawn on Montrose's Labe Bank account. (Ex. L). Montrose has not produced any records identifying where these funds were transferred or how the funds were used. In their response to Lorillard's motion, the Montrose defendants explain these funds were deposited at Parkway Bank & Trust in what they call an "ancillary" account and used to purchase cigarettes from a distributor called Fleming. (*Def.Resp.,* at 5, 10). Incredibly, the Montrose defendants fault Lorillard for "distort[ing] the use of the account by ... not demonstrating any disbursements from the account." (*Id.*). It is the Montrose defendants, however, who have produced no records relating to this account; any distortion of their activities is a product of their non-compliance with discovery.

Lorillard also obtained bank records for another undisclosed account. It seems Montrose held an account at Village Bank & Trust from November 2002 until the end of July 2004, despite the fact that Mr. Hazemi testified that Montrose did all its banking at Labe Bank. (Ex. M). These records reveal more than a million dollars in transactions during that period. Thus, approximately ten million dollars ran through these two accounts that apparently slipped Mr. Hazemi's mind at his second deposition. To date, Lorillard continues to seek records relating to these accounts, including cancelled checks, without success.

Village Bank & Trust was also a source of three loans to Montrose and the Hazemis. (Exs.N1-N3). Neither the Hazemis nor Montrose have produced records relating to these transactions. The first loan is a credit account for $85,000, for the Hazemis dated November 27, 2002, with a mortgage taken on the Hazemi's home at 650 Pleasant Lane, Lombard, Illinois. (Ex. N1). The second loan involves a $750,000 Promissory Note dated February 21, 2003. The loan agreement is referred to as a "Business Loan Agreement" and identifies Sandra Hazemi as the borrower of purchase money for the property located on three lots at 4417 W. Montrose Avenue, in Chicago-the property that houses Montrose. Interestingly, Mr. Hazemi is listed as an unlimited guarantor on the loan, despite the fact that, at his second deposition, he claimed that he had no assets, aside from being the sole shareholder in Montrose. (Ex. D, at 193). He also claimed neither he nor his wife owned any property except for the family home in Lombard, Illinois, and an interest in her family's home in Canada. (Ex. D, at 197).

**\*12** The third loan is dated April 8, 2003 and involves a Promissory Note for $350,000 to Montrose and First National

Bank of Blue Island, Trust No. 71013 as joint borrowers. (Ex. N3). Montrose has never produced nor otherwise disclosed any interests it has in property with this trust. Moreover, the address provided for First National Bank of Blue Island, Trust No. 71013, is 6630 W. Montrose Avenue-the same address as that linked to numerous businesses affiliated with the Hazemis and their relatives. Trust documents attached to the loan papers reveal that Ray Hazemi and his sister, Giti Azari, were assigned the beneficial rights in the trust on April 3, 2003, and that the trust was set up in connection with a 1999 installment contract for property that Giti Azari purchased. (Ex. N, at VBT 000117).

**F**

**Associated Businesses**

Mr. Hazemi has been similarly cryptic regarding the other businesses with which he has been, and is, affiliated. When Lorillard posed an interrogatory asking him to identity "each and every business" that he had ever been "affiliated with as an owner, shareholder, employee, officer or agent," Mr. Hazemi certified that the only businesses he has been affiliated with are Montrose Wholesale and G & D Pantry, as their respective presidents. (Ex. B2, ¶ 8). Lorillard's investigations have suggested otherwise. At his deposition, Mr. Cherachi testified that Mr. Hazemi had hired him to prepare taxes for at least three other business, S & D Pantry, Franklin Cigarette Depot, and Malibu, Inc. (Ex.G, at 59, 62-63, 67-68). In addition, other evidence Lorillard obtained pursuant to third-party subpoenas confirmed that Mr. Hazemi neglected to mention several businesses with which he had been affiliated in one capacity or another: Harwood Heights Gas Mart (employee); S & D Pantry (employee); Malibu Inc. (president and owner); Franklin Cigarette Depot (owner and employee); and Milano Pizza (owner or manager). (Ex. CC).

Mrs. Hazemi also has certain property interests that Mr. Hazemi chose to keep secret as his deposition: 4417-4425 W. Montrose Avenue, Chicago; 6764 W. Forest Preserve Drive, Harwood Heights (Ex. N); and, of course, the aforementioned 3019 N. Rose Street property. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. F). This contradicts not only the Hazemi's recent testimony at their depositions in July and August of 2005, but even Mr. Hazemi's earlier testimony that his wife had no real property interests aside from the Hazemi's house in Lombard and a house in Canada that had been in the family for sixty years. (Ex. D at 196-197). And of course, it

demonstrates that the Hazemis have no qualms about flirting with perjury to see to it that their assets remain hidden.

As is apparent from the forgoing, and from the Hazemis' efforts to secure the property where the Montrose store is located, Mr. Kakvand has a good deal of involvement with the Hazemis and their businesses. In October of 2004, he was indicted along with Ali Razvi in the Northern District of Illinois, for bank and wire fraud in connection with a scheme to defraud mortgage lenders out of more than $27 million. (Ex. KK, Case No. 04 CR 0896). According to the indictment, Kakvand would purchase run-down apartment buildings through companies he either owned or controlled-including Residential Realty Development, Inc., Infiniti Financial Corporation, Liberty Financial, and Mortgage Bankers Service Corporation-and obtain false, inflated appraisals from co-conspirators based on non-existent renovations. (Ex. KK, Case No. 04 CR 0896). He would then resell the properties as condo developments or apartments to shill buyers for whom he obtained and then pocketed mortgage loans. (Ex. KK, Case No. 04 CR 0896). One of the fraudulent apartment transactions identified in the indictment involves the aforementioned property at 6201-6203 S. Champlain Avenue and Mr Kakvand's company, 6201 S. Champlain, LLC. (Ex. KK, at 4). The address for the company is the same as Montrose's address, 4419 W. Montrose Avenue. (Ex. MM).

 *13 Interestingly, Mr. Kakvand purchased the Champlain property from Omni Investments, LLC, which is run by Bardan Azari, son of Giti Azari. (Ex. MM). Giti Azari was also the registered agent for the previously mentioned Kakvand company, Liberty Financial. (Ex. MM). Bardan and Bahar Azari also are linked to Liberty Financial as evidenced by the Citations to Discover Assets served on them in connection with a civil case against Kakvand, *Hoge v. Kakvand,* Cook County Case No. 95 CH 10195. (Ex. MM). Giti Azari and Bahar Azari also both worked at another of Mr. Kakvand's businesses, Mortgage Bankers Service Corporation, in 1999 through 2001, which received at least a few administrative penalties from the Illinois Office of Banks and Real Estate ("OBRE"), including a license revocation. (Ex. LL). The company also figures in several loans to Sandra Hazemi and the Azaris. (Ex. NN).

Through Illinois property records, Lorillard discovered that Bahar Azari used her connections at Mortgage Bankers Service Corporation to obtain loans to acquire properties at 5504 W Agatite Avenue and 5806 W Giddings Street in Chicago. In addition, Giti Azari approved a series of

loans to Sandra Hazemi from Mortgage Bankers Service Corporation. (Ex. NN). Sandra Hazemi obtained at least two loans from that firm for her home at 650 Pleasant Lane in Lombard, Illinois. (Ex. NN). Sandra Hazemi also acquired the property at 6774 W. Forest Preserve Drive, Chicago, in 1999 from Mr. Kakvand and Residential Realty Development with a $450,000 loan from Labe Bank. (Ex. OO, loan no. 01-12000452). Closing records show that $390,796.56 was distributed to Mr. Kakvand's Residential Realty Development, Inc. (Ex. OO, at LAB 2095). Interestingly, Giti Azari signed on behalf of MBBG, Inc. as guarantor on the Labe Bank note for Sandra Hazemi's purchase of 6774 W. Forest Preserve Drive. (Ex. OO, at LAB 2115).

## II

## THE PROPRIETY OF FREEZING ASSETS IN THIS CASE

Based on the foregoing record, Lorillard asks this court to enter an order freezing the assets of Montrose and the Hazemis under Fed.R .Civ.P. 65. A district court is not permitted to freeze a defendant's assets solely to preserve a plaintiff's right to recover damages. *Grupo Mexicano de Desarollo, S.A. v. Aliance Bond Fund,* 527 U.S. 308 (1999). The decision in *Grupo Mexicano,* however, did not concern the preliminary relief available in a suit seeking an equitable remedy. 527 U.S. at 325. Indeed, the Supreme Court made note of the fact that a restraint on assets was still available when the suit sought an equitable relief. *Id.* at 325 (*citing Deckert v. Independence Shares Corp.,* 311 U.S. 282 (1940)(upholding prejudgment asset freeze in case seeking equitable relief, including appointment of receiver to wind up corporation, rescission of contracts, and the return of disputed fund of money)). In this instance, Lorillard seeks, among other relief contemplated by the Lanham Act, a disgorgement of the Montrose defendants' profits, which is an equitable remedy. *CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 996 (7th Cir.2002); *BASF Corp.,* 41 F.3d at 1095-96.[11] Because Lorillard seeks to recover the Montrose defendants' profits, then, an order freezing the Montrose defendants' assets is within the court's authority. In, *CSC Holdings,* for example, the court found that an asset freeze was entirely proper where the plaintiff sought remedies that including accounting and profits. As such, the court has the authority to enter an order freezing assets in cases where the plaintiff seeks an equitable

2005 WL 3115892

remedy generally, *CSC Holdings,* 309 F.3d at 996; *S.E .C. v. ETS Payphones, Inc.,* 408 F.3d 727, 734 (11th Cir.2005); *Elliott v. Kiesewetter,* 98 F.3d 47, 58 (3rd Cir.1996), and specifically, in Lanham Act cases such as this one. *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995); *Reebok International, Ltd. v. Marnatech Enterprises,* 970 F.2d 552, 559 (9th Cir.1992). After a review of the voluminous record in this case, the court finds that a preliminary injunction freezing the Montrose defendants' assets is warranted in this case.[12]

**\*14** A party seeking a preliminary injunction under Fed.R.Civ.P. 65 is required to demonstrate a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if the relief is not granted. *Promatek Industries, Ltd. v. Equitrac Corp.,* 300 F.3d 808, 811 (7th Cir.2002). If the moving party can satisfy these conditions, the court must then consider any irreparable harm an injunction would cause the nonmoving party. *Promatek Industries,* 300 F.3d at 811. Finally, sitting as a court of equity, the court then weighs all these factors employing a sliding-scale approach: the more likely the plaintiff's chance of success on the merits, the less the balance of harms need weigh in its favor. *Promatek Industries,* 300 F.3d at 811.

## A

### Likelihood of Success on the Merits

In the context of a motion for a preliminary injunction in a trademark infringement claim, a likelihood of success exists if the party seeking the preliminary injunctive relief demonstrates that it has a "better than negligible" chance of succeeding on the merits of the underlying infringement claim. *Platinum Home Mortg. Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 726 (7th Cir.1998). The record thus far assembled in this matter certainly meets this rather minimal hurdle. Indeed, on July 15, 2003, Judge Aspen entered an ex parte seizure order in which he found that Lorillard was likely to succeed on the merits in this case. Nothing has occurred since Judge Aspen made that finding that would convince the court to disturb his ruling. At that time, one of Lorillard's division managers had purchased cigarettes that had turned out to be counterfeit at the Montrose store. The seizure produced further evidence of counterfeit cigarettes. MSA records reveal Montrose had sales of promotional Newport cigarettes that far exceed its

purchases, arguably suggesting that Montrose was acquiring significant volumes of Newport cigarettes from illegitimate, non-reporting sources and/or providing its retail customers with fraudulent invoices to obtain higher rebate payments from Lorillard. In addition, at his deposition, Mr. Hazemi was less than frank about his sources of Newport cigarettes. The record satisfies the court that Lorillard has "better than negligible" chase of succeeding on the merits of its case.

For the court's purposes here, however, the likelihood of Lorillard's success in pursuing their "alter ego" theory of liability against the Hazemis is just as important as their likelihood of success on their Lanham Act claims. Under Illinois law, to succeed on this theory, Lorillard must show that: "(1) there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances are such that adhering to the fiction of a separate corporate existence would promote injustice or inequity." *International Financial Services Corp. v. Chromas Technologies Canada, Inc.,* 356 F.3d 731, 736 (7th Cir.2004). Among the factors pertinent to this showing are whether there was inadequate capitalization, a failure to observe corporate formalities, an absence of corporate records, and commingling of funds. 356 F.3d at 738. Once again, the record as it stands in this case is more than adequate to demonstrate that Lorillard is likely to succeed on its "alter ego" theory.

**\*15** Corporate formalities such as meetings or corporate minutes are not a part of the Montrose defendants' operations. Courts are known to allow sole proprietors or husband-and-wife proprietors some leeway in this area, especially where they have made efforts to maintain records and keep corporate funds separate from their own. *See, e.g., Trustees of Pension, Welfare and Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co., Inc.,* 995 F.2d 785, 788 (7th Cir.1993). Here, however, the Hazemis admittedly have made no such efforts. In addition, they are less than forthcoming about Montrose's corporate ownership structure. While Mrs. Hazemi was listed as a 50% owner in 1998, she was apparently replaced in this position by her husband in 1999. She was a 50% owner once again in 2003, apparently taking over half of her husband's share at that time. What is a bit more disturbing, however, is that Mrs. Hazemi has filed an affidavit in which she swears she has never been a shareholder of Montrose. (*Def.Resp.,* Ex. 8). She also swore that she has never been an officer of Montrose, yet she signed an application for the corporation's reinstatement as vice president. This obfuscation about the Hazemi's shareholder status might not be a terribly significant

Lorillard Tobacco Co. v. Montrose Wholesale Candies, Not Reported in F.Supp.2d (2005)

2005 WL 3115892

factor when viewed in isolation, but in this case, it must be combined with the following evidence regarding the absence of any corporate record keeping and the Hazemi's commingling of Montrose's funds with their own.

Finding an absence of corporate records can be no easier than it is in this case: the Montrose defendants trumpet their failure to keep corporate records, employing it as a shield against discovery. According to them, there are no records such as balance sheets, cash flow statements, or accounting ledgers, for Montrose. (Mote Decl., Ex. D, at 188, 194, 210-11; *Def.Resp.* at 8). The Montrose defendants claim they do not keep order forms or track inventory. (Ex. D, at 205-06; *Def.Resp.,* at 9). Instead, Montrose's sole records are cancelled checks and bank deposits. (Ex. D, at 188, 194; *Def.Resp.,* at 8). Everything, the Montrose defendants claim, is based on cancelled checks and bank deposits, including tax returns. (*Def.Resp.,* at 10). Those tax returns were prepared by Mr. Hazemi dictating numbers to Mr. Cherachi without any corroborating financial records. (Mote Decl., Ex. G, at 150-54). The last time either Montrose or Mr. Hazemi filed a tax return was 1999. (Mote Decl., Ex. C, 133-34). The Montrose defendants explain that they simply do not have the man-power to keep any semblance of traditional corporate records. (*Def.Resp.,* at 1, 8, 9-10).

This absence of records not only supports Lorillard's alter ego theory, but creates conditions that are ripe for the commingling of assets. Mr. Hazemi does not bother to maintain a personal bank account; instead, he draws cash as needed from Montrose. (Mote Decl ., Ex. D, at 190). The Montrose defendants explain that they account for this as a "management fee" on tax returns. (*Def.Resp.,* at 4). There is no evidence that the Montrose defendants kept any record of Mr. Hazemi's cash withdrawals, however, and, as just noted, the tax returns are prepared without corroborative financial data and have not been filed since 1999. Mr Hazemi testified that the money in his wife's checking account came from Montrose as well. (Ex. D, at 192). But, Mrs. Hazemi swore that she has *never* received any money from Montrose and, more specifically, that she has never been paid for working at Montrose. (*Def.Resp.,* Ex.8). Thus, there is no telling what the funds in her checking account represent. Neither Mr. nor Mrs. Hazemi, then, seem to acknowledge that Montrose is a separate entity from themselves when it comes to Montrose's money.

**\*16** Montrose's banking practices allow for the commingling of assets as well. During discovery, Mr. Hazemi

maintained that Montrose did all its banking at one bank. (Mote Decl., Ex. D, at 188, 194). Lorillard's own efforts revealed that Montrose had accounts at two other banks as well. The Montrose defendants suggest that there was nothing secretive about these accounts; they did not disclose them because they were merely "ancillary" accounts. (*Def.Resp.,* at 10). They claim to have used one "ancillary" account to deposit over $8 million from checks Montrose wrote to itself on its Labe Bank account, but have produced no records of that activity. (*Def.Resp.,* at 5). Lorillard's third-party discovery efforts have revealed the other "ancillary" account was home to approximately $ 1 million in transactions over a twenty-month period. (Mote Decl., Ex. M). Nearly $10 million is quite a bit of activity for a couple of undisclosed, ancillary accounts, especially when the Hazemis feel free to help themselves to cash from Montrose without any accounting or records of their withdrawals. And, the fact that Mrs. Hazemi owns the property that houses Montrose, after a long and serpentine series of transactions involving an individual under indictment for defrauding mortgage lenders, does not escape the court's attention. Her ownership is made all the more suspicious by the fact that Mr. Hazemi testified his wife owned no property other than the family home in Lombard and an interest in her family's home in Canada. And, as has recently been made clear by the revelations regarding the 3019 N. Rose St. property, this is not the only property ownership the Hazemis have covered up.

The evidence Lorillard has advanced in this matter demonstrates that, with respect to Montrose, the Hazemis have disregarded corporate formalities, have kept no corporate records, and have treated corporate funds as their own. Judge Aspen has already found that there is a likelihood that Lorillard will succeed on it Lanham Act claims, and there have been no further developments that would counsel a revision of that opinion. Based on the record in this matter, the court finds that Lorillard has not only established a likelihood of success on the merits of its Lanham Act claims, but as to it "alter ego" theory as well.

**B**

**Inadequate Remedy at Law and Irreparable Harm**

Next, Lorillard must show that it has no adequate remedy at law and, as a result, that it will suffer irreparable harm if the injunction is not issued. *FoodComm Intern. v. Barry,* 328 F.3d 300, 304 (7th Cir.2003). "Inadequate remedy at law does not

2005 WL 3115892

mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *FoodCom Intern.,* 328 F.3d at 304. In this case, the Lanham Act provides Lorillard with the equitable remedy of recovering the Montrose defendants' profits. In such cases, courts have generally concluded that an asset freeze is appropriate to ensure that permanent equitable relief will be possible. *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995); *Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d 552, 559 (9th Cir.1992).

 **\*17** The evidence discussed above demonstrates that the Hazemis are hardly circumspect about segregating their assets from those of Montrose. Corporate financial records are non-existent, bank accounts go undisclosed. Clearly, the remedy of disgorgement of profits will be less than inadequate if the Hazemis continue to treat the Montrose coffers as their own and relieve Montrose of its corporate assets. In addition, especially given the Hazemis' disregard for corporate bookkeeping, the profits at issue in this case might become all but untraceable, if that is not already the case.

Finally, it is clearly not beyond the Hazemis to lie about the very ownership of assets. They have done so recently and repeatedly. It is not unusual, in a Lanham Act case, for a court to freeze assets where there is evidence that the defendants "may hide their allegedly ill-gotten funds if their assets are not frozen." *Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d 552, 563 (9th Cir.1992). This is not a case where there is a mere threat of the Hazemis hiding their assets; Lorillard has demonstrated that they are already actively doing so, and attempting to cover their trail with more deception. It is the Hazemis that have brought this case to this brink. They have seen to it that there is no other way to preserve the *status quo* but an asset freeze. Accordingly, the court finds that Lorillard has established that it has no adequate remedy at law and will suffer irreparable hardship without a freeze of the Hazemis' assets.

## C

### Balance of Harms to the Respective Parties

In balancing the harms, the court must weigh the error of denying a preliminary injunction to the party who would win the case on the merits against the error of granting an injunction to the party who would lose. *FoodComm Intern.,* 328 F.3d at 305. In so doing, the court bears in mind that

the purpose of a preliminary injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *AM General Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 804 (7th Cir.2002). In this case, there is no doubt that the Hazemis will suffer harm if their assets are frozen. But it is a harm they have brought upon themselves with their tactics of deception and underhandedness. Just how to quantify that is a difficult question because the Hazemis have not addressed the issue. But this much is certain: the Hazemis have had a rather long string of chances to end their pattern of deception in this litigation: the court has given them the benefit of the doubt time and again. They have chosen to blatantly lie, in depositions and in open court. The balance of harms, by far, favors the protection of Lorillard's rights by the issuance of an order freezing the Hazemis' assets.

The court also notes that, in balancing the harms to the parties, the greater a movant's chances of success on the merits, the less strong a showing it must make that the balance of harm is in its favor. *FoodComm Intern.,* 328 F.3d at 303. As the court's foregoing discussion reveals, Lorillard has made a rather strong showing that it will succeed on the merits of this case. Accordingly, the court grants Lorillard's motion for a preliminary injunction freezing the Hazemis' assets in this case. Lorillard shall submit a draft order freezing the Hazemis' assets and detailing the plan for the court's approval.

 **\*18** Recognizing that the freezing of assets could work a hardship on the Hazemis, the order should make provisions for withdrawal of living expenses, and for the payment of expenses related to legitimate business operations. If the Hazemis comply with the order, and submit the necessary proof to the Court, no undue hardship need be felt by defendants as a result of the asset freeze. Moreover, the Court is free to modify or dissolve the preliminary injunction if warranted by developments in this case subsequent to the noticing of this appeal.

Although the court accepts Lorillard's arguments regarding the necessity of an asset freeze, it cannot accept the argument that no bond is necessary in this case. Under Federal Rule of Civil Procedure 65(c):

> [n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Lorillard Tobacco Co. v. Montrose Wholesale Candies, Not Reported in F.Supp.2d (2005)

2005 WL 3115892

The rule, as the Seventh Circuit has stated, makes security mandatory. *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1141 (7th Cir.1994). While it is clearly within the court's discretion to fix the amount of the bond, *Id.,* the parties here have provided the court with no evidence, or even discussion, of what would constitute an appropriate amount. As such, the parties must file memoranda on this issue along with supporting documentation, in order that the court may determine a reasonable amount for security in this instance. *See, e.g. Mead Johnson & Co. v. Abbott Laboratories,* 201 F.3d 883, 887 (7th Cir.2000); *Gateway Eastern Ry. Co.,* 35 F.3d at 1142.

**III**

**CONCLUSION**

For the foregoing reasons, it is respectfully recommended that the plaintiff's motion-and emergency motion-for a preliminary injunction freezing the defendants' assets be granted. It is further recommended that the plaintiff be ordered to file a draft order for the court's approval, and the parties be ordered to file memoranda on the appropriate amount of the bond as per this report and recommendation.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 3115892

Footnotes

1   Under 28 U.S.C. § 636(b)(1)(A), "a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, *except a motion for injunctive relief,* for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action." Under section 636(b)(1)(B), "a judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court *proposed findings of fact and recommendations for the disposition,* by a judge of the court, of any motion excepted in subparagraph (A). Lorillard's motion to freeze assets is a motion for injunctive relief..

2   To support its motions, Lorillard filed the exhibits mentioned, as well as: (1) a declaration, (2) a substitute declaration, (3) a second declaration by Lorillard's counsel, (4) a declaration in support of the emergency motion, and (5) the actual motions and supporting memoranda. Through a good portion of the declarations and the memoranda, however, Lorillard fails to cite to pages of the voluminous record that support many of its assertions. Thus, in some instances, Lorillard often merely directs the court to entire 200-plus-page deposition transcripts or 100-page business transactions to locate specific quotes. (*See, e.g.,* Combined Motion to Compel Discovery and Freeze Assets, at 4(¶¶ 6-7); (Substitute) Declaration of Jeffrey Mote, ¶¶ 10-11, 14-15, 22, 39; Second Declaration of Jeffrey Mote, at ¶¶ 22, 34). In other instances, it does not even provide a general reference to any supporting documentation (*See, e.g.,* (Substitute)Declaration of Jeffrey Mote, ¶¶ 28-29, 32-34, 41, 42, 43, 44) or-more understandably given the volume of materials prepared-misidentifies purported supporting materials or fails to make pages part of the record. (*See, e.g.,* Combined Motion to Compel Discovery and Freeze Assets, at 6(¶ 12); (Substitute)Declaration of Jeffrey Mote, at ¶¶ 28-29, 32-34, 41, 42, 43, 44; Second Declaration of Jeffrey Mote, at ¶¶ 22, 64, 65). At the court's request, Lorillard's counsel filed a consolidated declaration which corrected some, but not all, of these deficiencies. The few that remain, however, do not make Lorillard's tale of woe any less compelling; those assertions that Lorillard does adequately support with evidence and the court's own perusal of the record provide enough detail regarding the Montrose defendants' discovery obfuscation and financial legerdemain for the court to grant Lorillard's motion.

3   On November 1, 2005, Bankruptcy Court Judge Hollis granted Lorillard's motion to modify the automatic stay to permit Lorillard to continue its lawsuit against the corporate defendant, Montrose.

4   The phrase "in name only" takes on a curious meaning here, as nearly every document associated with the Hazemi's transfer of the 3019 N. Rose St. property identifies the owner as "Sean Semler" or "Sandra Semler Hazemi a/k/a Sean Semler." (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. D; *Declaration of Jeffrey Mote in Support of Emergency Motion to Freeze Assets,* Exs. H at RN 0257; I at 00444; J at 0221, 0229; L; M). Sean Semler is Mrs. Hazemi's brother. At their depositions, neither Mr. nor Mrs. Hazemi could hazard a guess as to why these documents referred to Mrs. Hazemi in this manner.

Lorillard Tobacco Co. v. Montrose Wholesale Candies, Not Reported in F.Supp.2d (2005)

2005 WL 3115892

5     It would also appear that the Hazemi's attorney, Mr. Habib, was victimized by their misrepresentations as well. An able and experienced lawyer, Mr. Habib certainly would not have accepted his client's assertions at face value. Yet, he, too, was taken in by the Hazemis, and employed-unwittingly-in their ruse.

6     While Mr. Habib prepared the Hazemis' affidavits in consultation with them, he did not sign the documents. Only the Hazemis have sworn to their veracity.

7     The "Stock Sales Agreement was a bit out of the ordinary. It called for Mr. Shoushtari to pay Mr. Hazemi $67,952 pursuant to the following significant representation: "Payment of these monies is as a result of the corporation being insolvent at the time of this transaction, that is, its liabilities exceed its assets." (Ex. DD, at RN 279). Mr. Hazemi also agreed to indemnify Mr. Shoushtari against any judgment in a pending lawsuit, *Certified Grocers v. Montrose/Shoushtari,* Case No. 98 L 14808. (Ex. DD, at RN 284). In addition, Shoushtari agreed to transfer any shares received from Mr. Al Mikhi pursuant to those pending lawsuits to Mr. Hazemi for $1. (Ex. DD, at RN 285). The record suggests that he made this transfer on January 2, 2001. (Ex. DD, at RN 277-78).

8     Lorillard submits that rental income from tenants of the property at 4417-4425 W. Montrose would not come close to making this expedited payment schedule. Instead, it would appear that AB Venture was dependent on cash funneled from Montrose to cover the balance of each monthly payment. Although Montrose and the property owners represented that Montrose's rent was $3,500 per month, it was actually paying $6,000 per month by check to Mrs. Shoushtari and Ms. Azari. (Ex. SS). It would seem that utility bills for the property were directed to Montrose and its owners and paid with Montrose's funds. (Ex. SS). Montrose paid for the electrical utilities and property insurance directly, although all these expenses were identified as being paid by the nominal owners of the property. (*Id.*).

9     According to Lorillard's counsel, the last part of the cigarette distribution chain involves the sale of tobacco products from retailers who are authorized to participate in certain cigarette promotional programs to consumers. Typically, these promotions involve rebate payments-known in the industry as "buydown" programs-wherein an authorized retail distributor is paid a rebate for each carton it sells during the term of the "buydown" program, provided the retailer purchased such carton from an authorized wholesale distributor. Authorized wholesale distributors agree to report all purchases and sales of a particular manufacturer's promotional cigarette products to Management Science Associates, a consultant the tobacco companies employ to collect data on sales and distribution of their products. UPC scanning is a part of this sophisticated and far-reaching information gathering system *See* http:// www.msa.com; *Holiday Wholesale Grocery Co. v. Philip Morris Inc.,* 231 F.Supp.2d 1253, 1291 (N.D.Ga.2002). Tobacco manufacturers, including Lorillard, use the data reported to MSA to monitor and detect potential fraudulent reporting by wholesale distributors and their retail customers who are participating in the manufacturer's promotional programs.

10    According to the Montrose defendants, Mr. Hazemi accounts for this by declaring a "management fee" from Montrose, which is reflected in his personal tax returns. (*Def.Resp.,* at 4). As already noted, however, these returns have never been filed, and were based on figures Mr. Hazemi dictated to Mr. Cherachi which may or may not have been drawn from an actual financial record. Given Mr. Hazemi's admitted aversion to bookkeeping, it is more likely they were not.

11    The Montrose defendants argue that Lorillard must establish a nexus between the sale of counterfeit cigarettes-specifically, five cartons that apparently have been seized-and the assets to be frozen. (*Def.Resp.,* at 13-14). In support, they rely on two cases: *Mitsubishi International v. Cardinal Textile Sales,* 14 F.3d 1507 (11th Cir.1994); and *Rosen v. Cascade International, Inc.,* 21 F.3d 1520 (11th Cir.1994). Neither case supports the Montrose defendants' position. In *Mitsubishi,* while the Ninth Circuit did hold that "a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment," 14 F3.d at 1521, it had no occasion to consider the propriety of freezing assets to preserve a party's right to an equitable remedy. Instead, the relief at issue was the payment of a debt and money damages for fraud. The *Rosen* court held similarly, but took care to distinguish situations in which the plaintiff is seeking only an award of monetary damages from those in which the plaintiff is seeking equitable relief. 21 F.3d at 1527, 1528-29. That distinction, at work here, is apparently lost on the Montrose defendants. Furthermore, to the extent that the Montrose defendants argue that the individual Hazemis' assets are out of reach, such concerns are addressed in the court's discussion of Lorillard's "alter ego" theory.

12    The Montrose defendants submit, without authority, that a preliminary injunction cannot be entered without a hearing. (*Def.Resp.,* at 12). Rule 65, however, does not make a hearing a prerequisite for ruling on a preliminary injunction. Certainly, if genuine issues of material fact are created by the response to a motion for a preliminary injunction, an evidentiary hearing is indeed required. *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1171 (7th Cir.1997). "But as in any case in which a party seeks an evidentiary hearing, he must be able to persuade the court that the issue is indeed genuine and material and so a hearing would be productive-he must show in other words that he has and intends to introduce evidence that if believed will so weaken the moving party's case as to affect the judge's decision on whether to

**Lorillard Tobacco Co. v. Montrose Wholesale Candies, Not Reported in F.Supp.2d (2005)**

2005 WL 3115892

issue an injunction." *Id.* Here, the Montrose defendants have made no such showing and, indeed, do not even expound upon their assertion that the court must conduct a hearing. They do not indicate what evidence they might introduce against Lorillard's motion and, given that they admit that they keep virtually no corporate or financial records, it is doubtful that any such evidence exists. *See In re Aimster Copyright Litigation,* 334 F.3d 643, 654 (7th Cir.2003) (party's own activity hampered its ability to present contrary evidence in preliminary injunction proceeding). As the court has already detailed, the record assembled in this matter is extensive. It includes two depositions' worth of Mr. Hazemi's sworn testimony, not to mention a sworn affidavit from his wife. Add these to more than a thousand pages of financial and business records and the material before the court is more than adequate to allow the court to rule on Lorillard's motion without a hearing.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3633987
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

NATIONAL FINANCIAL
PARTNERS CORP., Plaintiff,
v.
PAYCOM SOFTWARE, INC. and
Paycom Payroll, LLC, Defendant.

No. 14 C 7424
|
Signed June 10, 2015

**Attorneys and Law Firms**

Richard Daniel Harris, Jeffrey P. Dunning, Matthew Joshua Levinstein, Paul Alexis Del Aguila, Greenberg Traurig, LLP, Chicago, IL, for Plaintiff.

Douglas J. Sorocco, Evan W. Talley, Joseph P. Titterington, Dunlap Codding, PC, John P. Falcone, Cheek & Falcone PLLC, Oklahoma City, OK, Jordan A. Sigale, Julie Lynn Langdon, Dunlap Codding, PC, Chicago, IL, for Defendant.

***MEMORANDUM OPINION AND ORDER***

MATTHEW F. KENNELLY, District Judge:

 **\*1** National Financial Partners Corp. (NFP) has sued Paycom Software, Inc. and Paycom Payroll, LLC (together, Paycom), alleging that Paycom's logo infringes NFP's trademark rights. NFP has alleged trademark infringement under sections 32 and 43(a) of the Lanham Act (counts 1 and 2), violations of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2 (count 3), violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (count 4), and common law unfair competition (count 5). NFP has moved for a preliminary injunction barring Paycom from using its logo. The Court held an evidentiary hearing on May 7, 8, and 15, 2015. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(2).

**Background**

NFP is a financial services company that offers investment and brokerage services and corporate benefits and consulting services. As part of its corporate benefits business, which makes up roughly seventy percent of its revenues, NFP offers financial products and consulting services related to employer health plans, retirement plans, and executive benefits. 5/7/2015 Tr. 12–14 (Boester testimony); Pl.'s Hr'g Ex. 1 at 4. Beginning in March 2013, NFP expanded its offerings to include human resources services, including "training of talent, compensation strategies, [human resources] and benefits administration, payroll policies and procedures, [and] call center for employee questions." 5/7/2015 Tr. 183 (O'Malley testimony).

NFP adopted and began using its current logo in 2010. *Id.* at 31. The logo, depicted below, consists of "a design of two interlocking shapes that form a hexagon with the left element in dark green and the right element in light green." Pl.'s Hr'g Ex. 12 (NFP's trademark registrations). NFP refers to its logo as "the interlink." 5/7/2015 Tr. 32. NFP obtained multiple federal trademark registrations for the interlink logo, including in color and in black-and-white. NFP also obtained registrations for the mark when used in combination with "NFP," "BenefitsPartners," and "PartnersFinancial." Pl.'s Hr'g Ex. 12 (trademark registration numbers 4,094,886, 4,094,887, 4,094,885, 4,097,433, 4,420, 178, and 4,094,882).



NFP owns about 120 companies, all of which use the NFP interlink in connection with their names. 5/7/2015 Tr. 8. The Court heard extensive testimony about one of these affiliated companies, Maschino, Hudelson & Associates (NFP–MHA).

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 47 of 73 PageID #:143

National Financial Partners Corp. v. Paycom Software, Inc., Not Reported in Fed. Supp....

2015 WL 3633987

*See, e.g., id.* at 67. NFP also allows roughly 400 members of its two membership organizations, Benefits Partners and Partners Financial, to use the NFP interlink logo but not the NFP name. *Id.* at 8–10. Neither of these organizations nor their members are owned by NFP.

Before it adopted its current logo in 2010, NFP used a logo with two diamonds depicted in dark green. NFP created the new interlink logo as part of a broader rebranding effort designed to emphasize the connection between NFP and its owned and member companies. Pl.'s Hr'g Ex. 4. Eric Boester, NFP's vice president of corporate development, testified that this effort was referred to internally as "one NFP," and its purpose was to "pull[ ] together all of the operating subsidiaries that used to operate in a relatively independent fashion under a common look and feel of the NFP logo." 5/7/2015 Tr. 27, 30. The new NFP logo with green interlocking diamonds was designed to represent the close partnerships between NFP and its subsidiaries while also referring to the old logo. *Id.* at 31; Pl.'s Hr'g Ex. 4.

**\*2** Paycom offers payroll administration and data management services for employers that range in size from "one employee to several thousand employees." 5/15/2015 Tr. 462 (Miller testimony). Paycom's primary business is payroll administrative services, although the company also offers information management software systems in the areas of talent acquisition, talent management, human resources management, and time and labor management. *Id.* at 459–60. Paycom licenses its proprietary software and database services to over 12,000 clients. *Id.* at 462.

In February 2014, Paycom adopted the logo at issue in this case. The logo consists of the "interlocking stylized letters P and C," with "P" depicted in dark green and "C" depicted in light green. Pl.'s Hr'g Ex. 1. Paycom uses two versions of the mark—a three-dimensional version with a gradient (depicted below on the left) and a two-dimensional version without a gradient (depicted below on the right). Amy Newman–Wells, director of marketing at Paycom, testified that the three-dimensional version is the preferred logo but that the two-dimensional version is used on Paycom's Brand Standards Guide, its website, the sign in front of its headquarters, some of its marketing materials, and employees' e-mail signatures. 5/8/2015 Tr. 280, 283–84.

 

Newman–Wells testified credibly that she conceptualized the new logo without knowledge of NFP's logo. 5/15/2015 Tr. 361. Paycom changed its website to include the new logo in late February 2014 and began to use the logo on its promotional materials in March 2014. 5/8/2015 Tr. 276, 279; 5/15/2015 Tr. 367–68. Newman–Wells, along with Paycom's chief marketing officer and one of Paycom's attorneys, discovered NFP's logo on March 24, 2014 when a Paycom employee e-mailed them to note the similarity between the two logos. 5/15/2015 Tr. 314–15; Pl.'s Hr'g Ex. 33. Paycom filed a trademark application with the U.S. Patent and Trademark Office for the three-dimensional version of its mark on June 12, 2014. It did not mention NFP's mark in the application. Pl.'s Hr'g Ex. 31.

NFP argues that Paycom has infringed its trademark rights because the mark causes confusion regarding affiliation. NFP contends that it will be irreparably harmed in the absence of a preliminary injunction.

## Discussion

"A party seeking to obtain a preliminary injunction must demonstrate: (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted." *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 895 (7th Cir. 2001). If the Court concludes that those conditions have been met, "then it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Id.* The Court must also consider the public's interest. *Id.*

### A. Likelihood of success on the merits

NFP has brought claims under section 32 and section 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), as well as claims under state law. NFP's state law claims are assessed under the same standard as its federal claims. *See*

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 48 of 73 PageID #:144

National Financial Partners Corp. v. Paycom Software, Inc., Not Reported in Fed. Supp....

2015 WL 3633987

*Morningware, Inc. v. Hearthware Home Prods., Inc.,* 673 F.Supp.2d 630, 639 (N.D.Ill. 2009) ("Where a plaintiff's factual allegations under the Illinois Uniform Deceptive Trade Practices Act also form the basis for plaintiff's claims under the Lanham Act, the legal inquiry is the same under both statutes."); *Spex, Inc. v. Joy of Spex, Inc.,* 847 F.Supp. 567, 579 (N.D.Ill. 1994) ("Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act.").

**\*3** A plaintiff can obtain relief under section 32 only for infringement of a registered mark, but a plaintiff can recover under section 43(a) for infringement of an unregistered mark. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768 (1992) ("[I]t is common ground that § 43(a) protects qualifying unregistered trademarks."). To prevail under either section, NFP "must establish that (1) its mark is protectable and (2) the defendant's use of the mark is likely to cause confusion among consumers." *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 673–74 (7th Cir. 2001); *see also McGraw–Edlson Co. v. Walt Disney Prods.,* 787 F.2d 1163, 1167 (7th Cir. 1986). At the preliminary injunction stage, NFP need only demonstrate that it has a "better than negligible chance of succeeding on the merits." *Ty, Inc.,* 237 F.3d at 897.

### 1. Validity of NFP's mark

NFP is entitled to a rebuttable presumption of the validity of its registered mark and of its exclusive right to use the mark in connection with the goods or services specified in its trademark registration. *See* 15 U.S.C. § 1115(a); *CAE, Inc.,* 267 F.3d at 673. Paycom argues that NFP cannot benefit from the presumption because its registrations do not extend to the services that Paycom offers.

Paycom is correct that NFP and Paycom's core businesses differ. Paycom is primarily a technology company that offers human resources software systems. NFP primarily offers financial services and brokerage and consulting services related to employer health plans, retirement plans, and executive benefits. Beginning in March 2013, however, NFP expanded its offerings to include human resources services. 5/7/2015 Tr. 183 (O'Malley testimony). At the hearing, there was extensive testimony concerning whether NFP offers payroll and benefits administration services. Edward O'Malley, executive vice president and president of NFP's insurance and brokers' division, testified that with respect to "vendor and technology evaluation," NFP "operate[s] primarily as consultants, where we go out and identify,

based on the needs of the employer, the unique criteria of the employer or customer, what technologies best fit or suit their needs." *Id.* at 187–88. In other words, NFP generally identifies third parties to provide payroll and benefits administration technology for its clients. In fact, evidence was presented that NFP has recommended Paycom as a possible vendor to its clients. *Id.* at 204–05. Although NFP does not offer payroll processing technology to most of its clients, O'Malley testified that NFP does have its own proprietary technology for processing payroll. *Id.* at 188–89. This testimony arguably conflicted with Boester's. When asked if NFP's benefits group "actually [has] any of its own software," Boester stated that the group has "leveraged other software." *Id.* at 90. The Court need not resolve this apparent conflict. Whether or not NFP outsources all or most of its payroll and benefits administration functions, NFP's human resources services overlap with Paycom's payroll and benefits administration business. Both target employers to assist with their human resources administration needs.

Paycom attempts to distinguish between NFP's human resources services, which correspond to international class 36 of the Trademark Manual of Examining Procedure, and Paycom's services, which correspond to international class 35. NFP's marks are registered under class 35 and class 36. Pl.'s Hr'g Ex. 31 (Paycom's trademark application); Pl.'s Hr'g Ex. 12 (NFP's trademark registration).[1] Even though NFP's employee benefits brokerage and consulting services are listed under class 36, there is nonetheless overlap in the parties' trademark registration classifications. More importantly, there is also overlap in the parties' descriptions of their respective services. NFP's registration application describes its services as including "brokerage and consulting services for employee benefits concerning insurance and finance, namely ... consulting and administrative services for executive benefits plans." Pl.'s Hr'g Ex. 12. Paycom's application describes its services as including "payroll administration and management services; human resources management; [and] performing employee benefits administration." Pl.'s Hr'g Ex. 31. In short, both parties list benefits administration as a service they provide.

**\*4** This overlap is sufficient for the Court to conclude that NFP's trademarks cover the services offered by Paycom. "The rights of an owner of a registered trademark extend to any goods or services that, in the minds of consumers, might be put out by a single producer." *AutoZone, Inc. v. Strick,* 543 F.3d 923, 931 (7th Cir. 2008). This case is like *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d

National Financial Partners Corp. v. Paycom Software, Inc., Not Reported in Fed. Supp....

2015 WL 3633987

947 (7th Cir. 1992), in which the court found that plaintiff's registration rights for beverage syrups also encompassed beverages. *Id.* at 955 (declining to conclude that plaintiff "had no registration rights covering the use of THIRST—AID on beverages," because "[w]e do not see the wide gulf between a trademark for beverage *syrups* and a trademark for beverages"). The parties' services are not so unrelated that the trademark registration does not cover the services offered by Paycom. *Cf. S Indus., Inc. v. Diamond Multimedia Sys., Inc.,* 991 F.Supp. 1012, 1017 (N.D.Ill. 1998) (finding that "the goods in plaintiff's registrations," which included sporting goods, lawn sprinklers, pool and billiard equipment, fishing tackle floats, and other items, were "so unrelated to [the defendant's] computer video and graphics computer boards that defendants' use of [the mark] cannot infringe plaintiff's registered [ ] marks"). Human resources technology and human resources consulting and financial services are similar enough that a consumer might conclude that the types of services provided by NFP and Paycom are offered by the same company.

Moreover, an important reason to protect "trademark owners against the use of similar marks on closely related products is to protect the owner's ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future." *Sands, Taylor & Wood,* 978 F.2d at 958. Put differently, "[t]he Lanham Act aims to protect the trademark owner's interest in capitalizing on the good will associated with its mark by moving into new markets." *CAE, Inc.,* 267 F.3d at 681 (internal quotation marks omitted). NFP started to expand its business to include human resources services and administration in 2013, with preparation for this expansion beginning in 2012. Even if this part of its business is currently rather small, NFP is entitled to capitalize on its trademark protection to help expand into this related market.

Paycom argues that the presumption of validity has been rebutted because Paycom is actually the senior user of the mark. NFP must be the first user of the mark to be entitled to trademark protection. *See G. Heileman Brewing Co. v. Anheuser-Busch, Inc.,* 873 F.2d 985, 999 (7th Cir. 1989); *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503 (7th Cir. 1992); *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 297 (3d Cir.1986). Paycom argues that it is the senior user because it started using two shades of green in its marketing materials (though not in its logo) in 1998. Def.'s Hr'g Ex. 16 (Paycom's old marketing materials). But the mark in question is NFP's interlink logo consisting of interlocking diamonds depicted in two shades of green, not simply two shades of green. NFP

created the interlink logo in 2010 and began to use that mark for human resources services in 2013. Paycom did not create the allegedly infringing mark until 2014. Thus, NFP is the senior user. In sum, NFP has a valid trademark that covers the services offered by Paycom.

### 2. Likelihood of confusion

The Court considers seven factors to determine whether there is a likelihood of confusion:

> (1) the similarity of the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiffs.

*Ty, Inc.,* 237 F.3d at 897. Although "[n]o single factor is dispositive," the most important factors are often "the similarity of the marks, the defendant's intent, and actual confusion." *CAE, Inc.,* 267 F.3d at 678.

### a. Similarity of marks, products, and use

The first factor, similarity of the marks, favors NFP. The test for similarity is "not whether the public would confuse the marks, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *AutoZone, Inc.,* 543 F.3d at 930 (internal quotation marks omitted). The marks are similar enough that a viewer would be likely to associate Paycom's services with NFP's services. Indeed, Paycom admits that the marks are very similar in appearance. 5/15/2015 Tr. 534 (closing argument of Paycom's attorney, Jordan Sigale). As additional support, NFP has offered evidence that several of Paycom's own employees commented on the logos' similarity. For instance, when presented with NFP's mark, Paycom's chief marketing officer remarked, "Whoa! That's pretty close." Pl.'s Hr'g Ex. 33 at 5. A Paycom client relationships representative commented that NFP and Paycom "have a similar logo." *Id.* at 6. And a Paycom specialist wrote, "Uhhhhh does that not look like our logo?!" *Id.* at 10.

**\*5** The second factor, the similarity of the products, also favors NFP. The Court must consider whether NFP and Paycom's products and services are closely related. *Ty, Inc.,* 237 F.3d at 899–900. "[A] closely related product [or

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 50 of 73 PageID #:146

National Financial Partners Corp. v. Paycom Software, Inc., Not Reported in Fed. Supp....

2015 WL 3633987

service] is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Id.* at 900. To be closely related, products or services need not be identical or in direct competition. Rather, the products or services must be "the kind the public might very well attribute to a single source." *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1089 (7th Cir.1988) (plaintiff who sponsored dog shows and defendant who created dog toys offered related products); *see also AutoZone, Inc.,* 543 F.3d at 931 (ruling that a reasonable consumer could conclude that plaintiff's automobile products and defendant's automobile services came from the same source). NFP and Paycom both offer services related to human resources management. Although NFP primarily offers consulting and financial services and Paycom primarily offers software products, a consumer reasonably would think that one company offered all of these services. NFP and Paycom market their services to the same general audience, namely executives who make human resources decisions. *See AutoZone, Inc.,* 543 F.3d at 932 ("[B]oth parties here operate automotive-oriented businesses that target segments of the general automobile-using public."). This "industrial affinity between their products and services [ ] is likely to increase consumer confusion if both parties market their products and services in connection with the ... mark." *CAE, Inc.,* 267 F.3d at 681.

For similar reasons, the third factor, area and manner of concurrent use, also favors NFP. Both parties promote their services nationally "in the same channels of commerce" and "have targeted the same general audience." *Id.* at 681–82; *see also AutoZone, Inc.,* 543 F.3d at 932. Thus, this factor weighs in favor of a finding of likelihood of confusion.

**b. Degree of care and strength of the mark**

The fourth factor, degree of care exercised by consumers, does not favor either party. Zachary Miller, a regional sales manager for Paycom, testified that Paycom's customers "exercise an extreme amount of care" in deciding whether or not to enter into an agreement with Paycom, because "[t]hey are trusting us with huge financial transactions, generally the largest financial transactions that happen in any given business." 5/15/2015 Tr. 454. Miller estimated that it "takes five to seven meetings over four to six weeks to close a deal with a new client," and the set-up fee for Paycom's services ranges from a few thousand dollars to up to $50,000.

Def.'s Hr'g. Ex. 44 ¶ 10 (Miller declaration); 5/15/2015 Tr. 454. This testimony was credible. Nonetheless, "customers' technical sophistication about their particular industry does not equate to trademark sophistication." *CAE, Inc.,* 267 F.3d at 683. The fact that consumers exercise considerable care in selecting human resources service providers does not mean that those consumers would not be confused as to affiliation based on the two logos. In fact, Brett Shumate and Rulissa Trout, who both work in the human resources field, were confused as to the relationship between NFP and Paycom, as the Court discusses in the next section. *See* Pl.'s Hr'g Ex. 14 (e-mails from Trout and Shumate expressing confusion about the relationship between NFP and Paycom). This suggests that insiders in the industry could be confused by the logos' similarity.

The fifth factor, the strength of the plaintiff's mark, does not favor either party. Even though NFP's mark is arbitrary, that classification does not necessarily mean the mark is strong in the areas in which Paycom offers services. *See Sullivan v. CBS Corp.,* 385 F.3d 772, 777 (7th Cir. 2004) ("A mark can be arbitrary for one purpose but it may still be used extensively in other areas."). "The crucial question is whether the mark is strong enough that the public will form an association between the mark and the source of that particular good." *Id.* As Boester testified, NFP has invested substantial resources in advertising and promoting its services under its mark, and the mark conveys the concept that NFP's owned entities and member organizations operate as "one NFP." 5/7/2015 Tr. 30–31. However, NFP has not presented evidence that potential customers recognize the logo as NFP's. In fact, when NFP's expert, Dr. Michael Rappeport, asked survey respondents, who were all involved in human resources, whether they had seen the NFP logo before, eleven out of 180 had seen it. None of those eleven could identify the company that used the logo. *Id.* at 160–61. Thus, this factor is neutral.

**c. Actual confusion**

\*6 The sixth factor, evidence of actual confusion, weighs in favor of NFP. To determine whether there is evidence of actual confusion, the Court must assess whether "reasonable and prudent consumers" would identify the infringing logo as coming from a company affiliated with NFP. *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.,* 149 F.3d 722, 729 (7th Cir. 1998). NFP offers four examples of actual confusion and the results of a consumer confusion survey administered by Dr. Rappeport. Paycom challenges each of

National Financial Partners Corp. v. Paycom Software, Inc., Not Reported in Fed. Supp....

2015 WL 3633987

the four instances of actual confusion and offers a report and survey administered by James Berger to rebut NFP's claims of confusion.

Two of the four purported instances of confusion are relatively weak. NFP says that Kristi Kromer–Jones, a vice president at Great Plains National Bank, "asked Jordan Cook, a benefits consultant at NFP's Oklahoma City office, whether there was a relationship between NFP and Paycom due to the similarities in the companies' logos." Pl.'s Mem. in Supp. of Mot. for Prelim. Inj., Ex. 47 at 4 (NFP's response to Paycom's Interrog. No. 1). Apart from this assertion in an interrogatory response, NFP has not provided any information about Kristi Kromer–Jones. It is unclear whether she is a client of NFP's. NFP's claim that an individual at Senior Star Management Company asked about the relationship between NFP and Paycom likewise is not entitled to significant weight. NFP has not identified who made that statement or provided any other information about the communication. *Id.* ("In approximately February 2015, a representative of Senior Star Management Company, a client of NFP–MHA, asked Thad Ledford, a Vice President–Sales for NFP–MHA, about the relationship between NFP and Paycom.").

NFP's other instances of actual confusion are, however, entitled to significant weight. First, NFP offers an e-mail sent by Brett Shumate, a district manager at Automatic Data Processing (ADP), asking Cooper Johnson, vice president of sales at NFP's Oklahoma City office (NFP–MHA), if there had been "an acquisition between [NFP and Paycom] that we were not aware of, as I have noticed that your logos are now identical." Pl.'s Hr'g Ex. 14. ADP and NFP–MHA "refer business back and forth between our clients." Shumate Dep. at 15. ADP and Paycom are competitors, so Shumate was concerned that he would be shut out of NFP if it was associated with Paycom. Although Shumate is not an NFP customer because he is not a human resources executive, ADP gives NFP ten percent of any business that NFP refers to ADP, and ADP refers its clients to NFP for its benefits products. *Id.* at 15, 18, 20. A perceived affiliation with Paycom could negatively affect NFP's business if it caused ADP to stop referring business to NFP and paying NFP referral fees. Thus, even though Shumate is not an NFP client, the conversation is probative of confusion because of the relationship between ADP and NFP. The fact that Kelly Hudelson, who runs NFP–MHA, asked Shumate to send the e-mail after the two men had a conversation about the logos' similarity does not provide a basis to discredit or discount Shumate's statement. *Id.* at 36.

NFP also offers an e-mail sent to Hudelson by Rulissa Trout, vice president at Asset Plus Corp., who stated that she had received a postcard from Paycom and noticed "that the logo is exactly like NFP's." Pl.'s Hr'g Ex. 14. She wrote, "[i]f you are connected with the Paycom team, have them take me off of their mailing list since they have my name spelled wrong anyway." *Id.* Trout is a client and former employee of NFP's Oklahoma City Office. If Trout received a postcard from Paycom, that means Paycom was targeting her as a potential client. Pl.'s Hr'g Ex. 45 (Newman–Wells declaration) ¶¶ 30–31 (stating that "Paycom mailed 81,912 pieces to potential Paycom customers" on March 17, 2014 and has mailed a similar number each month since then). In fact, the mailer Paycom offered as an exhibit is nearly identical to the mailer Trout received. *Compare* Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj., Ex. 17, *with* Pl.'s Hr'g Ex. 14. Because Trout was a potential client of both companies, her e-mail supports NFP's claim of confusion.

**\*7** Turning to the confusion studies, Paycom's expert, James Berger, conducted a *Squirt* survey with an array. *See* 6 McCarthy on Trademarks and Unfair Competition § 32:173.50 (describing *Squirt* surveys). The respondents in Berger's Internet survey were people whose jobs involved payroll, insurance, and personnel, although Berger did not limit the sample to employees with the authority to make human resources or payroll decisions. In the survey, respondents were presented six logos, including Paycom and NFP's logos. Pl.'s Hr'g Ex. 22 at 46–47 (Berger's original rebuttal report). All of the logos had interlocking bars, and three of the logos were green (including Paycom and NFP's). In addition to other questions, Berger asked each respondent if he or she thought any of the logos belonged to (1) the same company, (2) associated companies, (3) affiliated companies, or (4) sponsored companies. *Id.* at 17. He found that 4.6% of respondents thought Paycom and NFP's logos belonged to the same company, 6.6% thought they were associated, 5.6% thought they were affiliated, and 2% thought they were sponsored. Pl.'s Hr'g Ex. 40 at 5 (Berger's updated results). Berger did not indicate how many unique respondents answered at least one of the four questions in the affirmative. That is the relevant inquiry, as the Court must consider "whether the customer would believe that the trademark owner sponsored, endorsed *or* was otherwise affiliated with the product." *AutoZone, Inc.,* 543 F.3d at 930 (internal quotation marks omitted) (emphasis added). When asked about this at the evidentiary hearing, Berger admitted that his report did not include that tabulation. 5/15/2015 Tr. 437. It is conceivable that the proportion of respondents who

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 52 of 73 PageID #:148

National Financial Partners Corp. v. Paycom Software, Inc., Not Reported in Fed. Supp....

2015 WL 3633987

perceived some affiliation was as high as eighteen percent, if one assumes that different respondents saw a connection between NFP and Paycom for each question. At the very least, Berger's framing of the data likely understates the total percentage of source confusion, as presumably at least some respondents perceived a connection in response to certain questions but not others. Because the Court cannot ascertain how many participants perceived a relationship between NFP and Paycom based on their logos, Berger's survey is of little utility as evidence rebutting NFP's claim of actual confusion.

This is the first of a number of problems with Berger's survey. It was clear from his testimony that Berger was not personally involved in the administration of the survey or the analysis of its results. Though that is not a basis to disqualify him from testifying, Berger was unable to answer basic questions about the study. *See, e.g., id.* at 391 ("Q. And were—do you recall the very—in general, what the colors of the logos were [in the array]? A. Well, there was a little green, I think there was some yellow, some red. I don't remember exactly. You probably have it in the evidence."). Additionally, Berger's sample was not limited to people with the authority to make decisions about human resources. The relevant customers are purchasers of human resources services. Berger's study is appropriately given less weight because he did not limit his universe of respondents to potential customers. *See Piper Aircraft Corp. v. Wag–Aero, Inc.,* 741 F.2d 925, 930 (7th Cir. 1984).

Additionally, the independent validation of Berger's study casts doubt on his methodology. Of thirty-one survey participants contacted by an independent firm, ten were not actually qualified to take the survey. Pl.'s Hr'g Ex. 22 at 106. This calls into question how many of the other 201 participants were qualified.

Berger's methodology was also called into question by the fact that he issued a supplemental report after opposing counsel identified a problem with his methodology during his deposition. Specifically, "opposing counsel pointed out that if somebody [ ] just put down one letter or indicat[ed] one logo" when asked if they believed any of the six logos belonged to the same company, "they probably shouldn't be counted in the survey." 5/15/2015 Tr. 395; *see also* Pl.'s Hr'g Ex. 40 (Berger's supplemental rebuttal report). Although Berger updated his report to remedy this problem, this error demonstrates a lack of supervision and care.

Moreover, it was clear that no one from Berger's firm had read the verbatim responses to the survey questions. 5/15/2015 Tr. 422 (Berger testimony; "You know, I don't think I ever really looked in great depth at the verbatim responses."). Respondents listed answers such as "LOL" and "cool" to substantive questions like: "For each logo you are familiar with, please indicate the company or organization that is associated with it" and "Why do you say that?" (related to the question, "Do you know which one of these logos belongs to Paycom Payroll, LLC?"). Pl.'s Hr'g Ex. 22 at 71, 91, 93. Berger should have removed nonresponsive answers from the survey data.

Finally, Paycom and NFP's logos were not depicted in the same size in Berger's array. NFP's logo was significantly larger than Paycom's logo, which might have made them appear less similar to respondents. 5/15/2015 Tr. 414 (Berger testimony; "Q. It looks like the Paycom logo is about a fourth, a fifth smaller in width than the NFP logo, correct? A. It looks that way, yes."). Given these problems with Berger's study, the Court concludes that his survey was not reliable.

 **\*8** NFP's expert, Dr. Michael Rappeport, came up with a thirty-nine percent rate of source confusion when he conducted a two-room survey with a control cell. 5/7/2015 Tr. 128. All of the respondents were "people involved in making decisions about employee benefits and/or payroll administration as part of their work." Pl.'s Hr'g Ex. 18 at 3. Interviewers contacted each respondent by telephone and instructed the respondent to view a website. *Id.* Respondents viewed and answered questions about logos depicted on two separate screens (historically, the marks were presented in two rooms, hence the term used for this type of survey). On the first screen, respondents were shown NFP's logo. As a respondent viewed the first screen, the interviewer asked whether she had seen the logo and whether she knew the name of the company that uses the logo. *Id.* at 6. Each respondent was then directed to the second screen, where she viewed an array of five logos—half of the respondents viewed an array that contained Paycom's mark and half viewed a control cell that did not contain the mark (instead, it contained a flattened version of Paycom's mark depicted in two shades of blue with the orientation changed). Otherwise the logos in the control cell were identical to those in the experimental cell. The interviewer asked if the respondent thought

> 1. one or more of these logos is used by a company that is connected or affiliated with the company that uses the first logo I showed you, or

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 53 of 73 PageID #:149

National Financial Partners Corp. v. Paycom Software, Inc., Not Reported in Fed. Supp....

2015 WL 3633987

2. none of these logos are used by a company that is connected or affiliated with the company that uses the first logo I showed you, or

3. don't you have an opinion.
*Id.,* App. B at 3. The question and possible responses were also shown on the respondent's computer screen. *Id.,* App. C at 4.

In Rappeport's study, forty-five percent of respondents thought that the company that used Paycom's logo was "connected or affiliated" with the company that used NFP's logo. *Id.* at 9. Of the respondents who viewed the control room, six percent thought the altered blue Paycom logo's company was affiliated with NFP. That six percent, according to Rappeport, constituted the noise estimate, or the proportion of respondents who were simply guessing. Rappeport assumed the noise estimate was the same in the test cell and the control cell and subtracted that number from the forty-five percent confusion rate. Based on this calculation, Rappeport concluded that thirty-nine percent of respondents thought NFP and Paycom were affiliated. 5/7/2015 Tr. 147.

Berger criticized Rappeport's study. First, he argued that the two-room methodology biased respondents by instructing them to pick the most similar logo to the logo displayed on the first screen. Rappeport responded that the two-room study more accurately reflects marketplace conditions. NFP and Paycom offer services, rather than products that are viewed on a store shelf, so it is unlikely that consumers see the two logos side-by-side in the marketplace. Instead, they see them one at a time, as they were presented in the two-room survey. The Court finds this response persuasive. *See Ty, Inc.,* 237 F.3d at 898 (7th Cir. 2001) ("When attempting to determine if two marks are similar, the comparison should be made in light of what happens in the marketplace, [and] not merely by looking at the two marks side-by-side." (internal quotation marks omitted)). Two-room studies have been cited with approval as "an attempt to replicate the marketplace process of advertising exposure to a brand or trade dress, followed by being confronted in the market with both similar and differing brands or trade dresses." 6 McCarthy, *supra,* § 32:177. Additionally, the results from the control cell suggest that any bias was minimal in Rappeport's survey. In the experimental cell, forty-five percent of respondents thought Paycom and NFP were related, four percent thought NFP was related to one of the other companies in the array, and fifty-three percent thought none of the logos were affiliated or did not have an opinion. In the control cell, however, only six percent thought the NFP logo was affiliated with the modified

Paycom logo, thirteen percent thought NFP was affiliated with one of the other companies, and eighty percent thought none were affiliated or did not have an opinion. Pl.'s Hr'g Ex. 18 at 9. A significant proportion of respondents in the control cell, eighty percent, did not choose any logo when they did not perceive any affiliation or did not have an opinion, compared to fifty-three percent who did not choose an affiliated logo in the experimental cell. This data suggests that respondents were not all biased toward picking the closest match. The control cell in Rappeport's study helped to isolate any effect from potential bias.

**\*9** Berger also thought that the other logos in Rappeport's array were too dissimilar to NFP's logo and that this led more respondents to pick Paycom's logo. Rappeport responded that the other logos in the array were a "weaker form of control" compared to the true control (the modified Paycom logo in the control cell). He agreed that alone the weak controls "could just be too far away" from the NFP mark to allow for meaningful testing. 5/7/2015 Tr. 143. He noted that it is difficult to avoid highlighting the infringing product when portraying the infringing logo next to logos that are not as similar to the plaintiff's logo. Rappeport explained, however, that using a control cell helps to account for this problem. *Id.* at 167. In other words, the control cell, rather than the other logos in the array, is the main comparator. The Court concludes that the fact the other logos in the array were dissimilar to NFP's does not render Rappeport's survey problematic.

Berger also suggested that Rappeport's sample, which included 100 respondents in the experimental cell and 80 in the control cell, was too small. Although the study would have been more convincing with more respondents, resource limitations likely played a role. Michael Rappeport, *Litigation Surveys—Social "S cience" As Evidence,* 92 Trademark Rep. 957, 960 (2002) ("There are never infinite resources, so in trying to create the best possible survey one is always limited by the available time and money."). The relatively small sample size may affect the weight the Court gives the survey but does not render the survey unreliable.

Berger also argued that it was inappropriate for Rappeport to include "don't you have an opinion" as one of the options when respondents were asked if any of the logos in the array were affiliated with NFP. Pl.'s Hr'g Ex. 18, App. B at 3. The "don't you have an opinion" wording was rather clunky, but that does not mean that respondents were confused by it. When a respondent considered the "don't you have an

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 54 of 73 PageID #:150

National Financial Partners Corp. v. Paycom Software, Inc., Not Reported in Fed. Supp....

2015 WL 3633987

opinion" option after the other two choices—the first of which applied if a respondent thought the logos were from connected or affiliated companies and the second applied if she did not think the companies were connected or affiliated—it would have been obvious that "don't you have an opinion" meant "I don't have an opinion." Moreover, the wording does not appear to have affected the results, perhaps because a confused respondent could simply ask the interviewer what that option meant. Sixty percent of respondents in the control cell selected the "don't you know" option, as opposed to thirteen percent in the experimental cell. This suggests that the "don't you know" wording did not deter respondents from selecting that option.

No study is perfect, of course. *See* 6 McCarthy, *supra*, § 32:178 ("One must keep in mind that there is no such thing as a 'perfect' survey. The nature of the beast is that it is a sample, albeit a scientifically constructed one."). Additionally, the Court recognizes the inherent limitations of consumer confusion surveys conducted by hired experts. *See Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.,* 735 F.3d 735, 741–42 (7th Cir. 2013). Nonetheless, Rappeport presented a well-designed and well-supported study and thoughtfully discussed its results and justified his methodology. Accordingly, the Court finds Dr. Rappeport's thirty-nine percent rate of confusion to be probative evidence of actual confusion. *See H–D Mich., Inc. v. Top Quality Serv., Inc.,* 496 F.3d 755, 758 (7th Cir. 2007) (evidence that twenty-seven percent of consumers thought there was an association between companies was sufficient to survive defendant's motion for summary judgment); *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 572 F.2d 574, 576, 578 n.4 (7th Cir. 1978) (survey showing fifteen percent of consumers were confused as to sponsorship was sufficient to show likelihood of confusion); *Helene Curtis Indus., Inc. v. Church & Dwight Co.,* 560 F.2d 1325, 1331 (7th Cir. 1977) (affirming preliminary injunction where 290 out of 998 respondents were confused as to the source of the mark); *but see Simon Prop. Grp., L.P. v. mySIMON, Inc.,* 282 F.3d 986, 989 (7th Cir. 2002) (no likelihood of confusion when surveys "showed a 'completely negligible' likelihood of confusion, with under two percent of respondents indicating relevant confusion").

**d. Intent**

**\*10** The seventh factor, intent of the alleged infringer, weighs in favor of Paycom. Amy Newman–Wells, the

Paycom executive who conceptualized the infringing mark, testified that she did not know about NFP's interlink logo when she created the mark. 5/15/2015 Tr. 345. NFP offered no evidence suggesting that Newman–Wells intentionally copied the NFP mark. The Court finds Newman–Wells' testimony credible on this point.

In sum, four of the factors favor NFP, one favors Paycom, and two favor neither party. Given the overlap between the two parties' customers, the strong similarity between the marks, and the evidence of actual confusion, the Court concludes that NFP is highly likely to succeed on the merits of its infringement claim.

**3. Abandonment**
The Court concludes that Paycom has not shown that NFP abandoned its trademark rights by engaging in naked licensing of its logo. A defendant can assert a defense of abandonment through "uncontrolled or 'naked' licensing" by showing that a trademark owner failed to maintain "reasonable control" over product quality and "allow[ed] licensees to depart from its quality standards." *TMT N. Am., Inc. v. Magic Touch GmbH,* 124 F.3d 876, 885 (7th Cir. 1997). If that happens, "the public will be misled, and the trademark will cease to have utility as an informational device.' " *Id.* (quoting *Ky. Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 387 (5th Cir. 1977)); *see also Eva's Bridal Ltd. v. Halanick Enters., Inc.,* 639 F.3d 788, 789–90 (7th Cir. 2011) (finding abandonment by naked licensing when the mark owner "never tried to control any aspect of how defendants' shop operated or how the mark was used"). The Seventh Circuit applies "a flexible approach but allows licensors to rely at least somewhat on the reputation and expertise of licensees." *TMTN. Am., Inc.,* 124 F.3d at 885. Paycom bears a "heavy burden ... [of] asserting a lack of reasonable control by a licensor." *Id.* (quoting Restatement (Third) of Unfair Competition § 33 cmt. c (1995)).

NFP allows roughly 300 members of its two membership organizations, Benefits Partners and Partners Financial, to use the NFP interlink logo but not the NFP name. Those companies are not owned by NFP. Paycom suggests that NFP has not exercised reasonable control over these licensees, because NFP does not supervise their use of the interlink and has not produced an agreement governing trademark usage signed by any of those organizations.

NFP produced detailed style guides specifically created for Benefits Partners and Partners Financial that govern how

National Financial Partners Corp. v. Paycom Software, Inc., Not Reported in Fed. Supp....

2015 WL 3633987

their members may use the interlink logo. Pl.'s Hr'g Ex. 6. NFP also offered Benefits Partners and Partners Financial membership agreements, which require member companies to use the marks "in accordance with standards published from time to time...." Pl.'s Hr'g Ex. 7. Although NFP did not produce a signed membership agreement, Boester testified credibly that all member organizations have signed the agreements. 5/7/2015 Tr. 47. He also testified that some members' marketing materials are reviewed by NFP, although he admitted that NFP does not monitor all of their marketing materials. *Id.* at 89.

"Absent a significant deviation from the licensor's quality standards, a licensor does not forfeit its trademark rights through licensing agreements." *TMTN. Am., Inc.,* 124 F.3d at 886. There is no evidence tending to show that Benefits Partners or Partners Financial's members have significantly deviated from NFP's quality standards. Although Paycom pointed out one instance of inappropriate use of the NFP interlink by a Benefits Partners member company, this does not mean that NFP has ceded control of its logo. Pl.'s Hr'g Ex. 41 at 6 (e-mail signature of a Benefits Partners member employee depicting the NFP mark after the word "A" in "A Benefits Partners member"). Moreover, NFP has offered evidence that it exercises some degree of control over licensees' use of the mark. Accordingly, Paycom has not met its burden of showing abandonment.

**B. Irreparable harm and adequacy of legal remedies**

*\*11* The Seventh Circuit has articulated a presumption of irreparable harm in trademark infringement cases. *See Ty, Inc.,* 237 F.3d at 902; *Int'l Kennel Club,* 846 F.2d at 1092; *Processed Plastic Co. v. Warner Commc'ns, Inc.,* 675 F.2d 852, 858 (7th Cir. 1982). The Supreme Court, however, has called this presumption into question. In *eBay Inc. v. MercExchange, LLC,* 547 U.S. 388 (2006), the Supreme Court rejected the categorical rule that a permanent injunction must issue upon a showing of patent infringement. *Id.* at 392–94. The Court observed that in copyright cases it "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." *Id.* at 393–94. Applying these principles to a Patent Act case, the Court instructed that the district court should have applied "the traditional four-factor framework that governs the award of injunctive relief." *Id.* at 394.

Although the Seventh Circuit has not addressed whether *eBay* applies to preliminary injunctions in Lanham Act cases, the court has held that "*eBay* governs a motion for a preliminary injunction in a copyright case." *Flava Works, Inc. v. Gunter,* 689 F.3d 754, 755 (7th Cir. 2012). The Court sees no reason why the Seventh Circuit would reach a different conclusion in a Lanham Act case. The decisions of other appellate courts indicate a trend toward requiring irreparable harm before issuing an injunction in trademark infringement cases. The Third Circuit has held that "there is no presumption of irreparable harm afforded to parties seeking injunctive relief in Lanham Act cases." *Ferrlng Pharm., Inc. v. Watson Pharm., Inc.,* 765 F.3d 205, 216 (3d Cir. 2014). The Court noted that the Supreme Court's language in *eBay* was not limited to patent cases. *Id.* at 215–16. As the Third Circuit pointed out, the Court in *eBay* suggested that a departure from equity principles is permissible only when there is clear congressional intent. *eBay Inc.,* 547 U.S. at 391–92; *see also Ferrlng Pharm., Inc.,* 765 F.3d at 215. The Third Circuit observed that the Lanham Act, like the Patent Act, was drafted to incorporate " 'traditional principles of equity,' " and thus concluded that the same standards should apply. *Ferrlng Pharm., Inc.,* 765 F.3d at 214–15 (quoting *eBay,* 547 U.S. at 393–94). The Ninth Circuit has also held that likelihood of irreparable harm must be demonstrated before a preliminary injunction may issue in a trademark infringement action. *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.,* 736 F.3d 1239, 1249 (9th Cir. 2013), *cert. denied,* 135 S.Ct. 57 (2014). Other appellate courts have suggested in dicta that they would reach the same conclusion. *See, e.g., Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc.,* 704 F.3d 44, 54 (1st Cir. 2013) (noting that "there is no principled reason why [*eBay* ] should not apply to a request for a preliminary injunction to halt trademark infringement" but declining to decide the question); *N. Am. Med. Corp. v. Axiom Worldwide, Inc.,* 522 F.3d 1211, 1228 (11th Cir. 2008) ("Although *eBay* dealt with the Patent Act and with permanent injunctive relief, a strong case can be made that *eBay's* holding necessarily extends to the grant of preliminary injunctions under the Lanham Act."); *Audi AG v. D'Amato,* 469 F.3d 534, 550 (6th Cir. 2006) (applying *eBay* to a permanent injunction in a trademark infringement case without extensive analysis). The Court finds the Ninth and Third Circuits' reasoning persuasive and concludes that NFP must show a likelihood of irreparable harm to be entitled to a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008) (stating that plaintiffs requesting a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction").

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 56 of 73 PageID #:152

National Financial Partners Corp. v. Paycom Software, Inc., Not Reported in Fed. Supp....

2015 WL 3633987

**\*12** NFP has sufficiently shown that it will suffer irreparable harm in the absence of an injunction. The Lanham Act is designed to redress "the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill." *Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 16 (7th Cir. 1992).* "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods." *Processed Plastic Co., 675 F.2d at 858.* To show irreparable harm, NFP need not show that it lost business as a result of Paycom's alleged infringement. *See Int'l Kennel Club,* 846 F.2d at 1091.

NFP contends that it will suffer harm from "continued consumer confusion regarding whether or not these companies are related." 5/15/2015 Tr. 503. It also states that "NFP has no way of identifying those other consumers who have been confused by Paycom's use of the Infringing Paycom Logo." Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 23. NFP has offered evidence that it spent over $11 million from 2010 through 2014 on advertising, marketing, and promotion using its interlink logo. Pl.'s Hr'g Ex. 11. This evidence is probative of harm. If a company spends significant time and resources promoting its trademark, that is a strong indication that the mark has significant economic value as a source identifier. Any infringement that impedes that identifying function will cause significant harm. The use of the interlink brand was particularly important to NFP, because the new logo was designed and promoted as part of a mass marketing effort to emphasize that NFP and its owned and member companies were all part of "one NFP." Pl.'s Hr'g Ex. 4. Boester testified that the purpose of the rebranding effort was to "pull[ ] together all of the operating subsidiaries that used to operate in a relatively independent fashion under a common look and feel of the NFP logo." 5/7/2015 Tr. 30. The NFP logo with interlocking diamonds was designed to represent closer partnerships between NFP and its subsidiaries. *Id.* at 31; Pl.'s Hr'g Ex. 4.

The fact that the marks are similar and the target audiences are identical also supports NFP's contention that it will be irreparably harmed. *See Ideal Indus., Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1025 (7th Cir. 1979) ("The existence of irreparable injury is positively supported by the fact that the alleged trademark and the infringing use are identical, that the products are the same, and that the markets are the same. These factors by themselves are indicative of irreparable injury."). Additionally, the compelling evidence of consumer confusion supports a finding of irreparable

harm. "Where there is [ ] such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows," because the defendant's profits on the infringing items are "often difficult to determine" and "confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors." *Helene Curtis Indus., Inc., 560 F.2d at 1332–33* (quoting *Omega Importing Corp. v. Petri–Kine Camera Co., 451 F.2d 1190, 1195 (2d Cir. 1971)*). In this case, NFP has presented compelling evidence of consumer confusion. Because the damage to NFP's good will and reputation caused by this confusion is inherently intangible and impossible to quantify, the harm is irreparable. Although NFP's evidence of irreparable harm is not overwhelming, it has presented sufficient evidence to show that it will suffer such harm without an injunction.

**\*13** Paycom argues that NFP's delay in seeking a preliminary injunction undercuts its claim of irreparable harm. NFP became aware of Paycom's logo on June 16, 2014. It discovered in July or August of 2014 that Paycom was one of the biggest clients of a company that NFP was acquiring. NFP executives thought a lawsuit might put the transaction at risk, so NFP decided to wait until after the deal was finalized to approach Paycom about its logo. 5/7/2015 Tr. 69–70. Evidence was presented that $40,000 of the target company's yearly revenues was attributable to its business with Paycom. Pl.'s Hr'g Ex. 15. Paycom argues that if NFP was willing to delay suit to save $40,000 of yearly revenues, this suggests that its harm was not truly irreparable. The evidence indicated, however, that NFP was not simply concerned with the $40,000 of yearly revenues attributable to Paycom, but was worried that litigation with Paycom could put the entire transaction at risk. 5/7/2015 Tr. 69 (Boester testimony).

In any event, the delay does not preclude a finding of irreparable harm. Boester testified that NFP did not sue Paycom right away in part because "we felt that we could work out a solution" without suing. *Id.* at 66. He said that the original plan was for the target company's CEO to reach out to Paycom, but that plan fell through. Although the precise dates are unclear, Boester testified that NFP realized that this informal approach would not work "within weeks" after August 15. *Id.* at 71. NFP contacted Paycom on September 23, 2014, when it sent Paycom's general counsel a tolling agreement, the purpose of which was to help facilitate resolution without litigation. Pl.'s Hr'g Ex. 16 at 5. According to Boester, the companies' general counsels spoke. NFP filed

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 57 of 73 PageID #:153

National Financial Partners Corp. v. Paycom Software, Inc., Not Reported in Fed. Supp....

2015 WL 3633987

suit that same day "when it appeared that we weren't going to come to a resolution." 5/7/2015 Tr. 74. NFP moved for a preliminary injunction shortly after that on October 15, 2014.

Contrary to Paycom's contention, NFP's delay in filing suit does not support its contention that NFP's injuries are quantifiable. Based on the evidence presented to the Court, NFP always intended to approach Paycom about its logo. Thus, it is not correct to suggest that the logo can be valued at an amount less than $40,000 per year. Although NFP was willing to suffer some amount of harm to its good will and reputation during its three-month delay before filing this lawsuit, the decision to delay suit was not unreasonable under the circumstances and does not conflict with the Court's conclusion that NFP's harm is irreparable.

Moreover, "[w]hether the defendant has been lulled into a false sense of security or had acted in reliance on the plaintiff's delay influences whether we will find that a plaintiff's decision to delay in moving for a preliminary injunction is acceptable or not." *Ty, Inc.,* 237 F.3d at 903 (internal quotation marks omitted). Paycom has not offered any evidence that it acted in reliance on NFP's delay or was lulled into believing that Paycom would refrain from suing. Thus, the delay cited by Paycom does not weigh against a finding of irreparable harm. *See id.* (stating that a "[d]elay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm," but finding that the defendant "has not presented any affirmative evidence that Ty's delay in seeking a preliminary injunction caused Jones to be lulled into a false sense of security or that Jones in any way relied on Ty's delay"); *Ideal Indus., Inc.,* 612 F.2d at 1025 ("[D]elay is only one among several factors to be considered; these cases do not support a general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for a preliminary injunction.").

### C. Balancing the hardships and the public interest

To determine whether to issue an injunction, the Court must balance the harm NFP will suffer in the absence of an injunction with the harm that Paycom will suffer if it is enjoined from using its logo. *See Ty, Inc.,* 237 F.3d at 895. "[T]he more likely [it is that] the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Id.* Here, as the Court has concluded, it is highly likely that NFP will succeed on the merits, so NFP has a lower threshold of relative hardship to surmount.

**\*14** Paycom significantly overstates the hardship it would suffer if the Court issues an injunction. Newman–Wells estimated that it would cost $3 million to change Paycom's logo. Pl.'s Hr'g Ex. 45 ¶ 56. Paycom claims that it spent $450,000 in "out-of-pocket cost[s]" promoting its logo from February 2014 to the present. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. at 5. The Court acknowledges that designing a new logo and updating promotional materials and signage will be costly, but the Court does not accept Paycom's claimed expenses. Newman–Wells claims that Paycom stores $235,000 of inventory, such as promotional tee-shirts, keychains, and coffee mugs, at a warehouse at any given time. Pl.'s Hr'g Ex. 45 ¶ 40. If the warehouse only contained tee-shirts at a cost of $10 per tee-shirt, that would mean 23,500 tee-shirts were stored there, a rather ridiculously high number. The figure makes no more sense if it is divided among teeshirts, keychains, and mugs, all of which are low-cost items. The Court cannot and does not accept the otherwise unsupported contention that a company that sells technology products and services, not clothing or other objects, maintains this size of an inventory of logo merchandise. Newman–Wells also claims that Paycom created multiple trade show booths that depict its new logo at a cost of $80,000 per booth. Based on the image provided to the Court, Paycom's logo is only depicted in a few places on the booth. *Id.* ¶ 41. Based on the evidence before the Court, it appears highly unlikely that the trade show booths would have to be completely replaced were the Court to enter an injunction. Newman–Wells' calculation also includes roughly $4,000 per month for billboard advertisements, but this figure seems to be the cost to rent billboard space, not the cost of replacing the images displayed on the billboards. *Id.* ¶¶ 45–46.

Newman–Wells also claims that between March and December 2014, Paycom paid $2.7 million to the company that does its promotional materials. 5/15/2015 Tr. 373. It is likely that a good deal of that cost was for printing and mailing and other activities unrelated to design work. If so, it would be relatively easy to swap out the old logo and continue to print and mail materials. In short, though Paycom will have to alter its marketing materials if it is enjoined from using its logo, it has not isolated the cost of changing designs. Instead, Paycom has presented its general marketing expenses, much of which will remain constant whether or not it is forced to change its logo.

In its response brief, Paycom states that in addition to its out-of-pocket costs, its employees have worked "thousands

National Financial Partners Corp. v. Paycom Software, Inc., Not Reported in Fed. Supp....

2015 WL 3633987

of man-hours" to roll out the logo. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. at 5. Paycom has not offered any evidence that the design costs and opportunity costs would total $2.5 million ($3 million less its out-of-pocket costs of $450,000). Although it would no doubt impose a significant expense upon Paycom were it required to develop a new logo and change the logo on its business cards, website, payroll machines, building installations, and trade show booths, the evidence reflects that the cost would be significantly less than the $3 million that Paycom claims.

Additionally, "[o]ne entering a field already occupied by another has a duty to select a trademark that will avoid confusion." *Ty, Inc.,* 237 F.3d at 903 (internal quotation marks omitted). Although Paycom was unaware of NFP's mark when it begin using its logo on February 28, 2014, its executives and attorney discovered the NFP mark as early as March 24, 2014. Pl.'s Hr'g Ex. 33. Despite this discovery, Paycom's attorney did not stop the use of the mark and did not notify the company's chief financial officer of NFP's mark before he submitted a declaration to the U.S. Patent and Trademark Office on June 12, 2014, in which he stated that he believed "no other person has the right to use the mark in connection with the goods/services of such other person." Pl.'s Hr'g Ex. 31 at 14. The lawyer who learned of NFP's mark was the same lawyer who helped prepare the trademark application. 5/15/2015 Tr. 314. This evidence suggests that Paycom's legal team took a calculated risk by deciding to adopt and promote the company's new mark despite the similarity in appearance between the two logos.

When a defendant intentionally copies a mark, courts discount the defendant's expenditures in promoting the mark. *See Ty, Inc.* 237 F.3d at 903. ("Jones went ahead with its production of the Beanie Racers ... knowing full well it may face legal challenges to its product and in turn negative financial consequences."). Although Paycom was initially unaware of NFP's mark, Paycom realized the marks were similar less than one month after it created its mark. Paycom voluntarily assumed the risk that it might be held liable for infringement when it spent significant resources to promote its new logo after that time.

 **\*15** In sum, the balance of the hardships does not tilt the scale against entry of a preliminary injunction. NFP has presented some evidence that it will suffer harm if Paycom continues to use the infringing logo, though this evidence is far from overwhelming. Although Paycom will suffer if it has to stop using its mark, it has presented unconvincing evidence

about the exact cost of such a change and the Court discounts the claimed costs because of Paycom's early knowledge of NFP's logo. Under the sliding scale approach, "the stronger the case on the merits, the less irreparable harm must be shown" by the plaintiff. *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1172 (7th Cir. 1997). Because NFP's trademark infringement claim is very strong on the merits, the risk of error if an injunction is entered is low. *See Id.* (stating, in a copyright infringement case, that "[i]f the likelihood of a substantive mistake—relief granted without an actual infringement of the plaintiff's rights—is slight, the fact that the plaintiff may not have a compelling need for interim relief is not a great worry"); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008) (noting that the balancing of the hardships is "an attempt to minimize the cost of potential error").

Additionally, the Court finds that the public's interest in avoiding confusion about the companies' affiliation is relatively strong, particularly because these are logos whose sole purpose is to operate as source identifiers. Accordingly, the Court concludes that NFP is entitled to a preliminary injunction.

### D. Bond

Under Federal Rule of Civil Procedure 65(c), "the court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). The Seventh Circuit has stated that "absent extraordinary circumstances, the court errs in not granting" a defendant's request for a bond. *Reinders Bros. v. Rain Bird E. Sales Corp.,* 627 F.2d 44, 54 (7th Cir. 1980). "The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him." *Ty, Inc. v. Publ'ns Int'l Ltd.,* 292 F.3d 512, 516 (7th Cir. 2002). A bond is appropriate in this case, as Paycom argues, because it will be forced to incur costs in rebranding. *See* Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. at 30 ("If NFP ultimately cannot prove trademark infringement, then Paycom would be entitled to recover the costs of re-branding.").

"When setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.,* 201 F.3d 883, 888 (7th Cir.), *op. am. on denial of reh'g,* 209 F.3d 1032 (7th Cir.2000). Because "[a] party

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 59 of 73 PageID #:155

National Financial Partners Corp. v. Paycom Software, Inc., Not Reported in Fed. Supp....

2015 WL 3633987

injured by an erroneous preliminary injunction is entitled to be made whole," the bond must be high enough to cover any losses the defendant incurs in the event the preliminary injunction was erroneously entered. *See Roche Diagnostics Corp. v. Med. Automation Sys., Inc.,* 646 F.3d 424, 428 (7th Cir. 2011) ("Judges [ ] should take care that the bond is set high enough to cover the losses that their handiwork could cause."). "[B]ecause the damages for an erroneous preliminary injunction cannot exceed the amount of the bond," it is particularly important for the Court to consider Paycom's "full costs" when setting bond. *Mead Johnson & Co.,* 201 F.3d at 888; *see also Roche Diagnostics Corp.,* 646 F.3d at 428 ("Established doctrine has it that the damages payable to a person injured by an erroneously issued injunction cannot exceed the amount of the bond.").

The Court finds that only some of Paycom's rebranding costs are supported by the evidence. Those include the cost of changing employees' business cards ($33,500), the signage at corporate headquarters ($23,000), the installation of one billboard ($2,700), and a new tarp at the University of Central Oklahoma's stadium ($12,300), for a total of $71,500. Pl.'s Hr'g Ex. 45 ¶¶ 32, 37, 43, 45. Paycom cites other out-of-pocket costs, along with the "thousands of man-hours" associated with designing a new logo and updating its promotional materials. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. at 5. As the Court has discussed, none of these additional costs are supported by evidence in the record. Paycom offers no evidence to support its claim that "countless man-hours" were spent implementing the new logo, and it has not quantified its graphic design costs. Nonetheless, the Court recognizes that there will be expenses associated with the design and implementation of a new logo (although Paycom will not be entitled to design costs if it simply goes back to using its old logo, which would be the simplest course). Additionally, Paycom will have to update its inventory (although not to the tune of $235,000), mailers and other promotional materials, brand guidelines, YouTube videos, and the signage at its regional offices. Even though Paycom has not offered evidence that supports these costs, the Court nonetheless recognizes that these expenses may be significant. The Court therefore triples the $71,500 that is supported in the record to account for these rebranding costs and orders NFP to post a bond in the amount of $214,500. Although this is necessarily an imprecise estimate, Paycom was put on notice that the cost of rebranding would be litigated when NFP raised the issue in its brief and thus had ample opportunity to offer evidence about rebranding costs.

**Conclusion**

**\*16** For the foregoing reasons, the Court grants NFP's motion for a preliminary injunction and orders NFP to post a bond in the amount of $214,500 [dkt. no. 13], The parties are directed to file a proposed preliminary injunction by no later than June 12, 2014. The case is set for a status hearing regarding the form of the proposed order on June 16, 2015 at 9:30 a.m.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 3633987

Footnotes

1 Class 36 includes "[i]nsurance; financial affairs; monetary affairs; real estate affairs," whereas class 35 includes "[a]dvertising; business management; business administration; office functions." U.S. Patent & Trademark Office, Trademark Manual of Examining Procedure § 1401.02(a) (2015).

End of Document     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.  14

Otter Products, LLC v. Anke Group Indus. Ltd., Not Reported in F.Supp.2d (2013)

2013 WL 5910882

Case: 1:21-cv-01664 Document #: 5-2 Filed: 03/27/21 Page 60 of 73 PageID #:156

2013 WL 5910882
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

OTTER PRODUCTS, LLC, a
Colorado Limited Liability, Plaintiff,

v.

ANKE GROUP INDUSTRIAL LIMITED,
a Chinese Company, Defendant.

No. 2:13–cv–00029–MMD–RJJ.
|
Jan. 8, 2013.

**Attorneys and Law Firms**

Jonathan W. Fountain, Michael J. Mccue, Lewis Roca Rothgerber LLP, Las Vegas, NV, for Plaintiff.

ORDER

MIRANDA M. DU, District Judge.

(Plaintiff's Emergency Motion for an *Ex Parte* TRO and Seizure Order Without Notice and for a Preliminary Injunction—dkt. no. 3)

**I. BACKGROUND**

**\*1** Plaintiff Otter Products, LLC ("OtterBox") has moved *ex parte* for an Emergency Temporary Restraining Order ("TRO"), Seizure Order, and Preliminary Injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Lanham Act (15 U.S.C. § 1116), the Patent Act (35 U.S.C. § 283), and Local Rule 7–5. OtterBox alleges that Defendant Anke Group Industrial Limited ("Anke") is offering to sell products that violate OtterBox's intellectual property rights, including counterfeit OtterBox products bearing a counterfeit of the OTTERBOX trademark, on Anke's website at <ak-mobile.com>. OtterBox further alleges that Anke may be exhibiting the allegedly infringing products at the 2013 Consumer Electronics Show ("CES") in Las Vegas, Nevada, occurring between January 8–11, 2013, and that Anke representatives at CES may possess evidence of Anke's counterfeiting activities and sales.

**II. LEGAL STANDARD**

**A. Temporary Restraining Order**

Federal Rule of Civil Procedure 65 governs preliminary injunctions and temporary restraining orders, and requires that a motion for temporary restraining order include "specific facts in an affidavit or a verified complaint [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," as well as written certification from the movant's attorney stating "any efforts made to give notice and the reasons why it should not be required." Fed.R.Civ.P. 65(b).

Temporary restraining orders are governed by the same standard applicable to preliminary injunctions. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832 n. 7 (9th Cir.2001). Further, a temporary restraining order "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70,* 415 U.S. 423, 439 (1974).

A temporary restraining order may be issued if a plaintiff establishes: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. The Ninth Circuit has held that " 'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1132 (9th Cir.2011).

**B. Seizure Order**

Section 34 of the Lanham Act, 15 U.S.C. § 1116(d), expressly empowers the Court to grant an *ex parte* seizure order. ("Under this provision [15 U.S.C. § 1116(d)(1)(A) ], a district court may issue an ex parte seizure order in civil actions alleging a trademark infringement that involves the use of a counterfeit mark."); *see also In re Lorillard Tobacco Co.,* 370 F.3d 982, 984 (9th Cir.2004).

2013 WL 5910882

**\*2** The Court also has the inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief, including the seizure of assets. Fed.R.Civ.P. 64(a) ("At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment."); *see also Reebok Int'l v. Marnatech Enters.,* 970 F.2d 552, 559 (9th Cir.1992).

## III. FINDINGS AND CONCLUSIONS

The Court, having duly considered OtterBox's Complaint, emergency motions, and the accompanying declaration and exhibits, hereby makes the following findings and conclusions:

1. OtterBox is likely to succeed on the merits of its trademark counterfeiting claim under 15 U.S.C. §§ 1114 and 1116. OtterBox owns valid federal trademark registrations for the OTTERBOX marks, including: (1) an incontestable registration covering "[n]on-metal, water-tight containers for outdoor recreational use" in International Class 28 (U.S.Reg. No. 2,287,619); (2) a registration for "[p]rotective cases for handheld electronic devices, namely portable music players, portable video players, cell phones and computers; specially adapted protective carrying cases for computers," in International Class 9 (U.S.Reg.No.3,788,535); and (3) a registration for "[p]rotective cases for handheld electronic devices, namely portable music players, portable video players, cell phones and computers; specially adapted protective carrying cases for computers," in International Class 9 (U.S.Reg. No. 3,788,534) (collectively referred to as "OTTERBOX marks"). OtterBox is likely to succeed on its claim that Anke is using counterfeits of the OTTERBOX marks on counterfeit OtterBox products. OtterBox is likely to succeed on its claim that Anke is using the OTTERBOX marks in commerce, including in connection with displaying and offering such products for sale in the United States markets, at least through Anke's website. OtterBox is likely to succeed on its claim that Anke has offered to sell products bearing the OTTERBOX marks on counterfeit OtterBox products in the United States. Anke has indicated that it has "lots" of customers in the United States markets and that the Americas constitute Anke's main markets. Anke is currently exhibiting products at the 2013 CES in Las Vegas, Nevada.

2. OtterBox is also likely to succeed on the merits of its patent infringement claim. OtterBox owns design patents bearing numbers D641,013 and D636,005. OtterBox is likely to succeed on its claim that Anke is offering for sale in the United States markets products that infringe the '005 and '013 patents, based on the ordinary observer test.

3. Absent an *ex parte* TRO and seizure order, Anke's promotion, offers for sale, and/or sale of its counterfeit and infringing products will result in irreparable injury to OtterBox in the form of (a) loss of control over its intellectual property rights; (b) loss of consumer goodwill; and (c) interference with OtterBox's ability to exploit the OTTERBOX trademarks and design patents. Further, because Anke has no presence in the United States, it may be difficult or impossible for OtterBox to enforce a monetary judgment against Anke.

**\*3** 4. The harm to OtterBox in denying the requested TRO and seizure order outweighs the harm to Anke's legitimate interests, and the balance of the harms therefore favors granting OtterBox such relief.

5. The public interest weighs in favor of granting OtterBox the requested TRO and seizure order.

6. An *ex parte* seizure is necessary to achieve the purposes of Section 32 of the Lanham Act, 15 U.S.C. § 1114, because (a) Anke is a China-based manufacturer of portable electronic device cases; (b) with the exception of its temporary presence in Las Vegas for the CES tradeshow, Anke does not have any known regular place of business or assets in the United States; and (c) there is a significant risk that Anke will remove any evidence of its counterfeiting if an *ex parte* seizure order is not granted.

7. The evidence of Anke's unlawful conduct are or may be in Anke's possession at the CES show, and would likely be destroyed, moved, hidden, taken outside of the United States, or otherwise made inaccessible to OtterBox if Anke were to receive notice of OtterBox's application for a seizure order or TRO in advance of the service of this order.

8. OtterBox has not publicized its application for an *ex parte* TRO.

**WESTLAW** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Otter Products, LLC v. Anke Group Indus. Ltd., Not Reported in F.Supp.2d (2013)
2013 WL 5910882

9. OtterBox has deposited $10,000 with the Clerk of the Court as security for payment of any damages Anke may be entitled to recover as a result of a wrongful seized or a wrongful attempted seizure. The Court finds that this amount is sufficient security.

## IV. TEMPORARY RESTRAINING ORDER

IT IS HEREBY ORDERED that, pending a decision by the Court on OtterBox's application for a preliminary injunction, Anke and its officers, agents, servants, employees, confederates, attorneys, and all persons acting in concert or participation with any of them including, without limitation, third parties providing services used in connection with Anke's operations and websites owned or controlled by Anke (including, without limitation, the website at <ak-mobile.com>), including, Internet service providers ("ISPs"), domain name registrars, banks and other financial institutions, merchant account providers and payment processors (such as PayPal, Inc. and Western Union), and any other payment processing service having knowledge of this Order by service or actual notice ("Restrained Parties") ARE HEREBY TEMPORARILY ENJOINED AND RESTRAINED FROM:

1. Using any reproduction, counterfeit, copy, or colorable imitation of the OtterBox marks in commerce, including, without limitation: (a) by selling, offering for sale, distributing, promoting, or advertising any good or service in connection with such reproduction, counterfeit, copy, or colorable imitation of the OTTTERBOX marks; (b) by displaying any reproduction, counterfeit, copy, or colorable imitation of the OtterBox marks on the website accessible through the <ak-mobile.com> domain name or any other website owned or controlled by Anke or that displays Anke's products (collectively, "Enjoined Websites"); or (c) by displaying any reproduction, counterfeit, copy, or colorable imitation of the OtterBox marks at CES in Las Vegas, Nevada;

**\*4** 2. Manufacturing, using, selling, offering to sell, or importing into the United States, portable electronic device cases embodying designs that are the same or substantially similar to the designed claimed in U.S. Patent Nos. D41,013 and D638,005, including, without limitation, by: (a) offering to sell and selling such products to individual companies in the United States through the Enjoined Websites or otherwise; or (b) offering to sell or selling such products at CES in Las Vegas, Nevada;

3. Processing any payment (regardless of how the payment is made) for the sale of any of the accused products identified or encompassed in paragraphs 1 and 2 above; and

4. Transferring, moving, destroying, or otherwise disposing of: (a) any of the accused products identified or encompassed in paragraphs 1 and 2 above; or (b) any evidence of Anke's illegal activities, including, without limitation, any documents in any form or format and any portable media or device (such as, but not limited to, CDs, DVDs, flash drives, cell phones, PDAs, hard disk drives, laptop computers, and memory cards), relating to any use or infringement of the OtterBox marks or any use or infringement of the OtterBox design patents, except pursuant to the below Seizure Order (collectively, "Evidence.")

IT IS HEREBY FURTHER ORDERED that, in accordance with 15 U.S.C. § 1116(a) and the Court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief, Anke and the Restrained Parties must (1) immediately locate all financial accounts connected to or associated with sales made by Anke, including through the Enjoined Websites; (2) immediately refrain from transferring or disposing of any money or other of Anke's assets, not allowing such funds to be transferred or withdrawn, and not allowing any refunds, charge-backs, or other diminutions to be made from such accounts pending further order of the Court; and (3) provide notice of compliance to OtterBox's counsel within ten (10) business days of receipt of the notice of this Order.

IT IS HEREBY FURTHER ORDERED that, in accordance with 15 U.S.C. § 1116(a) and the Court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief, any web hosting company, domain name registry, and/or domain name registrar having notice of the Court's Order must (1) take any and all action necessary to remove the counterfeit and infringing products from Anke's website, or, alternatively, to disable access to the website; and (2) provide notice of compliance to OtterBox's counsel within ten (10) business days of receipt of the notice of this Order.

Otter Products, LLC v. Anke Group Indus. Ltd., Not Reported in F.Supp.2d (2013)

2013 WL 5910882

IT IS HEREBY FURTHER ORDRED THAT Anke may, upon proper showing, appear and move for the dissolution or modification of the provisions of this Order.

**V. SEIZURE ORDER**

IT IS HEREBY ORDERED that Evidence (as defined above in Part V(4)) shall be seized by the United States Marshals Service, assisted by one or more attorneys or representatives of OtterBox, at the booth rented or occupied by Anke at CES as soon as practicable during the period of January 8 through 11, 2013. The United States Marshals Service may use all reasonable force in conducting the seizure and may open doors, locks, boxes, brief cases, and containers of any type or nature to locate and identify Evidence to be seized. Attorneys and other representatives of OtterBox must accompany the United States Marshals Service during the seizure to identify the Evidence to be seized. OtterBox counsel must itemize and take possession of the seized Evidence, provide a copy of the inventory to the United States Marshals Service, and file the inventory with the Court. In addition, OtterBox's counsel may record the contents of Anke's booth and Evidence by photographic, audio, and/or videographic means during the seizure action. The United States Marshals Service shall not retain custody of seized Evidence but shall ensure that they are placed in the custody of OtterBox's counsel. OtterBox agrees to indemnify the United States Marshals Service and hold it harmless from any suit, claim, cause of action, damage, loss, or injury arising from the execution of the seizure described in this Order.

**\*5** IT IS HEREBY FURTHER ORDERED that Anke must provide any passwords necessary to access any electronically stored documents or electronic devices;

IT IS HEREBY FURTHER ORDERED that access to any seized Evidence will be limited to OtterBox's outside counsel, OtterBox's in-house legal counsel, and contractors retained by OtterBox's outside counsel to copy, image, and translate such evidence until five (5) days after entry of this Order,

or as otherwise ordered by the Court, to enable Anke the opportunity to respond and seek an appropriate protective order with respect to any confidential information or trade secrets.

**VI. CONCLUSION**

IT IS HEREBY ORDERED that this Order and the Summons and Complaint must be served upon Anke, if found, at the time of the seizure, and by other means reasonably calculated to give Anke notice of this action, which shall include via email to all e-mail addresses provided by Anke on its website at <ak-mobile.com>;

IT IS HEREBY FURTHER ORDERED that the $10,000 OtterBox has placed on deposit with the Clerk of the Court shall serve as sufficient security for the payment of any damages Anke may be entitled to recover as a result of a wrongful seizure or a wrongful attempted seizure. To the extent Anke believes that additional security is necessary pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, Anke shall so move the Court and shall provide notice to OtterBox's counsel of such motion on or before January 16, 2013.

IT IS HEREBY FURTHER OTERED that a preliminary injunction hearing in this case is set for January 24, 2013 at 11:00 a.m. in Courtroom 4A, before Hon. Miranda Du.

Anke must file and serve any opposition to OtterBox's Motion for a Preliminary Injunction on or before January 16, 2013 at 12:00 p.m.

OtterBox must file and serve any reply in support of its Motion for a Preliminary Injunction on or before January 18, 2013.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5910882

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4557812
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Donald VANCE and
Nathan Ertel, Plaintiffs,
v.
Donald RUMSFELD, United
States of America and
Unidentified Agents, Defendants.

No. 06 C 6964.
|
Dec. 21, 2007.

## Attorneys and Law Firms

Michael I. Kanovitz, Arthur R. Loevy, Gayle M. Horn, Jonathan I. Loevy, Loevy & Loevy, Chicago, IL, for Plaintiffs.

James R Whitman, Washington, DC, Samuel B. Cole, United States Attorney's Office, Chicago, IL, for Defendants.

MEMORANDUM OPINION AND ORDER

ARLANDER KEYS, United States Magistrate Judge.

 *1 Currently before the Court is Plaintiffs' Motion for Limited Discovery. Defendant United States argues that Plaintiffs are not entitled to the requested discovery and that the Court lacks jurisdiction to compel the production. For the reasons set forth below, Plaintiffs' Motion is granted in part, and denied in part.

## BACKGROUND FACTS[1]

Plaintiffs Donald Vance and Nathan Ertel, both American citizens, traveled to Iraq in 2004 to work for the Sandi Group, which provides security services for the Unites States State Department, nongovernmental organizations ("NGO's"), and commercial and media firms operating in Iraq. Dissatisfied

with their working conditions, Plaintiffs resigned from Sandi and returned to the United States.

In 2005, Shield Group Security ("SGS"), another private security firm operating in Iraq, recruited Plaintiffs, separately, to join the firm. Both Mr. Vance and Mr. Ertel accepted positions with SGS, and returned to Iraq in late 2005.

SGS maintained its offices in a gated community in the "Red Zone" in Baghdad, Iraq. Plaintiffs resided in this gated community, which was patrolled by armed guards, and was essentially a neighborhood populated by native Iraqis, SGS employees, and other expatriates employed by private firms doing business in Iraq.

Plaintiffs allege that, while working with SGS, they observed suspicious and potentially illegal activity. Specifically, Plaintiffs claim that they witnessed SGS agents making payments to Iraqi sheikhs, in an attempt (they believed) to gain an advantage from these influential Iraqis. Concerned about the legality of SGS's actions, Mr. Vance purportedly contacted the Federal Bureau of Investigation ("FBI") during a visit to Chicago. Mr. Vance was put in contact with FBI agent Travis Carlisle, who arranged for Mr. Vance to continue to report on SGS's suspicious activity in Iraq. Mr. Vance agreed to do so, and reported to Agent Carlisle daily.

Agent Carlisle subsequently put Mr. Vance in contact with Maya Dietz, a United States government official working in Iraq. Ms. Dietz asked Mr. Vance to copy SGS's computer documents and to forward them to her; Mr. Vance agreed.

Mr. Ertel apparently shared Mr. Vance's concerns, and subsequently became aware of Mr. Vance's communications with the FBI. Mr. Ertel agreed to assist Mr. Vance in reporting to Agent Carlisle, and the two also began communicating their concerns to Deborah Nagel and Douglas Treadwell, two U.S. government officials working in Iraq.

Plaintiffs reported to Agent Carlisle and other U.S. officials that SGS Vice President Jeff Smith[2] routinely sold arms, ammunition, night vision technology and infrared targeting systems throughout Iraq. Mr. Smith was well-connected politically, and had a direct relationship with both General George Casey and Iraqi President Jalal Talabani. Plaintiffs also informed both Agent Carlisle and Ms. Nagel that Laith Al-Khudairi, a well-connected employee in the detainee operations division of the United States State Department, conducted suspicious meetings at the SGS compound[3].

 **\*2** Plaintiffs found the government officials within Iraq to be unreceptive to their concerns, informing Plaintiffs that there was little the local officials could do to address the problem. Discouraged with the local officials' responses, Plaintiffs shared most of the information they gathered only with Agent Carlisle[4].

Plaintiffs allege that SGS began to question their loyalty to the firm. SGS's suspicions escalated, and on April 14, 2006, armed SGS agents confiscated Plaintiffs' access cards, effectively trapping Plaintiffs in the "Red Zone" within the SGS compound. Plaintiffs contacted Ms. Nagel and Mr. Treadwell, who advised Plaintiffs to barricade themselves in a secure room until U.S. forces could rescue them. Plaintiffs complied and were removed from the SGS compound by U.S. forces.

Plaintiffs were then escorted to the U.S. Embassy, where military personnel seized all of their personal property, including their laptop computers, cellular phones, and cameras. Plaintiffs claim that they were then separated and questioned by an FBI agent and two individuals from United States Air Force Intelligence. Plaintiffs revealed the suspicious activity that they had observed while employed by SGS, and their communications with the FBI. Plaintiffs informed their interrogators that information contained on their seized computers would support their statements. Following the interviews, Plaintiffs were escorted to trailers, where they were permitted to sleep for two to three hours.

Their rest was short-lived. Several armed guards arrested Plaintiffs, handcuffing and blindfolding the men, and escorted them into a humvee. Plaintiffs were taken to Camp Prosperity, a U.S. military compound in Baghdad, where they were placed in a cage, strip searched, and fingerprinted. They were then taken to separate cells, and held in solitary confinement. Plaintiffs were labeled "security internees" affiliated with SGS, and were suspected of supplying weapons to insurgents. Plaintiffs were allegedly informed that this information was sufficient, according to the policies enacted by Defendant Donald Rumsfeld, for the indefinite, incommunicado detention of Plaintiffs, without due process or access to an attorney.

Two days later, Plaintiffs were again shackled and blindfolded, and then transported to Camp Cropper, another U.S. military compound in Baghdad. At Camp Cropper, Plaintiffs were repeatedly interrogated and subjected to physically and mentally coercive tactics by military personnel, who refused to identify themselves. These unidentified individuals also denied Plaintiffs' repeated requests for an attorney.

On April 20, 2006, Plaintiffs received letters from the Detainee Status Board, indicating that a proceeding would be held on April 23rd, to determine their legal status as "enemy combatants," "security internees," or "innocent civilians." The letter explained that Plaintiffs did not have the right to legal counsel at that proceeding, and that they could only present evidence and witnesses who were reasonably available at Camp Cropper. On April 22, 2006, Plaintiffs received a notice that the Detainee Status Board had determined that they were "security internees," and that they had the right to appeal the determination to Camp Cropper officials. Plaintiffs appealed, and requested that they be allowed to testify on the other's behalf, and that their seized personal property be admitted as evidence of their innocent civilian status.

 **\*3** On April 26, 2006, Plaintiffs appeared before the Board. However, they were not permitted to testify on the others' behalf, nor were they provided with the evidence that they had requested. In addition, the Board refused to allow Plaintiffs to see the evidence against them or to confront any adverse witnesses. Nevertheless, on May 17, 2006, Major General John Gardner authorized Mr. Ertel's release-18 days after the Board officially acknowledged that he was an innocent civilian. Mr. Vance's detention continued for an additional two months, where he was continually interrogated. Major General Gardner authorized Mr. Vance's release on July 13, 2006, but he was not permitted to leave Camp Cropper until July 20, 2006. Neither Plaintiff was ever charged with any crime.

Plaintiffs filed suit against Donald Rumsfeld on December 18, 2006, alleging that Mr. Rumsfeld should be held accountable for constitutional violations that occurred in Iraq at the hands of unidentified agents of the United States, as well as for the allegedly unconstitutional practices and policies enacted by Defendant Rumsfeld, which led to Plaintiffs' arrest and confinement.

On December 22, 2006, Plaintiff Vance filed a Motion for Leave to Serve Expedited Third Party Discovery on the United States. The United States filed a Motion in Opposition and a "Statement of Interest" on January 11, 2007. Plaintiffs and the United States appeared before Judge Milton I. Shadur,

2007 WL 4557812

on January 16, 2007. At the hearing, Judge Shadur questioned the advisability of permitting the requested discovery directed at the United States, in the absence of Defendant Rumsfeld. However, Judge Shadur stated that it would be beneficial for the United States to facilitate the Plaintiffs in their quest to determine the identities of the unknown individuals responsible for their arrest, interrogation, mistreatment, and detention.

The United States agreed that the discovery of just the identities of other potential defendants would be less objectionable than allowing discovery against the United States on substantive issues, but argued that Plaintiffs had failed to demonstrate sufficient need that the information be obtained through expedited discovery. Judge Shadur, however, was sympathetic to Plaintiffs' concern that they likely would be faced with a statute of limitations defense if discovery were not expedited. In addition, Judge Shadur acknowledged the comparative difficulty Plaintiffs would face in attempting to secure the identities of the unknown defendants, most, if not all of whom, were stationed in Baghdad. Judge Shadur further stated that he did not believe "a reasonable inquiry on the part of the government would find any difficulty in identifying persons that the plaintiff is not in a position to identify." 1/16/2007 Hearing Transcript at p. 8. As such, Judge Shadur ordered the United States to "go back and inquire into the availability of such information through the kinds of sources that are available to you." *Id.* at p. 11,

 **\*4** The parties returned to Judge Shadur's courtroom ten days later, on January 26, 2007. The United States reported that initial conversations with officials at the State Department did not reveal any individuals who might be responsive to the relevant portion of Plaintiffs' discovery requests, but that the officials would require more time for investigation. Counsel then stated that the Department of Defense had conducted some interviews, and that "they are more likely to have people who are responsive to those categories, but they are going to require more time as well. Based on my conversation with them I would say that it would take at least 60 days in order to conduct that investigation and come to a determination as to who is not responsive to those requests." 1/26/2007 hearing transcript at p. 3.

Although the United States initially agreed to turn over the identities of potential defendants on a rolling basis, counsel later balked, explaining that the United States would not disclose the information absent a competent court order to

do so. Counsel reiterated the difficulty that even the United States government would face in attempting to conduct the requested discovery in an active war zone.

On February 12, 2007, Plaintiffs amended their Complaint, naming the United States of America as an additional Defendant. In Count XV of their Amended Complaint, Plaintiff asked that the Court, pursuant to the Administrative Procedure Act ("APA") 5 U.S.C § , 701 *et seq.* (West 2007), order the United States to return personal property that Plaintiffs allege military personnel confiscated from them when they were arrested in Iraq.

On February 21, 2007, the case was reassigned to Judge Wayne R. Andersen. Defendants subsequently filed a Motion for Transfer of Venue, which Judge Andersen denied on September 19, 2007. Plaintiffs, who had agreed to stay their discovery requests until Judge Andersen issued his ruling on Defendants' Motion for Transfer of Venue, refiled their discovery Motion on October 1, 2007. Judge Andersen referred all discovery matters, including Plaintiff's Motion for Limited Discovery, to this Court.

The parties appeared before the Court on October 5, 2007. At the hearing, the United States argued that Plaintiffs' APA claim was moot, because the United States Department of Defense ("DoD") had already returned all of the property that it could reasonably locate, and that the Plaintiffs were barred from seeking any other form of redress against military personnel under the APA. In response, Plaintiffs stated that they had reason to believe that agencies in addition to the DoD may have had possession of their property; thus the DoD's bald assertion that it did not have any additional property belonging to Plaintiffs was, at best, inconclusive. Plaintiffs also raised the possibility that employees of private government contractors might be among the "unidentified defendants" acting in concert with military personnel-and thus, were potentially outside of the scope of the protections afforded by the military authority exception-further undermining Defendant's argument that Plaintiffs' claims were moot.

## DISCUSSION

 **\*5** Plaintiffs seek leave to discover the identities of the individuals responsible for their arrest, detention, and mistreatment in Iraq. Plaintiffs note that the facilities where they were held are "sterilized" facilities, meaning that

2007 WL 4557812

all of the personnel are anonymous to the detainees. As such, Plaintiffs claim, they do not have effective means of identifying and naming these unknown defendants.

To that end, Plaintiffs have sought discovery from the United States since January of 2007, when the United States informed Judge Shadur and Plaintiffs that, despite the inherent difficulties involved in conducting such discovery, the United States' investigation into the identity of additional defendants would be complete in approximately 60 days. Obviously, more than 60 days has passed since the United States made this assertion, and the United States has never denied that it possesses much of the information that Plaintiff seeks. Yet, the United States has staunchly refused to divulge the fruits of its investigation.

In its Response, the United States argues that Plaintiffs are not entitled to the information and that their Motion must be denied, because: 1) Plaintiffs have not demonstrated that expedited discovery of any matters is appropriate in this case; 2) this Court lacks jurisdiction to order discovery against the United States; 3) granting Plaintiffs' Motion would raise serious Separation of Powers concerns; and 4) Plaintiffs' discovery requests are futile. The Court will address each of the government's arguments in turn.

## I. Expedited Discovery is Appropriate

The United States notes that, despite the fact that Plaintiffs have been seeking this information for approximately one year, Plaintiffs' Motion is actually one for expedited discovery, because the parties have not conferred pursuant to Fed.R.Civ.P. 26(f). The government asserts that Plaintiffs bear the burden of demonstrating that expediting discovery is necessary, and that any harm to Plaintiffs in not expediting discovery outweighs the prejudice to the responding party if discovery is expedited. *See generally, Merrill Lynch Pierce, Fenner & Smith, Inc. v. O'Connor,* 194 F.R.D. 618, 623 (N.D.Ill.2000).

Plaintiffs argue that delaying discovery would cause them irreparable harm, because of the looming statue of limitations deadline on their *Bivens'* claims. *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The parties dispute whether Illinois' two-year statute of limitations (which will expire in approximately April of 2008) should apply to Plaintiffs' *Bivens* claims or the District of Columbia's three-year limitations period should-or at least-could have controlled. *Compare Delgrado-Brunet v. Clar,* 93 F.3d 339, 342 (7th Cir.1996) (noting that courts applying

Illinois law impose a two year statute of limitations on such claims) *with Carney v. American Univ.,* 151 F.3d 1090, 1096 (D.C.Cir.1998) (finding that D.C. Circuit law imposes a three year statute of limitations on *Bivens'* claims). Contrary to the government's assertion[5], the question of which jurisdictions' law applies depends not upon the forum in which Plaintiffs filed suit, but upon Judge Andersen's resolution of the choice of law issues[6]. It is conceivable that such a ruling would be issued after Illinois' two-year statute of limitations period has passed, forcing Plaintiffs to shoulder the risk that the district court's decision could effectively foreclose their ability to seek redress from the unknown defendants.

**\*6** The government counters that conducting expedited discovery in a warzone outweighs any such concerns. The Court disagrees. There is no apparent end in sight to the hostilities in Iraq, and the United States is powerless to waive a statute of limitations defense on behalf of the unknown defendants. In addition, the government represented to Judge Shadur, almost one year ago, that it had already begun its investigation into the identities of the unknown defendants, and that it could conclude that investigation within about 60 days. The United States has never denied that it possesses some if not all of the information that Plaintiffs seek. Therefore, the Court finds that potential harm to Plaintiffs by delaying discovery outweighs any resulting prejudice to the United States.

## II. This Court has Jurisdiction to Compel Discovery

The United States bluntly asserts that this Court lacks jurisdiction to order the government to produce discovery for the reasons explained in its recently filed Motion to Dismiss Rule 12(b) (1). Of course, this Court lacks the authority to dispose of the arguments raised in Defendant's Motion to Dismiss. *See generally, Thomas v. Arn,* 474 U.S. 140, 141-42, 106 S.Ct. 466, 88 L.Ed.2d 435 (U.S.1985); *see also, Brown v. City of Chicago,* No. 98-7949, 2001 WL 1064259, at \*1 (N.D.Ill. Sept.10, 2001) (noting that magistrate judges lack jurisdiction to rule on the City's motion to bifurcate trial, where the referral only encompassed discovery disputes.) But the Court need not resolve the United States' Motion to Dismiss to properly evaluate Plaintiffs' present Motion; an analysis of relevant law makes clear that the government's filing of a Motion to Dismiss-even one challenging the district court's jurisdiction-does not strip the Court of the authority to order appropriate discovery.

Vance v. Rumsfeld, Not Reported in F.Supp.2d (2007)

2007 WL 4557812

The resolution of a question concerning "jurisdiction is vital only if the court proposes to issue a judgment on the merits." *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.,* --- U.S. ----, ----, 127 S.Ct. 1184, 1192, 167 L.Ed.2d 15 (U.S.2007) quoting *Intec USA, LCC v. Engels,* 467 F.3d 1038, 1041 (7th Cir.2006). In the instant case, it is clear that this discovery Motion is collateral to a resolution of the merits.

The United States Supreme Court has held that "federal courts have the power to order, at their discretion, the discovery of facts necessary to ascertain their competency to entertain the merits." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). "Where issues arise as to jurisdiction, or venue, discovery is available to ascertain facts bearing on such issues." *Id.* A district court has wide latitude in determining whether to grant a party's request for discovery and such decisions are reviewed for an abuse of discretion. *Doty v. Illinois Cent. R.R. Co.,* 162 F.3d 460, 461 (7th Cir.1998).

Courts have taken a rational approach to discovery requests made in advance of a determination regarding jurisdiction. Courts have generally found it unnecessary for a district court to order discovery or hold a hearing on a motion to dismiss for lack of subject matter jurisdiction where the facts are straightforward and the law is not complex. *See Hay v. Indiana State Bd. of Tax Com'rs,* 312 F.3d 876, 882 (7th Cir.2002) ("Because of the minimal procedural requirements for 'plain, speedy and efficient' set forth by the Supreme Court in *Rosewell,* the district court could make a determination of adequacy based on the information before it, including by reviewing the applicable statutes establishing the procedures for tax assessment review. Consequently, it was not an abuse of discretion for the district court to grant the motion to dismiss without allowing the landowners to conduct discovery"); *Cook v. Providence Hosp.,* 820 F.2d 176, 178 (6th Cir.1987) (finding that no hearing is required on a motion to dismiss where the facts are relatively simple, substantially uncontroverted, and the law is not complex.)

 **\*7** However, where additional discovery would assist the court in resolving the jurisdictional issues, discovery is appropriate. *Ignatiev v. United States,* 238 F.3d 464, 467 (D.C.Cir.2001) (rejecting the district court's determination that the plaintiffs requested discovery was nothing more than a fishing expedition, and finding that the district court erred in granting the motion to dismiss for lack of subject matter jurisdiction without permitting discovery on the jurisdictional question.); *Rosner v. United States,* 231 F.Supp.2d 1202,

1218 (S.D.Fla.2002) (permitting the plaintiffs to conduct discovery to determine whether the government's actions were non-military in nature, thus precluding the application of the APA's "military authority" exception, prior to resolving defendant's motion to dismiss.)

In the instant case, Plaintiffs have argued that the APA military authority exception may not apply to certain unidentified defendants, if those defendants were not military personnel[7]. Absent the requested discovery, however, it would be impossible for Plaintiffs to support such an argument. A full and fair analysis of the government's Motion to Dismiss hinges on the disclosure of the identities and status of the unknown defendants. Similarly, the district court's resolution of the Defendant Rumsfeld's qualified immunity argument would benefit from information about the types of defendants involved in the abuses claimed by Plaintiffs.

The United States counters that discovery is not warranted in any event, because Plaintiffs' sole claim against the government-their claim for the return of personal property seized in Iraq-is moot. The United States bases its mootness argument on: 1) the affidavit of Lt. David Melson, averring that the government has conducted a search of any and all places where the property would have been seized, stored or located; 2) Evidence/Property Custody documents ("Property Documents") that purportedly demonstrate the chain of custody of the property in question; and 3) the fact that the government has made arrangements to return that property belonging to Plaintiffs that it was able to locate[8].

Plaintiffs first attack Lt. Melson's affidavit, noting that Lt. Melson claims to have contacted only the Joint Personnel Recovery Center ("JPRC"), the Evidence Custodian for the Military Policy Criminal Investigative Division ("CID") and the 494th MP Battalion in his search for Plaintiffs' property. Lt. Melson did not contact any other government agencies or military departments, despite the fact that FOIA documents that Mr. Vance received demonstrate that the Naval Criminal Investigative Service ("NCIS") had control over at least some of Mr. Vance's property, including his thumb drives and cell phone. As such, the investigation described in Lt. Melson's affidavit appears on its face to be incomplete.

Plaintiffs next highlight numerous inconsistencies in the Property Documents proffered by the government. For example, the Property Documents include a property receipt for Mr. Vance that does not match the receipt that Mr. Vance has in his possession. Mr. Vance claims that

these discrepancies raise doubts about the authenticity and reliability of the property receipts.

**\*8** Finally, Plaintiffs argue that their APA claim relates to the United States' failure to return property that was seized more than 18 months ago. Because Plaintiffs' challenge against any governmental actors would be limited to the government's failure to return their property, and not to the seizure itself, the act is not military in nature, and, therefore, falls outside of the scope of the military authority exception. *See Jaffe v. United St ates,* 592 F.2d 712, 720 (3rd Cir.1979) (ruling that the plaintiff's APA claim for failure to warn about the medical risks associated with observing a nuclear test in Nevada did not fall within the military authority exception, as the challenged conduct did not occur in the field nor in time of war.) Indeed, Plaintiffs do not know if their property remains in military custody, with the State Department, the FBI, the CIA, or a host of other agencies. As such, Plaintiffs argue, their claim is neither clearly barred[9] by the military authority exception nor moot, and discovery is appropriate.

The Court agrees that the evidence proffered by the government is far from conclusive on the issue of mootness. Moreover, even if the government's evidence was not flawed, this evidence would not moot Plaintiffs' claims if the district court determines that the government's conduct was not military in nature, or if the unidentified actors were private governmental contractors-like many of the allegedly politically-connected individuals who were the subject of Plaintiffs reports to Agent Carlisle-who are not shielded by the APA's military authority exception. As such, it is difficult to see how the district court can resolve Defendants' argument that the military authority exception bars Plaintiffs' APA claim, without a more clear understanding of the individuals involved in the complained of abuses.

In conclusion, the Court finds that the issue of jurisdiction in this case is complex and fact intensive. Analysis of the issues raised in Defendants' Motion to Dismiss would only benefit from appropriately tailored discovery. As such, the Court rejects the United States' claim that the arguments raised in its Motion to Dismiss strip the Court of the power to compel discovery.

## III. Tailored Discovery Would Not Violate Separation of Powers Concerns.

The United States next argues that separation-of-powers concerns dictate against granting Plaintiffs' Motion for

discovery. The government notes that the purpose of the APA's "military authority" exception is to prevent federal courts from interfering in military strategy, decision-making, and actions occurring in "combat zones or in preparation for, or in the aftermath of, battle." Def.'s Resp. at 6, citing *Doe v. Sullivan,* 938 F.2d 1370, 1380 (D.C.Cir.1991) (finding that the plaintiff's challenge to a rule published by the FDA was not a military matter.) Notably, the district court has not ruled that the military authority exception to the APA applies in this case, and Plaintiffs have offered colorable arguments that the exception does not apply.

**\*9** Nevertheless, the government argues, it is impossible to divorce this case from the realities of an ongoing war in Iraq. Agreed. However, the cases cited by the government are tangential, at best, to the issue of whether the requested discovery in this case is advisable or even permissible. For example, the government cites to *Chappel v. Wallace*[10], where the Court discussed the unique distinction between military and civilian life:

> [J]udges are not given the task of running the Army. The responsibility for setting up channels through which ... grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.
>
> 462 U.S. 296, 301, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (quoting *Orloff v. Willoughby,* 345 U.S. 83, 93-94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953)).

But the case at bar involves charges filed by civilians-not soldiers attempting to avoid the jurisdiction of a military tribunal. And caselaw teaches that citizens have the right to sue the government for abuses that occurred during wartime, and that the judiciary retains the authority to adjudicate those suits. In *Hamdi v. Rumsfeld,* the United States Supreme Court rejected "the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts in such circumstances. Indeed, the position that the courts must forgo any examination of the individual case and focus exclusively on the legality of the broader detention scheme cannot be mandated by any reasonable view of separation of powers, as this approach serves only to *condense* power into a single branch of government. We have

Vance v. Rumsfeld, Not Reported in F.Supp.2d (2007)

2007 WL 4557812

long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens." 542 U.S. 507, 535-36, 124 S.Ct. 263, 265 (2004).

The *Hamdi* Court's decision demonstrates that, not only do citizens detained during wartime have the right to seek redress in the courts, but that the courts have the authority to require the United States to afford those litigants certain processes, despite the exigencies of war. Mr. Hamdi, a United States citizen, was taken into custody in Afghanistan, after he was allegedly found supporting Taliban soldiers against the United States. Mr. Hamdi was subsequently detained, indefinitely, in a military facility in the United States, and he filed a petition for habeas corpus. Mr. Hamdi argued that he was denied a meaningful and timely hearing on the issue of whether he was an enemy combatant, and that his extra-judicial detention, which began and ended with the submission of an affidavit based on third-party hearsay, violated his rights under the Fifth and Fourteenth Amendments. *Id,* 542 U.S. at 524-25,

 **\*10** The government argued that "[r]espect for separation of powers and the limited institutional capabilities of courts in matters of military decision-making in connection with an ongoing conflict" ought to eliminate entirely any individual process, restricting the courts to investigating only whether the broader detention scheme itself is legal. *Id.* at 527. A majority of the Supreme Court disagreed, and found instead that the "tension ... between the autonomy that the Government asserts is necessary .. and the process that a citizen contends he is due before he is deprived of a constitutional right," should be resolved by balancing the plaintiff's constitutional rights against the government's separation of power and wartime concerns. *Id., citing Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

The Court balanced Mr. Hamdi's assertion that he should have been afforded full due process rights, as the risk of an erroneous deprivation of liberty absent such protections was unacceptably high, with the government's claim that enemy combatants-even if they are citizens-are entitled to only minimal process. The government highlighted the "practical difficulties that would accompany a system of trial-like process" because "military officers who are engaged in the serious work of waging battle would be unnecessarily and dangerously distracted by litigation half a world away, and discovery into military operations would both intrude on the sensitive secrets of national defense and result in a futile

search for evidence buried in the rubble of war." 542 U.S. at 531-32, 124 S.Ct. at 2648.

The Court concluded that a citizen-detainee seeking to challenge his classification as an enemy combatant must receive actual notice of the factual basis for his classification, and a fair opportunity to rebut the government's assertions before a neutral tribunal. 542 U.S. at 533, 124 S.Ct. at 2648. In so ruling, the Court found it "unlikely that this basic process will have the dire impact on the central functions of warmaking that the Government forecasts." *Id* at 534, 124 S.Ct. at 2639. The Court further noted that such a process would meddle little into the waging of war, inquiring only into the appropriateness of certain detentions, explaining:

> While we accord the greatest respect and consideration to the judgments of military authorities in matters relating to the actual prosecution of a war, and recognize that the scope of that discretion necessarily is wide, it does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims like those presented here.

542 U.S. at 535, 124 S.Ct. at 1249-50.

Obviously, the issue presented here is distinguishable; the United States has not contested the feasibility of asserting an APA claim against it, but has instead challenged the validity of Plaintiffs' claims, and its obligation to produce discovery as a result. With the exception of the APA's military authority exception-the applicability of which Plaintiffs contest-the government has not argued that Congress has authorized the suspension of APA suits against it. Nevertheless, *Hamdi* is instructive in assisting this Court's balancing of Plaintiffs' need for information relevant to this litigation against the undeniable hurdles of gathering discovery in Iraq during wartime.

 **\*11** As discussed above, if the United States does not provide Plaintiffs with the identities of the unknown defendants, there is a very real possibility that the applicable statute of limitations will prevent Plaintiffs from ever seeking redress from potentially liable individuals. In addition, the Court is not persuaded that gathering this information will require the United States to "go out into the field to interview" soldiers "some of whom may be conducting combat operations." Def.'s Resp. at p. 7. Plaintiffs very specifically identified the dates and locations of their detention. It strains credulity to believe that the government and/or military does not have in place procedures for documenting individuals working in those facilities at specific times.

Moreover, the United States has already been ordered by Judge Shadur to begin such an investigation, and has stated that such an investigation would be completed in approximately March of 2007. The government does not deny that it already has the information that Plaintiffs seek, it simply refuses to divulge the information. As such, it is not clear the extent to which the separation of powers concerns cited by the United States are even implicated[11].

Finally, while the Court is sensitive to the extreme challenges presented by the ongoing hostilities in Iraq, the Court cannot accept the practical consequences of the United States' position-that the existence of a war so diminishes the authority of the judiciary that it must suspend the normal routes of discovery, based on little more than the United States' own assessment of its opponent's position. It is the resulting concentration of power in the executive branch that would offend separation of powers concerns.

The Court concludes that Plaintiffs should be afforded that basic discovery necessary to enable Plaintiffs to avoid a potential statute of limitations' defense. As such, the United States shall produce to Plaintiffs the identities of the unknown defendants within 30 days of the entry of this Opinion.

**IV. Potential Qualified Immunity Arguments are Insufficient to Defeat Plaintiffs' Discovery Request.**

The United States asserts that requiring it to undertake discovery in a war zone is inappropriate for the additional reason that Plaintiffs' claims against the unidentified defendants will be futile. The United States confidently asserts that any and all claims against both known and unknown defendants will be dismissed on qualified immunity grounds, and that caselaw dictates that any order compelling discovery should await a ruling on the district court's determination of the Defendants' qualified immunity arguments.

Many courts have noted the "importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). While *Harlow* and its progeny sought to protect government officials who were likely entitled to immunity from broad reaching discovery, the Supreme Court has acknowledged that "limited discovery may sometimes be necessary" before a court

can resolve the issue of qualified immunity. *CrawfordEl v. Britton,* 523 U.S. 574, 593 n. 14, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *see also, Fairley v. Fermaint* 482 F.3d 897, 900 (7th Cir.2007) (noting that "qualified immunity gives the defendant a right not only to prevail but also to avoid entanglement in the litigation-sometimes dubbed a 'right not to be tried,' this entitlement includes a right to avoid discovery", but only if matters are "sufficiently clear" at the outset of the suit.)

**\*12** In the instant case, it is impossible to determine whether the unknown defendants can raise a colorable claim for qualified immunity, precisely because they-and their positions either within the government, military, or the private sector-are unknown. The only Defendant to have thus far filed a claim for qualified immunity is Defendant Rumsfeld. While Defendant Rumsfeld might present a viable argument[12] that he should not be required to engage in discovery until his claim for immunity is resolved, Plaintiffs are not seeking discovery from Defendant Rumsfeld. Plaintiffs are seeking the identities of the unknown defendants from the United States, and the United States did not raise a claim for qualified immunity in its Response to Plaintiffs' Motion or in its Motion to Dismiss.

The government's position is simply untenable. There is no statutory or caselaw support for the proposition that a court should delay discovery based on the United States' bald representation that unknown defendants will be immune from suit. Nor do the allegations in Plaintiffs' Amended Complaint compel a conclusion that the unknown defendants are necessarily military employees entitled to immunity. *See* Fed. R. Civ. P. 15(a)(2) (noting that courts should "freely give leave" to allow plaintiffs to amend their complaints "when justice so requires.") Plaintiffs' allegations are consistent with theories advanced by counsel in court, that private government contractors may have been acting in concert with the military in orchestrating Plaintiffs' arrests. Only additional discovery will reveal if the government's predictions are accurate. Therefore, the Court rejects the United States' argument that the issue of qualified immunity prevents the Court from proceeding on Plaintiffs' discovery Motion.

In addition, Plaintiffs' unopposed request for leave to serve subpoenas on SBC Global for email correspondence and on Orascom for relevant cell phone records is granted.

Vance v. Rumsfeld, Not Reported in F.Supp.2d (2007)

2007 WL 4557812

**CONCLUSION**

The present Motion seeks to discover the identities of those individuals responsible for Plaintiffs' arrest and detention in Iraq. Almost one year ago, the United States represented to Judge Shadur that it could obtain this information within 60 days, and the government has never denied that it possesses information responsive to Plaintiffs' request. In refusing to produce such information, the government has raised a dubious challenge to the court's jurisdiction, speculated as to the viability of potential defenses that might be asserted by presently unknown defendants, decided that its assessment of the weakness of Plaintiffs' claims should excuse the government's participation in discovery, and argued that separation-of-powers concerns counsel against the court performing its judicial duties, in favor of concentrating discretion and power within the executive branch.

The Court does not presume to foresee the ultimate validity of the claims and defenses raised in this lawsuit. But the Court is convinced that it has both the authority and the obligation to order the United States to discover and produce to Plaintiffs the identities of the individuals responsible for Plaintiffs' arrests, detention, and mistreatment in Iraq.

**\*13** Therefore, the Court grants Plaintiffs' Motion to the extent that it seeks the identities of unknown defendants responsible for their arrest, detention, and mistreatment while at Camps Prosperity and Cropper in Iraq. The Court denies Plaintiffs' Motion to the extent that it seeks all documents concerning Plaintiffs, as this evidence does not implicate the statute of limitations concerns that informed this Court's decision. Similarly, the Court denies Plaintiffs' Motion to the extent that it asks the government to identify all persons who issued and or signed any policy or order that relates to the topics listed in six broad categories, even if such policy and/or order was of general applicability and not specific to Plaintiffs' case.

Therefore, Plaintiffs' Motion to identify the unknown defendants is Granted, Plaintiff's Motion for leave to serve subpoenas on SBC Global and Orascom is Granted, but Plaintiffs' Motion for all additional discovery is Denied, without prejudice.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 4557812

Footnotes

1    The Background Facts were taken from the allegations in Plaintiffs' Amended Complaint, which, at this stage of the proceedings and for purposes of the present Motion, the Court will accept as true.

2    Although Mr. Smith did not serve as SGS's Vice President at all relevant times, he was consistently "high-up in the chain of command at SGS." Amen. Compl. at ¶ 65. Plaintiffs also reported on a number of other SGS employees, including their supervisor, Mr. Josef Trimpert, who was involved in an illegal "Beer for Bullets" scheme.

3    Plaintiffs also informed on a number of other SGS-Affiliated members of the Al-Khudairi family. Plaintiffs imply that, in addition to SGS, all of the individuals that they informed on would have a motive to have them arrested. Plaintiffs also find it suspicious that none of these individuals were detained and questioned in a manner similar to Plaintiffs, despite the incriminating information Plaintiffs presented about them to the FBI and other officials.

4    Plaintiffs' Amended Complaint also alleges that, once these government officials working in Iraq realized they were being left out of the loop, they chose to retaliate by having Plaintiffs arrested and interrogated.

5    The United States insists that Plaintiffs have effectively manufactured the purported prejudice by choosing to file in a forum with a shorter limitations period.

6    Of course, the forum in which the suit is filed is a factor in the choice of law analysis.

7    Plaintiffs also argue that the exception may not apply, because the government's failure to return the Plaintiffs' personal property is not military in nature.

8    Plaintiffs note that the only item that the United States has found is Mr. Vance's laptop, and that the government has offered no explanation as to why it was able to locate this one item and no others.

9    The Court is not ruling on the validity of Plaintiffs' arguments, merely noting the existence of reasonable opposition to the government's position.

10   Similarly, *Alhassan v. Hagee,* 424 F.3d 518, 525 (7th Cir.2005) concludes that it would be inappropriate for courts to review whether a soldier's evidence of his opposition to war was sufficient to establish that he was a conscientious objector whether his objection to war was based on religious concerns, and whether his beliefs were deeply felt. Responsibility for making such determinations rest with the military, not the courts.

Vance v. Rumsfeld, Not Reported in F.Supp.2d (2007)

2007 WL 4557812

11    The United States complains that the requested discovery is inappropriate, because military personnel on active duty in Iraq should not be required to defend against a lawsuit, half way around the world. Plaintiffs correctly point out that such concerns can be appropriately addressed after the unknown defendants have been identified. For example, Congress has enacted the Servicemembers' Civil Relief Act, 50 U.S.C. app. § 501 *et seq.,* which allows courts to stay litigation against' defendants in the active duty military.

12    Of course, Plaintiffs challenge the viability of Defendant Rumsfeld's qualified immunity claim, noting that an American citizen's right to be free from involuntary confinement without due process, even while living abroad, was well established at the time they were detained. *Citing Hamdi,* 542 U.S. at 533.

---

**End of Document**                                                      © 2021 Thomson Reuters. No claim to original U.S. Government Works.