# Exhibit 6

No *Shepard's* Signal™
As of: December 2, 2015 9:43 AM EST

# *Christian Dior Couture, S.A. v. Liu*

United States District Court for the Northern District of Illinois, Eastern Division

November 17, 2015, Decided; November 17, 2015, Filed

No. 15 C 6324

**Reporter**
2015 U.S. Dist. LEXIS 158225

CHRISTIAN DIOR COUTURE, S.A., Plaintiff, v. LEI LIU, et al., Defendants.

## Core Terms

consumers, personal jurisdiction, contacts, jewelry, products, infringed, seller, motion to dismiss, ship, purposefully, activities, courts, sales, sufficient evidence, fair play, trademarks, contends, internet, argues, reside

**Counsel:** [*1] For Christian Dior Couture, S.A., Plaintiff: Kevin W. Guynn, LEAD ATTORNEY, Amy Crout Ziegler, Jessica Lea Bloodgood, Justin R. Gaudio, Greer, Burns & Crain, Ltd., Chicago, IL.

For Wholesale 925 Silver Jewelry Online Store, OMFENG, Defendants: Michael Joseph Parrent, LEAD ATTORNEY, Barrister Law, Chicago, IL.

For YWBeads Rhinestone & Beads Firm, Zaki Company 01, Zaki Company 02, Defendants: Cathleen S Huang, Richard A Ergo, LEAD ATTORNEYS, Bowles & Verna, Llp, Walnut Creek, CA.

**Judges:** Samuel Der-Yeghiayan, United States District Judge.

**Opinion by:** Samuel Der-Yeghiayan

## Opinion

### MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Omfeng (Omfeng) and Defendant Wholesale 925 Silvery Jewelry's (Silvery) motions to dismiss. For the reasons stated below, the motions to dismiss are denied.

### BACKGROUND

Plaintiff Christian Dior Couture, S.A. (Dior) allegedly engages in the manufacture, sale, and distribution of luxury merchandise worldwide. Dior's merchandise is allegedly labeled with federally-registered trademarks and sold to consumers by authorized retailers throughout the United States. Omfeng and Silvery allegedly operate as commercial internet stores on the website AliExpress.com [*2] (AliExpress) and sell products to buyers in the United States. The owners of Omfeng and Silvery allegedly reside in the People's Republic of China. Dior contends that until the court granted its request for injunctive relief, Defendants were offering counterfeit Dior products for sale on their internet stores on AliExpress. Dior's amended complaint includes claims brought pursuant to *15 U.S.C. 1501, et seq.* of the Lanham Act (Lanham Act) for trademark infringement and counterfeiting (Count I), false designation of origin claims (Count II), cybersquatting claims (Count III), and claims brought pursuant to the Illinois Uniform Deceptive Trade Practices Act, *815 ILCS § 510, et seq.* (Count IV). Dior filed a motion for a temporary restraining order (TRO) to stop the alleged counterfeit sales, which the court granted. At a subsequent preliminary injunction hearing, Dior presented evidence that Defendants targeted their internet stores towards consumers in the United States, including Illinois. Defendants, at that time, argued that the court lacked personal jurisdiction over them since they were located in China and had no sales in Illinois. The court found that it had personal jurisdiction over the Defendants since Dior had sufficiently [*3] established, at that stage in the proceedings, that Defendants were directly targeting their business activities toward consumers in the United States, including Illinois. The court then entered the preliminary injunction order. Defendants now move to dismiss the instant action pursuant to *Federal Rule of Civil Procedure 12(b)(2)*, again arguing that this court lacks personal jurisdiction over them.

### LEGAL STANDARD

Pursuant to *Federal Rule of Civil Procedure 12(b)(2)*, a party can move to dismiss claims for lack of personal

2015 U.S. Dist. LEXIS 158225, *3

jurisdiction. *Fed. R. Civ. P. 12(b)(2)*. The plaintiff bears the burden of demonstrating the existence of personal jurisdiction. *Steel Warehouse of Wisconsin, Inc. v. Leach, 154 F.3d 712, 715 (7th Cir. 1998)*; *RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1276 (7th Cir. 1997)*. When the court adjudicates a motion to dismiss brought pursuant to *Rule 12(b)(2)* based on written materials submitted to the court, "the plaintiff need only make out a *prima facie* case of personal jurisdiction." *Purdue Research Found. v. Sanofi -Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003)*(internal quotations omitted). In determining whether the plaintiff has met his burden, the "court accepts all well-pleaded allegations in the complaint as true." *Hyatt Int'l. Corp. v. Coco, 302 F.3d 707, 712-13 (7th Cir. 2002)*. In addition, "the plaintiff is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Purdue Research Found., 338 F.3d at 782*; *see also Leong v. SAP America, Inc., 901 F.Supp. 2d 1058, 1061-62 (N.D. Ill. 2012)*(explaining that "when the defendant challenges by declaration a fact alleged in the plaintiff's complaint, the plaintiff has an obligation [*4] to go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction").

## DISCUSSION

Defendants contend that this court lacks personal jurisdiction over them and that all claims brought against them should thus be dismissed. Personal jurisdiction involves consideration of both federal and state law. *Illinois v. Hemi Group, LLC, 622 F.3d 754, 756-57 (7th Cir. 2010)*(stating that the Court was "still unable to discern an operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction")(internal quotations omitted)(quoting *Hyatt Int'l Corp., 302 F.3d at 715*). A court has general personal jurisdiction over a defendant if the defendant has "continuous and systematic" contacts with the forum that are "sufficiently extensive and pervasive to approximate physical presence." *Tamburo v. Dworkin, 601 F.3d 693, 701 (7th Cir. 2010)*. The court has specific personal jurisdiction over a defendant if "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Id. at 702* (citation omitted). Dior argues that Defendants are subject to the jurisdiction of this court based on specific personal [*5] jurisdiction. (Resp. O 7-10; Resp. S 6-10).

I. Contacts with Illinois

Defendants argue that they lack sufficient contacts with Illinois to be subject to personal jurisdiction.

A. Omfeng

Omfeng contends that it is not subject to personal jurisdiction, arguing that it did not have any intentional contacts with Illinois consumers. (O Mot. 2-6); (O Reply 1-2). Omfeng claims that it is not based in Illinois and its owners and employees reside in China. (O Mot 1-3). Omfeng argues that its owner, FenFen Zeng, is a citizen and resident of the People's Republic of China and has never visited Illinois. However, the record shows that Omfeng regularly sells to consumers in the United States and recently offered to sell jewelry to an Illinois consumer. (Resp. O 4-5). Omfeng's Illinois offer occurred on AliExpress this year and involved jewelry that infringed on Dior's product line. (Resp. O 4-5). The Seventh Circuit has also found that when a company indicates to consumers an ability to ship to a certain state, that such an offer to consumers is pertinent in assessing whether that company is subject to personal jurisdiction. *Illinois v. Hemi Grp. LLC, 622 F.3d 754, 758 (7th Cir. 2010)*. The record shows that Omfeng operates on AliExpress, which prices products [*6] in U.S. dollars and the consumers that purchase Omfeng's products are informed that Omfeng will ship the products to the United States, including Illinois. Dior has shown that Omfeng sells products to consumers in the United States and has offered to sell and ship jewelry to Illinois. By both operating on AliExpress and actually offering to sell a product to an Illinois consumer, Omfeng has intentionally directed its activities at Illinois and purposefully availed itself of the privilege of conducting business in Illinois. *Dworkin, 601 F.3d at 701*. Further, the alleged injury in this case arises directly out of Omfeng's offer to sell jewelry to an Illinois consumer. *Id.* Omfeng also argues that the jewelry it offered for sale in Illinois was never actually sold to the Illinois buyer in question. (O Reply 1-4). However, Omfeng has pointed to no controlling precedent that would require a completed sale in order to be subject to personal jurisdiction. If Omfeng made efforts to extend offers to Illinois consumers, Omfeng purposefully availed itself of the privilege of conducting business in Illinois, whether or not the deals were finalized. In addition, whether the jewelry in question was actually sold is not [*7] pertinent to Omfeng's liability since a mere offer to sell infringed merchandise is sufficient to establish liability under the Lanham Act. *15 U.S.C. § 1114*.

Omfeng further argues that the jewelry in question did not infringe on Dior's product line. This court was provided with evidence at the TRO and preliminary injunction stage. In evaluating the merits of Dior's claims, this court found sufficient evidence of infringing conduct by Omfeng. Dior has also provided additional evidence in response to the

instant motion. Dior is not required to prove its case at this juncture. *Purdue Research Found., 338 F.3d at 782*. Although Omfeng contends that the jewelry in question is not infringing, there is no indication that Omfeng has made the actual product in question available to Dior. Nor has Dior yet been given the opportunity to conduct discovery in this case. Dior has provided sufficient evidence to show that the product in question was an infringing product. Therefore, Dior has presented sufficient evidence to establish a *prima facie* case as to Omfeng's contacts with Illinois to show that it is subject to personal jurisdiction.

### B. Silvery

Silvery contends that it is not subject to personal jurisdiction, arguing that it did not purposefully direct **[*8]** its activities at residents of Illinois. (S Mot. 4); (S Reply 1-2). Silvery argues personal jurisdiction cannot exist since the offer was "made from within China. . . ." (S Mot. 4); (S Reply 4-5). However, Silvery points to no controlling precedent that would insulate a seller from being subject to personal jurisdiction simply because the seller was physically located in another jurisdiction. Courts have found, for example, that reaching out via telephone or mail to a state is sufficient to form minimum contacts with a state. *See Heritage House Restaurants, Inc. v. Cont'l Funding Grp., Inc., 906 F.2d 276, 281 (7th Cir. 1990)*(stating that "[t]he physical presence of a defendant in Illinois during the transaction is not necessary to obtain jurisdiction under the long-arm statute" and that "[w]here a relationship is naturally based on telephone and mail contacts, these contacts can justify jurisdiction over a defendant").

Silvery acknowledges that its owners are YunBo Yue, GaoWen Wu and Qi Huang, and that they use aliases such as Shuai Liu and Tony Lee. (S Mot. 2). Although Silvery is vague as to the citizenship of all such persons, Silvery does argue that GaoWen Wu is a citizen and resident of the People's Republic of China and has never visited Illinois. The record shows that Silvery recently **[*9]** offered to sell jewelry to an Illinois consumer, that Silvery's Illinois offer occurred on AliExpress this year, and that the offer involved jewelry that infringed on Dior's product line. (S Resp. 4-5). Silvery operates on AliExpress, which prices products in U.S. dollars. Consumers who purchase Silvery's products are informed that Silvery will ship the products to the United States, including Illinois. By operating on AliExpress and selling and offering to sell products to Illinois consumers, Silvery has intentionally directed its activities at Illinois and purposefully availed itself of the privilege of conducting business in Illinois. *Dworkin, 601 F.3d at 701*. Further, the alleged injury in this case arises directly out of Silvery's

offer to sell jewelry to an Illinois consumer. Therefore, Dior has presented sufficient evidence to establish a *prima facie* case as to Silvery's contacts with Illinois to show that it is subject to personal jurisdiction.

### II. Fair Play

Defendants argue that they are merely sellers in a global market place and that consumers who choose to reach out to them for products should understand that they will have no legal recourse in the consumers' home forums. Defendants also argue that **[*10]** companies such as Dior who are bringing Lanham Act claims such as this should not be able bring suit in United States courts.

In the instant action, it is true that Dior is not a company based in the United States. The Supreme Court has explained, however, that "[t]he Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 198, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985)*(stating that '[b]ecause trademarks desirably promote competition and the maintenance of product quality, Congress determined that sound public policy requires that trademarks should receive nationally the greatest protection that can be given them"). Dior, in bringing the Lanham Act claims, is pursuing the interests of United States consumers and acting in accordance with public policy of the United States and the will of Congress.

The court notes that Defendants rely heavily upon the Seventh Circuit decision in *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc., 751 F.3d 796 (7th Cir. 2014)*. In that case, the Seventh Circuit cautioned that merely shipping an item to a state does not automatically create personal jurisdiction, explaining that, there is not a "de facto universal jurisdiction" simply because **[*11]** a seller operates a website and ships an item to a state. *Id. at 801-02*. The Seventh Circuit further explained that merely operating an interactive website that is accessed by a consumer within a state may not be sufficient to form minimum contacts. *Id. at 802-03; see also Monster Energy Co. v. Wensheng, 2015 U.S. Dist. LEXIS 132283, 2015 WL 5732050, at *4 (N.D. Ill. 2015)*(holding that "[d]isplaying photos of an item for sale and inviting potential purchasers to place an order and buy the product through an Internet store is an offer for sale"); *Coach, Inc. v. Di Da Imp. & Exp., Inc., 2015 U.S. Dist. LEXIS 22222, 2015 WL 832410, at *2 (N.D. Ill. 2015)*(indicating that personal jurisdiction existed based upon internet sales). Although Dior has offered

2015 U.S. Dist. LEXIS 158225, *11

sufficient evidence at this juncture to establish the necessary contacts with Illinois by Defendants, there is one important distinction between the instant action and *Advanced*. In *Advanced*, the seller was located in California. *Id. at 798*. Thus, although the seller may not have been found to be subject to suit in all fifty states, the seller presumably would have been subject to suit in California. Any consumer or aggrieved seller could at least presumably seek legal relief in a federal court in California.

In this case, Defendants are not physically present and operating in the United States. Apparently, Defendants indicate that injured parties have one option, that is, that they can go [*12] to China and try and work their way through the Chinese legal system and try and get relief. Defendants indicate that "jurisdiction would be appropriate outside of the United States only." (S Reply 14). Defendants do not suggest any alternative forum in the United States, or acknowledge that any of their contacts would subject them to personal jurisdiction in the United States in states other than Illinois. Defendants also argue that a transfer of this case to China will not be possible, contending that "this court does not have the capability of transferring a case internationally." (S Reply 14). If the court accepts Defendants' arguments, the United States consumers, and parties like Dior, who claim to be harmed by Defendants' acts, will have no access to the federal courts in the United States, and the protections of the Lanham Act, will not be available. The record shows that Defendants have significant sales within the United States. The Supreme Court has explained that a court can exercise personal jurisdiction over a defendant if that defendant has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play [*13] and substantial justice." *Philos Techs., Inc. v. Philos & D, Inc., 802 F.3d 905, 912-13 (7th Cir. 2015)*(quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945)* and *Milliken v. Meyer, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940))*. Requiring Defendants such as this who reap significant profits from sales to consumers such as those in Illinois, to come to court and defend their actions certainly does not offend traditional notions of fair play and substantial justice, particularly as in this case where specific contacts have allegedly harmed Illinois consumers. Fair play means that if you decide to sell to consumers in the United States you must come to the United States and stand accountable for conduct relating to such sales. Dior has shown that Defendants have had more than minimum contacts with Illinois, and also contacts with others in the United States as well. *See, e.g.*, *Fed. R. Civ. P. 4* (stating that "serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws"). Fair play means that if a company accuses you of profiting by illegally using a mark that you do not own, that you appear and answer that accusation. The Seventh Circuit has also explained that [*14] "[d]ue process requires that potential defendants should have some control over and certainly should not be surprised by the jurisdictional consequences of their actions." *Hemi Grp. LLC, 622 F.3d at 758* (internal quotations omitted)(quoting *RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1277 (7th Cir. 1997))*. In this instance, as the Defendants continued to sell to United States consumers and the United States dollars continued to flow back to Defendants, they should not have been surprised to learn that they are subject to the jurisdiction of United States courts in regard to their transactions. It may be a global market place as Defendants claim, but they cannot insulate themselves from any harm that they cause simply by locating themselves within the borders of China or any other country outside the United States. Dior has shown that Defendants attempted to sell a product to Illinois consumers and ship at least one product to Illinois. In fairness, Defendants should be required to defend themselves in a court in Illinois.

The court is not making any determinations as to the ultimate merits of Dior's claims. The court is merely holding that Defendants must come to this court and defend themselves. They will be provided with all of the protections accorded to every defendant in United [*15] States courts and will be given an opportunity to prepare a complete defense to all the claims alleged against them in this action. Based on the above, Defendants' motions to dismiss are denied.

## CONCLUSION

Based on the foregoing analysis, Defendants' motions to dismiss are denied.

/s/ Samuel Der-Yeghiayan

Samuel Der-Yeghiayan

United States District Court Judge

Dated: November 17, 2015

Westlaw.

Not Reported in F.Supp.2d, 2001 WL 527404 (N.D.Ill.)
**(Cite as: 2001 WL 527404 (N.D.Ill.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
CHARTER NATIONAL BANK AND TRUST,
Plaintiff,
v.
CHARTER ONE FINANCIAL, INC., Charter One
Bank, FSB and St. Paul Federal Bank for Savings,
Defendants.

No. 01 C 0905.
May 15, 2001.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.

**\*1** This case is before the Court on the Motion
for a Temporary Restraining Order brought by
plaintiff Charter National Bank and Trust. Charter
National seeks to restrain Charter One Financial,
Inc ., Charter One Bank, FSB and St. Paul Federal
Bank for Savings from operating any location in the
Chicago metropolitan area using the mark
"charter." For the following reasons, Charter Na-
tional's motion is granted in part and denied in part.

*ALLEGED FACTS*

Northwest Bankcorp acquired a bank in Han-
over Park and renamed it Charter Bank and Trust of
Illinois on October 1, 1987. In 1993, two more loc-
ations were added, one in Schaumburg and one in
Hoffman Estates. Charter Bank and Trust of Illinois
changed its name to Charter Bank and Trust, N.A.
and then to Charter National Bank and Trust
("Charter National"). Since 1987, the entity now
known as Charter National has continuously oper-
ated the Hanover Park facility and has displayed a
large sign out front with the words "Charter Bank".
Since 1993, the Hoffman Estates and Schaumburg
branches have displayed large signs with the words
"Charter Bank".

Charter One did not do business in the State of

Illinois until it acquired St. Paul Federal Bank for
Savings in 1999. Until January of 2001 it operated
St. Paul's fifty-eight Chicago metropolitan locations
under the trade name and trademark "St. Paul". In
January of 2001, St. Paul announced that it was
changing its name to Charter One Bank. On Febru-
ary 6, 2001, counsel for Charter National faxed a
letter to Charter One informing Charter One of its
contention that Charter National was the senior
common law user in Chicago and that the name
change was already causing customer confusion.

After Charter One did not stop converting
branches from the mark "St. Paul" to "Charter
One", Charter National filed the instant lawsuit.
The issues have been extensively briefed and we
have conducted an evidentiary hearing. While this
court has reviewed the motion for a temporary re-
straining order, defendants have agreed to refrain
from displaying the name "Charter One" in the geo-
graphic area surrounding Charter National's three
branches.

*DISCUSSION*

The purpose of preliminary injunctive relief is
"to minimize the hardship to the parties pending the
ultimate resolution of the lawsuit." *Platinum Home
Mortgage Corp. v. Platinum Financial Group Inc.,*
149 F.3d 722, 726 (7th Cir.1998). The standards for
a temporary restraining order and the standards for
a preliminary injunction are identical. *Atkins v. Ar-
son Pirie Scott & Co., Inc.,* 1999 WL 1249342 at *1
(N.D.Ill.Dec. 13, 1999). Therefore, a TRO is war-
ranted if the party seeking the injunction can make
a threshold showing that: (1) the case has a reason-
able likelihood of success on the merits; (2) no ad-
equate remedy at law exists; (3) it will suffer irre-
parable harm if the injunction is not granted; (4) the
balance of hardships is in favor of the moving
party; and (5) the preliminary injunction will not
harm the public interest. *Rust Environment & Infra-
structure, Inc. v. Teunissen,* 131 F.3d 1210, 1213
(7th Cir.1997).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2001 WL 527404 (N.D.Ill.)
**(Cite as: 2001 WL 527404 (N.D.Ill.))**

**\*2** "Trademark law aims to aid consumers in identifying the source of goods by allowing producers the exclusive right to particular identifying words or symbols which they may attach to their products as a designator of source." *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 657 (7th Cir.1995).

Charter National has shown a reasonable likelihood of success on the merits. In order to show a reasonable likelihood of success on the merits in a trademark infringement claim, the plaintiff must demonstrate: (1) the validity of its trademark and (2) the infringement of that mark. *Echo Travel, Inc. v. Travel Associates, Inc.,* 870 F.2d 1264, 1266 (7th Cir.1989). The validity of a mark is established by showing that a "word, term, name, symbol or device" is entitled to protection because that mark specifically identifies and distinguished one company's goods from those of its competitors. *Platinum,* 149 F.3d at 726. Charter National is the senior user of the mark in the Chicago metropolitan area. Although Charter One has registered its mark at the U.S. Patent and Trademark Office, that trademark only allows it to use its mark if no other senior user, who has been continuously using the mark, has priority. 15 U.S.C. § 1065. A trademark application is always subject to previously established common law rights of another party. *The Money Store v. Harriscorp Fin.,* 689 F.2d 666, 672 (7.th Cir1982). Therefore, if "Charter National Bank" is protectable under common law trademark law, Charter National has a reasonable likelihood of success on the merits.

Charter National contends that its mark is protectable because the term "charter" is more than a generic term, such as bank. Charter One argues that the mark is not protectable because it simply signifies that the bank has been certified, or chartered, by the state or federal government. We disagree. "Charter National Bank" is entitled to protection.

The determination of whether a party has established a protectable right in a trademark is made on a case by case basis, considering the totality of the circumstances. *New West Corp. v. NYM Co. of Cal., Inc.,* 595 F.2d 1194, 1200 (9 th Cir.1979). A party may acquire a protectable right simply through the use of the mark in connection with goods or services. *Zazu Designs v. L'Oreal,* S.A., 979 F.2d 499, 503 (7 th Cir.1992). We find that Charter National has shown a reasonable likelihood of success in its claim to have acquired a protectable right in "Charter National" through its evidentiary submissions of advertising brochures, ads, and pictures of signs, as well as its evidence of actual confusion. Later in the course of this case, Charter National will have to present more substantial evidence of confusion, but at this point the evidence it has presented is sufficient to convince this court that there is a reasonable likelihood of success in showing that its name has acquired a secondary meaning in the minds of customers and, therefore, deserves protection.

**\*3** In a trademark infringement case, damages are by "their very nature irreparable and not susceptible of adequate measurement for remedy at law." *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 (7 th Cir.1988). Charter National has shown a reasonable likelihood of success on the merits because of customer confusion and frustration. Furthermore, the fact that it is virtually impossible to calculate the financial impact of these damages shows that there is no adequate remedy at law.

Balancing of the hardships and the public's interest presents the closest question here. Defendants operate over seventy locations in the entire Chicago metropolitan region and forcing them to cover all of their signs on all banks is a hardship. However, they knew of this potential conflict before they changed the names of their banking operations from St. Paul to Charter One.

We have considered different geographical parameters for a temporary restraining order. Eighty percent of Charter National's deposit customers are clustered within three miles around its branches. Therefore, we have entertained the option

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 527404 (N.D.Ill.)
**(Cite as: 2001 WL 527404 (N.D.Ill.))**

of structuring a TRO to include that geographic area. In response, Charter National argued that it makes a profit only by virtue of the loans that it makes and, since its loan customers live in a much broader geographic area than its deposit customers, its damages will not by redressed unless we totally enjoin Charter One from any use of the mark "charter" in the entire Chicago metropolitan area. In the event that we determine that a preliminary injunction is justified, we might require that Charter One stop using the mark "charter" in the entire Chicago metropolitan area. However, given the balancing of the hardships at this stage in the litigation and the inconvenience to Charter One's hundreds of thousands of customers in the Chicago area, we will not order Charter One to stop using the mark "charter" in the entire metropolitan area.

We have fashioned a remedy which balances the public interests and the hardships, but still recognizes Charter National's likelihood of succeeding on the ultimate merits. We will restrain Charter One entities from operating any type of bank facility using the word "charter" on any outdoor sign within the geographic area between Lake Cook Road, on the north, I 290/I355/Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west. Furthermore, we will enjoin Charter One from opening any new locations, in the above geographic area, which use the mark "charter" in any way or is identified as "Charter One". This solution balances the strength of Charter National's mark in a smaller geographic area against the hardship of Charter One changing all of the signs on all of its facilities in the Chicago area on a temporary basis.

*CONCLUSION*

Charter National Bank & Trust's motion for a temporary restraining order is granted in part and denied in part. Charter One Financial, Inc., Charter One Bank, FSB and St. Paul Federal Bank for Savings are enjoined from operating any type of bank facility using the word "charter" on any outdoor signs within the geographic area between Lake

Cook Road, on the north, I 290/I355/Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west. Furthermore, Charter One is enjoined from opening any new locations in that geographic area that use the mark "charter" in any way or is identified as "Charter One". Charter National's request for a temporary restraining order prohibiting Charter One from using the mark "charter" throughout the entire Chicago metropolitan area is denied.

**\*4** It is so ordered.

N.D.Ill.,2001.
Charter National Bank and Trust v. Charter One Financial, Inc.
Not Reported in F.Supp.2d, 2001 WL 527404 (N.D.Ill.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2001 WL 527404
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

CHARTER NATIONAL
BANK AND TRUST, Plaintiff,
v.
CHARTER ONE FINANCIAL, INC.,
Charter One Bank, FSB and St. Paul
Federal Bank for Savings, Defendants.

No. 01 C 0905.
|
May 15, 2001.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.

**\*1** This case is before the Court on the Motion for a Temporary Restraining Order brought by plaintiff Charter National Bank and Trust. Charter National seeks to restrain Charter One Financial, Inc ., Charter One Bank, FSB and St. Paul Federal Bank for Savings from operating any location in the Chicago metropolitan area using the mark "charter." For the following reasons, Charter National's motion is granted in part and denied in part.

*ALLEGED FACTS*

Northwest Bankcorp acquired a bank in Hanover Park and renamed it Charter Bank and Trust of Illinois on October 1, 1987. In 1993, two more locations were added, one in Schaumburg and one in Hoffman Estates. Charter Bank and Trust of Illinois changed its name to Charter Bank and Trust, N.A. and then to Charter National Bank and Trust ("Charter National"). Since 1987, the entity now known as Charter National has continuously operated the Hanover Park facility and has displayed a large sign out front with the words "Charter Bank". Since 1993, the Hoffman Estates and Schaumburg branches have displayed large signs with the words "Charter Bank".

Charter One did not do business in the State of Illinois until it acquired St. Paul Federal Bank for Savings in 1999. Until January of 2001 it operated St. Paul's fifty-eight Chicago metropolitan locations under the trade name and trademark "St. Paul". In January of 2001, St. Paul announced that it was changing its name to Charter One Bank. On February 6, 2001, counsel for Charter National faxed a letter to Charter One informing Charter One of its contention that Charter National was the senior common law user in Chicago and that the name change was already causing customer confusion.

After Charter One did not stop converting branches from the mark "St. Paul" to "Charter One", Charter National filed the instant lawsuit. The issues have been extensively briefed and we have conducted an evidentiary hearing. While this court has reviewed the motion for a temporary restraining order, defendants have agreed to refrain from displaying the name "Charter One" in the geographic area surrounding Charter National's three branches.

*DISCUSSION*

The purpose of preliminary injunctive relief is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortgage Corp. v. Platinum Financial Group Inc.,* 149 F.3d 722, 726 (7th Cir.1998). The standards for a temporary restraining order and the standards for a preliminary injunction are identical. *Atkins v. Arson Pirie Scott & Co., Inc.,* 1999 WL 1249342 at *1 (N.D.Ill.Dec. 13, 1999). Therefore, a TRO is warranted if the party seeking the injunction can make a threshold showing that: (1) the case has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm if the injunction is not granted; (4) the balance of hardships is in favor of the moving party; and (5) the preliminary injunction will not harm the public interest. *Rust Environment & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1213 (7th Cir.1997).

**\*2** "Trademark law aims to aid consumers in identifying the source of goods by allowing producers the exclusive right to particular identifying words or symbols which they may attach to their products as a designator of source." *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 657 (7th Cir.1995).

Case: 1:21-cv-01664 Document #: 6-6 Filed: 03/27/21 Page 10 of 51 PageID #:319

Charter National Bank and Trust v. Charter One Financial, Inc., Not Reported in...

2001 WL 527404

Charter National has shown a reasonable likelihood of success on the merits. In order to show a reasonable likelihood of success on the merits in a trademark infringement claim, the plaintiff must demonstrate: (1) validity of its trademark and (2) the infringement of that mark. *Echo Travel, Inc. v. Travel Associates, Inc.,* 870 F.2d 1264, 1266 (7th Cir.1989). The validity of a mark is established by showing that a "word, term, name, symbol or device" is entitled to protection because that mark specifically identifies and distinguished one company's goods from those of its competitors. *Platinum,* 149 F.3d at 726. Charter National is the senior user of the mark in the Chicago metropolitan area. Although Charter One has registered its mark at the U.S. Patent and Trademark Office, that trademark only allows it to use its mark if no other senior user, who has been continuously using the mark, has priority. 15 U.S.C. § 1065. A trademark application is always subject to previously established common law rights of another party. *The Money Store v. Harriscorp Fin.,* 689 F.2d 666, 672 (7.[th] Cir1982). Therefore, if "Charter National Bank" is protectable under common law trademark law, Charter National has a reasonable likelihood of success on the merits.

Charter National contends that its mark is protectable because the term "charter" is more than a generic term, such as bank. Charter One argues that the mark is not protectable because it simply signifies that the bank has been certified, or chartered, by the state or federal government. We disagree. "Charter National Bank" is entitled to protection.

The determination of whether a party has established a protectable right in a trademark is made on a case by case basis, considering the totality of the circumstances. *New West Corp. v. NYM Co. of Cal., Inc.,* 595 F.2d 1194, 1200 (9th Cir.1979). A party may acquire a protectable right simply through the use of the mark in connection with goods or services. *Zazu Designs v. L'Oreal,* S.A., 979 F.2d 499, 503 (7th Cir.1992). We find that Charter National has shown a reasonable likelihood of success in its claim to have acquired a protectable right in "Charter National" through its evidentiary submissions of advertising brochures, ads, and pictures of signs, as well as its evidence of actual confusion. Later in the course of this case, Charter National will have to present more substantial evidence of confusion, but at this point the evidence it has presented is sufficient to convince this court

that there is a reasonable likelihood of success in showing that its name has acquired a secondary meaning in the minds of customers and, therefore, deserves protection.

**\*3** In a trademark infringement case, damages are by "their very nature irreparable and not susceptible of adequate measurement for remedy at law." *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 (7th Cir.1988). Charter National has shown a reasonable likelihood of success on the merits because of customer confusion and frustration. Furthermore, the fact that it is virtually impossible to calculate the financial impact of these damages shows that there is no adequate remedy at law.

Balancing of the hardships and the public's interest presents the closest question here. Defendants operate over seventy locations in the entire Chicago metropolitan region and forcing them to cover all of their signs on all banks is a hardship. However, they knew of this potential conflict before they changed the names of their banking operations from St. Paul to Charter One.

We have considered different geographical parameters for a temporary restraining order. Eighty percent of Charter National's deposit customers are clustered within three miles around its branches. Therefore, we have entertained the option of structuring a TRO to include that geographic area. In response, Charter National argued that it makes a profit only by virtue of the loans that it makes and, since its loan customers live in a much broader geographic area than its deposit customers, its damages will not by redressed unless we totally enjoin Charter One from any use of the mark "charter" in the entire Chicago metropolitan area. In the event that we determine that a preliminary injunction is justified, we might require that Charter One stop using the mark "charter" in the entire Chicago metropolitan area. However, given the balancing of the hardships at this stage in the litigation and the inconvenience to Charter One's hundreds of thousands of customers in the Chicago area, we will not order Charter One to stop using the mark "charter" in the entire metropolitan area.

We have fashioned a remedy which balances the public interests and the hardships, but still recognizes Charter National's likelihood of succeeding on the ultimate merits. We will restrain Charter One entities from operating any type of bank facility using the word "charter" on any

Charter National Bank and Trust v. Charter One Financial, Inc., Not Reported in...

2001 WL 527404

outdoor sign within the geographic area between Lake Cook Road, on the north, I 290/I355/Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west. Furthermore, we will enjoin Charter One from opening any new locations, in the above geographic area, which use the mark "charter" in any way or is identified as "Charter One". This solution balances the strength of Charter National's mark in a smaller geographic area against the hardship of Charter One changing all of the signs on all of its facilities in the Chicago area on a temporary basis.

### CONCLUSION

Charter National Bank & Trust's motion for a temporary restraining order is granted in part and denied in part. Charter One Financial, Inc., Charter One Bank, FSB

and St. Paul Federal Bank for Savings are enjoined from operating any type of bank facility using the word "charter" on any outdoor signs within the geographic area between Lake Cook Road, on the north, I 290/I355/ Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west. Furthermore, Charter One is enjoined from opening any new locations in that geographic area that use the mark "charter" in any way or is identified as "Charter One". Charter National's request for a temporary restraining order prohibiting Charter One from using the mark "charter" throughout the entire Chicago metropolitan area is denied.

**\*4** It is so ordered.

### All Citations

Not Reported in F.Supp.2d, 2001 WL 527404

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:21-cv-01664 Document #: 6-6 Filed: 03/27/21 Page 12 of 51 PageID #:321

2013 WL 169998
United States District Court,
N.D. Illinois,
Eastern Division.

DECKERS OUTDOOR CORPORATION, Plaintiff,
v.
DOES 1–100 d/b/a the aliases
identified on Schedule "A", Defendants.

No. 12 C 10006.
|
Jan. 16, 2013.

**Attorneys and Law Firms**

Justin R. Gaudio, Kevin W. Guynn, Amy Crout Ziegler, Greer, Burns & Crain, Ltd., Chicago, IL, for Plaintiff.

***MEMORANDUM OPINION AND ORDER***

JOHN Z. LEE, District Judge.

**\*1** Plaintiff Deckers Outdoor Corporation ("Plaintiff" or "Deckers") has sued Defendants DOES 1–100 ("Defendants") for federal trademark infringement, counterfeiting and false designation of origin in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), cyberpiracy in violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), and deceptive practices in violation of the Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. § 510, *et seq.* Plaintiff is a fashion brand that produces and distributes high-end footwear products, most prominently UGG® brand products. Deckers sells UGG® brand products throughout the United States and in Illinois via a network of authorized retailers, Concept Stores and on its website, with the domain name <www.uggaustralia.com>. Deckers holds the registration for the UGG® trademark in more than 100 countries worldwide, including U.S. Trademark Registration No. 3,050,925.

Plaintiff alleges that Defendants, individuals and business entities who reside in the People's Republic of China or other foreign jurisdictions, operate commercial websites targeting Illinois residents with offers to sell counterfeit UGG® products. Deckers contends that Defendants use a variety of domain names set up by registrants (the "Accused Domain Names") and create websites that incorporate copyright-protected content, images, and product descriptions to mislead consumers into believing that they are purchasing genuine UGG® products.

On December 20, 2012, the Court granted Deckers' *ex parte* motion for entry of (1) a temporary restraining order ("TRO"); (2) a domain name transfer order; (3) an asset restraining order; (4) an expedited discovery order; and (5) an order permitting service of process by email and electronic publication. Defendants were served with notice of the preliminary injunction proceedings and the TRO. On December 28, 2012, this Court extended the time for the TRO to remain in effect (through 3:00 p.m. on January 16, 2013) on Plaintiff's motion, finding that Plaintiff had demonstrated good cause for the extension. On January 15, 2013, the Court held a hearing on Plaintiffs' motion for a preliminary injunction. No Defendant appeared at the preliminary injunction hearing or submitted any written objection to the motion. For the reasons set forth below, Plaintiffs' motion for entry of a preliminary injunction is granted.

**Discussion**

A party seeking a preliminary injunction must show (1) that its case has "some likelihood of success on the merits," and (2) that it has "no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied." *Ezell v. City of Chi.,* 651 F.3d 684, 694 (7th Cir.2011). If the moving party meets these threshold requirements, the district court "weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id.* The district court's weighing of the facts is not mathematical in nature; rather, it is "more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 895–96 (7th Cir.2001) (quoting *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir.1992)). The Court addresses each factor in turn.

**I. Likelihood of Success on the Merits**

2013 WL 169998, 105 U.S.P.Q.2d 1894

### A. Trademark Claims

**\*2** Under the Lanham Act, a defendant is liable for federal trademark infringement and counterfeiting if the defendant "without the consent of the registrant ... use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(a). Section 43(a) of the Lanham Act further imposes liability upon a defendant who "on or in connection with any goods or services ... uses in commerce any ... false designation of origin, false or misleading description of fact, or false or misleading misrepresentation of fact, which is likely to cause confusion or to cause mistake, or to deceive as to the ... origin, sponsorship, or approval of his or her goods ... by another person." 15 U.S.C. § 1125(a)(1). Under the UDPTA, a defendant is liable for, among other things, (1) passing off goods as those of another; (2) causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods; or (3) causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with another. 815 Ill. Comp. Stat. 510/2(a).

Deckers' Lanham Act and UDTPA claims involve the same elements. See Packaging Supplies, Inc. v. Harley–Davidson, Inc., No. 08 C 400, 2011 WL 1811446, at \*5 (N.D.Ill. May 12, 2011); Morningware, Inc. v. Hearthware Home Prods., Inc., 673 F.Supp.2d 630, 639 (N.D.Ill.2009) ("Where a plaintiff's factual allegations under the Illinois Uniform Deceptive Trade Practices Act also form the basis for plaintiff's claims under the Lanham Act, the legal inquiry is the same under both statutes. Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act.") (citing Gimix, Inc. v. JS & A Group, Inc., 699 F.2d 901, 908 (7th Cir.1983)). Moreover, "the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks .... Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical—is there a likelihood of confusion?" Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 780, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (internal citations omitted).

A trademark infringement claim under the Lanham Act has two elements. See 15 U.S.C. § 1125(a). First, the plaintiff must show "that its mark is protected under the Lanham Act." Barbecue Marx, Inc. v. 551 Ogden, Inc., 235 F.3d 1041, 1043 (7th Cir.2000). Second, the plaintiff must show that "the challenged mark is likely to cause confusion among consumers." Id. A court will not reach the second element "until persuaded that the mark is sufficiently distinctive to warrant prima facie protection as a trademark." Spraying Sys. Co. v. Delavan, Inc., 975 F.2d 387, 392 (7th Cir.1992).

**\*3** When considering whether a particular mark is protected under the Lanham Act, the law recognizes five categories of trademarks, in ascending order of distinctiveness: generic, descriptive, suggestive, arbitrary, and fanciful. See Two Pesos, 505 U.S. at 768; Packman v. Chi. Tribune Co., 267 F.3d 628, 638 (7th Cir.2001). A plaintiff with a trademark registered in accordance with the Lanham Act is entitled to one of two presumptions: (1) that his registered trademark is not merely descriptive or generic; or (2) that if descriptive, the mark is accorded secondary meaning. See Packman, 267 F.3d at 638. Secondary meaning exists "only if most consumers have come to think of the mark not as descriptive at all but as the name of the product." Id. at 639. A defendant may overcome this presumption with evidence that the mark is merely generic or descriptive, or that it lacks secondary meaning. Id.

In this case, Deckers is entitled to the presumption that its marks are protected under the Lanham Act because it holds valid and subsisting registrations for trademarks in the United States. (Evert–Burks Decl. ¶ 3.) Deckers has not licensed or authorized Defendants to use any of its UGG® trademarks. (Id. ¶ 20.) Defendants have put forth no evidence that the UGG® trademarks registered by Deckers are merely generic or descriptive. Thus, Deckers satisfies the first element of its Lanham Act claim.

In determining whether a plaintiff satisfies the second element of a Lanham Act claim, that the challenged mark is likely to cause confusion among consumers, the Seventh Circuit has identified seven relevant factors: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the

intent of the defendant to "palm off" his product as that of another. *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir.2008). No one factor is dispositive, but the similarity of the marks, actual confusion, and the defendant's intent are "particularly important." *Id.*

Here, Deckers has submitted extensive documentation showing that Defendants are selling counterfeit versions of UGG® products. (Evert–Burks Decl. ¶ 17.) Both Deckers and Defendants advertise and sell their products over the Internet, targeting consumers looking for UGG® merchandise. (*Id.* ¶¶ 11, 17–20.) Those consumers are diverse with varying degrees of sophistication, and they are likely to have difficulty distinguishing authentic UGG® merchandise from counterfeit products. Indeed, it appears that Defendants are intentionally trying to induce consumers looking for genuine UGG® products to purchase fake products instead. In that regard, Defendants use the UGG® trademark in many of their Accused Domain Names, and they advertise products that look almost exactly like authentic UGG® products and bear the UGG® logo. (Compl., Schedule A.) Although Deckers does not offer evidence of actual consumer confusion at this time, such evidence is not required to prove that a likelihood of confusion exists, particularly given the compelling evidence that Defendants are attempting to "palm off" their goods as genuine UGG® merchandise. *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 685 (7th Cir.2001).

**\*4** Taking the evidence as a whole, the Court believes that Deckers is likely to establish a prima facie case of trademark infringement and false designation of origin under the Lanham Act and the UDPTA sufficient to support the entry of a preliminary injunction.

### B. Cyberpiracy

Deckers also sues Defendants for cyberpiracy in violation of the ACPA. The ACPA was enacted to combat "cybersquatting," which is "the bad faith registration of domain names with intent to profit from the goodwill associated with the trademarks of another." *Vulcan Golf, LLC v. Google Inc.,* 726 F.Supp.2d 911, 915 (N.D.Ill.2010) (quoting *Solid Host, NL v. Namecheap, Inc.,* 652 F.Supp.2d 1092, 1099 (C.D.Cal.2009)). Cybersquatters "register well-known marks to prey on customer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site." *Id.* To state a claim

under the ACPA, Deckers must show that "(1) it had a distinctive or famous mark at the time the domain name was registered, (2) the defendant[s] registered, trafficked in, or used a domain name that is identical or confusingly similar to plaintiff's mark, and (3) the defendant[s] had a bad faith intent to profit from that mark." [1] *MasterCard Int'l Inc. v. Trehan,* 629 F.Supp.2d 824, 830 (N.D.Ill.2009) (quoting *Flentye v. Kathrein,* 485 F.Supp.2d 903, 914 (N.D.Ill.2007)).

Here, the UGG® trademarks are well-known among fashion consumers worldwide, as evidenced by the extensive media coverage of the brand, including popular magazines like *Time, Vogue* and *Elle.* (Evert–Burks Decl. ¶¶ 12–13.) International celebrities including Kate Moss and Jennifer Aniston are frequently photographed in UGG® products. (*Id.* ¶ 13.) Additionally, Defendants register, traffic in and use domain names that are identical or confusingly similar to the well-known UGG® mark. As described above, many of Defendants' Accused Domain Names directly incorporate the word "UGG" and Defendants use copyrighted photographs of UGG® products and logos in order to sell counterfeit versions of them. These facts manifest a bad-faith intent to profit from the UGG® mark. Therefore, the Court finds that Deckers is likely to succeed on the merits of its ACPA claim.

### II. Irreparable Harm/Inadequate Remedy at Law

Having determined Deckers is likely to succeed on the merits of its claims, the Court next considers whether the company will suffer irreparable harm without a preliminary injunction, and whether the company has an adequate remedy at law. There is a "well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss." *Abbott Labs.,* 971 F.2d at 16; s*ee also AM Gen. Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 805 (7th Cir.2002) (confirming "the law's presumption that trademark dilution or infringement threatens irreparable injury for which there is no adequate remedy at law."). "This willingness to find irreparable harm in trademark cases stems from an understanding that the 'most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled

**Deckers Outdoor Corp. v. Does 1-100, Not Reported in F.Supp.2d (2013)**
2013 WL 169998, 105 U.S.P.Q.2d 1894

by the acts of another.' " *7–Eleven, Inc. v. Spear,* No. 10 C 6697, 2011 WL 830069, at *6 (N .D. Ill. Mar. 3, 2011) (quoting *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 (7th Cir.1988)).

**\*5** Deckers has submitted evidence that it has spent substantial sums of money to market the UGG® brand in the United States and abroad. (Evert–Burks Decl. ¶¶ 5–7.) The UGG® brand has earned numerous awards and accolades, including Brand or Boots of the Year awards for the years 2004, 2007, 2008, 2010 and 2011 from *Footwear Plus,* and was selected as one of Forbes Best 200 Small Companies numerous times. (*Id.* ¶ 8.) As noted, popular magazines and television shows have covered the success of the UGG® brand, celebrities are frequently photographed wearing UGG® footwear, and Deckers regularly promotes its products with extensive, international advertising campaigns. (*Id.* ¶ 10, 12–15.) The Court finds that Defendants' unauthorized use of the UGG® trademark threatens to irreparably harm the reputation and goodwill Deckers has developed with respect to its merchandise. This risks diluting the mark and undermining the years Deckers has spent "nurturing its business." *Ty, Inc.,* 237 F.3d at 903. Thus, the Court finds that Deckers will suffer irreparable harm without a preliminary injunction, and that there is no adequate remedy at law for this harm.

### III. Balancing the Harms/Public Interest

Because Deckers has met the threshold requirements necessary for the Court to grant its request for a preliminary injunction, the Court now weighs the factors against one another and assesses whether the balance of harms favors Deckers or whether the harm to the Defendants or the public is sufficiently weighty that the injunction should be denied. In balancing the harms between Deckers and Defendants, the Court applies a "sliding scale: [t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *Girl Scouts of Manitou Council v. Girl Scouts of U.S. of Am., Inc.,* 549 F.3d 1079, 1086 (7th Cir.2008) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 387 (7th Cir.1984)). Here, Deckers has a strong likelihood of prevailing on the merits, leaving Defendants with a proportionately small chance of showing that they have any right to sell or market counterfeit UGG® merchandise. As a result, Defendants have little basis for arguing that they will suffer any harm by virtue of the preliminary injunction. Indeed, as one court has noted,

"one who adopts the marks of another for similar goods acts at his own peril, since he has no claim to the profits or advantages thereby derived." *Burger King Corp. v. Majeed,* 805 F.Supp. 994, 1006 (S.D.Fla.1992) (internal quotations omitted).

The public interest also weighs in favor of entering a preliminary injunction. *See Girl Scouts of Manitou Council,* 549 F.3d at 1086 (the balancing process should encompass "any effects that granting or denying the preliminary injunction would have on nonparties."). In trademark infringement cases such as this, "the public interest is served by [an] injunction because enforcement of the trademark laws prevents consumer confusion." *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 469 (7th Cir.2000). The public has an interest in not being confused or defrauded into buying counterfeit UGG® products.

**\*6** In sum, Deckers is likely to succeed on the merits of its claims, and the balance of the harms weighs in its favor. On these facts, the Court holds that Deckers has satisfied its burden of establishing the prerequisites for entry of a preliminary injunction.

### IV. Specific Equitable Relief

Deckers asks that the TRO entered by this Court on December 20, 2012 be converted into a preliminary injunction so that Defendants remain enjoined from the manufacture, importation, distribution, offer for sale, and sale of products bearing counterfeit UGG® trademarks during the pendency of this litigation. Pursuant to the TRO, Deckers caused dozens of PayPal accounts associated with Defendants' websites to be frozen. (Gaudio Decl. ¶ 2.) Deckers also served the TRO on the relevant domain-name registries, requesting transfer of the Defendants' names. (*Id.*) Deckers argues that a preliminary injunction is necessary so that the domain names remain in Deckers' control and the Defendants' PayPal and other accounts remain frozen until completion of these legal proceedings. Without this relief, Defendants would be able to continue to sell counterfeit UGG® products and move monies from such sales to offshore accounts.

In sum, the Court holds that, under all the circumstances presented, the preliminary injunction that Deckers seeks is necessary and appropriate.

2013 WL 169998, 105 U.S.P.Q.2d 1894

**V. Conclusion**

For these reasons, the Court grants Plaintiff's motion for entry of a preliminary injunction.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 169998, 105 U.S.P.Q.2d 1894

---

Footnotes

1    The ACPA identifies nine factors to consider in assessing bad-faith intent, including: (1) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark; (2) the person's provision of material and misleading false contact information when applying for the registration of the domain name; (3) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others; and (4) the extent to which the mark incorporated in the person's domain name is not distinctive or famous. 15 U.S.C. § 1125(d)(1)(B)(i). A court is not limited to considering only the enumerated factors, and "the most important grounds for finding bad faith 'are the unique circumstances of th[e] case.' " *Virtual Works, Inc. v. Volkswagen of America, Inc.,* 238 F.3d 264, 268 (4th Cir.2001) (quoting *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.,* 202 F.3d 489, 499 (2d Cir.2000)).

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 6733685
United States District Court,
N.D. Illinois, Eastern Division.

H-D U.S.A., LLC, Plaintiff,
v.
GUANGZHOU TOMAS CRAFTS
CO., LIMITED, et al., Defendants.

Case No. 16-cv-10096
|
Signed December 18, 2017

**Attorneys and Law Firms**

Justin R. Gaudio, Jessica Lea Bloodgood, Kevin W. Guynn, Allyson M. Martin, Amy Crout Ziegler, Greer, Burns & Crain, Ltd., Chicago, IL, for Plaintiff.

Alice Christine Svenson, Svenson Law Offices, Daniel John Voelker, Olga S. Dmytriyeva, Voelker Litigation Group, Alexander Nicholas Loftus, Stotlmann Law Offices, Chicago, IL, Elizabeth Wolstein, Schlam Stone & Dolan LLP, New York, NY, for Defendants.

## MEMORANDUM OPINION AND ORDER

John Robert Blakey, United States District Judge

*1 Plaintiff Harley-Davidson moved for summary judgment against the Defendant identified by and operating the eBay store bg27cyf for alleged trademark infringement. [99]. Plaintiff seeks at least $150,000 in statutory damages, a permanent injunction prohibiting Defendant from selling and offering for sale counterfeit Harley-Davidson products, and an award of reasonable attorney fees and costs pursuant to 15 U.S.C. § 1117. Id. For the reasons explained below, this Court grants summary judgment to Plaintiff, awards Plaintiff $150,000 in statutory damages, enters a permanent injunction against Defendant, and awards reasonable attorney fees and costs to Plaintiff.

This opinion also addresses three other motions: Defendant's motion to lift the asset freeze that this Court entered in November 2016 [111]; Plaintiff's motion to compel discovery and/or strike Defendant's motion to lift the asset freeze [132]; and Defendant's motion to

strike one of Plaintiff's declarations [143]. For the reasons explained below, this Court denies Defendant's motion to lift the asset freeze, denies Plaintiff's motion to compel and/or strike as moot, and denies Defendant's motion to strike as moot.

## I. Background [1]

### A. Local Rule 56.1 and Evidentiary Rules

Throughout Defendant's response to Plaintiff's statement of facts, Defendant denies facts by responding with legal arguments and conclusions. See, e.g., [116] at 3. Similarly, Defendant's statement of additional facts contains conclusory legal arguments. See, e.g., id. at 5 ("A reasonable purchaser would realize that one could not expect to receive legitimate Harley-Davidson front axle nut cover caps for $12.13 price [sic] charged by Defendant."). Legal arguments and conclusions do not belong in Local Rule 56.1 statements. See Phillips v. Quality Terminal Servs., LLC, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) ("Including legal arguments in a 56.1 statement is wholly improper, redundant, unpersuasive, and irksome; in short, it advances neither the interests of the parties nor of the court."). Thus, this Court does not consider the improper "facts" in Defendant's statement, and this Court deems admitted any of Plaintiff's facts that Defendant denies improperly.

Along with improper legal arguments, Defendant also seeks to support its statement of facts with an undated declaration from bg27cyf's manager. [117]. Declarations may substitute for affidavits and constitute evidence if they comply with the requirements of 27 U.S.C. § 1746. Sheikh v. Grant Reg'l Health Ctr., 769 F.3d 549, 551 (7th Cir. 2014). Section 1746 requires a dated signature. Accordingly, this Court does not consider the undated declaration as evidence. See Rivera v. Allstate Ins. Co., 140 F. Supp. 3d 722, 729 (N.D. Ill. 2015).

### B. Facts

Plaintiff holds a federal trademark registration for the Harley-Davidson "Bar & Shield Logo." [101] ¶ 1. The Bar & Shield Logo registration has incontestable status under 15 U.S.C. § 1065. Id.

*2 Defendant advertised, offered for sale, and sold—through the eBay store identified as bg27cyf—motorcycle axle nut covers featuring counterfeit versions of the Bar

& Shield Logo. *Id.* ¶ 2. Defendant advertised and sold products to consumers in the United States, including Illinois consumers. *Id.* ¶ 5. Plaintiff did not authorize the use of its Bar & Shield Logo on the axle nut covers that Defendant sold. *Id.* Plaintiff also did not authorize Defendant to use the Bar & Shield Logo in connection with any other products in Defendant's eBay store. *Id.* ¶ 4.

## II. Legal Standard

Courts should grant summary judgment when the moving party shows that no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 248. To show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

Courts must evaluate evidence in the light most favorable to the non-moving party and must refrain from making credibility determinations or weighing evidence. *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255). The moving party bears the burden of establishing the lack of genuine disputes as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III. Analysis

### A. Plaintiff's Motion for Summary Judgment

Plaintiff asserts three claims against Defendant: federal trademark infringement and counterfeiting under the Lanham Act (Count I); false designation of origin under the Lanham Act (Count II); and violation of the Illinois Uniform Deceptive Trade Practices Act (UDTPA) (Count III). Each claim requires Plaintiff to make the same showing: (1) it has a protectable mark; and (2) Defendant's unauthorized use of the mark would likely cause confusion among consumers. *See Phx. Entm't Partners v. Rumsey*, 829 F.3d 817, 822 (7th Cir. 2016); *Monster Energy Co. v. Jing*, No. 15-cv-277, 2015 WL 4081288, at *2 (N.D. Ill. July 6, 2015) (explaining that the same analysis applies to UDTPA and Lanham Act claims). Defendant's argument that Plaintiff's motion fails

as to Counts II and III because Plaintiff "provides legal analyses only as to Count I" demonstrates a serious misunderstanding of the applicable law. [115] at 3.

Turning to the merits, Plaintiff has a protectable mark. The Bar & Shield Logo registration has incontestable status under 15 U.S.C. § 1065. [101] ¶ 1. Registering a trademark provides prima facie evidence of a mark's validity and the registrant's exclusive right to use that mark. *See CAE, Inc. v. Clean Eng'g, Inc.*, 267 F.3d 660, 673 (7th Cir. 2001) (citing 15 U.S.C. § 1115(a)). When a mark obtains incontestable status, the registration then provides "conclusive evidence" of the mark's validity and the registrant's exclusive right to use that mark. 15 U.S.C. § 1115(b). Thus, Plaintiff meets its burden of showing that it has a protectable mark.

As for unauthorized use, Plaintiff's evidence shows that it never authorized Defendant to use the Bar & Shield Logo in connection with any products. [101] ¶¶ 4–5. Yet Defendant sold and offered for sale into the United States "knockoff products" featuring marks "substantially indistinguishable from" Plaintiff's mark. *Monster*, 2015 WL 4081288, at *2.

**\*3** Finally, Plaintiff also shows that Defendant's unauthorized use of the Bar & Shield Logo would likely cause consumer confusion. The Seventh Circuit held in an unpublished opinion that producing "counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product" creates a "presumption of a likelihood of confusion." *Microsoft Corp. v. Rechanik*, 249 Fed.Appx. 476, 479 (7th Cir. 2007) (internal quotation marks omitted). Following *Microsoft*, this Court can presume a likelihood of confusion arising from Defendant's use of a counterfeit Bar & Shield Logo. *See Monster*, 2015 WL 4081288, at *2 (citing *Microsoft*, 249 Fed.Appx. at 479).

Even if this Court could not presume a likelihood of confusion, this Court would still find a likelihood of confusion based upon Plaintiff's evidence. Although whether a likelihood of confusion exists presents a factual question, a district court may resolve that question on summary judgment if the evidence favors one side so heavily that the court has no doubt about how to answer the question. *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008) (internal quotation marks omitted). This case falls within the doubt-free zone.

The Seventh Circuit follows a seven-factor test for assessing likelihood of confusion: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care that consumers will likely exercise; (5) the strength of the protected mark; (6) actual confusion, if any; and (7) the defendant's intent to "palm off" his product as another's product. *Id.* The similarity of the marks, the defendant's intent, and actual confusion (if any) tend to carry the most weight, but no one factor determines the outcome. *Id.* This Court reviews each factor in turn.

First, like the plaintiff in *Monster*, Plaintiff submitted images of Defendant's counterfeit goods; the images show a mark "so nearly identical" to the Bar & Shield Logo that viewers would likely associate Defendant's axle nut covers with Plaintiff's axle nut covers. *Monster*, 2015 WL 4081288, at *2. Second, the products—axle nut covers —"are the kind the public might very well attribute to a single source (the plaintiff)." *AutoZone*, 543 F.3d at 931 (quoting *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 463 (7th Cir. 2000)). Plaintiff and Defendant both offer axle nut covers compatible with Harley-Davidson motorcycles, and Plaintiff authorizes *some* retailers to sell products bearing its mark. Thus, consumers could easily believe that the marks on Defendant's counterfeit goods originated with Plaintiff. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 899 (7th Cir. 2001). No genuine issue of fact exists as to the first and second factors.

On the third factor, Plaintiff offers almost no evidence other than that it distributes products with the genuine Bar & Shield Logo throughout the United States and that Defendant offers its counterfeit axle nut covers to the same market. *See generally* [102]. So, Plaintiff gets only minimal support from this factor, but regardless, no genuine issue of material fact exists as to the area and manner of concurrent use. *See Monster*, 2015 WL 4081288, at *3.

Fourth, courts assume that consumers "exercise a lesser degree of care and discrimination" when purchasing widely accessible and inexpensive products. *Sorensen v. WD-40 Co.*, 792 F.3d 712, 730 (7th Cir. 2015). A lesser degree of consumer care supports a finding that a likelihood of confusion exists. *Id.* Defendant sold its axle nut covers bearing the counterfeit mark for about

$12 per pair. [116] at 5. Although Plaintiff's genuine axle nut covers cost more than the counterfeit items, *id.*, the genuine products still retail for a relatively low price, especially compared to the cost of a motorcycle that the products would accessorize. Thus, consumers likely would not exercise a tremendous deal of care in purchasing axle nut covers, so this factor favors Plaintiff. Defendant offers no evidence to contradict this finding, other than the improper legal argument that this Court previously disregarded for violating Local Rule 56.1.

**\*4** Fifth, Plaintiff has a strong mark. The strength factor refers to a mark's distinctiveness, or its "propensity to identify the products or services sold as emanating from a particular source." *CAE*, 267 F.3d at 684. Courts often measure this factor through a mark's "economic and marketing strength." *AutoZone*, 543 F.3d at 933. In *AutoZone*, for example, the court found a strong mark where the plaintiff displayed its mark prominently on thousands of stores across the country and used the mark in hundreds of millions of dollars' worth of advertising over several decades. *Id.* Similarly, Plaintiff here began using the Bar & Shield Logo around 1910, and now spends millions of dollars yearly on advertising that includes the Bar & Shield Logo. [102] ¶¶ 4, 8. Defendant offers no contradicting evidence, so this factor wholly supports Plaintiff.

As for the sixth factor, Plaintiff offers no evidence of actual confusion. But Plaintiff does not have to show actual confusion to demonstrate a likelihood of confusion, *CAE*, 267 F.3d at 685–86, so this factor does not affect the analysis here, *see Monster*, 2015 WL 4081288, at *3.

Seventh, Defendant's "use of identical marks on nearly identically-designed products" shows that Defendant "intended to confuse and deceive consumers into believing" that Defendant offers axle nut covers affiliated with or made by Plaintiff. *Id.* Defendant protests to the contrary, but through an undated, conclusory declaration that this Court already disregarded. This Court may infer Defendant's intent to confuse consumers "from the similarity of the marks where the senior mark has attained great notoriety." *AutoZone*, 543 F.3d at 934. Plaintiff has used the Bar & Shield Logo since the early 1900s and now owns one of the most valuable brands in the world. [102] ¶ 12. Given the similarity of the marks and products at issue here and the notoriety of Plaintiff's mark, the evidence

shows that Defendant intended to "palm off" his product as Plaintiff's. *AutoZone*, 543 F.3d at 929.

Overall, the evidence favors Plaintiff so heavily that this Court has no doubt that Defendant's unauthorized use of the Bar & Shield Logo creates a likelihood of confusion. This Court grants summary judgment to Plaintiff on all counts.

### 1. Statutory Damages

For Defendant's infringement, Plaintiff seeks at least $150,000 in statutory damages under 15 U.S.C. § 1117(c). The Lanham Act ordinarily allows up to $200,000 in statutory damages per counterfeit mark, although a plaintiff may recover up to $2,000,000 per counterfeit mark for willful infringement. § 1117(c)(1), (c)(2). Courts enjoy "wide discretion" in awarding statutory damages and should consider various factors to set awards, such as "the difficulty or impossibility of proving actual damages, the circumstances of the infringement, and the efficacy of the damages as a deterrent" to future infringement. *Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1229 (7th Cir. 1991). Courts also consider the value of the plaintiff's brand and efforts to protect the brand. *Lorillard Tobacco Co. v. S & M Cent. Serv. Corp.*, No. 03-cv-4986, 2004 WL 2534378, at *6 (N.D. Ill. Nov. 8, 2004).

Plaintiff argues that Defendant willfully infringed the Bar & Shield Logo. This Court agrees. Infringement qualifies as willful when the infringer knows that its conduct constitutes infringement or acts "in reckless disregard" of the owner's rights. *Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 511 (7th Cir. 1994). To find knowing infringement, "willful blindness" constitutes "knowledge enough." *Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 590 (7th Cir. 1989). As this Court found above, Defendant intended to pass off his product as Plaintiff's. Because products featuring the Bar & Shield Logo "are widely recognized and associated exclusively with" Plaintiff, and because Defendant used a mark "virtually identical" to Plaintiff's mark, this Court finds that Defendant willfully infringed the Bar & Shield Logo. *Monster*, 2015 WL 4081288, at *3. That finding of willfulness means that Plaintiff may recover up to $2,000,000 under § 1117(c)(2).

**\*5** The inquiry now turns to *Chi-Boy's* discretionary factors for awarding statutory damages. Defendant argues that this Court should award less than $150,000 because Plaintiff did not calculate its actual damages or "provide nexus [sic] between the violation and its actual damages." [115] at 4. Again, Defendant's argument demonstrates a misunderstanding of the applicable law. Plaintiff's actual damages "do not ultimately matter" because Plaintiff "elected to pursue statutory damages under § 1117(c)" instead of actual damages under § 1117(b). *Luxottica Grp. S.p.A. v. Chen*, No. 16-cv-6850, 2017 WL 836228, at *3 (N.D. Ill. Mar. 2, 2017). Indeed, Congress allowed statutory damages as a remedy in part because "actual damages may be difficult, if not impossible, to determine" in many counterfeiting schemes involving online retailers. *Lorillard*, 2004 WL 2534378, at *6. Defendant's argument carries little weight here.

This Court must craft an award that will deter both Defendant and other potential future violators. *Id.* An award limited to Plaintiff's lost profits "would have little to no deterrent effect on future violations," because a counterfeiter must "understand that he risks his financial future by engaging in his illegal practice." *Id.* And the fact that Defendant's counterfeiting took place online favors a higher statutory damages award because online counterfeiting can reach a much wider audience than counterfeiting through a physical store. *Luxottica USA LLC v. The P'ships*, No. 14-cv-9061, 2015 WL 3818622, at *2 (N.D. Ill. June 18, 2015). Plaintiff's request for a $150,000 award gains more traction from the high value of Plaintiff's brand and the efforts (such as this litigation) that Plaintiff undertakes to protect that brand. *See* [102] ¶ 12 (independent branding firm ranked Plaintiff's brand as one of the 100 most valuable in the world in 2015). Taking Defendant's willful infringement and the other factors discussed here into consideration, this Court awards $150,000 in statutory damages to Plaintiff. *See The P'ships*, 2015 WL 3818622, at *3 (collecting cases with similar awards).

### 2. Permanent Injunction

Plaintiff also seeks a permanent injunction barring Defendant from advertising, offering for sale, and selling counterfeit Harley-Davidson products. A plaintiff seeking a permanent injunction must show that: (1) it has suffered an irreparable injury; (2) legal remedies, such

2017 WL 6733685, 125 U.S.P.Q.2d 1627

as monetary damages, cannot adequately compensate for that injury; (3) the balance of hardships between the parties warrants an equitable remedy; and (4) a permanent injunction would not harm the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiff easily satisfies that test here.

For the first and second factors, the damage that trademark holders suffer from counterfeit goods constitutes "irreparable injury for which the trademark owner has no adequate legal remedy." *RelMax N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001). The balance of hardships also favors Plaintiff; Defendant has no legitimate interest in selling goods bearing Plaintiff's counterfeit mark, but Plaintiff's goodwill would suffer if Defendant continued selling its counterfeit goods. *See Bulgari, S.P.A. v. Xiaohong*, No. 15-cv-5148, 2015 WL 6083202, at *3 (N.D. Ill. Oct. 15, 2015). Finally, a permanent injunction would serve the public interest by removing counterfeit goods from the marketplace and reducing consumer confusion. *Id.*; *see also Eli Lilly*, 233 F.3d at 469. Accordingly, this Court grants Plaintiff's request for a permanent injunction.

### 3. Attorney Fees and Costs

Plaintiff seeks an award of reasonable attorney fees under § 1117(b), and costs. Absent "extenuating circumstances," courts "shall" award reasonable attorney fees in cases involving intentional infringement. § 1117(b); *see also BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1099 (7th Cir. 1994). Federal Rule of Civil Procedure 54(d)(1) entitles Plaintiff, as the prevailing party, to its costs other than attorney fees. Thus, this Court awards Plaintiff reasonable attorney fees and costs. The parties must follow Local Rule 54.3 to allow this Court to determine the amount of fees and costs it should award.

### B. Defendant's Motion to Lift the November 2016 Asset Freeze

**\*6** Defendant moved to modify the preliminary injunction freezing its PayPal account that this Court entered in November 2016. [111]. Defendant bears the burden of presenting "documentary proof that particular assets are not the proceeds of counterfeiting activities." *The P'ships*, 2015 WL 3818622, at *5 (quoting *N. Face Apparel Corp. v. TC Fashions, Inc.*, No. 05 Civ. 9083

(RMB), 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006)). Defendant fails to meet that burden.

Instead of documentary proof, Defendant offers another undated declaration from bg27cyf's manager. [111-1]. The declaration states: "None of the $165,000 currently on deposit in bg27cyf's Pay Pal [sic] account is derived from the sale of products in the United States bearing the Harley-Davidson trademark or logo." *Id.* ¶ 5. Setting aside the evidentiary issues arising from an undated declaration, such a conclusory statement plainly does not qualify as documentary proof that Defendant's PayPal account contains no proceeds from its counterfeiting activities. In fact, Plaintiff submitted PayPal transaction logs for bg27cyf showing over 24,000 transactions for products featuring "Harley" in the name. [141]. Given that evidence, and Defendant's lack of documentary proof that its account contains legitimate funds, this Court denies Defendant's motion to modify the preliminary injunction and lift the asset freeze on its PayPal account.

### C. Plaintiff's Motion to Compel Discovery and/or Strike Defendant's Motion to Lift the Asset Freeze

Plaintiff moved to compel Defendant to produce certain information allegedly necessary for Plaintiff to respond to Defendant's motion to lift the asset freeze. [132]. Alternatively, Plaintiff moved to strike Defendant's motion to lift the asset freeze. *Id.* Because this Court denied Defendant's motion to lift the asset freeze, this Court denies Plaintiff's motion to compel and/or strike as moot.

### D. Defendant's Motion to Strike

Defendant moved to strike a declaration that Plaintiff filed with its reply brief supporting summary judgment. [143]. This Court did not rely upon that declaration in granting summary judgment to Plaintiff or in ruling on the other motions at issue, so this Court denies Defendant's motion to strike as moot.

### IV. Conclusion

This Court grants Plaintiff's motion for summary judgment [99] and awards Plaintiff $150,000 in statutory damages, enters a permanent injunction barring Defendant from selling and offering for sale counterfeit Harley-Davidson products, and awards Plaintiff its reasonable attorney fees and costs. This Court denies

Defendant's motion to lift the November 2016 asset freeze [111]. This Court denies both Plaintiff's motion to compel and/or strike [132] and Defendant's motion to strike [143] as moot.

**All Citations**

Slip Copy, 2017 WL 6733685, 125 U.S.P.Q.2d 1627

Footnotes

1   The following facts come from Plaintiff's Local Rule 56.1 statement of facts [101] and Defendant's Local Rule 56.1 statement of additional facts [116].

**End of Document**                                   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:21-cv-01664 Document #: 6-6 Filed: 03/27/21 Page 23 of 51 PageID #:332

2012 WL 4581409
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

TORY BURCH LLC and
River Light V, L.P., Plaintiffs,
v.
DOES 1–100 d/b/a the aliases
identified on Schedule "A", Defendants.

No. 12 C 7163.
|
Oct. 2, 2012.

**Attorneys and Law Firms**

Kevin W. Guynn, Amy Crout Ziegler, Justin R. Gaudio, Greer, Burns & Crain, Ltd., Chicago, IL, for Plaintiffs.

*MEMORANDUM OPINION AND ORDER*

JOHN Z. LEE, District Judge.

**\*1** Plaintiffs Tory Burch LLC and River Light V, L.P. (collectively, "Plaintiffs," "Tory Burch" or "Tory Burch") have sued Defendants DOES 1–100 ("Defendants") for federal trademark infringement, counterfeiting and false designation of origin in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), cyberpiracy in violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), and deceptive practices in violation of the Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. § 510, *et seq.* Plaintiffs, a United States-based fashion brand that produces Tory Burch branded footwear, handbags, accessories, clothing, and related products and services, allege that Defendants, individuals and business entities who reside in the People's Republic of China or other foreign jurisdictions, operate commercial websites targeting Illinois residents with offers to sell counterfeit Tory Burch products. Tory Burch contends that Defendants use a variety of domain names set up by registrants (the "Accused Domain Names") and create websites that incorporate copyrightprotected content, images, and product descriptions to mislead consumers into believing that they are purchasing genuine Tory Burch products.

On September 14, 2012, the Court granted Tory Burch's *ex parte* motion for entry of (1) a temporary restraining order ("TRO"); (2) a domain name transfer order; (3) an asset restraining order; (4) an expedited discovery order; and (5) service of process by email and electronic publication. Defendants were served with notice of the preliminary injunction proceedings and the TRO. On September 28, 2012, the Court held a hearing on Plaintiffs' motion for a preliminary injunction. No defendant appeared at the preliminary injunction hearing or submitted any written objection to the motion. For the reasons herein, Plaintiffs' motion for entry of a preliminary injunction is granted.

**Discussion**

A party seeking a preliminary injunction must show (1) that its case has "some likelihood of success on the merits" and; (2) that it has "no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied." *Ezell v. City of Chi.,* 651 F.3d 684, 694 (7th Cir.2011). If the moving party meets these threshold requirements, the district court "weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id.* The district court's weighing of the facts is not mathematical in nature; rather, it is "more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 895–96 (7th Cir.2001) (quoting *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir.1992)). The Court addresses each factor in turn.

**I. Likelihood of Success on the Merits**

**A. Trademark Claims**

**\*2** Under the Lanham Act, a defendant is liable for federal trademark infringement and counterfeiting if the defendant "without the consent of the registrant ... use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(a). Section

43(a) of the Lanham Act further imposes liability upon a defendant who "on or in connection with any goods or services ... uses in commerce any ... false designation of origin, false or misleading description of fact, or false or misleading misrepresentation of fact, which is likely to cause confusion or to cause mistake, or to deceive as to the ... origin, sponsorship, or approval of his or her goods ... by another person." 15 U.S.C. § 1125(a)(1). Under the UDPTA, a defendant is liable for, among other things, (1) passing off goods as those of another; (2) causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods; or (3) causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with another. 815 Ill. Comp. Stat. 510/2(a).

Tory Burch's Lanham Act and UDTPA claims involve the same elements. See *Packaging Supplies, Inc. v. Harley–Davidson, Inc.,* No. 08 C 400, 2011 WL 1811446, at *5 (N.D.Ill. May 12, 2011); *Morningware, Inc. v. Hearthware Home Prods., Inc.,* 673 F.Supp.2d 630, 639 (N.D.Ill.2009) ("Where a plaintiff's factual allegations under the Illinois Uniform Deceptive Trade Practices Act also form the basis for plaintiff's claims under the Lanham Act, the legal inquiry is the same under both statutes. Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act.") (citing *Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 908 (7th Cir.1983)). Moreover, "the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks.... Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical—is there a likelihood of confusion?" *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 780, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (internal citations omitted).

A trademark infringement claim under the Lanham Act has two elements. See 15 U.S.C. § 1125(a). First, the plaintiff must show "that its mark is protected under the Lanham Act." *Barbecue Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041, 1043 (7th Cir.2000). Second, the plaintiff must show that "the challenged mark is likely to cause confusion among consumers." *Id.* A court will not reach the second element "until persuaded that the mark is sufficiently distinctive to warrant prima facie protection as a trademark." *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992).

*3 When considering whether a particular mark is protected under the Lanham Act, the law recognizes five categories of trademarks, in ascending order of distinctiveness: generic, descriptive, suggestive, arbitrary, and fanciful. See *Two Pesos,* 505 U.S. at 768; *Packman v. Chi. Tribune Co.,* 267 F.3d 628, 638 (7th Cir.2001). A plaintiff with a trademark registered in accordance with the Lanham Act is entitled to one of two presumptions: (1) that his registered trademark is not merely descriptive or generic; or (2) that if descriptive, the mark is accorded secondary meaning. See *Packman,* 267 F.3d at 638. Secondary meaning exists "only if most consumers have come to think of the mark not as descriptive at all but as the name of the product." *Id.* at 639. A defendant may overcome this presumption with evidence that the mark is merely generic or descriptive, or that it lacks secondary meaning. *Id.*

In this case, Tory Burch is entitled to the presumption that its marks are protected under the Lanham Act because it holds valid and subsisting registrations for trademarks in the United States. (Walden Decl. ¶ 4.) Tory Burch has not licensed or authorized Defendants to use any of its trademarks. (*Id.* ¶ 17.) Defendants have put forth no evidence that the marks registered by Tory Burch are merely generic or descriptive. Thus, Tory Burch satisfies the first element of its Lanham Act claim.

In determining whether a plaintiff satisfies the second element of a Lanham Act claim, that the challenged mark is likely to cause confusion among consumers, the Seventh Circuit has identified seven relevant factors: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the intent of the defendant to "palm off" his product as that of another. *AutoZone, Inc. v. Strick,* 543 F.3d 923, 929 (7th Cir.2008). No one factor is dispositive, but the similarity of the marks, actual confusion, and the defendant's intent are "particularly important." *Id.*

Here, Tory Burch has submitted extensive documentation showing that Defendants are selling counterfeit versions of Tory Burch products that are virtually identical in appearance to the products sold by Tory Burch itself. (Walden Decl. ¶ 13–17.) Both Tory Burch and

Defendants advertise and sell their products over the Internet, targeting consumers looking for Tory Burch merchandise. (*Id.* ¶¶ 8–9, 13–17.) Those consumers are diverse with varying degrees of sophistication, and they are likely to have difficulty distinguishing authentic Tory Burch merchandise from counterfeit products. Indeed, it appears that Defendants are intentionally trying to induce consumers looking for genuine Tory Burch products to purchase fake products instead. In that regard, Defendants use the Tory Burch mark in many of their Accused Domain Names, such astoryburchonlines.com andtoryburchflats2012.com, and they advertise products that look almost exactly like authentic Tory Burch products and bear the Tory Burch logo. (Compl., Schedule A.) Tory Burch does not have evidence of actual consumer confusion, but that is not required to prove that a likelihood of confusion exists, particularly given the compelling evidence that Defendants are attempting to "palm off" their goods as genuine Tory Burch merchandise. *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 685 (7th Cir.2001).

**\*4** Taking the evidence as a whole, the Court believes that Tory Burch is likely to establish a prima facie case of trademark infringement and false designation of origin under the Lanham Act and the UDPTA sufficient to support the entry of a preliminary injunction.

### B. Cyberpiracy

Tory Burch also sues Defendants for cyberpiracy in violation of the ACPA. The ACPA was enacted to combat "cybersquatting," which is "the bad faith registration of domain names with intent to profit from the goodwill associated with the trademarks of another." *Vulcan Golf, LLC v. Google Inc.,* 726 F.Supp.2d 911, 915 (N.D.Ill.2010) (quoting *Solid Host, NL v. Namecheap, Inc.,* 652 F.Supp.2d 1092, 1099 (C.D.Cal.2009)). Cybersquatters "register wellknown marks to prey on customer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site." *Id.* To state a claim under the ACPA, Tory Burch must show that "(1) it had a distinctive or famous mark at the time the domain name was registered, (2) the defendant[s] registered, trafficked in, or used a domain name that is identical or confusingly similar to plaintiff's mark, and (3) the defendant[s] had a bad faith intent to profit from that mark." [1] *MasterCard Int'l Inc. v. Trehan,* 629 F.Supp.2d

824, 830 (N.D.Ill.2009) (quoting *Flentye v. Kathrein,* 485 F.Supp.2d 903, 914 (N.D.Ill.2007)).

Here, Tory Burch's trademarks are well-known among fashion consumers worldwide, as evidenced by the extensive media coverage of the brand, including by popular magazines like *Vogue, InStyle, Marie Claire,* and *Elle,* and television shows like CBS Sunday Morning and the Oprah Winfrey Show. (Walden Decl. ¶¶ 10–12.) Additionally, Defendants register, traffic in and use domain names that are identical or confusingly similar to Tory Burch's well-known mark. As described above, many of Defendants' Accused Domain Names directly incorporate the words "Tory Burch," and Defendants use copyrighted photographs of Tory Burch products and logos in order to sell counterfeit versions of them. These facts manifest a bad-faith intent to profit from the Tory Burch mark, and the Court finds that Tory Burch is likely to succeed on the merits of its ACPA claim.

### II. Irreparable Harm/Inadequate Remedy at Law

Having determined Tory Burch is likely to succeed on the merits of its claims, the Court next considers whether the company will suffer irreparable harm without a preliminary injunction, and whether the company has an adequate remedy at law. There is a "wellestablished presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss." *Abbott Labs.,* 971 F.2d at 16; s*ee also AM Gen. Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 805 (7th Cir.2002) (confirming "the law's presumption that trademark dilution or infringement threatens irreparable injury for which there is no adequate remedy at law."). "This willingness to find irreparable harm in trademark cases stems from an understanding that the 'most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another.' " *7–Eleven, Inc. v. Spear,* No. 10 C 6697, 2011 WL 830069, at \*6 (N.D.Ill. Mar. 3, 2011) (quoting *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 (7th Cir.1988)).

**\*5** Tory Burch has submitted evidence that it has spent substantial sums of money to market the Tory Burch brand in the United States and abroad. (Walden Decl. ¶¶ 5–6.) The Tory Burch brand has earned numerous

awards and accolades, including the "Accessory Designer of the Year" award at the 2009 Council of Fashion Designers of America Awards. (*Id.* ¶ 7.) As noted, popular magazines and television shows have covered the success of the Tory Burch brand, and Tory Burch regularly promotes its products with extensive, worldwide advertising campaigns. (*Id.* ¶ 5–12.) The Court finds that Defendants' unauthorized use of the Tory Burch trademarks threaten to irreparably harm the reputation and goodwill Tory Burch has developed with respect to its merchandise. This risks diluting the mark and undermining the years Tory Burch has spent "nurturing its business." *Ty, Inc.,* 237 F.3d at 903. Thus, the Court finds that Tory Burch will suffer irreparable harm without a preliminary injunction, and that the company does not have an adequate remedy at law.

### III. Balancing the Harms/Public Interest
Because Tory Burch has met the threshold requirements necessary for the Court to grant its request for a preliminary injunction, the Court now weighs the factors against one another and assesses whether the balance of harms favors Tory Burch or whether the harm to the Defendants or the public is sufficiently weighty that the injunction should be denied. In balancing the harms between Tory Burch and Defendants, the Court employs a "sliding scale approach: [t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *Girl Scouts of Manitou Council v. Girl Scouts of U.S. of Am., Inc.,* 549 F.3d 1079, 1086 (7th Cir.2008) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 387 (7th Cir.1984)). Here, Tory Burch has a strong likelihood of prevailing on the merits, leaving Defendants with a proportionately small chance of showing that they have any right to sell or market counterfeit Tory Burch merchandise. As a result, Defendants have little basis for arguing that they will suffer any harm by virtue of the preliminary injunction. Indeed, as one court has noted, "one who adopts the marks of another for similar goods acts at his own peril, since he has no claim to the profits or advantages thereby derived." *Burger King Corp. v. Majeed,* 805 F.Supp. 994, 1006 (S.D.Fla.1992) (internal quotations omitted).

The public interest also weighs in favor of entering a preliminary injunction. *See Girl Scouts of Manitou Council,* 549 F.3d at 1086 (the balancing process should encompass "any effects that granting or denying the preliminary injunction would have on nonparties."). In

trademark infringement cases such as this, "the public interest is served by [an] injunction because enforcement of the trademark laws prevents consumer confusion." *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 469 (7th Cir.2000). The public has an interest in not being confused or defrauded into buying counterfeit Tory Burch products.

**\*6** In sum, Tory Burch is likely to succeed on the merits of its claims, and the balance of the harms weighs in its favor. On these facts, the Court holds that Tory Burch has satisfied its burden of establishing the prerequisites for entry of a preliminary injunction.

### IV. Specific Equitable Relief
Tory Burch asks that the TRO entered by this Court on September 14, 2012, be converted into a preliminary injunction so that Defendants remain enjoined from the manufacture, importation, distribution, offer for sale, and sale of products bearing counterfeit Tory Burch trademarks during the pendency of this litigation. Pursuant to the TRO, Tory Burch caused dozens of PayPal accounts associated with Defendants' websites to be frozen. (Gaudio Decl. ¶ 2.) Tory Burch also served the TRO on the relevant domain-name registries, requesting transfer of the Defendants' names. (*Id.*) Tory Burch argues that a preliminary injunction is necessary so that the domain names remain in Tory Burch's control and the Defendants' PayPal and other accounts remain frozen until completion of these legal proceedings. Otherwise, Defendants would be able to continue to sell counterfeit Tory Burch products and could move monies from such sales to offshore accounts.

In sum, the Court holds that, under all the circumstances presented, the preliminary injunction that Tory Burch seeks is necessary and appropriate.

### V. Conclusion
For these reasons, the Court grants Plaintiffs' motion for entry of a preliminary injunction.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 4581409

**Tory Burch LLC v. Does 1-100, Not Reported in F.Supp.2d (2012)**

2012 WL 4581409

Footnotes

1    The ACPA identifies nine factors to consider in assessing bad-faith intent, including: (1) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark; (2) the person's provision of material and misleading false contact information when applying for the registration of the domain name; (3) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others; and (4) the extent to which the mark incorporated in the person's domain name is not distinctive or famous. 15 U.S.C. § 1125(d)(1)(B)(i). A court is not limited to considering only the enumerated factors, and "the most important grounds for finding bad faith 'are the unique circumstances of th[e] case.' " *Virtual Works, Inc. v. Volkswagen of America, Inc.,* 238 F.3d 264, 268 (4th Cir.2001) (quoting *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.,* 202 F.3d 489, 499 (2d Cir.2000)).

---

**End of Document**                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Bulgari, S.p.A. v. Partnerships and Unincorporated..., Not Reported in...

2014 WL 3749132

Case: 1:21-cv-01664 Document #: 6-6 Filed: 03/27/21 Page 28 of 51 PageID #:337

2014 WL 3749132
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Bulgari, S.p.A., Plaintiff,
v.
The Partnerships and Unincorporated Associations
Identified On Schedule "A," Defendants.

Case No. 14–cv–4819
|
Signed July 18, 2014

**Attorneys and Law Firms**

Kevin W. Guynn, Amy Crout Ziegler, Jessica Lea
Bloodgood, Justin R. Gaudio, Greer, Burns & Crain, Ltd.,
Chicago, IL, for Plaintiff.

## REPORT AND RECOMMENDATION

MARY M. ROWLAND, United States Magistrate Judge

*1 Plaintiff Bulgari, S.p.A. ("Bulgari") brings the present
action against the Partnerships and Unincorporated
Associations identified on Schedule A to the Complaint
(collectively, the "Defendants") for federal trademark
infringement and counterfeiting (Count I), false
designation of origin (Count II), cybersquatting (Count
III), and violation of the Illinois Uniform Deceptive Trade
Practices Act ("UDTPA") (Count IV).

## I. STATEMENT OF FACTS

As alleged in the Complaint, the Defendants are
promoting, advertising, marketing, distributing, offering
for sale and selling counterfeit products, including jewelry,
watches and other merchandise, bearing counterfeit
versions of Bulgari's trademarks (collectively, the
"Counterfeit BVLGARI Products") through various fully
interactive commercial Internet websites operating under
at least the Defendant Domain Names and Online
Marketplace Accounts listed in Schedule A to the
Complaint (collectively, the "Defendant Internet Stores").

The Defendants create the Defendant Internet Stores by
the hundreds and design them to appear to be selling
genuine BVLGARI Products, while actually selling low-
quality, unlicensed Counterfeit BVLGARI Products to
unknowing consumers. The Defendant Internet Stores
share unique identifiers, such as website design and
similarities of the counterfeit products offered for sale,
establishing a logical relationship between them and
suggesting that Defendants' counterfeiting operation
arises out of the same transaction, occurrence, or series of
transactions or occurrences. Defendants attempt to avoid
liability by going to great lengths to conceal both their
identities and the full scope and interworking of their
massive counterfeiting operation. Defendants directly
target unlawful business activities toward consumers in
Illinois, cause harm to Bulgari's business within this
Judicial District, and have caused and will continue to
cause irreparable injury to Bulgari.

Defendants facilitate sales of Counterfeit BVLGARI
Products by designing the Defendant Internet Stores
so that they appear to unknowing consumers to be
authorized online retailers, outlet stores, or wholesalers
selling genuine BVLGARI Products. *See* Docket Entry
11 at ¶ 17. The Defendant Internet Stores look
sophisticated and accept payment in U.S. dollars. *Id.*
Numerous Defendant Domain Names also incorporate
the BVLGARI Trademarks into the URL, and oftentimes
Defendants include Bulgari's copyright-protected content,
images, and product descriptions on their websites to
make it very difficult for consumers to distinguish such
counterfeit sites from an authorized retailer. *Id.* Some of
the Defendant Internet Stores even go so far as to admit
to selling counterfeit products, explicitly stating that they
are offering "replica" or "fake" BVLGARI Products for
sale. *Id.* at ¶ 16. Bulgari has not licensed or authorized
Defendants to use any of the BVLGARI Trademarks,
and none of the Defendants are authorized re-sellers of
genuine BVLGARI Products. *Id.* at ¶ 17.

*2 The Defendant Internet Stores accept payment via
Western Union, credit card and/or PayPal and ship the
Counterfeit BVLGARI Products in small quantities via
international mail to minimize detection by U.S. Customs
and Border Protection. *Id.* at ¶ 18. Defendants further
perpetuate the illusion of legitimacy by offering "live
24/7" customer service and using indicia of authenticity
and security that consumers have come to associate with
authorized retailers, including the McAfee® Security,
VeriSign®, Visa®, MasterCard®, and PayPal® logos. *Id.*

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Bulgari, S.p.A. v. Partnerships and Unincorporated..., Not Reported in...

Case: 1:21-cv-01664 Document #: 6-6 Filed: 03/27/21 Page 29 of 51 PageID #:338

2014 WL 3749132

Defendants also deceive unknowing consumers by using the BVLGARI Trademarks without authorization within the content, text, and/or meta tags of their websites in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for BVLGARI Products. *Id.* at ¶ 19. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics to increase website rank. *Id.* As a result, links to Defendants' websites show up at or near the top of popular search results and misdirect consumers searching for genuine BVLGARI Products. *Id.*

Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores. *Id.* at ¶ 20. Many of Defendants' names and addresses used to register the Defendant Internet Stores are incomplete, contain randomly typed letters, or fail to include cities or states. *Id.* Other Defendant Domain Names use privacy services that conceal the owners' identity and contact information. *Id.* On information and belief, Defendants constantly register new Defendant Internet Stores using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. *Id.* Such Defendant Internet Store registration patterns are one of many tactics used by the Defendants to conceal both their identities and the full scope and in-terworking of Defendants' massive counterfeiting operation. *Id.* Another tactic commonly used by Defendants to thwart enforcement efforts is to constantly change the location to which the Defendant Domain Names redirect. *Id.*

Even though Defendants operate under multiple fictitious names, many similarities between the Defendant Internet Stores indicate a coordinated effort to sell Counterfeit BVLGARI Products. *Id.* at ¶ 21. For example, many of the Defendant Internet Stores have virtually identical layouts, even though different aliases were used to register the respective domain names. *Id.* In addition, Counterfeit BVLGARI Products for sale in the Defendant Internet Stores bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit BVLGARI Products were manufactured by and come from a common source and that Defendants are interrelated. *Id.* The Defendant Internet Stores also include other notable common features, including use of the same domain name registration patterns,

unique shopping cart platforms, accepted payment methods, check-out methods, meta data, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, the same incorrect grammar and misspellings, similar hosting services, similar name servers, and the use of the same text and images, including content copied from Bulgari's officialbulgari.com website. *Id.*

On July 1, 2014, this Court granted Bulgari's *ex parte* Motion for Entry of a(1) Temporary Restraining Order, (2) Domain Name Transfer Order, (3) Asset Restraining Order, (4) Expedited Discovery Order, and (5) Service of Process by Email and Electronic Publication ("the TRO"). *See* Docket Entry 33. The TRO was extended by the Court and will expire on July 29, 2014, pursuant to Federal Rule of Civil Procedure 65(b)(2). *See* Docket Entry 26. The TRO authorized Bulgari to provide notice of these proceedings and the preliminary injunction hearing to Defendants by electronic mail at the e-mail addresses identified in Schedule A to Bulgari's Complaint and electronic publication at the Defendant Domain Names that have been transferred to Bulgari's control. TRO at ¶ 8. Since and pursuant to entry of the TRO, dozens of PayPal accounts associated with Defendants' websites have been frozen. *See* Docket Entry 35–1, at ¶ 2. In addition, Bulgari is in the process of requesting transfer of the Defendant Domain Names. *Id.*

**\*3** On July 11, 2014, Plaintiff filed a motion for preliminary injunction. *See* Docket Entry 34. On July 16, 2014, the Court held a hearing on Plaintiff's motion for a preliminary injunction. No Defendant appeared at the preliminary injunction hearing or submitted any written objection to the motion. For the reasons set forth below, the Court recommends that the TRO be converted to a preliminary injunction against Defendants, so that they remain enjoined from the manufacture, importation, distribution, offer for sale, and sale of Counterfeit BVLGARI Products during the pendency of this litigation. As part of the Preliminary Injunction, the Court recommends that Defendant Domain Names remain in Bulgari's control and Defendants' PayPal accounts and funds remain frozen until completion of these proceedings.

**II. DISCUSSION**

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:21-cv-01664 Document #: 6-6 Filed: 03/27/21 Page 30 of 51 PageID #:339

Bulgari, S.p.A. v. Partnerships and Unincorporated..., Not Reported in...

2014 WL 3749132

### i) Standard for Preliminary Injunction

Since the standard for granting a TRO and the standard for granting a preliminary injunction are identical in this Circuit, the requirements for entry of a preliminary injunction extending the TRO have been satisfied. *See, e.g. Charter Nat'l Bank & Trust v. Charter One Fin., Inc.,* No. 1:01–cv–00905, 2001 WL 527404, *1 (N.D.Ill. May 15, 2001)* (citations omitted). A party seeking to obtain a preliminary injunction must demonstrate: (1) that its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that it will suffer irreparable harm if the injunction is not granted. *See TY, Inc. v. The Jones Group, Inc.,* 237 F.3d 891, 895 (7th Cir.2001).

If the Court is satisfied that these three conditions have been met, then it must consider the harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Id.* Finally, the Court must consider the potential effect on the public interest (non-parties) in denying or granting the injunction. *Id.* The Court then weighs all of these factors, "sitting as would a chancellor in equity," when it decides whether to grant the injunction. *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir.1992)). This process involves engaging in what the Court has deemed "the sliding scale approach"—the more likely the plaintiff will succeed on the merits, the less the balance of harms need favor the plaintiff's position. *Id.* The sliding scale approach is not mathematical in nature, rather "it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Id.* at 895–896. The greater the movant's likelihood of succeeding on the merits, the less the balancing of harms need be in his favor. *See Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 461 (7th Cir.2000).

### (1) Likelihood of Success on the Merits

### (a) Trademark Claims

Under the Lanham Act, a defendant is liable for federal trademark infringement and counterfeiting if the defendant "without the consent of the registrant ... use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(a). Section 43(a) of the Lanham Act further imposes liability upon a defendant who "on or in connection with any goods or services ... uses in commerce any ... false designation of origin, false or misleading description of fact, or false or misleading misrepresentation of fact, which is likely to cause confusion or to cause mistake, or to deceive as to the ... origin, sponsorship, or approval of his or her goods ... by another person." 15 U.S.C. § 1125(a)(1). Under the UDTPA, a defendant is liable for, among other things: (1) passing off goods as those of another; (2) causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods; or (3) causing likelihood of confusion or misunderstanding as to affiliation, connection, or association with another. 815 ILCS § 510/2(a).

**\*4** Bulgari's Lanham Act and UDTPA claims involve the same elements. *See Packaging Supplies, Inc. v. Harley–Davidson, Inc.,* No. 08 C 400, 2011 WL 1811446, at *5 (N.D.Ill. May 12, 2011); *Morningware, Inc. v. Hearthware Home Prods., Inc.,* 673 F.Supp.2d 630, 639 (N.D.Ill.2009) ("Where a plaintiff's factual allegations under the Illinois Uniform Deceptive Trade Practices Act also form the basis for plaintiff's claims under the Lanham Act, the legal inquiry is the same under both statutes. Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act.") (quoting *SB Designs v. Reebok Int'l, Ltd.,* 338 F.Supp.2d 904, 911 (N.D.Ill.2004)). Moreover, "the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks.... Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical – is there a likelihood of confusion?" *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 780 (1992) (internal citations omitted).

To prove a *prima facie* case of trademark infringement, Bulgari must show that: (1) the BVLGARI Trademarks are distinctive enough to be worthy of protection; (2) Defendants are not authorized to use the BVLGARI Trademarks; and (3) Defendants' use of the BVLGARI Trademarks causes a likelihood of confusion as to

Bulgari, S.p.A. v. Partnerships and Unincorporated..., Not Reported in...

2014 WL 3749132

tion or sponsorship of Defendants' products. *See Neopost Industrie B.V. v. PFE Int'l Inc.,* 403 F.Supp.2d 669, 684 (N.D.Ill.2005) (citation omitted).

Regarding the first two elements, Bulgari's BVLGARI Trademarks are inherently distinctive and are registered with the United States Patent and Trademark Office on the Principal Register. The BVLGARI Trademarks have been used exclusively and continuously by Bulgari for years, some since at least as early as 1970. *See* Docket Entry 11 at ¶ 10. Furthermore, Bulgari has not licensed or authorized Defendants to use any of the BVLGARI Trademarks, and none of the Defendants are authorized resellers of genuine BVLGARI Products. *Id.* at ¶ 17.

In determining whether a plaintiff satisfies the third element of a Lanham Act claim, that the challenged mark is likely to cause confusion among consumers, the Seventh Circuit has identified seven relevant factors: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of the defendants to palm off their products as that of another. *Eli Lilly,* 233 F.3d at 461–462 (citation omitted). These factors are not a mechanical checklist, and "[t]he proper weight given to each of [the] factors will vary from case to case." *Dorr– Oliver, Inc. v. Fluid–Quip, Inc.,* 94 F.3d 376, 381 (7th Cir.1996). At the same time, although no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the most important considerations. *G. Heileman Brewing Co., Inc. v. Anheuser–Busch, Inc.,* 873 F.2d 985, 999 (7th Cir.1989).

Bulgari plainly satisfies the likelihood of confusion test. The Defendants are selling low-quality, counterfeit versions of products that look similar to BVLGARI Products and use counterfeit marks identical to the BVLGARI Trademarks. As such, the first and second likelihood of confusion factors weigh heavily in favor of Bulgari.

Bulgari also satisfies the third factor, namely, the area and manner of concurrent use. When considering the third factor, a court looks at "whether there is a relationship in use, promotion, distribution or sales between the goods or services of the parties." *CAE, Inc. v. Clean Air Eng'g Inc.,* 267 F.3d 660, 681 (7th Cir.2001). A court also

looks to whether the parties used the same channels of commerce, targeted the same general audience, and/ or used similar marketing procedures. *Id.* Here, both Bulgari and Defendants advertise and sell their products to consumers via the Internet. Both parties use the same means and the same channels of commerce to target the same Internet consumers looking for genuine BVLGARI Products. The Defendant Internet Stores advertise and sell Counterfeit BVLGARI Products online, just as Bulgari advertises and sells its genuine BVLGARI Products online atus.bulgari.com.

**\*5** Regarding the fourth factor, degree of consumer care, consumers purchasing BVLGARI Products are not a certain, specialized group of people. Rather, the consumer base is a diverse group of people. "[W]hen a buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class." *Trans Union,* 142 F.Supp.2d at 1043 (citation omitted). Further, the Counterfeit BVLGARI Products offered for sale on the Defendant Internet Stores are typically priced slightly below standard retail prices, making it very difficult for consumers to determine that the products are counterfeit. Taking into account the diverse group of Bulgari consumers and the closely related pricing schemes between the Counterfeit BVLGARI Products and the genuine BVLGARI Products, consumers are very likely to be confused, so this factor favors Bulgari.

Due to their long-standing use and wide acceptance by the public, the BVLGARI Trademarks have become famous and associated with high quality BVLGARI Products. The BVLGARI Trademarks are distinctive when applied to the BVLGARI Products. The marks signify to consumers that the products come from Bulgari and are manufactured to Bulgari's high quality standards. Consumers have come to recognize the BVLGARI brand as a source of luxury watches, jewelry and accessories. Thus, the fifth factor, the strength of the marks, also weighs heavily in favor of Bulgari.

As for the sixth factor, actual confusion, Bulgari has submitted extensive evidence showing that Defendants are selling Counterfeit BVLGARI Products that look virtually identical in appearance to genuine BVLGARI Products. *See* Docket Entries 27–30. Bulgari does not need to prove likelihood of confusion with evidence of actual confusion; instead, it merely needs to show *some*

Bulgari, S.p.A. v. Partnerships and Unincorporated..., Not Reported in...

Case: 1:21-cv-01664 Document #: 6-6 Filed: 03/27/21 Page 32 of 51 PageID #:341

2014 WL 3749132

evidence of potential confusion. *See Libman Co. v. Vining Indus., Inc.,* 69 F.3d 1360, 1363 (7th Cir.1995); *see also Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 960 (7th Cir.1992) (the Seventh Circuit has consistently found that "plaintiff need not show actual confusion in order to establish likelihood of confusion."). In this case, actual confusion can be inferred because Defendants are selling counterfeit versions of BVLGARI Products that use the same BVLGARI Trademarks. Because the goods look nearly identical, consumers will be confused and think that Defendants' products are genuine BVLGARI Products or are sponsored or endorsed by Bulgari.

Regarding the seventh and final factor, Defendants are intentionally using the BVLGARI Trademarks to confuse and deceive the consuming public into thinking that Defendants' Counterfeit BVLGARI Products are manufactured by or emanate from Bulgari. Defendants use the BVLGARI marks in many of the Defendant Domain Names, such as bvlgariwatches.info andtopbulgari.com, and they advertise products that look almost identical to genuine BVLGARI Products and bear the BVLGARI Trademarks. *See* Docket Entries 27–30, 31. Defendants are purposefully attempting to benefit and trade off of Bulgari's goodwill and reputation. Therefore, the final factor regarding Defendants' intent also weighs heavily in Bulgari's favor.

Taking the evidence as a whole, Bulgari is likely to establish a *prima facie* case of trademark infringement and counterfeiting, false designation of origin under the Lanham Act, and violation of the UDTPA sufficient to support the entry of a preliminary injunction.

### (b) Cybersquatting

Bulgari also sues Defendants for cybersquatting. Pursuant to the Anticybersquatting Consumer Protection Act of 1996 (ACPA), a person alleged to be a cybersquatter is liable to the owner of a protected mark if that person: (i) has a bad faith intent [1] to profit from the mark; and (ii) registers, traffics in, or uses a domain name that ... is identical or confusingly similar to or dilutive of a mark that is "distinctive" or "famous." 15 U.S.C. § 1125(d)(1) (A).

**\*6** The BVLGARI Trademarks are highly distinctive, well-known and famous marks among consumers in the United States and worldwide, as evidenced by the success of the brand and the extensive, unsolicited media coverage of the brand. *See* Docket Entry 11 at ¶¶ 7 and 11. Defendants register, traffic in and use domain names that are identical or confusingly similar to Bulgari's distinctive and famous BVLGARI Trademarks. As described above, many of the Defendant Domain Names directly incorporate the marks "BVLGARI" and "BULGARI," and Defendants use copyright-protected photographs of BVLGARI Products and logos without a license in order to sell Counterfeit BVLGARI Products. *See* Docket Entries 27–30, 31. These facts manifest bad faith intent to profit from the BVLGARI Trademarks, and the Court should find that Bulgari is likely to succeed on the merits of its ACPA claim.

### ii) Irreparable Harm and Inadequate Remedy at Law

The Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." *Re/Max N. Cent., Inc. v. Cook,* 272 F.3d 424, 432 (7th Cir.2001) (citing *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 469 (7th Cir.2000)); *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1114 (7th Cir.1997); *Wesley–Jessen Division of Schering Corp. v. Bausch & Lomb Inc.,* 698 F.2d 862, 867 (7th Cir.1983). Irreparable injury "almost inevitably follows" when there is a high probability of confusion because such injury "may not be fully compensable in damages." *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.,* 560 F.2d 1325, 1332 (7th Cir.1977) (citation omitted). "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 (7th Cir.1988); *see also 4 Callmann on Unfair Competition, Trademarks and Monopolies* § 88.3(b) at 205 (3d ed.1970). As such, monetary damages are likely to be inadequate compensation for such harm. *Ideal Indus., Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1026 (7th Cir.1979).

Defendants' unauthorized use of the BVLGARI Trademarks has and continues to irreparably harm Bulgari through diminished goodwill and brand confidence, damage to Bulgari's reputation, loss of exclusivity, and loss of future sales. *See* Docket Entry 11

at ¶¶ 22–26. The extent of the harm to Bulgari's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are both irreparable and incalculable, thus warranting conversion of the TRO issued by this Court on July 1, 2014, to a preliminary injunction.

### iii) Balancing the Harms and Public Interest

As willful infringers, Defendants are entitled to little equitable consideration. "When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." *Krause Int'l Inc. v. Reed Elsevier, Inc.,* 866 F.Supp. 585, 587–88 (D.D.C.1994). This is because "[o]ne who adopts the mark of another for similar goods acts at his own peril since he has no claim to the profits or advantages thereby derived." *Burger King Corp. v. Majeed,* 805 F.Supp. 994, 1006 (S.D.Fla.1992) (internal quotation marks omitted). Therefore, the balance of harms "cannot favor a defendant whose injury results from the knowing infringement of the plaintiff's trademark." *Malarkey–Taylor Assocs., Inc. v. Cellular Telecomms. Indus. Ass'n,* 929 F.Supp. 473, 478 (D.D.C.1996).

As Bulgari has demonstrated, Defendants have been profiting from the sale of Counterfeit BVLGARI Products. Thus, the balance of equities tips decisively in Bulgari's favor. An injunction in these circumstances is in the public interest because it will prevent consumer confusion and stop Defendants from violating federal trademark law. The public is currently under the false impression that Defendants are operating their Defendant Internet Stores with Bul-gari's approval and endorsement. An injunction serves the public interest in this case "because enforcement of the trademark laws prevents consumer confusion." *Eli Lilly,* 233 F.3d at 469. In this case, the injury to the public is significant, and the injunctive relief that Bulgari seeks is specifically intended to remedy that injury by dispelling the public confusion created by Defendants' actions.

### iv) The Equitable Relief Sought Remains Appropriate

**\*7** The Lanham Act authorizes courts to issue injunctive relief "according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark...." 15 U.S.C. § 1116(a).

### (1) *The Domain Name Transfer Order Remains Appropriate*

Bulgari seeks a conversion of the TRO issued by this Court on July 1, 2014, allowing Bulgari to retain control of the Defendant Domain Names until the completion of these proceedings. To prevent the Defendants from further manufacture, importation, distribution, offering for sale, and sale of Counterfeit BVLGARI Products and to provide notice to Defendants regarding these proceedings, it is my recommendation that the injunctive relief already awarded be extended through the pendency of this case.

### (2) *The Asset Restraining Order Remains Appropriate*

Bulgari also requests conversion of the TRO to a preliminary injunction so that Defendants' U.S.-based financial accounts remain frozen. Since entry of the TRO, PayPal has provided Plaintiff with information, including the identification of dozens of PayPal accounts linked to the Defendants' websites which were offering for sale and/or selling Counterfeit BVLGARI Products. In the absence of a preliminary injunction, Defendants may attempt to move any assets from any U.S.-based financial accounts, including PayPal accounts, to an offshore account. Therefore, Defendants' assets should remain frozen for the remainder of the proceedings.

The amount of damages to which Bulgari is entitled as set forth in the Complaint far exceeds any amount contained in any of the Defendants' frozen PayPal accounts. For example, Bulgari's prayer for relief requests statutory damages of $2 million from each Defendant. In addition, and as established in Bulgari's TRO Memorandum, many federal courts, including the Northern District of Illinois, have granted orders preventing the fraudulent transfer of assets. *See, e.g., Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.,* No. 1:03–cv–04844, 2005 WL 3115892 (N.D.Ill. Nov. 8, 2005); *Animale Grp. Inc. v. Sunny's Perfume Inc.,* 256 Fed.Appx. 707, 709 (5th Cir.2007); *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995); *Reebok Int'l Ltd. v. Marnatech Enters., Inc.,* 970 F.2d 552, 559 (9th Cir.1992).

### III. CONCLUSION

Bulgari, S.p.A. v. Partnerships and Unincorporated..., Not Reported in...

2014 WL 3749132

For the foregoing reasons, the Court recommends that Plaintiff's motion for a preliminary injunction (Docket Entry No. 34) be GRANTED, under the terms that were employed in the TRO. Counsel has 14 days from the date of service of this Court's Report and Recommendation to file objections with the Honorable Ronald A. Guzman. *See* Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object timely constitutes a waiver of the right to appeal. *Lorentzen v. Anderson Pest Control,* 64 F.3d 327, 330 (7th Cir.1995).

**All Citations**

Not Reported in F.Supp.2d, 2014 WL 3749132

Footnotes

1    The ACPA identifies nine factors to consider in assessing bad-faith intent, including: (1) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark; (2) the person's provision of material and misleading false contact information when applying for the registration of the domain name; (3) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others; and (4) the extent to which the mark incorporated in the person's domain name is not distinctive or famous. 15 U.S.C. § 1125(d)(1)(B)(i). A court is not limited to considering only the enumerated factors, and "the most important grounds for finding bad faith 'are the unique circumstances of th[e] case.' " *Virtual Works, Inc. v. Volkswagen of America, Inc.,* 238 F.3d 264, 268 (4th Cir.2001) (quoting *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.,* 202 F.3d 489, 499 (2d Cir.2000)).

**End of Document**
© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4557812
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Donald VANCE and Nathan Ertel, Plaintiffs,
v.
Donald RUMSFELD, United States of America
and Unidentified Agents, Defendants.

No. 06 C 6964.
|
Dec. 21, 2007.

**Attorneys and Law Firms**

Michael I. Kanovitz, Arthur R. Loevy, Gayle M. Horn, Jonathan I. Loevy, Loevy & Loevy, Chicago, IL, for Plaintiffs.

James R Whitman, Washington, DC, Samuel B. Cole, United States Attorney's Office, Chicago, IL, for Defendants.

MEMORANDUM OPINION AND ORDER

ARLANDER KEYS, United States Magistrate Judge.

**\*1** Currently before the Court is Plaintiffs' Motion for Limited Discovery. Defendant United States argues that Plaintiffs are not entitled to the requested discovery and that the Court lacks jurisdiction to compel the production. For the reasons set forth below, Plaintiffs' Motion is granted in part, and denied in part.

BACKGROUND FACTS [1]

Plaintiffs Donald Vance and Nathan Ertel, both American citizens, traveled to Iraq in 2004 to work for the Sandi Group, which provides security services for the Unites States State Department, nongovernmental organizations ("NGO's"), and commercial and media firms operating in Iraq. Dissatisfied with their working conditions, Plaintiffs resigned from Sandi and returned to the United States.

In 2005, Shield Group Security ("SGS"), another private security firm operating in Iraq, recruited Plaintiffs, separately, to join the firm. Both Mr. Vance and Mr. Ertel accepted positions with SGS, and returned to Iraq in late 2005.

SGS maintained its offices in a gated community in the "Red Zone" in Baghdad, Iraq. Plaintiffs resided in this gated community, which was patrolled by armed guards, and was essentially a neighborhood populated by native Iraqis, SGS employees, and other expatriates employed by private firms doing business in Iraq.

Plaintiffs allege that, while working with SGS, they observed suspicious and potentially illegal activity. Specifically, Plaintiffs claim that they witnessed SGS agents making payments to Iraqi sheikhs, in an attempt (they believed) to gain an advantage from these influential Iraqis. Concerned about the legality of SGS's actions, Mr. Vance purportedly contacted the Federal Bureau of Investigation ("FBI") during a visit to Chicago. Mr. Vance was put in contact with FBI agent Travis Carlisle, who arranged for Mr. Vance to continue to report on SGS's suspicious activity in Iraq. Mr. Vance agreed to do so, and reported to Agent Carlisle daily.

Agent Carlisle subsequently put Mr. Vance in contact with Maya Dietz, a United States government official working in Iraq. Ms. Dietz asked Mr. Vance to copy SGS's computer documents and to forward them to her; Mr. Vance agreed.

Mr. Ertel apparently shared Mr. Vance's concerns, and subsequently became aware of Mr. Vance's communications with the FBI. Mr. Ertel agreed to assist Mr. Vance in reporting to Agent Carlisle, and the two also began communicating their concerns to Deborah Nagel and Douglas Treadwell, two U.S. government officials working in Iraq.

Plaintiffs reported to Agent Carlisle and other U.S. officials that SGS Vice President Jeff Smith [2] routinely sold arms, ammunition, night vision technology and infrared targeting systems throughout Iraq. Mr. Smith was well-connected politically, and had a direct relationship with both General George Casey and Iraqi President Jalal Talabani. Plaintiffs also informed both Agent Carlisle and Ms. Nagel that Laith Al-Khudairi, a well-connected employee in the detainee operations

division of the United States State Department, conducted suspicious meetings at the SGS compound [3].

**\*2** Plaintiffs found the government officials within Iraq to be unreceptive to their concerns, informing Plaintiffs that there was little the local officials could do to address the problem. Discouraged with the local officials' responses, Plaintiffs shared most of the information they gathered only with Agent Carlisle [4].

Plaintiffs allege that SGS began to question their loyalty to the firm. SGS's suspicions escalated, and on April 14, 2006, armed SGS agents confiscated Plaintiffs' access cards, effectively trapping Plaintiffs in the "Red Zone" within the SGS compound. Plaintiffs contacted Ms. Nagel and Mr. Treadwell, who advised Plaintiffs to barricade themselves in a secure room until U.S. forces could rescue them. Plaintiffs complied and were removed from the SGS compound by U.S. forces.

Plaintiffs were then escorted to the U.S. Embassy, where military personnel seized all of their personal property, including their laptop computers, cellular phones, and cameras. Plaintiffs claim that they were then separated and questioned by an FBI agent and two individuals from United States Air Force Intelligence. Plaintiffs revealed the suspicious activity that they had observed while employed by SGS, and their communications with the FBI. Plaintiffs informed their interrogators that information contained on their seized computers would support their statements. Following the interviews, Plaintiffs were escorted to trailers, where they were permitted to sleep for two to three hours.

Their rest was short-lived. Several armed guards arrested Plaintiffs, handcuffing and blindfolding the men, and escorted them into a humvee. Plaintiffs were taken to Camp Prosperity, a U.S. military compound in Baghdad, where they were placed in a cage, strip searched, and fingerprinted. They were then taken to separate cells, and held in solitary confinement. Plaintiffs were labeled "security internees" affiliated with SGS, and were suspected of supplying weapons to insurgents. Plaintiffs were allegedly informed that this information was sufficient, according to the policies enacted by Defendant Donald Rumsfeld, for the indefinite, incommunicado detention of Plaintiffs, without due process or access to an attorney.

Two days later, Plaintiffs were again shackled and blindfolded, and then transported to Camp Cropper, another U.S. military compound in Baghdad. At Camp Cropper, Plaintiffs were repeatedly interrogated and subjected to physically and mentally coercive tactics by military personnel, who refused to identify themselves. These unidentified individuals also denied Plaintiffs' repeated requests for an attorney.

On April 20, 2006, Plaintiffs received letters from the Detainee Status Board, indicating that a proceeding would be held on April 23rd, to determine their legal status as "enemy combatants," "security internees," or "innocent civilians." The letter explained that Plaintiffs did not have the right to legal counsel at that proceeding, and that they could only present evidence and witnesses who were reasonably available at Camp Cropper. On April 22, 2006, Plaintiffs received a notice that the Detainee Status Board had determined that they were "security internees," and that they had the right to appeal the determination to Camp Cropper officials. Plaintiffs appealed, and requested that they be allowed to testify on the other's behalf, and that their seized personal property be admitted as evidence of their innocent civilian status.

**\*3** On April 26, 2006, Plaintiffs appeared before the Board. However, they were not permitted to testify on the others' behalf, nor were they provided with the evidence that they had requested. In addition, the Board refused to allow Plaintiffs to see the evidence against them or to confront any adverse witnesses. Nevertheless, on May 17, 2006, Major General John Gardner authorized Mr. Ertel's release-18 days after the Board officially acknowledged that he was an innocent civilian. Mr. Vance's detention continued for an additional two months, where he was continually interrogated. Major General Gardner authorized Mr. Vance's release on July 13, 2006, but he was not permitted to leave Camp Cropper until July 20, 2006. Neither Plaintiff was ever charged with any crime.

Plaintiffs filed suit against Donald Rumsfeld on December 18, 2006, alleging that Mr. Rumsfeld should be held accountable for constitutional violations that occurred in Iraq at the hands of unidentified agents of the United States, as well as for the allegedly unconstitutional practices and policies enacted by Defendant Rumsfeld, which led to Plaintiffs' arrest and confinement.

Vance v. Rumsfeld, Not Reported in F.Supp.2d (2007)

2007 WL 4557812

On December 22, 2006, Plaintiff Vance filed a Motion for Leave to Serve Expedited Third Party Discovery on the United States. The United States filed a Motion in Opposition and a "Statement of Interest" on January 11, 2007. Plaintiffs and the United States appeared before Judge Milton I. Shadur, on January 16, 2007. At the hearing, Judge Shadur questioned the advisability of permitting the requested discovery directed at the United States, in the absence of Defendant Rumsfeld. However, Judge Shadur stated that it would be beneficial for the United States to facilitate the Plaintiffs in their quest to determine the identities of the unknown individuals responsible for their arrest, interrogation, mistreatment, and detention.

The United States agreed that the discovery of just the identities of other potential defendants would be less objectionable than allowing discovery against the United States on substantive issues, but argued that Plaintiffs had failed to demonstrate sufficient need that the information be obtained through expedited discovery. Judge Shadur, however, was sympathetic to Plaintiffs' concern that they likely would be faced with a statute of limitations defense if discovery were not expedited. In addition, Judge Shadur acknowledged the comparative difficulty Plaintiffs would face in attempting to secure the identities of the unknown defendants, most, if not all of whom, were stationed in Baghdad. Judge Shadur further stated that he did not believe "a reasonable inquiry on the part of the government would find any difficulty in identifying persons that the plaintiff is not in a position to identify." 1/16/2007 Hearing Transcript at p. 8. As such, Judge Shadur ordered the United States to "go back and inquire into the availability of such information through the kinds of sources that are available to you." *Id.* at p. 11,

 **\*4** The parties returned to Judge Shadur's courtroom ten days later, on January 26, 2007. The United States reported that initial conversations with officials at the State Department did not reveal any individuals who might be responsive to the relevant portion of Plaintiffs' discovery requests, but that the officials would require more time for investigation. Counsel then stated that the Department of Defense had conducted some interviews, and that "they are more likely to have people who are responsive to those categories, but they are going to require more time as well. Based on my conversation with them I would say that it would take at least 60 days in order to conduct that investigation and come

to a determination as to who is not responsive to those requests." 1/26/2007 hearing transcript at p. 3.

Although the United States initially agreed to turn over the identities of potential defendants on a rolling basis, counsel later balked, explaining that the United States would not disclose the information absent a competent court order to do so. Counsel reiterated the difficulty that even the United States government would face in attempting to conduct the requested discovery in an active war zone.

On February 12, 2007, Plaintiffs amended their Complaint, naming the United States of America as an additional Defendant. In Count XV of their Amended Complaint, Plaintiff asked that the Court, pursuant to the Administrative Procedure Act ("APA") 5 U.S.C § , 701 *et seq.* (West 2007), order the United States to return personal property that Plaintiffs allege military personnel confiscated from them when they were arrested in Iraq.

On February 21, 2007, the case was reassigned to Judge Wayne R. Andersen. Defendants subsequently filed a Motion for Transfer of Venue, which Judge Andersen denied on September 19, 2007. Plaintiffs, who had agreed to stay their discovery requests until Judge Andersen issued his ruling on Defendants' Motion for Transfer of Venue, refiled their discovery Motion on October 1, 2007. Judge Andersen referred all discovery matters, including Plaintiff's Motion for Limited Discovery, to this Court.

The parties appeared before the Court on October 5, 2007. At the hearing, the United States argued that Plaintiffs' APA claim was moot, because the United States Department of Defense ("DoD") had already returned all of the property that it could reasonably locate, and that the Plaintiffs were barred from seeking any other form of redress against military personnel under the APA. In response, Plaintiffs stated that they had reason to believe that agencies in addition to the DoD may have had possession of their property; thus the DoD's bald assertion that it did not have any additional property belonging to Plaintiffs was, at best, inconclusive. Plaintiffs also raised the possibility that employees of private government contractors might be among the "unidentified defendants" acting in concert with military personnel- and thus, were potentially outside of the scope of the protections afforded by the military authority exception-

2007 WL 4557812

further undermining Defendant's argument that Plaintiffs' claims were moot.

### DISCUSSION

**\*5** Plaintiffs seek leave to discover the identities of the individuals responsible for their arrest, detention, and mistreatment in Iraq. Plaintiffs note that the facilities where they were held are "sterilized" facilities, meaning that all of the personnel are anonymous to the detainees. As such, Plaintiffs claim, they do not have effective means of identifying and naming these unknown defendants.

To that end, Plaintiffs have sought discovery from the United States since January of 2007, when the United States informed Judge Shadur and Plaintiffs that, despite the inherent difficulties involved in conducting such discovery, the United States' investigation into the identity of additional defendants would be complete in approximately 60 days. Obviously, more than 60 days has passed since the United States made this assertion, and the United States has never denied that it possesses much of the information that Plaintiff seeks. Yet, the United States has staunchly refused to divulge the fruits of its investigation.

In its Response, the United States argues that Plaintiffs are not entitled to the information and that their Motion must be denied, because: 1) Plaintiffs have not demonstrated that expedited discovery of any matters is appropriate in this case; 2) this Court lacks jurisdiction to order discovery against the United States; 3) granting Plaintiffs' Motion would raise serious Separation of Powers concerns; and 4) Plaintiffs' discovery requests are futile. The Court will address each of the government's arguments in turn.

### I. Expedited Discovery is Appropriate

The United States notes that, despite the fact that Plaintiffs have been seeking this information for approximately one year, Plaintiffs' Motion is actually one for expedited discovery, because the parties have not conferred pursuant to Fed.R.Civ.P. 26(f). The government asserts that Plaintiffs bear the burden of demonstrating that expediting discovery is necessary, and that any harm to Plaintiffs in not expediting discovery outweighs the prejudice to the responding party if discovery is expedited. *See generally, Merrill Lynch Pierce,*

*Fenner & Smith, Inc. v. O'Connor,* 194 F.R.D. 618, 623 (N.D.Ill.2000).

Plaintiffs argue that delaying discovery would cause them irreparable harm, because of the looming statue of limitations deadline on their *Bivens*' claims. *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The parties dispute whether Illinois' two-year statute of limitations (which will expire in approximately April of 2008) should apply to Plaintiffs' *Bivens* claims or the District of Columbia's three-year limitations period should-or at least-could have controlled. *Compare Delgado-Brunet v. Clar,* 93 F.3d 339, 342 (7th Cir.1996) (noting that courts applying Illinois law impose a two year statute of limitations on such claims) *with Carney v. American Univ.,* 151 F.3d 1090, 1096 (D.C.Cir.1998) (finding that D.C. Circuit law imposes a three year statute of limitations on *Bivens*' claims). Contrary to the government's assertion[5], the question of which jurisdictions' law applies depends not upon the forum in which Plaintiffs filed suit, but upon Judge Andersen's resolution of the choice of law issues[6]. It is conceivable that such a ruling would be issued after Illinois' two-year statute of limitations period has passed, forcing Plaintiffs to shoulder the risk that the district court's decision could effectively foreclose their ability to seek redress from the unknown defendants.

**\*6** The government counters that conducting expedited discovery in a warzone outweighs any such concerns. The Court disagrees. There is no apparent end in sight to the hostilities in Iraq, and the United States is powerless to waive a statute of limitations defense on behalf of the unknown defendants. In addition, the government represented to Judge Shadur, almost one year ago, that it had already begun its investigation into the identities of the unknown defendants, and that it could conclude that investigation within about 60 days. The United States has never denied that it possesses some if not all of the information that Plaintiffs seek. Therefore, the Court finds that potential harm to Plaintiffs by delaying discovery outweighs any resulting prejudice to the United States.

### II. This Court has Jurisdiction to Compel Discovery

The United States bluntly asserts that this Court lacks jurisdiction to order the government to produce discovery for the reasons explained in its recently filed Motion

2007 WL 4557812

to Dismiss Rule 12(b) (1). Of course, this Court lacks the authority to dispose of the arguments raised in Defendant's Motion to Dismiss. *See generally, Thomas v. Arn,* 474 U.S. 140, 141-42, 106 S.Ct. 466, 88 L.Ed.2d 435 (U.S.1985); *see also, Brown v. City of Chicago,* No. 98-7949, 2001 WL 1064259, at *1 (N.D.Ill. Sept.10, 2001) (noting that magistrate judges lack jurisdiction to rule on the City's motion to bifurcate trial, where the referral only encompassed discovery disputes.) But the Court need not resolve the United States' Motion to Dismiss to properly evaluate Plaintiffs' present Motion; an analysis of relevant law makes clear that the government's filing of a Motion to Dismiss-even one challenging the district court's jurisdiction-does not strip the Court of the authority to order appropriate discovery.

The resolution of a question concerning "jurisdiction is vital only if the court proposes to issue a judgment on the merits." *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.,* --- U.S. ----, ----, 127 S.Ct. 1184, 1192, 167 L.Ed.2d 15 (U.S.2007) quoting *Intec USA, LCC v. Engels,* 467 F.3d 1038, 1041 (7th Cir.2006). In the instant case, it is clear that this discovery Motion is collateral to a resolution of the merits.

The United States Supreme Court has held that "federal courts have the power to order, at their discretion, the discovery of facts necessary to ascertain their competency to entertain the merits." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). "Where issues arise as to jurisdiction, or venue, discovery is available to ascertain facts bearing on such issues." *Id.* A district court has wide latitude in determining whether to grant a party's request for discovery and such decisions are reviewed for an abuse of discretion. *Doty v. Illinois Cent. R.R. Co.,* 162 F.3d 460, 461 (7th Cir.1998).

Courts have taken a rational approach to discovery requests made in advance of a determination regarding jurisdiction. Courts have generally found it unnecessary for a district court to order discovery or hold a hearing on a motion to dismiss for lack of subject matter jurisdiction where the facts are straightforward and the law is not complex. *See Hay v. Indiana State Bd. of Tax Com'rs,* 312 F.3d 876, 882 (7th Cir.2002) ("Because of the minimal procedural requirements for 'plain, speedy and efficient' set forth by the Supreme Court in *Rosewell,* the district court could make a determination of adequacy based

on the information before it, including by reviewing the applicable statutes establishing the procedures for tax assessment review. Consequently, it was not an abuse of discretion for the district court to grant the motion to dismiss without allowing the landowners to conduct discovery"); *Cook v. Providence Hosp.,* 820 F.2d 176, 178 (6th Cir.1987) (finding that no hearing is required on a motion to dismiss where the facts are relatively simple, substantially uncontroverted, and the law is not complex.)

**\*7** However, where additional discovery would assist the court in resolving the jurisdictional issues, discovery is appropriate. *Ignatiev v. United States,* 238 F.3d 464, 467 (D.C.Cir.2001) (rejecting the district court's determination that the plaintiffs requested discovery was nothing more than a fishing expedition, and finding that the district court erred in granting the motion to dismiss for lack of subject matter jurisdiction without permitting discovery on the jurisdictional question.); *Rosner v. United States,* 231 F.Supp.2d 1202, 1218 (S.D.Fla.2002) (permitting the plaintiffs to conduct discovery to determine whether the government's actions were non-military in nature, thus precluding the application of the APA's "military authority" exception, prior to resolving defendant's motion to dismiss.)

In the instant case, Plaintiffs have argued that the APA military authority exception may not apply to certain unidentified defendants, if those defendants were not military personnel[7] . Absent the requested discovery, however, it would be impossible for Plaintiffs to support such an argument. A full and fair analysis of the government's Motion to Dismiss hinges on the disclosure of the identities and status of the unknown defendants. Similarly, the district court's resolution of the Defendant Rumsfeld's qualified immunity argument would benefit from information about the types of defendants involved in the abuses claimed by Plaintiffs.

The United States counters that discovery is not warranted in any event, because Plaintiffs' sole claim against the government-their claim for the return of personal property seized in Iraq-is moot. The United States bases its mootness argument on: 1) the affidavit of Lt. David Melson, averring that the government has conducted a search of any and all places where the property would have been seized, stored or located; 2) Evidence/Property Custody documents ("Property Documents") that purportedly demonstrate the chain of

Vance v. Rumsfeld, Not Reported in F.Supp.2d (2007)

2007 WL 4557812

custody of the property in question; and 3) the fact that the government has made arrangements to return that property belonging to Plaintiffs that it was able to locate [8].

Plaintiffs first attack Lt. Melson's affidavit, noting that Lt. Melson claims to have contacted only the Joint Personnel Recovery Center ("JPRC"), the Evidence Custodian for the Military Policy Criminal Investigative Division ("CID") and the 494th MP Battalion in his search for Plaintiffs' property. Lt. Melson did not contact any other government agencies or military departments, despite the fact that FOIA documents that Mr. Vance received demonstrate that the Naval Criminal Investigative Service ("NCIS") had control over at least some of Mr. Vance's property, including his thumb drives and cell phone. As such, the investigation described in Lt. Melson's affidavit appears on its face to be incomplete.

Plaintiffs next highlight numerous inconsistencies in the Property Documents proffered by the government. For example, the Property Documents include a property receipt for Mr. Vance that does not match the receipt that Mr. Vance has in his possession. Mr. Vance claims that these discrepancies raise doubts about the authenticity and reliability of the property receipts.

**\*8** Finally, Plaintiffs argue that their APA claim relates to the United States' failure to return property that was seized more than 18 months ago. Because Plaintiffs' challenge against any governmental actors would be limited to the government's failure to return their property, and not to the seizure itself, the act is not military in nature, and, therefore, falls outside of the scope of the military authority exception. *See Jaffe v. United States, 592 F.2d 712, 720 (3rd Cir.1979)* (ruling that the plaintiff's APA claim for failure to warn about the medical risks associated with observing a nuclear test in Nevada did not fall within the military authority exception, as the challenged conduct did not occur in the field nor in time of war.) Indeed, Plaintiffs do not know if their property remains in military custody, with the State Department, the FBI, the CIA, or a host of other agencies. As such, Plaintiffs argue, their claim is neither clearly barred [9] by the military authority exception nor moot, and discovery is appropriate.

The Court agrees that the evidence proffered by the government is far from conclusive on the issue of mootness. Moreover, even if the government's

evidence was not flawed, this evidence would not moot Plaintiffs' claims if the district court determines that the government's conduct was not military in nature, or if the unidentified actors were private governmental contractors-like many of the allegedly politically-connected individuals who were the subject of Plaintiffs reports to Agent Carlisle-who are not shielded by the APA's military authority exception. As such, it is difficult to see how the district court can resolve Defendants' argument that the military authority exception bars Plaintiffs' APA claim, without a more clear understanding of the individuals involved in the complained of abuses.

In conclusion, the Court finds that the issue of jurisdiction in this case is complex and fact intensive. Analysis of the issues raised in Defendants' Motion to Dismiss would only benefit from appropriately tailored discovery. As such, the Court rejects the United States' claim that the arguments raised in its Motion to Dismiss strip the Court of the power to compel discovery.

### III. Tailored Discovery Would Not Violate Separation of Powers Concerns.

The United States next argues that separation-of-powers concerns dictate against granting Plaintiffs' Motion for discovery. The government notes that the purpose of the APA's "military authority" exception is to prevent federal courts from interfering in military strategy, decision-making, and actions occurring in "combat zones or in preparation for, or in the aftermath of, battle." Def.'s Resp. at 6, citing *Doe v. Sullivan,* 938 F.2d 1370, 1380 (D.C.Cir.1991) (finding that the plaintiff's challenge to a rule published by the FDA was not a military matter.) Notably, the district court has not ruled that the military authority exception to the APA applies in this case, and Plaintiffs have offered colorable arguments that the exception does not apply.

**\*9** Nevertheless, the government argues, it is impossible to divorce this case from the realities of an ongoing war in Iraq. Agreed. However, the cases cited by the government are tangential, at best, to the issue of whether the requested discovery in this case is advisable or even permissible. For example, the government cites to *Chappel v. Wallace* [10], where the Court discussed the unique distinction between military and civilian life:

[J]udges are not given the task of running the Army. The responsibility for setting up channels through which ... grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

462 U.S. 296, 301, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (quoting *Orloff v. Willoughby,* 345 U.S. 83, 93-94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953)).

But the case at bar involves charges filed by civilians-not soldiers attempting to avoid the jurisdiction of a military tribunal. And caselaw teaches that citizens have the right to sue the government for abuses that occurred during wartime, and that the judiciary retains the authority to adjudicate those suits. In *Hamdi v. Rumsfeld,* the United States Supreme Court rejected "the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts in such circumstances. Indeed, the position that the courts must forgo any examination of the individual case and focus exclusively on the legality of the broader detention scheme cannot be mandated by any reasonable view of separation of powers, as this approach serves only to *condense* power into a single branch of government. We have long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens." 542 U.S. 507, 535-36, 124 S.Ct. 263, 265 (2004).

The *Hamdi* Court's decision demonstrates that, not only do citizens detained during wartime have the right to seek redress in the courts, but that the courts have the authority to require the United States to afford those litigants certain processes, despite the exigencies of war. Mr. Hamdi, a United States citizen, was taken into custody in Afghanistan, after he was allegedly found supporting Taliban soldiers against the United States. Mr. Hamdi was subsequently detained, indefinitely, in a military facility in the United States, and he filed a petition for habeas corpus. Mr. Hamdi argued that he was denied a meaningful and timely hearing on the issue of whether he was an enemy combatant, and that his extra-judicial detention, which began and ended with the submission of an affidavit based on third-party hearsay, violated his rights under the Fifth and Fourteenth Amendments. *Id,* 542 U.S. at 524-25,

**\*10** The government argued that "[r]espect for separation of powers and the limited institutional capabilities of courts in matters of military decision-making in connection with an ongoing conflict" ought to eliminate entirely any individual process, restricting the courts to investigating only whether the broader detention scheme itself is legal. *Id.* at 527. A majority of the Supreme Court disagreed, and found instead that the "tension ... between the autonomy that the Government asserts is necessary .. and the process that a citizen contends he is due before he is deprived of a constitutional right," should be resolved by balancing the plaintiff's constitutional rights against the government's separation of power and wartime concerns. *Id., citing Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

The Court balanced Mr. Hamdi's assertion that he should have been afforded full due process rights, as the risk of an erroneous deprivation of liberty absent such protections was unacceptably high, with the government's claim that enemy combatants-even if they are citizens-are entitled to only minimal process. The government highlighted the "practical difficulties that would accompany a system of trial-like process" because "military officers who are engaged in the serious work of waging battle would be unnecessarily and dangerously distracted by litigation half a world away, and discovery into military operations would both intrude on the sensitive secrets of national defense and result in a futile search for evidence buried in the rubble of war." 542 U.S. at 531-32, 124 S.Ct. at 2648.

The Court concluded that a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the government's assertions before a neutral tribunal. 542 U.S. at 533, 124 S.Ct. at 2648. In so ruling, the Court found it "unlikely that this basic process will have the dire impact on the central functions of warmaking that the Government forecasts." *Id* at 534, 124 S.Ct. at 2639. The Court further noted that such a process would meddle little into the waging of war, inquiring only into the appropriateness of certain detentions, explaining:

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

> While we accord the greatest respect
> and consideration to the judgments
> of military authorities in matters
> relating to the actual prosecution
> of a war, and recognize that the
> scope of that discretion necessarily is
> wide, it does not infringe on the core
> role of the military for the courts to
> exercise their own time-honored and
> constitutionally mandated roles of
> reviewing and resolving claims like
> those presented here.

542 U.S. at 535, 124 S.Ct. at 1249-50.

Obviously, the issue presented here is distinguishable; the United States has not contested the feasibility of asserting an APA claim against it, but has instead challenged the validity of Plaintiffs' claims, and its obligation to produce discovery as a result. With the exception of the APA's military authority exception-the applicability of which Plaintiffs contest-the government has not argued that Congress has authorized the suspension of APA suits against it. Nevertheless, *Hamdi* is instructive in assisting this Court's balancing of Plaintiffs' need for information relevant to this litigation against the undeniable hurdles of gathering discovery in Iraq during wartime.

**\*11** As discussed above, if the United States does not provide Plaintiffs with the identities of the unknown defendants, there is a very real possibility that the applicable statute of limitations will prevent Plaintiffs from ever seeking redress from potentially liable individuals. In addition, the Court is not persuaded that gathering this information will require the United States to "go out into the field to interview" soldiers "some of whom may be conducting combat operations." Def.'s Resp. at p. 7. Plaintiffs very specifically identified the dates and locations of their detention. It strains credulity to believe that the government and/or military does not have in place procedures for documenting individuals working in those facilities at specific times.

Moreover, the United States has already been ordered by Judge Shadur to begin such an investigation, and has stated that such an investigation would be completed in approximately March of 2007. The government does not deny that it already has the information that Plaintiffs seek, it simply refuses to divulge the information. As such, it is not clear the extent to which the separation of powers concerns cited by the United States are even implicated [11] .

Finally, while the Court is sensitive to the extreme challenges presented by the ongoing hostilities in Iraq, the Court cannot accept the practical consequences of the United States' position-that the existence of a war so diminishes the authority of the judiciary that it must suspend the normal routes of discovery, based on little more than the United States' own assessment of its opponent's position. It is the resulting concentration of power in the executive branch that would offend separation of powers concerns.

The Court concludes that Plaintiffs should be afforded that basic discovery necessary to enable Plaintiffs to avoid a potential statute of limitations' defense. As such, the United States shall produce to Plaintiffs the identities of the unknown defendants within 30 days of the entry of this Opinion.

### IV. Potential Qualified Immunity Arguments are Insufficient to Defeat Plaintiffs' Discovery Request.

The United States asserts that requiring it to undertake discovery in a war zone is inappropriate for the additional reason that Plaintiffs' claims against the unidentified defendants will be futile. The United States confidently asserts that any and all claims against both known and unknown defendants will be dismissed on qualified immunity grounds, and that caselaw dictates that any order compelling discovery should await a ruling on the district court's determination of the Defendants' qualified immunity arguments.

Many courts have noted the "importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). While *Harlow* and its progeny sought to protect government officials who were likely entitled to immunity from broad reaching discovery, the Supreme Court has acknowledged that "limited discovery may sometimes be necessary" before a court can resolve the issue of qualified immunity. *CrawfordEl v. Britton,* 523 U.S. 574, 593 n. 14,

Vance v. Rumsfeld, Not Reported in F.Supp.2d (2007)

2007 WL 4557812

118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *see also, Fairley v. Fermaint* 482 F.3d 897, 900 (7th Cir.2007) (noting that "qualified immunity gives the defendant a right not only to prevail but also to avoid entanglement in the litigation-sometimes dubbed a 'right not to be tried,' this entitlement includes a right to avoid discovery", but only if matters are "sufficiently clear" at the outset of the suit.)

**\*12** In the instant case, it is impossible to determine whether the unknown defendants can raise a colorable claim for qualified immunity, precisely because they-and their positions either within the government, military, or the private sector-are unknown. The only Defendant to have thus far filed a claim for qualified immunity is Defendant Rumsfeld. While Defendant Rumsfeld might present a viable argument [12] that he should not be required to engage in discovery until his claim for immunity is resolved, Plaintiffs are not seeking discovery from Defendant Rumsfeld. Plaintiffs are seeking the identities of the unknown defendants from the United States, and the United States did not raise a claim for qualified immunity in its Response to Plaintiffs' Motion or in its Motion to Dismiss.

The government's position is simply untenable. There is no statutory or caselaw support for the proposition that a court should delay discovery based on the United States' bald representation that unknown defendants will be immune from suit. Nor do the allegations in Plaintiffs' Amended Complaint compel a conclusion that the unknown defendants are necessarily military employees entitled to immunity. *See* Fed. R. Civ. P. 15(a)(2) (noting that courts should "freely give leave" to allow plaintiffs to amend their complaints "when justice so requires.") Plaintiffs' allegations are consistent with theories advanced by counsel in court, that private government contractors may have been acting in concert with the military in orchestrating Plaintiffs' arrests. Only additional discovery will reveal if the government's predictions are accurate. Therefore, the Court rejects the United States' argument that the issue of qualified immunity prevents the Court from proceeding on Plaintiffs' discovery Motion.

In addition, Plaintiffs' unopposed request for leave to serve subpoenas on SBC Global for email correspondence and on Orascom for relevant cell phone records is granted.

**CONCLUSION**

The present Motion seeks to discover the identities of those individuals responsible for Plaintiffs' arrest and detention in Iraq. Almost one year ago, the United States represented to Judge Shadur that it could obtain this information within 60 days, and the government has never denied that it possesses information responsive to Plaintiffs' request. In refusing to produce such information, the government has raised a dubious challenge to the court's jurisdiction, speculated as to the viability of potential defenses that might be asserted by presently unknown defendants, decided that its assessment of the weakness of Plaintiffs' claims should excuse the government's participation in discovery, and argued that separation-of-powers concerns counsel against the court performing its judicial duties, in favor of concentrating discretion and power within the executive branch.

The Court does not presume to foresee the ultimate validity of the claims and defenses raised in this lawsuit. But the Court is convinced that it has both the authority and the obligation to order the United States to discover and produce to Plaintiffs the identities of the individuals responsible for Plaintiffs' arrests, detention, and mistreatment in Iraq.

**\*13** Therefore, the Court grants Plaintiffs' Motion to the extent that it seeks the identities of unknown defendants responsible for their arrest, detention, and mistreatment while at Camps Prosperity and Cropper in Iraq. The Court denies Plaintiffs' Motion to the extent that it seeks all documents concerning Plaintiffs, as this evidence does not implicate the statute of limitations concerns that informed this Court's decision. Similarly, the Court denies Plaintiffs' Motion to the extent that it asks the government to identify all persons who issued and or signed any policy or order that relates to the topics listed in six broad categories, even if such policy and/or order was of general applicability and not specific to Plaintiffs' case.

Therefore, Plaintiffs' Motion to identify the unknown defendants is Granted, Plaintiff's Motion for leave to serve subpoenas on SBC Global and Orascom is Granted, but Plaintiffs' Motion for all additional discovery is Denied, without prejudice.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 4557812

Footnotes

1     The Background Facts were taken from the allegations in Plaintiffs' Amended Complaint, which, at this stage of the proceedings and for purposes of the present Motion, the Court will accept as true.

2     Although Mr. Smith did not serve as SGS's Vice President at all relevant times, he was consistently "high-up in the chain of command at SGS." Amen. Compl. at ¶ 65. Plaintiffs also reported on a number of other SGS employees, including their supervisor, Mr. Josef Trimpert, who was involved in an illegal "Beer for Bullets" scheme.

3     Plaintiffs also informed on a number of other SGS-Affiliated members of the Al-Khudairi family. Plaintiffs imply that, in addition to SGS, all of the individuals that they informed on would have a motive to have them arrested. Plaintiffs also find it suspicious that none of these individuals were detained and questioned in a manner similar to Plaintiffs, despite the incriminating information Plaintiffs presented about them to the FBI and other officials.

4     Plaintiffs' Amended Complaint also alleges that, once these government officials working in Iraq realized they were being left out of the loop, they chose to retaliate by having Plaintiffs arrested and interrogated.

5     The United States insists that Plaintiffs have effectively manufactured the purported prejudice by choosing to file in a forum with a shorter limitations period.

6     Of course, the forum in which the suit is filed is a factor in the choice of law analysis.

7     Plaintiffs also argue that the exception may not apply, because the government's failure to return the Plaintiffs' personal property is not military in nature.

8     Plaintiffs note that the only item that the United States has found is Mr. Vance's laptop, and that the government has offered no explanation as to why it was able to locate this one item and no others.

9     The Court is not ruling on the validity of Plaintiffs' arguments, merely noting the existence of reasonable opposition to the government's position.

10    Similarly, *Alhassan v. Hagee,* 424 F.3d 518, 525 (7th Cir.2005) concludes that it would be inappropriate for courts to review whether a soldier's evidence of his opposition to war was sufficient to establish that he was a conscientious objector whether his objection to war was based on religious concerns, and whether his beliefs were deeply felt. Responsibility for making such determinations rest with the military, not the courts.

11    The United States complains that the requested discovery is inappropriate, because military personnel on active duty in Iraq should not be required to defend against a lawsuit, half way around the world. Plaintiffs correctly point out that such concerns can be appropriately addressed after the unknown defendants have been identified. For example, Congress has enacted the Servicemembers' Civil Relief Act, 50 U.S.C. app. § 501 *et seq.,* which allows courts to stay litigation against' defendants in the active duty military.

12    Of course, Plaintiffs challenge the viability of Defendant Rumsfeld's qualified immunity claim, noting that an American citizen's right to be free from involuntary confinement without due process, even while living abroad, was well established at the time they were detained. *Citing Hamdi,* 542 U.S. at 533.

**End of Document**           © 2019 Thomson Reuters. No claim to original U.S. Government Works.



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| OAKLEY, INC.<br><br>               Plaintiff,<br><br>     v.<br><br>DOES 1 - 100 d/b/a the aliases identified on<br>Schedule "A",<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 12-cv-9864<br><br>   **Judge Robert M. Dow, Jr.**<br><br>   **Magistrate Judge Jeffrey Cole** |

## SEALED ORDER

THIS CAUSE being before the Court on Plaintiff Oakley, Inc.'s ("Plaintiff" or "Oakley") *Ex Parte* Motion for entry of a Temporary Restraining Order, Domain Name Transfer Order, Asset Restraining Order, Expedited Discovery Order and Order to allow Service by Electronic Mail and Electronic Publication (the "Ex Parte Motion") against defendants identified in Schedule A to the Complaint and attached hereto (the "Defendants") and using at least the Defendant Domain Names and the Online Marketplace Accounts identified in Schedule A to the Complaint (the "Defendant Internet Stores"), and this Court having heard the evidence before it hereby GRANTS Plaintiff's Ex Parte Motion in its entirety and orders that:

1.    Defendants, their officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily enjoined and restrained from:

        a.  using the OAKLEY Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, advertising,

1

offering for sale, or sale of any product that is not a genuine Oakley branded product or not authorized by Oakley to be sold in connection with the OAKLEY Trademarks;

b.  passing off, inducing, or enabling others to sell or pass off any product as a genuine OAKLEY branded product or any other product produced by Oakley, that is not Oakley's or not produced under the authorization, control or supervision of Oakley and approved by Oakley for sale under the OAKLEY Trademarks;

c.  committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Oakley, or sponsored or approved by, or otherwise connected with Oakley;

d.  further infringing the OAKLEY Trademarks and damaging Oakley's goodwill;

e.  otherwise competing unfairly with Oakley in any manner;

f.  shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Oakley, nor authorized by Oakley to be sold or offered for sale, and which bear any of the OAKLEY Trademarks or any reproductions, counterfeit copies or colorable imitations thereof;

g.  using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell counterfeit Oakley products; and

h.  operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product bearing the OAKLEY Trademarks or any reproductions, counterfeit copies or colorable

2

imitations thereof that is not a genuine Oakley branded product or not authorized by Oakley to be sold in connection with the OAKLEY Trademarks.

2.    The domain name registries for the Defendant Domain Names, namely, VeriSign, Inc., Neustar, Inc., Afilias Limited and the Public Interest Registry, within two (2) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Oakley's selection until further ordered by this Court, and the domain name registrars shall take any steps necessary to transfer the Defendant Domain Names to a registrar of Oakley's selection until further ordered by this Court.

3.    Those in privity with Defendants and those with notice of the injunction, including any online marketplace such as iOffer, Internet search engines, web hosts, domain name registrars and domain name registries that are provided with notice of the injunction, shall immediately cease facilitating access to any and all websites and accounts through which Defendants engage in the sale of counterfeit and infringing goods using the OAKLEY Trademarks.

4.    Discovery herein by Oakley may continue by providing actual notice, pursuant to subpoena, e-mail or otherwise, of this Order to any of the following:

   a.  Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them;

   b.  any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, or other merchant account providers, payment providers, third party payment processors, credit card associations

(e.g., MasterCard and VISA), which receive payments or hold assets on Defendants' behalf; or

c.  any third party service providers, including without limitation the online B2B selling platforms including iOffer, Internet service providers, backend service providers, web designers, sponsored search engine or ad-word providers, shippers, domain name registrars and domain name registries who have provided services for Defendants.

5.  Any third party providing services in connection with any of the Defendant Internet Stores or other websites operated by Defendants, including, without limitation, Internet Service Providers ("ISP"), back-end service providers, web designers, sponsored search engine or ad-word providers, banks, merchant account providers, including PayPal, third party processors and other payment processing service providers, shippers, domain name registrars and domain name registries (collectively, "Third Party Providers") shall, within five (5) business days after receipt of such notice, provide to Oakley copies of all documents and records in such person's or entity's possession or control relating to:

a.  The identities and addresses of Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them and the locations and identities of Defendants' operations, including, without limitation, identifying information associated with Defendants' websites, Defendant Domain Names and financial accounts;

b.  Defendants' websites;

c.  The Defendant Domain Names or any domain name registered by Defendants; and

d.  Any financial accounts owned or controlled by Defendants, including their agents, servants, employees, confederates, attorneys, and any persons acting in concert or

participation with them, including such accounts residing with or under the control of any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, Western Union, or other merchant account providers, payment providers, third party processors, and credit card associations (e.g., MasterCard and VISA).

6.  Defendants and any persons in active concert or participation with them shall be temporarily restrained and enjoined from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

7.  Any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, for any Defendant or any of Defendants' websites, shall immediately locate all accounts held by or connected with Defendants or Defendants' websites and any such accounts shall be temporarily restrained and enjoined from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

8.  Oakley may provide notice of these proceedings to Defendants, including notice of the preliminary injunction hearing and service of process pursuant to Fed.R.Civ.P 4(f)(3), by electronically publishing a link to the Complaint, this Order and other relevant documents on a website to which the Defendant Domain Names which are transferred to Oakley's control will redirect, and by sending an e-mail to the e-mail addresses identified in Schedule A to Oakley's Complaint that includes a link to said website. The combination of providing notice via electronic publication and e-mail, along with any notice that Defendants receive from domain name registrars and payment processors, shall constitute

notice reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and afford them the opportunity to present their objections.

9.    Schedule A and Exhibits 1 and 2 attached to the Declaration of Adrian Punderson shall remain sealed until further ordered by this Court.

10.    Oakley shall deposit with the Court Ten Thousand dollars ($10,000.00) as security, which amount was determined adequate for the payment of such damages as any person may be entitled to recover as a result of a wrongful restraint hereunder.

11.    Any Defendants that are subject to this Order may appear and move to dissolve or modify the Order on two days' notice to Oakley or on shorter notice as set by this Court.

12.    This Temporary Restraining Order without notice is entered at _____ A.M. on this ____ day of December, 2012 and shall remain in effect for (14) fourteen days.

_____

U.S. District Court Judge Robert M. Dow, Jr.

RB

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Deckers Outdoor Corporation   )
            )  Case No: 15 C 3249
v.           )
            )  Chief Judge Ruben Castillo
The Partnerships and Unincorporated )
Associations Identified on Schedule "A" )

## ORDER

Motion hearing held on 4/21/2015. Counsel for the Plaintiff appeared. Plaintiff's motion to exceed page limitation [11] is granted. Plaintiff's motion for leave to file under seal (1) Plaintiff's amended complaint, (2) Schedule A attached to the Amended Complaint, and (3) Exhibits 22 and 23 to the Declaration of Graham Thatcher [12] is granted. Plaintiff's ex parte motion for entry of a temporary restraining order, including a temporary injunction, a temporary transfer of the defendant domain names, a temporary asset restraint, expedited discovery, and service of process by email and/or electronic publication [10] are all granted. The Temporary Restraining Order will also be filed under seal until further Court order. All defendants are to answer or otherwise plead to the complaint within fourteen days of service. The Court will hold a status hearing in open court on 5/6/2015 at 10:00 a.m.

Date: April 21, 2015     /s/ Chief Judge Ruben Castillo