**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Dan Wang, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:21-cv-01664 |
| v. | ) | |
| | ) | Hon. Judge Virginia Kendall |
| The Partnerships, and Unincorporated | ) | |
| Associations Identified in Schedule "A" | ) | Hon. Mag. Judge Sheila M. Finnegan |
| | ) | |
| Defendants. | ) | |

**<u>Unreported Opinions Cited in Plaintiff's Reply Memorandum in Support of its</u>**
**<u>Motion For Entry of a Preliminary Injunction</u>**

Case: 1:21-cv-01664 Document #: 33-2 Filed: 05/24/21 Page 2 of 61 PageID #:3104

Charter National Bank and Trust v. Charter One Financial, Inc., Not Reported in...

2001 WL 527404

2001 WL 527404
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

CHARTER NATIONAL
BANK AND TRUST, Plaintiff,
v.
CHARTER ONE FINANCIAL, INC.,
Charter One Bank, FSB and St. Paul
Federal Bank for Savings, Defendants.

No. 01 C 0905.
|
May 15, 2001.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.

**\*1** This case is before the Court on the Motion for a Temporary Restraining Order brought by plaintiff Charter National Bank and Trust. Charter National seeks to restrain Charter One Financial, Inc ., Charter One Bank, FSB and St. Paul Federal Bank for Savings from operating any location in the Chicago metropolitan area using the mark "charter." For the following reasons, Charter National's motion is granted in part and denied in part.

*ALLEGED FACTS*

Northwest Bankcorp acquired a bank in Hanover Park and renamed it Charter Bank and Trust of Illinois on October 1, 1987. In 1993, two more locations were added, one in Schaumburg and one in Hoffman Estates. Charter Bank and Trust of Illinois changed its name to Charter Bank and Trust, N.A. and then to Charter National Bank and Trust ("Charter National"). Since 1987, the entity now known as Charter National has continuously operated the Hanover Park facility and has displayed a large sign out front with the words "Charter Bank". Since 1993, the Hoffman Estates and Schaumburg branches have displayed large signs with the words "Charter Bank".

Charter One did not do business in the State of Illinois until it acquired St. Paul Federal Bank for Savings in 1999. Until January of 2001 it operated St. Paul's fifty-eight Chicago metropolitan locations under the trade name and trademark "St. Paul". In January of 2001, St. Paul announced that it was changing its name to Charter One Bank. On February 6, 2001, counsel for Charter National faxed a letter to Charter One informing Charter One of its contention that Charter National was the senior common law user in Chicago and that the name change was already causing customer confusion.

After Charter One did not stop converting branches from the mark "St. Paul" to "Charter One", Charter National filed the instant lawsuit. The issues have been extensively briefed and we have conducted an evidentiary hearing. While this court has reviewed the motion for a temporary restraining order, defendants have agreed to refrain from displaying the name "Charter One" in the geographic area surrounding Charter National's three branches.

*DISCUSSION*

The purpose of preliminary injunctive relief is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortgage Corp. v. Platinum Financial Group Inc., 149 F.3d 722, 726 (7th Cir.1998).* The standards for a temporary restraining order and the standards for a preliminary injunction are identical. *Atkins v. Arson Pirie Scott & Co., Inc., 1999 WL 1249342* at *1 (N.D.Ill.Dec. 13, 1999). Therefore, a TRO is warranted if the party seeking the injunction can make a threshold showing that: (1) the case has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm if the injunction is not granted; (4) the balance of hardships is in favor of the moving party; and (5) the preliminary injunction will not harm the public interest. *Rust Environment & Infrastructure, Inc. v. Teunissen, 131 F.3d 1210, 1213 (7th Cir.1997).*

**\*2** "Trademark law aims to aid consumers in identifying the source of goods by allowing producers the exclusive right to particular identifying words or symbols which they may attach to their products as a designator of source." *Thomas & Betts Corp. v. Panduit Corp., 65 F.3d 654, 657 (7th Cir.1995).*

Charter National has shown a reasonable likelihood of success on the merits. In order to show a reasonable likelihood of success on the merits in a trademark infringement claim,

Case: 1:21-cv-01664 Document #: 33-2 Filed: 05/24/21 Page 3 of 61 PageID #:3105

Charter National Bank and Trust v. Charter One Financial, Inc., Not Reported in...

2001 WL 527404

the plaintiff must demonstrate: (1) the validity of its trademark and (2) the infringement of that mark. *Echo Travel, Inc. v. Travel Associates, Inc.,* 870 F.2d 1264, 1266 (7th Cir.1989). The validity of a mark is established by showing that a "word, term, name, symbol or device" is entitled to protection because that mark specifically identifies and distinguished one company's goods from those of its competitors. *Platinum,* 149 F.3d at 726. Charter National is the senior user of the mark in the Chicago metropolitan area. Although Charter One has registered its mark at the U.S. Patent and Trademark Office, that trademark only allows it to use its mark if no other senior user, who has been continuously using the mark, has priority. 15 U.S.C. § 1065. A trademark application is always subject to previously established common law rights of another party. *The Money Store v. Harriscorp Fin.,* 689 F.2d 666, 672 (7.[th] Cir1982). Therefore, if "Charter National Bank" is protectable under common law trademark law, Charter National has a reasonable likelihood of success on the merits.

Charter National contends that its mark is protectable because the term "charter" is more than a generic term, such as bank. Charter One argues that the mark is not protectable because it simply signifies that the bank has been certified, or chartered, by the state or federal government. We disagree. "Charter National Bank" is entitled to protection.

The determination of whether a party has established a protectable right in a trademark is made on a case by case basis, considering the totality of the circumstances. *New West Corp. v. NYM Co. of Cal., Inc.,* 595 F.2d 1194, 1200 (9th Cir.1979). A party may acquire a protectable right simply through the use of the mark in connection with goods or services. *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503 (7th Cir.1992). We find that Charter National has shown a reasonable likelihood of success in its claim to have acquired a protectable right in "Charter National" through its evidentiary submissions of advertising brochures, ads, and pictures of signs, as well as its evidence of actual confusion. Later in the course of this case, Charter National will have to present more substantial evidence of confusion, but at this point the evidence it has presented is sufficient to convince this court that there is a reasonable likelihood of success in showing that its name has acquired a secondary meaning in the minds of customers and, therefore, deserves protection.

**\*3** In a trademark infringement case, damages are by "their very nature irreparable and not susceptible of adequate measurement for remedy at law." *International Kennel Club*

*of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 (7th Cir.1988). Charter National has shown a reasonable likelihood of success on the merits because of customer confusion and frustration. Furthermore, the fact that it is virtually impossible to calculate the financial impact of these damages shows that there is no adequate remedy at law.

Balancing of the hardships and the public's interest presents the closest question here. Defendants operate over seventy locations in the entire Chicago metropolitan region and forcing them to cover all of their signs on all banks is a hardship. However, they knew of this potential conflict before they changed the names of their banking operations from St. Paul to Charter One.

We have considered different geographical parameters for a temporary restraining order. Eighty percent of Charter National's deposit customers are clustered within three miles around its branches. Therefore, we have entertained the option of structuring a TRO to include that geographic area. In response, Charter National argued that it makes a profit only by virtue of the loans that it makes and, since its loan customers live in a much broader geographic area than its deposit customers, its damages will not by redressed unless we totally enjoin Charter One from any use of the mark "charter" in the entire Chicago metropolitan area. In the event that we determine that a preliminary injunction is justified, we might require that Charter One stop using the mark "charter" in the entire Chicago metropolitan area. However, given the balancing of the hardships at this stage in the litigation and the inconvenience to Charter One's hundreds of thousands of customers in the Chicago area, we will not order Charter One to stop using the mark "charter" in the entire metropolitan area.

We have fashioned a remedy which balances the public interests and the hardships, but still recognizes Charter National's likelihood of succeeding on the ultimate merits. We will restrain Charter One entities from operating any type of bank facility using the word "charter" on any outdoor sign within the geographic area between Lake Cook Road, on the north, I 290/I355/Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west. Furthermore, we will enjoin Charter One from opening any new locations, in the above geographic area, which use the mark "charter" in any way or is identified as "Charter One". This solution balances the strength of Charter National's mark in a smaller geographic area against the hardship of Charter One changing

Charter National Bank and Trust v. Charter One Financial, Inc., Not Reported in...

2001 WL 527404

all of the signs on all of its facilities in the Chicago area on a temporary basis.

*CONCLUSION*

Charter National Bank & Trust's motion for a temporary restraining order is granted in part and denied in part. Charter One Financial, Inc., Charter One Bank, FSB and St. Paul Federal Bank for Savings are enjoined from operating any type of bank facility using the word "charter" on any outdoor signs within the geographic area between Lake Cook Road, on the north, I 290/I355/Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west. Furthermore, Charter One is enjoined from opening any new locations in that geographic area that use the mark "charter" in any way or is identified as "Charter One". Charter National's request for a temporary restraining order prohibiting Charter One from using the mark "charter" throughout the entire Chicago metropolitan area is denied.

**\*4** It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 527404

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:21-cv-01664 Document #: 33-2 Filed: 05/24/21 Page 5 of 61 PageID #:3107

Coach, Inc. v. The Partnerships and Unincorporated..., Not Reported in Fed....

2013 WL 5477573

2013 WL 5477573
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

COACH, INC. and Coach
Services, Inc., Plaintiffs,

v.

THE PARTNERSHIPS
AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED
ON SCHEDULE "A", Defendants.

No. 13 C 6618
|
October 1, 2013

**Attorneys and Law Firms**

Kevin W. Guynn, Amy Crout Ziegler, Justin R. Gaudio, Greer
Burns & Crain Ltd., Chicago, IL, for Plaintiff.

**REPORT AND RECOMMENDATION**

JEFFREY COLE, United States Magistrate Judge

 *1  The plaintiffs (collectively, "Coach" Company) are
a United States-based fashion brand that produces Coach
branded handbags, accessories, footwear, clothing, etc.
They are suing the defendants—individuals and entities
that reside in the People's Republic of China or other
foreign jurisdictions—for federal trademark infringement,
counterfeiting and false designation of origin in violation of
the LanhamAct, 15 U.S.C. §§ 1114 and 1125(a), cyberpiracy
in violation of the Anticybersquatting Consumer Protection
Act ("ACPA"), 15 U.S.C. § 1125(d), and deceptive practices
in violation of the Illinois Uniform Deceptive Trade Practices
Act ("UDTPA"), 815 Ill. Comp. Stat. § 510, et seq.
The defendants allegedly operate commercial websites,
or internet stores, targeting Illinois residents with offers
to sell products bearing counterfeit versions of plaintiffs'
trademarks by using a variety of domain names set up by
registrants and creating websites that incorporate copyright-
protected content, images, and product descriptions to
mislead consumers into believing that they are purchasing

genuine Coach Products. The plaintiffs have not licensed or
authorized the defendants to use any of their marks.

On September 20, 2013, Judge Guzman granted Coach's *ex
parte* motion for entry of (1) a temporary restraining order
("TRO"); (2) a domain name transfer order; (3) an asset
restraining order; (4) an expedited discovery order; and (5)
service of process by email and electronic publication. [Dkt. #
19]. The TRO was set to expire on October 4th. Fed.R.Civ.P.
65(b)(2). On September 24th, the plaintiffs moved for an
order extending the TRO to October 18th. [Dkt. # 23]. They
also moved for a preliminary injunction on September 25th.
[Dkt. # 24]. Judge Guzman has referred that motion to me for
a report and recommendation.

A party seeking a preliminary injunction must establish that
it has (1) some likelihood of success on the merits, and (2)
no adequate remedy at law and will suffer irreparable harm
if a preliminary injunction is denied. *Grote v. Sebelius,* 708
F.3d 850, 853 n.2 (7th Cir.2013); *Ezell v. City of Chicago,* 651
F.3d 684, 694 (7th Cir.2011). Once the threshold requirements
are met, the court weighs the equities, balancing each party's
likelihood of success against the potential harms. *Grote,* 708
F.3d at 853 n.2; *Girl Scouts of Manitou Council, Inc. v. Girl
Scouts of the U.S., Inc.,* 549 F.3d 1079, 1100 (7th Cir.2008).
The more the balance of harms tips in favor of an injunction,
the lighter the burden on the party seeking the injunction to
demonstrate that it will ultimately prevail. *Grote,* 708 F.3d at
853 n.2.

**I.**

**Likelihood of Success on the Merits**

**A.**

**Trademark Claims**

Under the Lanham Act, a defendant is liable for federal
trademark infringement and counterfeiting if the defendant
"without the consent of the registrant ... use[s] in commerce
any reproduction, counterfeit, copy, or colorable imitation
of a registered mark in connection with the sale, offering
for sale, distribution, or advertising of any goods or services
or in connection with which such use is likely to cause
confusion, or to cause mistake, or to deceive." 15 U.S.C. §
1114(a). Section 43(a) of the Lanham Act further imposes

Case: 1:21-cv-01664 Document #: 33-2 Filed: 05/24/21 Page 6 of 61 PageID #:3108

Coach, Inc. v. The Partnerships and Unincorporated..., Not Reported in Fed....

2013 WL 5477573

liability upon a defendant who "on or in connection with any goods or services ... uses in commerce any ... false designation of origin, false or misleading description of fact, or false or misleading misrepresentation of fact, which is likely to cause confusion or to cause mistake, or to deceive as to the ... origin, sponsorship, or approval of his or her goods ... by another person." 15 U.S.C. § 1125(a)(1). Under the UDTPA, a defendant is liable for, among other things: (1) passing off goods as those of another; (2) causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods; or (3) causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with another. 815 ILCS 510/2(a).

**\*2** The elements of plaintiffs' Lanham Act and UDTPA claims are the same. *Deckers Outdoor Corp. v. Does 1– 100,* 2013 WL 169998, 2 (N.D.Ill.2013)(collecting cases). First, a plaintiff must show that its mark is protected under the Lanham Act. Second, a plaintiff must demonstrate that the challenged mark is likely to cause confusion among consumers. *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 643 (7th Cir.2001); *Barbecue Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041, 1043 (7th Cir.2000).

The plaintiffs hold valid and subsisting registrations under 15 U.S.C. § 1052 for their trademarks in the United States. [Dkt. # 12, Lau Decl. ¶ 8]. As such, they are entitled to a presumption that their mark is valid. *Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 209 (2000). That means that, even if the mark is considered descriptive, it is presumed to have acquired secondary meaning. *Custom Vehicles, Inc. v. Forest River, Inc.,* 476 F.3d 481, 485 (7th Cir.2007). Here, there is no evidence that the plaintiff's marks are generic or descriptive. *See Georgia–Pacific Consumer Products LP v. Kimberly–Clark Corp.,* 647 F.3d 723, 727 (7th Cir.2011)(it is up to the party challenging the mark to put forth evidence of invalidity; *Custom Vehicles, Inc. v. Forest River, Inc.,* 476 F.3d 481, 486 (7th Cir.2007)(opponent has the burden of rebutting the presumption of validity that accompanies registration). The plaintiffs have not licensed or authorized defendants to use any Coach trademarks. [Dkt. # 12, Lau. Decl. ¶ 18]. The plaintiffs have shown they have a strong likelihood of succeeding on the first element.

To determine whether a plaintiff satisfies the second element —that the challenged mark is likely to cause confusion among consumers—a court should consider several factors: (1) the similarity between the marks in appearance and suggestion;

(2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the intent of the defendant to "palm off" his product as that of another. *AutoZone, Inc. v. Strick,* 543 F.3d 923, 929 (7th Cir.2008). No one factor is dispositive, but the similarity of the marks, actual confusion, and the defendant's intent are "particularly important." *Id.*

Plaintiffs have submitted extensive documentation showing that defendants are selling counterfeit Coach products that are virtually identical in appearance to the products plaintiffs sell. [Dkt. # 12, Lau Decl., ¶¶ 16–22]. Plaintiffs and defendants both advertise and sell their products over the internet, targeting consumers looking for genuine Coach merchandise. [*Id.* ¶¶ 16–22]. The defendants' websites are metatagged so that consumers searching for authentic Coach merchandise on the internet are directed to the counterfeit sites. They use the mark "Coach" in many of their domain and website names. The plaintiffs claim that those consumers are diverse with varying degrees of sophistication, and they are likely to have difficulty distinguishing authentic Coach merchandise from counterfeit products. *See Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 170 (2nd Cir.1991)(the sophisticated consumer is more likely to assume presence of well-known mark means an association with the manufacturer); *see also CAE, Inc. v. Clean Air Engineering, Inc.,* 267 F.3d 660, 685 (7th Cir.2001)(evidence of actual confusion is not required); *but see Coach, Inc. v. Diva's House of Style,* 2012 WL 6049722, 6 (N.D.Ind.2012)(the high price of authentic Coach items tends to suggest that the consumers would take a great deal of care when making a purchase).

**\*3** The plaintiffs also state that some of the defendants' websites acknowledge the products they are selling are fakes or knock-offs. [Dkt. # 12, Lau Decl. ¶ 17]. In those instances, the evidence tends to support a claim for trademark dilution. *AM General Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 812 (7th Cir.2002); *Ty Inc. v. Perryman,* 306 F.3d 509, 511 (7th Cir.2002). It should come as no surprise that there is a fair segment of the consuming public that seeks out, not authentic Coach bags, but facsimiles in order to avoid the cost of the original. It is unclear from the complaint and the evidence how many of the defendants acknowledge they are selling knock-offs. Apparently, a fair portion attempt to masquerade as authorized dealers. [Dkt. # 1, Compl., ¶ 16]. In those instances, of course, confusion among consumers at point of sale is a real threat.

Coach, Inc. v. The Partnerships and Unincorporated..., Not Reported in Fed....

2013 WL 5477573

Lastly, the plaintiffs' Coach marks are strong. The brand and trademark are famous and have a great deal of economic and marketing strength. *Diva's House of Style,* 2012 WL 6049722, 7; *Coach, Inc. v. Ocean Point Gifts,* 2010 WL 2521444 *4 (D.N.J.2010).* "The stronger the mark, the more likely it is that encroachment on it will produce confusion." *AutoZone, Inc.,* 543 F.3d at 933. Taking all the relevant factors into consideration, the plaintiffs have demonstrated they are highly likely to succeed on the element of confusion among consumers.

## B.

### Cyberpiracy

Plaintiffs also charge defendants with cyberpiracy in violation of the ACPA. The ACPA was enacted to combat "cybersquatting," which is the bad faith registration of domain names with intent to profit from the goodwill associated with the trademarks of another. *Deckers Outdoor,* 2013 WL 169998, 4; *Vulcan Golf, LLC v. Google Inc.,* 726 F.Supp.2d 911, 915 (N.D.Ill.2010). Cybersquatters register well-known marks to prey on customer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site. *Deckers Outdoor,* 2013 WL 169998, 4. To state a claim under the ACPA, Deckers must show that (1) it had a distinctive or famous mark at the time the domain name was registered, (2) the defendant[s] registered, trafficked in, or used a domain name that is identical or confusingly similar to plaintiff's mark, and (3) the defendant[s] had a bad faith intent to profit from that mark. *Deckers Outdoor,* 2013 WL 169998, 4.

It is undisputed that the COACH trademarks are well-known and famous among consumers in the United States and worldwide, *Sara Lee Corp. v. American Leather Products, Inc.,* 1998 WL 433764, 10 (N.D.Ill.1998); *Coach, Inc. v. O'Brien,* 2012 WL 1255276, 12 (S.D.N.Y.2012), since Coach products were first sold in 1941, as evidenced by the extensive, unsolicited media coverage of the brand. [Dkt. # 12, Lau Decl., ¶¶ 6, 10]. Additionally, defendants register, traffic in and use domain names that are identical or confusingly similar to Coach's well-known marks. As described above, many of the defendants' domain names directly incorporate the word "Coach," and use copyright-protected photographs of Coach products and logos without a license in order to sell counterfeit Coach products. These facts

manifest bad faith intent to profit from the Coach marks. The plaintiffs are likely to succeed on the merits of their ACPA claim.

## II.

### Irreparable Harm and Inadequate Remedy at Law

Once a court determines that a plaintiff is likely to succeed on the merits of its claims, it must then consider whether the plaintiff will suffer irreparable harm without a preliminary injunction, and whether it has an adequate remedy at law. It is well settled that injuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss. *Promatek Industries, Ltd. v. Equitrac Corp.,* 300 F.3d 808, 813 (7th Cir.2002). In addition, the plaintiff has submitted evidence that it has spent substantial sums of money to market the Coach brand in the United States and abroad. [Dkt. # 12, Lau Decl., ¶ 10]. There is also evidence that Coach products have also been the subject of extensive unsolicited publicity and have long been among the most popular purses and handbags in the world. *Id.* This shows a threat of irreparable harm to the reputation and goodwill Coach has developed with respect to its brand. This risks diluting the mark and undermining the many years that Coach has spent "nurturing its business." *Ty, Inc.,* 237 F.3d at 903. Accordingly, the plaintiff has shown that it is likely to suffer irreparable harm and has no adequate remedy at law.

## III.

### Balancing the Harms and Public Interest

*4 Finally, the court must consider the balance of harms—the irreparable harm defendants will suffer if the injunction is enforced weighed against the irreparable harm plaintiffs will suffer if it is not. *Protomark,* 300 F.3d at 813. The court must also look at the effect the injunction will have on the public. *Id.* The more likely the plaintiff is to succeed on the merits, the less heavily these balances need tip in its favor. *Grote v. Sebelius,* 708 F.3d 850, 853 n.2 (7th Cir. 2013); *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Dept. Health,* 699 F.3d 962, 972 (7th Cir.2012). Here, the plaintiffs are very likely to succeed on the merits, and it is difficult, if not impossible, to imagine that the defendants will somehow establish they have any right to make unauthorized

use of the Coach trademarks. As such, while the defendants might claim to suffer harm, it is not legally recognized harm. They are free to sell their products under their own trademarks, of course.

Additionally, the public interest also weighs in favor of entering a preliminary injunction. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.,* 549 F.3d 1079, 1086 (7th Cir.2008)("Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')."). In trademark infringement cases such as this, "the public interest is served by [an] injunction because enforcement of the trademark laws prevents consumer confusion." *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 469 (7th Cir.2000).

**CONCLUSION**

For the foregoing reasons, it is hereby recommended that the plaintiffs' motion for a preliminary injunction [Dkt. # 24] be GRANTED, under the terms that were employed in the TRO.

**All Citations**

Not Reported in Fed. Supp., 2013 WL 5477573

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Deckers Outdoor Corporation | ) | |
| | ) | Case No: 15 C 3249 |
| v. | ) | |
| | ) | Chief Judge Ruben Castillo |
| Chen Xiao, et al., | ) | |

### **ORDER**

Status hearing held on 5/6/2015 and continued to 6/10/2015 at 9:45 a.m.  All defendants failed to appear.  Plaintiff's motion for entry of a preliminary injunction [28] is granted.

(T: 0:05)

Date:   May 6, 2015                    /s/  Chief Judge Ruben Castillo

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FEAR OF GOD, LLC,

        Plaintiff,

        v.

THE PARTNERSHIPS and
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A,"

        Defendants.

Case No. 21-cv-01660

**Judge Virginia M. Kendall**

**Magistrate Judge Young B. Kim**

## PRELIMINARY INJUNCTION ORDER

THIS CAUSE being before the Court on Plaintiff Fear of God, LLC's ("Fear of God" or "Plaintiff") Motion for Entry of a Preliminary Injunction, and this Court having heard the evidence before it hereby GRANTS Plaintiff's Motion for Entry of a Preliminary Injunction in its entirety against the fully interactive, e-commerce stores[1] operating under the seller aliases identified in Schedule A to the Complaint and attached hereto (the "Seller Aliases").

THIS COURT HEREBY FINDS that it has personal jurisdiction over the Defendants since the Defendants directly target their business activities toward consumers in the United States, including Illinois. Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold products using infringing and counterfeit versions

---

[1] The e-commerce store urls are listed on Schedule A hereto under the Online Marketplaces and Domain Names.

of Fear of God's federally registered trademarks (the "FEAR OF GOD Trademarks") to residents

of Illinois. A list of the FEAR OF GOD Trademarks is included in the below chart.

| Registration No. | Trademark | Goods and Services |
|---|---|---|
| 5,097,345 | FOG FEAR OF GOD | For: coats; jackets; tops in class 025. |
| 5,345,843 | FOG FEAR OF GOD | For: hoodies; kilts; leggings; ponchos; shorts; sweat pants; sweat shirts; t-shirts in class 025. |
| 5,696,924 | FEAR OF GOD | For: clothing, namely, coats, hooded sweatshirts, jackets, jeans, pants, shirts, shorts, sports coats, sweaters, sweatpants, sweatshirts, tank tops, t-shirts, track suits, trousers and vests; footwear, namely, sneakers; headwear, namely, caps in class 025. |

THIS COURT FURTHER FINDS that injunctive relief previously granted in the

Temporary Restraining Order ("TRO") should remain in place through the pendency of this

litigation and that issuing this Preliminary Injunction is warranted under Federal Rule of Civil

Procedure 65. Evidence submitted in support of this Motion and in support of Fear of God's

previously granted Motion for Entry of a Temporary Restraining Order establishes that Fear of

God has demonstrated a likelihood of success on the merits; that no remedy at law exists; and that

Fear of God will suffer irreparable harm if the injunction is not granted. Specifically, Fear of God

has proved a *prima facie* case of trademark infringement because (1) the FEAR OF GOD

Trademarks are distinctive marks and are registered with the U.S. Patent and Trademark Office on

the Principal Register, (2) Defendants are not licensed or authorized to use any of the FEAR OF

GOD Trademarks, and (3) Defendants' use of the FEAR OF GOD Trademarks is causing a

likelihood of confusion as to the origin or sponsorship of Defendants' products with Fear of God

Furthermore, Defendants' continued and unauthorized use of the FEAR OF GOD Trademarks

irreparably harms Fear of God through diminished goodwill and brand confidence, damage to Fear

of God's reputation, loss of exclusivity, and loss of future sales. Monetary damages fail to address such damage and, therefore, Fear of God has an inadequate remedy at law. Moreover, the public interest is served by entry of this Preliminary Injunction to dispel the public confusion created by Defendants' actions. As such, this Court orders that:

1.     Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be preliminarily enjoined and restrained from:

   a.  using the FEAR OF GOD Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Fear of God product or not authorized by Fear of God to be sold in connection with the FEAR OF GOD Trademarks;

   b.  passing off, inducing, or enabling others to sell or pass off any product as a genuine Fear of God product or any other product produced by Fear of God, that is not Fear of God's or not produced under the authorization, control or supervision of Fear of God and approved by Fear of God for sale under the FEAR OF GOD Trademarks;

   c.  committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Fear of God, or are sponsored by, approved by, or otherwise connected with Fear of God;

   d.  further infringing the FEAR OF GOD Trademarks and damaging Fear of God's goodwill; and

   e.  manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or

3

inventory not manufactured by or for Fear of God, nor authorized by Fear of God to be sold or offered for sale, and which bear any of Fear of God's trademarks, including the FEAR OF GOD Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof.

2.  The domain name registries for the Domain Names, including, but not limited to, VeriSign, Inc., Neustar, Inc., Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, within ten (10) business days of receipt of this Order, shall, at Fear of God's choosing:

    a.  unlock and change the registrar of record for the Domain Names to a registrar of Fear of God's selection until further ordered by this Court; or

    b.  disable the Domain Names and make them inactive and untransferable until further ordered by this Court.

3.  The domain name registrars, including, but not limited to, GoDaddy Operating Company, LLC ("GoDaddy"), Name.com, PDR LTD. d/b/a PublicDomainRegistry.com ("PDR"), and Namecheap Inc. ("Namecheap"), within ten (10) business days of receipt of this Order, shall take any steps necessary to transfer the Domain Names to a registrar account of Fear of God's selection so that the Domain Names can be redirected or disabled until further ordered by this Court.

4.  Upon Fear of God's request, any third party with actual notice of this Order who is providing services for any of the Defendants, or in connection with any of the Online Marketplaces or Domain Names, including, without limitation, any online marketplace platforms such as eBay, Inc. ("eBay"), AliExpress, Alibaba Group Holding Ltd. ("Alibaba"), Amazon.com, Inc. ("Amazon"), ContextLogic Inc. d/b/a Wish.com ("Wish.com"), and DHgate (collectively, the "Third Party Providers") shall, within ten (10)

4

business days after receipt of such notice, provide to Fear of God expedited discovery, including copies of all documents and records in such person's or entity's possession or control relating to:

a. the identities and locations of Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, including all known contact information, and all associated e-mail addresses;

b. the nature of Defendants' operations and all associated sales, methods of payment for services and financial information, including, without limitation, identifying information associated with the Online Marketplaces, Domain Names, and Defendants' financial accounts, as well as providing a full accounting of Defendants' sales and listing history related to their respective Online Marketplaces and Domain Names; and

c. any financial accounts owned or controlled by Defendants, including their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, including such accounts residing with or under the control of any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, Inc. ("PayPal"), Alipay, Alibaba, Ant Financial Services Group ("Ant Financial"), Amazon Pay, Wish.com, or other merchant account providers, payment providers, third party processors, and credit card associations (e.g., MasterCard and VISA).

5. Upon Fear of God's request, those with notice of the injunction, including Third Party Providers as defined in Paragraph 4, shall within ten (10) business days after receipt of such notice, disable and cease displaying any advertisements used by or associated with

Defendants in connection with the sale of counterfeit and infringing goods using the FEAR OF GOD Trademarks.

6. Defendants shall be temporarily and preliminarily restrained and enjoined from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

7. Any Third Party Providers, including PayPal, Alipay, Alibaba, Ant Financial, Wish.com, and Amazon Pay, shall, within ten (10) business days of receipt of this Order:

   a. locate all accounts and funds connected to Defendants and the Seller Aliases, Online Marketplaces and Domain Names, including, but not limited to, any financial accounts connected to the information listed in Schedule A hereto, the e-mail addresses identified in Exhibits 3 and 4 to the Declaration of Glenn Milus, and any e-mail addresses provided for Defendants by third parties; and

   b. restrain and enjoin any such accounts or funds from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

8. Fear of God is authorized to issue expedited written discovery, pursuant to Federal Rules of Civil Procedure 33, 34 and 36, related to:

   a. the identities and locations of Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, including all known contact information, including any and all associated e-mail addresses; and

   b. the nature of Defendants' operations and all associated sales, methods of payment for services and financial information, including, without limitation, identifying information associated with the Online Marketplaces, Domain Names, and Defendants'

6

financial accounts, as well as providing a full accounting of Defendants' sales and listing history related to their respective Online Marketplaces and Domain Names.

Fear of God is authorized to issue any such expedited discovery requests via e-mail. Defendants shall respond to any such discovery requests within three (3) business days of being served via e-mail.

9.  Fear of God may provide notice of these proceedings to Defendants, including service of process pursuant to Fed. R. Civ. P. 4(f)(3), and any future motions by electronically publishing a link to the Complaint, this Order and other relevant documents on a website to which the Domain Names which are transferred to Fear of God's control will redirect, or by sending an e-mail to the e-mail addresses identified in Exhibits 3 and 4 to the Declaration of Glenn Milus and any e-mail addresses provided for Defendants by third parties that includes a link to said website. The Clerk of the Court is directed to issue a single original summons in the name of "The Partnerships and all other Defendants identified in the Complaint" that shall apply to all Defendants. The combination of providing notice via electronic publication or e-mail, along with any notice that Defendants receive from payment processors and domain name registrars, shall constitute notice reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and afford them the opportunity to present their objections.

10. Schedule A to the Complaint [2], Exhibits 3 and 4 to the Declaration of Glenn Milus [16] and [17], and the TRO are unsealed.

11. Any Defendants that are subject to this Order may appear and move to dissolve or modify the Order as permitted by and in compliance with the Federal Rules of Civil Procedure and Northern District of Illinois Local Rules.

12.     The $10,000 bond posted by Fear of God shall remain with the Court until a Final

disposition of this case or until this Preliminary Injunction is terminated.

IT IS SO ORDERED.

DATED: April 3, 2021

Virginia M. Kendall
United States District Judge

8

**Fear of God, LLC v. The Partnerships and Unincorporated Associations Identified on Schedule "A" -
Case No. 21-cv-1660**

# Schedule A

| No. | Seller Aliases | No. | Seller Aliases |
|-----|----------------|-----|----------------|
| 1 | mypopularclothes.com | 2 | mypopularstyle.com |
| 3 | QoolXCWear Official Store | 4 | Hip hop trend shop |
| 5 | Gigante Gym Store | 6 | Shop4617025 Store |
| 7 | Shop4642030 Store | 8 | fashionboy Store |
| 9 | GIWSMOOR Official Store | 10 | LYFT Store |
| 11 | Ningbo-Liyuan Store | 12 | OT Men Store |
| 13 | 9.9 drop shipping Store | 14 | Winmoon Store |
| 15 | Bryant sportswear Store | 16 | The first store of export Store |
| 17 | Shop910319036 Store | 18 | made in trend Store |
| 19 | Einiosaurus Official Store | 20 | Shop910443160 Store |
| 21 | Shop910640016 Store | 22 | BLFX Dropshipping Store |
| 23 | muscletimes Store | 24 | TK Men's Store |
| 25 | Shop911013046 Store | 26 | Kanye Hip-Hop Store |
| 27 | Shop911056111 Store | 28 | Shop911108173 Store |
| 29 | Wsnging Store | 30 | Good quality China Strength Factory Store Store |
| 31 | Fashionable high quality Store | 32 | Shop911333002 Store |
| 33 | Shop911333037 Store | 34 | Shop911335021 Store |
| 35 | FashionCHEAP Store | 36 | Winstone Store |
| 37 | Shop911391088 Store | 38 | THE FARM ANIMAL CAPS Store |
| 39 | lyteshop88 | 40 | Leo-Fashion |
| 41 | Fire Epsice | 42 | Arknights |
| 43 | ChengDuXinWengDianZiShangWu | 44 | ngQuChong |
| 45 | gxgjeans | 46 | For L and Yu |
| 47 | Lbuxinqu | 48 | LUMII |
| 49 | Chengyue Detection | 50 | Wonder Terrier |
| 51 | Ailiao luo | 52 | SBANK |
| 53 | DGGHHHF | 54 | Shumin clothing |
| 55 | IreDi | 56 | gxqeshop88 |
| 57 | Jshan in | 58 | bdvaxbvxz |
| 59 | hmqe_2 | 60 | abby555 |
| 61 | anderson9527 | 62 | auting168 |
| 63 | chenlu1998 | 64 | chongshenginternational |
| 65 | efssdffdsxd | 66 | eku_80 |
| 67 | ezhli0 | 68 | feidgg |
| 69 | fengyb2021 | 70 | flying.pig |

| No. | Seller Aliases | No. | Seller Aliases |
|---|---|---|---|
| 71 | frozen-dress | 72 | gjg6_67 |
| 73 | gongya335957-4 | 74 | huangmin100 |
| 75 | infashion1997 | 76 | jacke-5025 |
| 77 | jee-2029 | 78 | jga619 |
| 79 | jidu_7862 | 80 | julia6300 |
| 81 | lcm.lmchangmao | 82 | liaozhu58 |
| 83 | liyh58-19 | 84 | lqx7-18lqx |
| 85 | luxiaoyu18 | 86 | lvstore_01 |
| 87 | milanofashion2014 | 88 | peppe3224 |
| 89 | qijiancjhsdco | 90 | qq9-85 |
| 91 | redtuliper | 92 | sheny9864 |
| 93 | super-vip-2019 | 94 | worldfashiontrend |
| 95 | xianlianchen0 | 96 | xiaojingwaimao |
| 97 | yinfg-1 | 98 | YIWU PU'ER E-commerce Co.,Ltd |
| 99 | haiguang fashion | 100 | pricernikesplaza |
| 101 | dongyi fashion | 102 | Y&M LOVE ALL |
| 103 | jiajia0409 | 104 | THE wolf come |
| 105 | Bad Girl's Fashion Memory 2 | 106 | liuxiaojun |
| 107 | wulongcun | 108 | guangxiren |
| 109 | qq_200815@163.com | 110 | chedng d |
| 111 | hitthehottest | 112 | GlobalBuddy |
| 113 | chpwhxwxg | 114 | ZLLZLLL |
| 115 | feibigmowang | 116 | Rainyweather |
| 117 | zhaotingting1980 | 118 | cycyingchunchun |
| 119 | Dream Fly Wu | 120 | chaoshidaixiewu |
| 121 | handoumiqing | 122 | zhaoliz |
| 123 | xixilinvzhuang | 124 | QQYstars |
| 125 | renzixin778899 | 126 | fenshengqing |
| 127 | mnvb | 128 | chaonangongshe |
| 129 | DZ.USA.Store | 130 | kebohao |
| 131 | fhgkgkjj | 132 | UKK SQUARE |
| 133 | asdfg56 | 134 | DKLFJQWFG |
| 135 | euihf539 | 136 | XIAONENGWU |
| 137 | Fary play | 138 | tbwiwc2727 |
| 139 | ChXlYu | 140 | Zhiflowers givts |
| 141 | DISMISSED | 142 | xinyunlanqiu |
| 143 | Benben123 | 144 | pouiondking |
| 145 | Frindoern Giftsbags | 146 | mfy6356 |
| 147 | cuidaopuchin | 148 | luzhishenzahuopu |
| 149 | wuyongzahuodian | 150 | qinmingbaihuo |

10

| No. | Seller Aliases | No. | Seller Aliases |
|-----|----------------|-----|----------------|
| 151 | xiaoyanfang75663 | 152 | guixiaocaideng |
| 153 | zhangjinsuo720925 | 154 | Mengli yingzi form locely marrydom |
| 155 | lkm3 | 156 | VMCGYDRTWAE |
| 157 | mhgfdgsfszf | 158 | HGXFZDSA |
| 159 | bounetwdthga | 160 | Threegolde Tuime |
| 161 | Pink Selebration Loloy | 162 | maofucui552 |
| 163 | fuzhida GT | 164 | wxyjlrdfrgzem |
| 165 | zhonggei | 166 | every2020hight |
| 167 | zhnghm | 168 | guojiajun6660 |
| 169 | xiaozhiqinshishui | 170 | Zenglian0928 |
| 171 | Xiaoyongping | 172 | kengkeng |
| 173 | addbg | 174 | gcgge16shop |
| 175 | hascohey | 176 | mklhoiasdnhio |
| 177 | Lisezizi | 178 | hhihahay |
| 179 | hutahaya | 180 | evvqzsvyj |
| 181 | ruifayhld | 182 | zhanshifengchang |
| 183 | denxiucanqiu | 184 | Zuyierye Pants |
| 185 | ukjmtupo | 186 | songbochao521 |
| 187 | uovh70wern | 188 | bjjiokgt |
| 189 | lpprbbshop | 190 | gaxilwrpz |
| 191 | keqtnsqfh | 192 | Sunkin |
| 193 | lanying141 | 194 | Opfiaikfjke |
| 195 | Geufere | 196 | DISMISSED |
| 197 | casimirey | 198 | jiangcheng780 |
| 199 | heying1234568459547 | 200 | liangqi1618 |
| 201 | wangfangfang3825 | 202 | Blue Princess |

| No. | Online Marketplaces | No. | Online Marketplaces |
|-----|---------------------|-----|---------------------|
| 1 | aliexpress.com/store/1779105 | 2 | aliexpress.com/store/2059133 |
| 3 | aliexpress.com/store/3214167 | 4 | aliexpress.com/store/4617025 |
| 5 | aliexpress.com/store/4642030 | 6 | aliexpress.com/store/5117100 |
| 7 | aliexpress.com/store/5588077 | 8 | aliexpress.com/store/5633285 |
| 9 | aliexpress.com/store/5673015 | 10 | aliexpress.com/store/5741132 |
| 11 | aliexpress.com/store/5837010 | 12 | aliexpress.com/store/5870354 |
| 13 | aliexpress.com/store/5886727 | 14 | aliexpress.com/store/5940317 |
| 15 | aliexpress.com/store/910319036 | 16 | aliexpress.com/store/910324291 |
| 17 | aliexpress.com/store/910356100 | 18 | aliexpress.com/store/910443160 |
| 19 | aliexpress.com/store/910640016 | 20 | aliexpress.com/store/910821009 |
| 21 | aliexpress.com/store/910836040 | 22 | aliexpress.com/store/910974009 |
| 23 | aliexpress.com/store/911013046 | 24 | aliexpress.com/store/911054173 |

| No. | Online Marketplaces | No. | Online Marketplaces |
|---|---|---|---|
| 25 | aliexpress.com/store/911056111 | 26 | aliexpress.com/store/911108173 |
| 27 | aliexpress.com/store/911112230 | 28 | aliexpress.com/store/911142229 |
| 29 | aliexpress.com/store/911194128 | 30 | aliexpress.com/store/911333002 |
| 31 | aliexpress.com/store/911333037 | 32 | aliexpress.com/store/911335021 |
| 33 | aliexpress.com/store/911345076 | 34 | aliexpress.com/store/911386010 |
| 35 | aliexpress.com/store/911391088 | 36 | aliexpress.com/store/911427270 |
| 37 | amazon.com/s?me=AX8P5HB4CJPJS | 38 | amazon.com/sp?seller=A1AKUKFT4I8H1A |
| 39 | amazon.com/sp?seller=A1ETHCXBQ2IHPF | 40 | amazon.com/sp?seller=A1OP9CC8IGLTG7 |
| 41 | amazon.com/sp?seller=A1SYNCKKP9QWFM | 42 | amazon.com/sp?seller=A228YDG4L2EYH8 |
| 43 | amazon.com/sp?seller=A2606GL2OSEU0H | 44 | amazon.com/sp?seller=A2BCFU6O641D0G |
| 45 | amazon.com/sp?seller=A2KKUN6LOADAOQ | 46 | amazon.com/sp?seller=A2OYAMF1A3VG9Z |
| 47 | amazon.com/sp?seller=A2QA8ELM705XW6 | 48 | amazon.com/sp?seller=A31HI02DESDOEO |
| 49 | amazon.com/sp?seller=A37PTDBQNU9PAY | 50 | amazon.com/sp?seller=A3ICJ2ME4MDHFJ |
| 51 | amazon.com/sp?seller=A3Q9CXUY6QK9IH | 52 | amazon.com/sp?seller=A3TCAE050YKP7M |
| 53 | amazon.com/sp?seller=A8D3XI66GPILJ | 54 | amazon.com/sp?seller=AAV6RC27FE9X |
| 55 | amazon.com/sp?seller=ACSUX6K8QPQCF | 56 | amazon.com/sp?seller=AV6Y6IPQA4B16 |
| 57 | ebay.com/itm/383824580599 | 58 | ebay.com/usr/abby555 |
| 59 | ebay.com/usr/anderson9527 | 60 | ebay.com/usr/auting168 |
| 61 | ebay.com/usr/chenlu1998 | 62 | ebay.com/usr/chongshenginternational |
| 63 | ebay.com/usr/efssdffdsxd | 64 | ebay.com/usr/eku_80 |
| 65 | ebay.com/usr/ezhli0 | 66 | ebay.com/usr/feidgg |
| 67 | ebay.com/usr/fengyb2021 | 68 | ebay.com/usr/flying.pig |
| 69 | ebay.com/usr/frozen-dress | 70 | ebay.com/usr/gjg6_67 |
| 71 | ebay.com/usr/gongya335957-4 | 72 | ebay.com/usr/huangmin100 |
| 73 | ebay.com/usr/infashion1997 | 74 | ebay.com/usr/jacke-5025 |
| 75 | ebay.com/usr/jee-2029 | 76 | ebay.com/usr/jga619 |
| 77 | ebay.com/usr/jidu_7862 | 78 | ebay.com/usr/julia6300 |
| 79 | ebay.com/usr/lcm.lmchangmao | 80 | ebay.com/usr/liaozhu58 |
| 81 | ebay.com/usr/liyh58-19 | 82 | ebay.com/usr/lqx7-18lqx |
| 83 | ebay.com/usr/luxiaoyu18 | 84 | ebay.com/usr/lvstore_01 |
| 85 | ebay.com/usr/milanofashion2014 | 86 | ebay.com/usr/peppe3224 |
| 87 | ebay.com/usr/qijiancjhsdco | 88 | ebay.com/usr/qq9-85 |
| 89 | ebay.com/usr/redtuliper | 90 | ebay.com/usr/sheny9864 |

| No. | Online Marketplaces | No. | Online Marketplaces |
|---|---|---|---|
| 91 | ebay.com/usr/super-vip-2019 | 92 | ebay.com/usr/worldfashiontrend |
| 93 | ebay.com/usr/xianlianchen0 | 94 | ebay.com/usr/xiaojingwaimao |
| 95 | ebay.com/usr/yinfg-1 | 96 | wish.com/merchant/53c5d41aff4d6d745c2cac63 |
| 97 | wish.com/merchant/540d25ec1d2d4312967a82c5 | 98 | wish.com/merchant/5410254a1d2d4368cec964cd |
| 99 | wish.com/merchant/5415a08982b9ac45f373d009 | 100 | wish.com/merchant/541ff8339719cd3d4e8a525b |
| 101 | wish.com/merchant/545324159719cd671aaa43dc | 102 | wish.com/merchant/54a2cd4940b3782666e8a5bf |
| 103 | wish.com/merchant/55bb28abec31eb43c384d117 | 104 | wish.com/merchant/55e51e53c9f8235d17759948 |
| 105 | wish.com/merchant/57093745fa6bee43300e8438 | 106 | wish.com/merchant/580a26719916b83628acef30 |
| 107 | wish.com/merchant/58463a56c7c94f4d2d25ac09 | 108 | wish.com/merchant/584ebfbfd060604c9c682cd6 |
| 109 | wish.com/merchant/587edfb273be704cb32da239 | 110 | wish.com/merchant/59e5ed14ddda8c7771434d7b |
| 111 | wish.com/merchant/5a031a239fbc51174ff4f572 | 112 | wish.com/merchant/5a2e9cf163aa6d2fa24c3e81 |
| 113 | wish.com/merchant/5a55de96430b714b5677405d | 114 | wish.com/merchant/5a8f8739856edf543f8eaa0e |
| 115 | wish.com/merchant/5aacd085c2c8921b5b6e6556 | 116 | wish.com/merchant/5abb03ab28a2b363b0757543 |
| 117 | wish.com/merchant/5af2b29cef49802112ed5538 | 118 | wish.com/merchant/5af932e7642fc7022f8b6501 |
| 119 | wish.com/merchant/5afa3f138aa33d161806f5eb | 120 | wish.com/merchant/5b3f1d5e03859563ab1aa114 |
| 121 | wish.com/merchant/5b5ac3c9109f1b6fbaba882d | 122 | wish.com/merchant/5b63b839105a37188fa36419 |
| 123 | wish.com/merchant/5b9287d81e174e33c212033c | 124 | wish.com/merchant/5d4238a34eac172ec1bf98e7 |
| 125 | wish.com/merchant/5d49399a70327a5558b85a1f | 126 | wish.com/merchant/5d4a7ba291b72f41e9dd6157 |
| 127 | wish.com/merchant/5d4bceb7933fb149012088bf | 128 | wish.com/merchant/5d5114ed8388977294e6907f |
| 129 | wish.com/merchant/5d57b5fd560eca4252ede18f | 130 | wish.com/merchant/5d57e31e4dd91b75df6a575b |
| 131 | wish.com/merchant/5d5a1668cf65030a80312a95 | 132 | wish.com/merchant/5d5ab11f560eca0272ed42a9 |

13

| No. | Online Marketplaces | No. | Online Marketplaces |
|---|---|---|---|
| 133 | wish.com/merchant/5d5b4248560eca1b894275c8 | 134 | wish.com/merchant/5d5d42e81d86296db6bfd4f1 |
| 135 | wish.com/merchant/5d64d6d2169ed95d1955cf8a | 136 | wish.com/merchant/5d7767828c8dc70d14a6aa3f |
| 137 | wish.com/merchant/5d878ce12888352897c32d84 | 138 | wish.com/merchant/5d8967ce2888356cc84b6ef5 |
| 139 | DISMISSED | 140 | wish.com/merchant/5dc511fbb0a3640180a4e884 |
| 141 | wish.com/merchant/5dd26a84a264fd78e1cecc74 | 142 | wish.com/merchant/5ddb4bb68da010644896c790 |
| 143 | wish.com/merchant/5de48e2aba451803c095e128 | 144 | wish.com/merchant/5e1fd4220076c503f3af03ce |
| 145 | wish.com/merchant/5e438ca1e763db385b4921dd | 146 | wish.com/merchant/5e5e7af7f41f893540f9202d |
| 147 | wish.com/merchant/5e5f55e7ec5cd30052412e30 | 148 | wish.com/merchant/5e5f72f429e7867b3107480e |
| 149 | wish.com/merchant/5e60a36bd6f61c8e807bcb98 | 150 | wish.com/merchant/5e60e9eba31ee946b7fe1465 |
| 151 | wish.com/merchant/5e6769f729e7861812176d85 | 152 | wish.com/merchant/5e689793c96e28224090e725 |
| 153 | wish.com/merchant/5e695f3aa1f2af06bb2ebe33 | 154 | wish.com/merchant/5e7f085593fb00a032ca7a83 |
| 155 | wish.com/merchant/5e855fcbef453c0a09994d25 | 156 | wish.com/merchant/5e85644b57156f06c63864e7 |
| 157 | wish.com/merchant/5e916290bdebf459f0041f39 | 158 | wish.com/merchant/5e957e7db3ec20240509b5b9 |
| 159 | wish.com/merchant/5e97e7b896126c471570b209 | 160 | wish.com/merchant/5e9811413db6636ad974e6cf |
| 161 | wish.com/merchant/5e981cdd58532f170f9ceded | 162 | wish.com/merchant/5e9bc7c62405fb63dbc4a516 |
| 163 | wish.com/merchant/5ea15237ad8c7d6d7e400f74 | 164 | wish.com/merchant/5ea3fd7cd5db02fa8028efec |
| 165 | wish.com/merchant/5eb108814739b9004b9fa1e0 | 166 | wish.com/merchant/5eb8b8876de01538c059f92e |
| 167 | wish.com/merchant/5ecf4bea59ef3063ac8a3c46 | 168 | wish.com/merchant/5ee1d9cc29e7867340aadcba |
| 169 | wish.com/merchant/5ee877331194a569fe046a4a | 170 | wish.com/merchant/5eeb22adcdbb0220daf09eeb |
| 171 | wish.com/merchant/5f0aa0c86e3a9279ec5f0747 | 172 | wish.com/merchant/5f1121f5b5cc23004cffa4ab |

14

| No. | Online Marketplaces | No. | Online Marketplaces |
|-----|---------------------|-----|---------------------|
| 173 | wish.com/merchant/5f1167fc328e1f86441aee14 | 174 | wish.com/merchant/5f117369c13a52eb12b55b57 |
| 175 | wish.com/merchant/5f1177713fc73037aa585e40 | 176 | wish.com/merchant/5f13d2a349fbb517108060ad |
| 177 | wish.com/merchant/5f1407f2b4702f1f92a90fb3 | 178 | wish.com/merchant/5f4767e129e78619cae42dad |
| 179 | wish.com/merchant/5f48cdeecd344738ec62b47f | 180 | wish.com/merchant/5f4dc9692de32f0039e5dc89 |
| 181 | wish.com/merchant/5f4df564fe31f19e75787d05 | 182 | wish.com/merchant/5f4dffd51070f0d662f0c86f |
| 183 | wish.com/merchant/5f4f6e5ed3295e0c4d62fc74 | 184 | wish.com/merchant/5f642030497c8400404a8094 |
| 185 | wish.com/merchant/5f69ab1a7edd75550ae86089 | 186 | wish.com/merchant/5f6c1261877e3cdf13ac0269 |
| 187 | wish.com/merchant/5f6ed08bc4fbcd5957fed9e6 | 188 | wish.com/merchant/5f72a78c2914a8562a6d5bf5 |
| 189 | wish.com/merchant/5f74029a23d2b643da49723e | 190 | wish.com/merchant/5f81954194ffba358c8ea731 |
| 191 | wish.com/merchant/5f8544b4aa3c33993ded327c | 192 | wish.com/merchant/5f86649da7c3c4fa277c01e8 |
| 193 | wish.com/merchant/5f920fe155f52c545847c1a5 | 194 | DISMISSED |
| 195 | wish.com/merchant/5f9d8c886535343ae2d4f9d2 | 196 | wish.com/merchant/5fa766a40c42de1b2e1ea2f4 |
| 197 | wish.com/merchant/5fa8f1283d54c76bc5933e4b | 198 | wish.com/merchant/5fc5ab74e74ab37b6e19db82 |
| 199 | wish.com/merchant/5fd459de43a9df004ce8d2cf | 200 | wish.com/merchant/5fd72293e69fe8af463a5d6b |

| No. | Domain Names | No. | Domain Names |
|-----|--------------|-----|--------------|
| 1 | mypopularclothes.com | 2 | mypopularstyle.com |

Lorillard Tobacco Co. v. Montrose Wholesale Candies, Not Reported in F.Supp.2d (2005)

2005 WL 3115892

KeyCite Yellow Flag - Negative Treatment

Distinguished by Oak Leaf Outdoors, Inc. v. Double Dragon Intern., Inc.,
C.D.Ill., August 8, 2011

2005 WL 3115892
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

LORILLARD TOBACCO COMPANY,
a Delaware Corporation, Plaintiff,
v.

MONTROSE WHOLESALE CANDIES
and Sundries, Inc., et al., Defendants.

Nos. 03 C 4844, 03 C 5311.
|
Nov. 8, 2005.

**Attorneys and Law Firms**

John S. Pacocha, Cameron Matthew Nelson, Jeffrey G. Mote,
Kevin D. Finger, Greenberg Traurig, LLP, Chicago, IL, for
Plaintiff.

Robert A. Egan, Robert A. Egan P.C., Robert A. Hobit,
Chicago, IL, for Defendants.

*REPORT AND RECOMMENDATION*

MARVIN E. ASPEN, Judge.

*1 Plaintiff, Lorillard Tobacco Company ("Lorillard"),
moves to freeze the assets of defendants Reza and
Sandra Hazemi This matter originally came before me
as a motion to freeze the assets of the Hazemis
and Montrose Wholesale Candies and Sundries, Inc.
("Montrose")(collectively, "Montrose defendants"). Judge
Aspen had referred that motion to Magistrate Judge Keys, and
the referral was subsequently transferred to me. Accordingly,
the court addresses Lorillard's motion for an order freezing the
Hazemis' assets in this Report and Recommendation pursuant
to 28 U.S.C. § 636(b)(1)(B).[1]

**I. BACKGROUND**

Lorillard is one of the largest cigarette manufacturers in
the United States and its brand, Newport, is the best-selling
menthol cigarette in the country. Lorillard has registered
the trademark, Newport, with the United States Patent
and Trademark Office, giving it the exclusive right to
manufacture, distribute, advertise, and sell Newport cigarettes
in the United States. Lorillard distributes its cigarettes through
a network of wholesalers and retailers, subject to a wide range
of state and federal regulations. Over the past several years,
the federal government and many states have substantially
increased taxes on cigarettes and other tobacco products,
which has made it profitable for "bootleggers" to sell
counterfeit tobacco products, as well as import and distribute
tobacco products in a manner designed to avoid paying the
taxes, thereby reaping a handsome, but ill-gotten reward.

In July of 2003, one of Lorillard's division managers paid
a call on the Montrose store in Chicago, Illinois, and
purchased a carton of what he suspected to be counterfeit
Newport cigarettes, and sent it for inspection to Lorillard's
offices in Greensboro, North Carolina. There, a quality
assurance inspection convinced Lorillard that the cigarettes
were counterfeit and it filed this suit against Montrose on July
14, 2003, alleging trademark violations under the Lanham Act
15 U.S.C. § 1051, *et seq.,* as well as various Illinois statutory
violations and common law offenses. On July 15, 2003,
Judge Marvin Aspen granted Lorillard's application for an ex
parte seizure order allowing Lorillard to seize any counterfeit
cigarettes, as well as records documenting the manufacture,
importation, purchase, sale, distribution, or receipt of any
merchandise bearing any Lorillard marks. The United States
Marshals Service returned service on the seizure of four
cartons of "counterfeit cigarettes and documents" on July 16,
2003. Montrose's owners, Reza and Sandra Hazemi, have
since been added as defendants.

After enduring a maddening course of fruitless attempts
at garnering any meaningful discovery from Montrose and
the Hazemis, and becoming understandably suspicious that
the Hazemis were looting Montrose's assets, Lorillard filed
a motion to compel discovery and to freeze the assets of
Montrose and the Hazemis, supporting it with over 1200
pages of documents detailing what Lorillard has learned, and
has had to endure, over a year-and-a-half.[2] In the interim,
however, and less than a week after being informed that the
court was preparing to rule on Lorillard's motions, Montrose

filed a Chapter 11 bankruptcy petition in the Bankruptcy Court for the Northern District of Illinois on September 7, 2005. This stayed the proceedings as to the corporate defendant.[3] On September 9, 2005, the Hazemis filed a motion before me to stay these proceedings as to them, which I denied on the grounds that I did not have the authority to rule on the motion and that it should have been filed before Judge Aspen. To date, the Hazemis have not filed an appropriate motion before Judge Aspen.

**\*2** On October 31, 2005, Lorillard filed an emergency motion to freeze the assets of the individual defendants Ray and Sandra Hazemi. Lorillard's motion was prompted by its discovery that the Hazemis own certain property at 3019 N. Rose St. in Franklin Park, Illinois, despite the Hazemis' repeated denials, under oath, to the contrary. As it happens, this is merely the most recent installment in a continuing saga of deception, obfuscation, shuffling of assets, and corporate looting. While the evidence demonstrates that this has long been the Hazemi's pattern of doing business, it most recently has been calculated to place the Hazemi's assets beyond the reach of Lorillard. This most recent revelation regarding the property at 3019 N. Rose St. demonstrates that Mr. Hazemi has not only given what appears to be perjured deposition testimony, but made bald misrepresentations to the court regarding their ownership of the property. When examined in insolation, this episode alone would be sufficient to support an order freezing their assets. But when examined in context of what has gone on before, there can be no question that such an order is warranted.

## A

### The Hazemis' Misrepresentations Regarding Their Ownership of the Property at 3019 N. Rose St.

During its long and arduous discovery experience in this case, Lorillard has brought several motions to obtain compliance with subpoenas served on various third parties, including a business located at 3019 N. Rose Street in Franklin Park, Illinois (the "3019 N. Rose St. Property") doing business as "Franklin Cigarette Depot." Through the discovery it was able to gain, Lorillard learned that defendant Sandra Hazemi had owned the 3019 N. Rose St. Property and transferred it to a Janesville, Wisconsin wholesale supplier named Chambers & Owens in or about June 2003 as part of a settlement in a lawsuit between Chambers & Owens and defendant Montrose

Wholesale. During Mrs. Hazemi's deposition she indicated that she was an "owner" in name only[4] and that the details concerning the purchase and transfer of the 3019 N. Rose Street Property, among others, were entirely controlled by Ray Hazemi. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. A, Sandra Hazemi Dep. of 7/26/05 at 359-65). During his deposition on July 21, 2005, Ray Hazemi testified that the Hazemis transferred the 3019 N. Rose Street Property to Chambers & Owens in 2003 and that Chambers & Owens still owned the property on the day of the deposition. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. B, Ray Hazemi Dep. of 7/21/05 at 94). Mr. Hazemi further testified that he and his wife were attempting to get the property back from Chambers & Owens. (*Id.*).

Ray Hazemi's deposition continued on August 3, 2005. Once again, plaintiff asked whether Chambers & Owens still owned the 3019 N. Rose St. property and Mr. Hazemi states "[t]hat's correct." (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. C, Ray Hazemi Dep. of 8/3/05, at 350). When Mr. Hazemi was asked whether he has had discussions with Chambers & Owens about the return of the 3019 N. Rose St. property, he answered: "[n]o, nothing." (*Id.* at 535). But he added that he and his wife were trying to work out a plan by which the property could be returned to them. (*Id.* at 535-36).

**\*3** The subject of the 3019 N. Rose St. property also came up in court. The parties' counsel appeared before me on July 25 and August 1, 2005, in connection with plaintiff's motion for rule to show cause why Franklin Cigarette Depot should not be held in contempt for failing to respond to a duly served subpoena. (*Plaintiff's Emergency Motion to Freeze Assets,* Exs. D and E, Hearing Transcript Excerpts for the 7/25/05 and 8/1/05 hearings, respectively). These particular hearings concerned the Hazemis' ownership of Franklin Cigarette Depot and the property associated with it located at 3019 N. Rose St. During the July 25, 2005 hearing, the Hazemis' counsel, Robert A. Habib, stated that Ray Hazemi had admitted during his July 21, 2005 deposition that he had an ownership interest in Franklin Cigarette Depot, but that he did not own the real property because it had been turned over to Chambers & Owens. Mr. Habib stated unequivocally that Ray Hazemi testified that the 3019 N. Rose Street Property was no longer owned by the Hazemis, stating "the real estate is gone." (Ex. D at pp. 5-6). Similarly, during the August 1st hearing, Mr. Habib stated that "[t]he property at 3019 North Rose Street they don't own anymore." (Ex. E, pp. 10-11).

As it happens, the Hazemis misrepresented the facts surrounding the Hazemi's ownership of the 3019 N. Rose St. property at their depositions and in open court.[5] During a Rule 341 Meeting of Creditors (the "341 Meeting") on September 24, 2005, in connection with Montrose's Chapter 11 Bankruptcy case, Chambers & Owens' counsel Scott Shadel informed plaintiffs counsel that Chambers & Owens had transferred the 3019 N. Rose Street Property back to the Hazemis in 2003. Mr. Shadel also indicated he believed the Hazemis had purchased the property back from Chambers & Owens for about $250,000. On October 21, 2005, Mr. Shadel faxed a copy of the Warranty Deed prepared by Chambers & Owens to transfer the 3019 N. Rose St. property to Sandra Hazemi on September 2, 2003. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. F).

When these serious circumstances came to light by way of Lorillard's emergency motion, I allowed the Hazemis and their attorney a week to file whatever they felt might be an adequate response to being caught in a lie. After what one must assume was a complete and thorough consultation among clients and counsel, Mr. Hazemi offers an explanation by way of a rather sketchy, five-paragraph affidavit.[6] He states that the transfer of the 3019 N. Rose St. property was made to stop Chambers & Owens from collecting on the judgment from Mr. Hazemi only. When he sold another parcel of property for $250,000, he applied those assets to the judgment as against him. Mr. Hazemi asserts that as Mr. Phil Jackson of Chambers & Owens then "handed [him] a piece of paper and stated that no longer we owe Chambers, but that the debt as to Montrose remained pending." (Reza Hazemi Aff., ¶ 4). The piece of paper, according to Mr. Hazemi, turned out to be the warranty deed, but he swears he did not look at it at the time or know what it was. Instead, he simply put it in his safe, where it languished uninspected until Lorillard filed this motion. (Reza Hazemi Aff. ¶ 4). Similarly, Mrs. Hazemi also swears that she never saw the warranty deed. (Sandra Hazemi Aff.).

**\*4** According to Mr. Hazemi, he regarded the mysterious piece of paper as proof that his personal debt to Chambers & Owens had been discharged by payment of $250,000. (Reza Hazemi Aff., ¶ 4). Having never looked at the document-that is what he claims-it is curious how he can be so sure that it amounted to such proof. As Mr. Hazemi tells the tale, the paper might have been anything at all. Why he was confident that it proved he had paid Chambers & Owen $250,000 is unexplained. Having handed over a quarter-million dollars to satisfy a debt, one might expect even the least sophisticated

of businessmen to inspect the note received in return. But Mr. Hazemi is by no means an unsophisticated businessman. He has a masters degree in accounting, and counsel has represented that he has practiced as a CPA in the past. He owns or has owned several businesses with millions of dollars of revenue running through them. The Hazemi's explanation that they were simply unaware that they owned the 3019 N. Rose St. property strains credulity past the breaking point.

The 3019 N. Rose St. property, then, has been in the possession of the Hazemis all along, a hidden asset during this litigation. To ensure that it remained hidden, the Hazemis committed what appears to be perjury at their depositions, then lied to me in an inherently incredible affidavit. Given the history of the Hazemis' conduct in this litigation, and the manner in which they operated their business, however, none of this is surprising. It is just the latest in a long line of underhandedness and deception, as the following discussion will make clear.

## B

### The Organization and Structure of the Montrose Corporation

#### 1

#### The Hazemis' Acquisition of the Corporation

Shortly after filing suit, Lorillard served Montrose with its first set of interrogatories and document requests, which regarded, in part, Montrose's corporate structure, organization, and financial condition. ((Substitute)Declaration of Jeffrey G. Mote, ("Mote Decl."), Ex. A). In what would become a disheartening pattern for Lorillard, Montrose and the Hazemis initially thwarted Lorillard's discovery efforts. Montrose did, however, produce income tax records for the years 1997 through 2003, which revealed its ownership structure during that period:

1997 Tarek Al-Mikhi (50%); Sandra Semler Hazemi (25%); Jack Shoushtari (25%)

1998 Sandra Semler Hazemi (50%); Jack Shoushtari (50%)

1999 Mr. Hazemi (50%); Jack Shoushtari (50%)

2000 Mr. Hazemi (50%); Jack Shoushtari (50%)

2001 Mr. Hazemi (100%)

2002 Mr. Hazemi (100%)

2003 Mr. Hazemi (50%); Sandra Semler Hazemi (50%) (Mote Decl., ¶ 7; Ex. I). Finally, on March 8, 2005, after more than a year-and-a-half of awaiting the twice-promised production, Lorillard filed a motion to compel discovery.

At least with respect to the corporate records, the motion did the trick: Montrose produced the documents, however unapologetically, in time to take credit for its "compliance" in its response to Lorillard's motion on April 11, 2005. Significantly, in support of the Montrose defendants' response to Lorillard's motion, Mr. Hazemi's wife, Sandra Semler Hazemi, filed an affidavit in which she swore that she had never been a shareholder, officer or director of Montrose and had never authorized anyone to say she was shareholder, officer or director of Montrose, directly contradicting Montrose's tax returns. (*Def.Resp.,* Ex. 8). The first of many such contradictions.

**\*5** The tardily-produced records reveal that Tarek Al-Mikhi originally formed Montrose on or about March 28, 1997. (Second Declaration of Jeffrey Mote ("2nd Decl."), Ex.DD, Articles of Incorporation and related corporate records, RN 48-82). The company issued 1200 shares to its three shareholders and directors: Tarek Al-Mikhi (President) received 600 shares, Mr. Hazemi (Vice-President) received 300 shares, and Jack Shoushtari (Secretary/Treasurer) received 300 shares. (Ex. DD, at RN 53). On or about February 6, 1998, the Montrose owners entered into an agreement whereby Tarek Al-Mikhi sold all of his shares in Montrose, transferring 300 each to Mr. Hazemi and Jack Shoushtari. (Ex. DD, at RN 6044-6048). Under the transfer agreement, Mr. Al-Mikhi was paid $89,000 at closing and was to receive another $26,250 on the earlier of January 2, 2000, the date Montrose exercised its option to purchase the property housing Montrose at 4417-4425 W. Montrose Avenue in Chicago Illinois, or the date it sold or otherwise transferred this option. (Ex. DD, at 6045). Shortly thereafter, however, the three became entangled in litigation over the transaction. On or about January 2, 2001, Mr. Shoushtari and Mr. Hazemi entered into a "Stock Sales Agreement", whereby Mr. Hazemi immediately acquired 300 shares of Mr. Shoushtari's original Montrose Stock. (Ex. DD, at RN 279-288).[7]

**2**

### The Hazemis' Convoluted Acquisition of the Site of Montrose's Operations

At or near the time Montrose was formed in 1997, it entered into a lease agreement with a Joseph Cholewa, dated March 27, 1997, for the property at 4417-4425 W. Montrose Ave. (Ex. JJ, at RN 84-86). A few days later, on April 3, 1997, Montrose and Mr. Cholewa agreed to a supplemental "Rider" amending the lease agreement by granting, *inter alia,* Montrose an option to buy the property at 4417-4425 W. Montrose for $710,000, to which $7,500 of the $10,500 monthly rent would be credited towards the purchase price of the property. (Ex. JJ, at RN 87-96). In exchange for this purchase option, Montrose paid Mr. Cholewa $60,000, which was to be credited to the eventual purchase price if Montrose exercised its option to purchase. (*Id.*) If Montrose decided not to exercise its option, the "Rider" provided that it was entitled to a "rebate" of two-thirds of the $60,000 option and two-thirds of the $7,500 rent that was to have been allocated towards the purchase price. (*Id.*). Rather than exercising the option outright, Mr. Hazemi and Mr. Shoushtari concocted a scheme whereby they would acquire control of the at 4417-4425 W. Montrose property without appearing to exercise the option, thereby hiding the property as an asset of Montrose and avoiding the need to pay Mr. Al-Mikhi the remaining $26,000 under the stock purchase agreement previously discussed. (Ex. DD, at RN 6045). Once Mr. Cholewa lost his interest in the property sometime between entering into the lease agreement in 1997, and June of 1998, pursuant to a foreclosure proceeding initiated by Parkway Bank & Trust. (Ex. JJ, at GN 187-194), the scheme went into effect.

**\*6** The convoluted process began in June of 1998, when Antonia Shoushtari-Montrose owner Jack Shoushtari's wife-and Bahar Azari-Mr. Hazemi's niece and a then-employee of Montrose-acquired the 4417-4425 W. Montrose property via a Trustee's Deed from Parkway Bank and Trust Company dated June 12, 1998. (Ex. JJ, at SH 65-67). It would appear from the documents that the two purchased the property for $523,000, taking out a $418,400 loan from Labe Bank. (Ex. JJ, at SH 57). They purportedly managed the property under the name "AB Venture," and the loan was paid off over an 84-month period.[8] Next, Antonia Shoushtari transferred her entire interest in the property at 4417-4425 W. Montrose

2005 WL 3115892

property to Bahar Azari through a quitclaim deed dated January 2, 2001. The transfer between Antonia and Bahar was made for *no* consideration. (Ex. JJ, at GN 184-186). On February 20, 2003, Bahar Azari transferred her entire interest in the 4417-4425 W. Montrose property via a quitclaim deed to a company called 6201 S. Champlain LLC, which was formed by Mike Kakvand, who will be discussed later. Interestingly, the company listed 4417 W. Montrose, the location of the Montrose store, as its address. (Ex. JJ, at GN 36-38). The very next day, on February 21, 2003, Mr. Kakvand's company executed a resolution purporting to authorize the transfer of the 4417-4425 W. Montrose property (Ex. JJ. at GN 138), and transferred the property to Sandra Hazemi via a warranty deed. (Ex. JJ, at GN 28-35).

**3**

**Montrose's Shakey Corporate Standing**

Despite the Montrose defendants' recalcitrance throughout discovery, Lorillard has been able to uncover some information regarding Montrose's corporate status, which suggests that Montrose has had some difficulty with the Secretary of State for the State of Illinois. The State of Illinois administratively dissolved Montrose on August 1, 1998. On August 10, 2000, Montrose submitted a change of registered agent (changing from Ganders P. Caponize to its counsel in this suit, Robert Egan) to the Illinois Secretary of State as well as an Application for Reinstatement signed by Jack Shoushtari as Montrose' Secretary and Sandra Hazemi as Montrose Vice President. (Ex. DD, at RN 97-101). Mrs. Hazemi's signature in that capacity is rather curious, given the fact that she has sworn that she has never been an officer or director with Montrose. (*Def.Resp.,* Ex. E).

In any event, the State issued a formal Certificate of Reinstatement on August 10, 2000. (Ex. DD, at RN 100). The State administratively dissolved Montrose again a year later on August 1, 2001, and subsequently reinstated it on March 18, 2002. (Ex. DD, at RN 114-116). Continuing the pattern, Montrose was administratively dissolved on August 1, 2003, for failure to file its annual report and pay its annual franchise tax, but was subsequently reinstated on October 3, 2003. (Ex. DD, at RN 117-120). The Montrose defendants claim that Montrose closed its operations as of October 31, 2003 (*Def.Resp.,* at 2, 8), but, as of February 19, 2005, the Illinois Secretary of State's Real Time Corporate/LLC database

identified Montrose's status as "Goodstanding." (Ex. K). In the interim, according to Mr. Mote's Second Declaration, Sean Semler, Sandra Hazemi's brother, incorporated Montrose Wholesale Food Co. at Mr. Hazemi's request; it was administratively dissolved on November 1, 2004. (2nd Decl., ¶ 37; Ex. FF). As of May 12, 2005, the database listed Montrose as "Not Good Standing." (Ex. FF).

 **\*7** It is telling, that the Montrose defendants never produced any records relating to these changes in the corporation's status. Moreover, the Montrose defendants have never disclosed that Montrose is no longer operating in any of their discovery responses; not in Montrose's original October 15, 2003, initial disclosures (Ex. T), or in the Montrose defendants' initial disclosures from on March 1, 2005 (Ex. U). Timely disclosure of this information would have been required under Fed.R.Civ.P. 26(e). Purchase records that Lorillard has obtained through third parties indicate that Montrose continued doing business at least through September of 2004. (2nd Mote Decl., Ex. HH). Similarly, Montrose answered Lorillard's Second Amended Complaint in February 2005, long after it purportedly stopped doing business. That the corporation seems to be an apparition, appearing from time to time, may be no accident, and it is certainly in keeping with the manner in which its financial records were, and are, "kept."

**C**

**The Hazemis' Questionable Business Practices**

**1**

**Cigarette Purchases**

After a long and fruitless pursuit of Montrose's financial records and accounting information, Lorillard appears to be resigned to the fate that business records one might ordinarily expect to exist in an operation with the sales of Montrose simply do not. (*Plaintiff's Reply,* at 9-11). Among these would appear to be records of cigarette purchases. Initially, in its August 2003 responses, Montrose promised to make 10 to 12 boxes of cigarette purchase invoices available for inspection. (Mote Decl., Ex A2, Resp. 3). Montrose's counsel also wrote Lorillard's counsel a letter dated July 25, 2003, indicating the same thing. (*Def.Resp.;* Ex. 3). But Lorillard was still seeking these records at the time of Mr. Hazemi's

first deposition on February 2, 2004. (Mote Decl., Ex. C, at 160). That day, Mr. Hazemi explained that records of his purchases were loosely kept in 5 or 6 boxes at the Montrose facility, and Montrose's counsel again stated that Lorillard could inspect the documents. (Mote Decl., Ex. C, at 160-62). Nevertheless, Lorillard had to request these records again when it served discovery requests on Mr. Hazemi. At that time Mr. Hazemi declared that Montrose had already produced them. (Mote Decl., Ex. B1, Resp. 2, 4). By the time of his second deposition, however, he was not as certain.

At Mr. Hazemi's second deposition on December 14, 2004, the topic of these boxes, be there 5 or 6, or 10 or 12, came up once again.

> Q: Now, where are these 10 to 12 boxes maintained?
>
> A: I will try to tell you guys. I think you guys took it. You guys say no, but I think you guys took it.
>
> Q: ... [L]ong after the date of the seizure, [you said] you had 10 to 12 boxes ... and you would make them available to us to come to inspect.
>
> I'm asking you, where are those 10 to 12 boxes of documents presently stored?
>
> A: I don't know. I don't know.

\* \* \*

> **\*8** Q: So is it possible that you've destroyed or discarded the 10 to 12 boxes?
>
> A: Not whatsoever.

\* \* \*

> A: They're someplace in my basement or someplace. I have to find them.

\* \* \*

> Q: Is it possible that they might still be at Montrose Wholesale?
>
> A: No.
>
> Q: ... Is there a place other than your house where they might have been taken?
>
> A: No. I take everything to my house.

(Mote Decl., Ex. D, at 231-33).

Later in his deposition, Mr. Hazemi added further confusion to the question of the whereabouts of the cigarette purchase invoices. He testified that when Montrose purchased Newport cigarettes from distributors, he "dumped" the invoices in a cabinet. (Mote Decl., Ex. D, at 209). He did not maintain these purchase invoices, however, but discarded them. (Ex. D, at 210). Shockingly, he testified that he did this even after Lorillard filed suit, seemingly admitting to spoliation of evidence. (Ex. D, at 210). According to Mr. Hazemi, he did not feel the need to keep such records because MSA"[9] kept track of these things. (Ex. D, at 210-11).

Along similar lines, Mr. Hazemi described his bookkeeping:

> There's no accounting book. It's very, very simple. Either money comes or money goes. Money goes to the bank. Money comes and then turns around and goes to the bank. Then you purchase. There is no accounting. There is no booking.

(Ex. D, at 188, 194). Mr. Hazemi did allow, however, that he could contact the suppliers that sold him Newport cigarettes-Costco and City Sales-for copies of Montrose's purchase invoices. (Ex. D, at 209-10, 212). He later admitted that he also bought Newport cigarettes from other suppliers as well: McClain, Chambers & Owen, and Flemming. (Ex. D, at 229). Lorillard's counsel specifically asked him about one more distributor, Peter Karfias, and Mr. Hazemi testified that Montrose purchased only "fourth tier" cigarettes from him, never Newports. (Ex. D, at 91-93). In fact, invoices from Mr. Karfias indicate that Montrose had actually purchased more than $60,000 worth of Newport cigarettes from him between August 12, 2003, and November 18, 2004. (2nd Decl., Ex. QQ).

Mr. Hazemi testified that he paid for these cigarettes by check on Montrose's account at Labe Bank, and kept the cancelled checks in a drawer. (Ex. D, at 213). He thought Lorillard had obtained these in the seizure. (Ex. D, at 213). On other occasions, Mubeen Hussain purchased cigarettes for Montrose and paid for them with his personal credit card; Mr. Hazemi would reimburse him with cash. (Ex. D, at 214). Mr. Hazemi testified that he had no receipts for these purchases. (Ex. D, at 216).

In the time since Mr. Hazemi's second deposition, the Montrose defendants have decided that he does not take everything to his house or discard invoices after "dumping them in a cabinet. In its response to Lorillard's previous

Lorillard Tobacco Co. v. Montrose Wholesale Candies, Not Reported in F.Supp.2d (2005)

2005 WL 3115892

motion, Montrose and the Hazemis maintain the Lorillard obtained the boxes of documents at the seizure. (*Def.Resp.,* at 3). Unfortunately for the Montrose defendants, the seizure occurred on July 16, 2003. Some two weeks later, on August 1, 2003, Montrose offered to produce the 10 to 12 boxes of invoices in response to Lorillard's discovery requests. (Ex. A2, Resp.3). This, despite the fact that the offer to allow the boxes to be inspected came after the cigarette and document seizure occurred on July 16, 2003. In addition, in a letter dated April 18, 2005, Montrose's counsel informed Lorillard that he had three boxes of Montrose documents including "bank statements, delivery sheets, orders, purchase invoices, and other business documents." (Second Declaration of Jeffrey Mote ("2nd Mote Decl."), Ex. BB). Montrose's purchase orders and invoices, then, seem to be a target forever in motion, if they exist at all.

## 2

### Cigarette Sales

**\*9** Lorillard also sought sales records that purportedly existed on Montrose's computer's hard drive which it used for cigarette sales reporting. (*Combined Motion and Memorandum to Compel Discovery and Freeze Assets* ("*Pl.Mem.* "), at 3). This was necessary in order to explain PDF images on a compact disc that Montrose had produced as evidence of cigarette sales it reported to MSA in 2003. (2nd Mote Decl., ¶ 30). After repeated requests for the hard drive went unfulfilled, Lorillard subpoenaed a backup file of Montrose's computer records from Montrose's computer consultant, Osama Mouhsen, on January 12, 2005. (*Pl.Mem.,* at 3). Mr. Mouhsen had two overlapping data bases from Montrose, one covering November of 2003 through February of 2005, and one covering December of 2001 to March of 2004. (2nd Decl., Ex. II, at 78-79). At his deposition on March 21, 2005, Mr. Mouhsen explained that Mr. Hazemi had asked him to switch data bases in March of 2004, and to create a new one that covered the period beginning in November of 2003. (Ex. II, at 78-79). He also indicated that he offered to sell Mr. Hazemi a scanning device and program for incoming inventory, but Mr. Hazemi was not interested. (Ex. II, at 80). Mr. Hazemi did, at least, use a UPC scanner dedicated to the sales of cigarettes. (Mote Decl., Ex. D, at 202-04). Once Montrose became aware of the subpoena, it agreed to produce the hard drive for inspection, and Lorillard engaged a forensics firm to image it. (*Pl.Mem.,* at 3). All this to secure

discovery of sales records that one would ordinarily expect to be much easier to obtain.

According to Mr. Hazemi, he did not bother to track inventory at Montrose, he would simply looked at the shelves and take a rough guess. (Mote Decl., Ex. D, at 205-06). At any given time, Mr. Hazemi said, there were 6000 cartons of cigarettes at Montrose, 15 to 20% of which were Newport cigarettes. (Mote Decl., Ex. D, at 206). After the seizure, Mr. Hazemi said that figure was closer to 3 to 5%. (Mote Decl., Ex. D, at 207). Mr. Hazemi testified that those inventory levels would also reflect the percentages of Newport sales. (Mote Decl., Ex. D, at 207). For a more specific answer, Mr. Hazemi referred Lorillard's counsel to MSA. (Mote Decl., Ex. D, at 207-08).

## 3

### Other Discovery Efforts

Given the paucity of Montrose's records, Lorillard consulted the MSA records as Mr. Hazemi had repeatedly encouraged it to do. Those records for the year 2003 detailing inbound and outbound shipments reveal Montrose had sales of promotional Newport cigarettes that far exceed its purchases. (Ex. O). This information is certainly suspicious and, as Lorillard points out, seems to suggest that Montrose was acquiring significant volumes of Newport cigarettes from illegitimate, non-reporting sources and/or providing its retail customers with fraudulent invoices to obtain higher rebate payments from Lorillard.

Montrose still refuses to produce financial or accounting records, even for the very recent past, claiming that it does not keep even the most basic records, such as balance sheets, income statements, or cash flow statements. (*Pl.Mem.,* at 3-4). According to the Montrose defendants, this is because the Hazemis work long hours and have little time for paperwork, relying instead on deposits and expenditures for income and expenses. (*Def.Resp.,* at 1). Nevertheless, it is strange-to say the least-that Mr. Hazemi, who has a masters degree in accounting from Roosevelt University (Mote Decl., Ex C. at 30), would cavalierly eschew even the simplest of business practices. Strange, unless there turns out to be an underhanded explanation for it.

## D

### Creative Tax Returns

**\*10** At his first deposition in February 2004, Mr. Hazemi testified that he had not filed a return for Montrose or himself since 1999. (Ex. C, at 133-34). He explained that he had asked for extensions every year. (Ex. C, at 134). The returns produced, then, were apparently merely drafts. On February 22, 2005, Montrose made a supplemental production of purported income tax returns for the years 1997 through1999. The 1997 return is the only one signed by an officer of Montrose; again, it would appear that the others were never filed. (Exs.I1-I7). Once again, Lorillard was left to its own devices to assemble some kind of picture of Montrose's finances.

Lorillard deposed Montrose's tax preparer, John Cherachi, on February 2, 2005. According to Mr. Cherachi, the Montrose returns for the years 2000-2003 were "draft" tax returns that had not been filed. (Ex. G, at 195, 199-200, 231). Mr. Cherachi also produced income tax return records for the Hazemis for the years 2000, 2002, and 2003 (the 2001 return was missing). (Exs.H1-H4). He prepared returns for the years 2001 through 2003 all at the same time, in May or June of 2004. (Ex. G. at 149-50). Mr. Cherachi testified that he had prepared tax returns for the Hazemis since the early 1990s, but could not recall a single instance in which the Hazemis had not required an extension from the IRS because their records were always incomplete. (Ex. G, at 231-35). And he did not know if the Hazemis had ever actually filed these returns. (Ex. G, at 151).

During his deposition, Mr. Cherachi testified that he met with Mr. Hazemi in approximately June of 2004, and prepared summary spreadsheets (Ex. J) for Montrose's 2001-2003 income tax returns. (Ex. G, at 154-55). At that time, however, Mr. Hazemi did not provide Mr. Cherachi with any financial records or documents to prepare these spreadsheets. Instead, he sat next to him at a computer in his home and orally told him, reading from notes, what numbers to insert in the spreadsheets. (Ex. G, at 150-154). Tellingly, Mr. Cherachi testified that Mr. Hazemi requested he prepare Montrose's 2003 return as a "final" return and that he zero out the books for Montrose Wholesale on the balance sheets included in that return. (Ex. G, at 179; Ex. I7). This, as already noted, directly conflicts with evidence elsewhere in the record.

At various times since at least January 2, 2001, Montrose's principals have represented to others that Montrose was insolvent, beginning with, as already noted, the Stock Purchase Agreement. (Ex. DD, at RN 279). In February 2002, the Montrose defendants' counsel in this lawsuit, Robert Egan, represented to plaintiff's counsel in another lawsuit involving a supplier, Chambers & Owens, that both Montrose and Ray Hazemi were financially insolvent. (Ex. GG). Montrose's income tax returns from 1997 through 2003, show purported losses of more than $2,889,350 during that period. (Exs.I1-I7). Nearly all of those losses-$2,771,756-were reported after the Hazemis took full control of Montrose. Mr. Cherachi confirmed that the losses reported in Montrose's 2001-2003 tax returns were based on numbers Mr. Hazemi dictated to him as he sat at his computer; he never saw any corroborating financial records. (See Exs. I5-I7; Ex. G at 150-157). That is certainly not surprising, given Mr. Hazemi's "bookkeeping" or lack thereof.

## E

### The Hazemis' Banking Records and Use of Corporate Funds

**\*11** Throughout this litigation, bank records-even the mere existence of accounts-have, like records of every other type, been a matter of some secrecy for the Hazemis and the Montrose corporation. At his second deposition, Mr. Hazemi testified that Montrose maintained its only bank account-a checking account-at Labe Bank. (Mote Decl., Ex. D, at 188, 194). He also stated that he had no personal bank account of any kind. (Mote Decl., Ex. D, at 188, 190). His wife, however, maintained an account with Citibank. (Mote Decl., Ex. D, at 189). Although Mr. Hazemi testified that the funding for that account comes from Montrose (Mote Decl., Ex. D, at 192), his wife swore in her affidavit that she has never received any money from Montrose. (*Def.Resp.,* Ex. 8). As for his lack of any type of banking or checking account, Mr. Hazemi explained that he simply paid cash to cover his day-to-day expenses, using money from Montrose.[10] (Mote Decl., Ex. D, at 190). The Hazemis used Sandra Hazemi's account to pay the mortgage, the utilities, grocery bills, and clothing expenses. (Mote Decl., Ex. D, at 191).

When Montrose refused to voluntarily produce its bank records, Lorillard began to subpoena its banks including Labe Federal Bank and Village Bank and Trust. Records

from Labe Federal Bank reveal that between February 2, 2002 and June 13, 2003, Mr. Hazemi wrote more than $8,779,000 in checks to "Montrose Wholesale," purportedly for cash drawn on Montrose's Labe Bank account. (Ex. L). Montrose has not produced any records identifying where these funds were transferred or how the funds were used. In their response to Lorillard's motion, the Montrose defendants explain these funds were deposited at Parkway Bank & Trust in what they call an "ancillary" account and used to purchase cigarettes from a distributor called Fleming. (*Def.Resp.,* at 5, 10). Incredibly, the Montrose defendants fault Lorillard for "distort[ing] the use of the account by ... not demonstrating any disbursements from the account." (*Id.*). It is the Montrose defendants, however, who have produced no records relating to this account; any distortion of their activities is a product of their non-compliance with discovery.

Lorillard also obtained bank records for another undisclosed account. It seems Montrose held an account at Village Bank & Trust from November 2002 until the end of July 2004, despite the fact that Mr. Hazemi testified that Montrose did all its banking at Labe Bank. (Ex. M). These records reveal more than a million dollars in transactions during that period. Thus, approximately ten million dollars ran through these two accounts that apparently slipped Mr. Hazemi's mind at his second deposition. To date, Lorillard continues to seek records relating to these accounts, including cancelled checks, without success.

Village Bank & Trust was also a source of three loans to Montrose and the Hazemis. (Exs.N1-N3). Neither the Hazemis nor Montrose have produced records relating to these transactions. The first loan is a credit account for $85,000, for the Hazemis dated November 27, 2002, with a mortgage taken on the Hazemi's home at 650 Pleasant Lane, Lombard, Illinois. (Ex. N1). The second loan involves a $750,000 Promissory Note dated February 21, 2003. The loan agreement is referred to as a "Business Loan Agreement" and identifies Sandra Hazemi as the borrower of purchase money for the property located on three lots at 4417 W. Montrose Avenue, in Chicago-the property that houses Montrose. Interestingly, Mr. Hazemi is listed as an unlimited guarantor on the loan, despite the fact that, at his second deposition, he claimed that he had no assets, aside from being the sole shareholder in Montrose. (Ex. D, at 193). He also claimed neither he nor his wife owned any property except for the family home in Lombard, Illinois, and an interest in her family's home in Canada. (Ex. D, at 197).

*12 The third loan is dated April 8, 2003 and involves a Promissory Note for $350,000 to Montrose and First National Bank of Blue Island, Trust No. 71013 as joint borrowers. (Ex. N3). Montrose has never produced nor otherwise disclosed any interests it has in property with this trust. Moreover, the address provided for First National Bank of Blue Island, Trust No. 71013, is 6630 W. Montrose Avenue-the same address as that linked to numerous businesses affiliated with the Hazemis and their relatives. Trust documents attached to the loan papers reveal that Ray Hazemi and his sister, Giti Azari, were assigned the beneficial rights in the trust on April 3, 2003, and that the trust was set up in connection with a 1999 installment contract for property that Giti Azari purchased. (Ex. N, at VBT 000117).

**F**

**Associated Businesses**

Mr. Hazemi has been similarly cryptic regarding the other businesses with which he has been, and is, affiliated. When Lorillard posed an interrogatory asking him to identity "each and every business" that he had ever been "affiliated with as an owner, shareholder, employee, officer or agent," Mr. Hazemi certified that the only businesses he has been affiliated with are Montrose Wholesale and G & D Pantry, as their respective presidents. (Ex. B2, ¶ 8). Lorillard's investigations have suggested otherwise. At his deposition, Mr. Cherachi testified that Mr. Hazemi had hired him to prepare taxes for at least three other business, S & D Pantry, Franklin Cigarette Depot, and Malibu, Inc. (Ex.G, at 59, 62-63, 67-68). In addition, other evidence Lorillard obtained pursuant to third-party subpoenas confirmed that Mr. Hazemi neglected to mention several businesses with which he had been affiliated in one capacity or another: Harwood Heights Gas Mart (employee); S & D Pantry (employee); Malibu Inc. (president and owner); Franklin Cigarette Depot (owner and employee); and Milano Pizza (owner or manager). (Ex. CC).

Mrs. Hazemi also has certain property interests that Mr. Hazemi chose to keep secret as his deposition: 4417-4425 W. Montrose Avenue, Chicago; 6764 W. Forest Preserve Drive, Harwood Heights (Ex. N); and, of course, the aforementioned 3019 N. Rose Street property. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. F). This contradicts not only the Hazemi's recent testimony at their depositions in July and August of 2005, but even Mr. Hazemi's earlier testimony that his wife had no real property interests aside from the Hazemi's

2005 WL 3115892

house in Lombard and a house in Canada that had been in the family for sixty years. (Ex. D at 196-197). And of course, it demonstrates that the Hazemis have no qualms about flirting with perjury to see to it that their assets remain hidden.

As is apparent from the forgoing, and from the Hazemis' efforts to secure the property where the Montrose store is located, Mr. Kakvand has a good deal of involvement with the Hazemis and their businesses. In October of 2004, he was indicted along with Ali Razvi in the Northern District of Illinois, for bank and wire fraud in connection with a scheme to defraud mortgage lenders out of more than $27 million. (Ex. KK, Case No. 04 CR 0896). According to the indictment, Kakvand would purchase run-down apartment buildings through companies he either owned or controlled-including Residential Realty Development, Inc., Infiniti Financial Corporation, Liberty Financial, and Mortgage Bankers Service Corporation-and obtain false, inflated appraisals from co-conspirators based on non-existent renovations. (Ex. KK, Case No. 04 CR 0896). He would then resell the properties as condo developments or apartments to shill buyers for whom he obtained and then pocketed mortgage loans. (Ex. KK, Case No. 04 CR 0896). One of the fraudulent apartment transactions identified in the indictment involves the aforementioned property at 6201-6203 S. Champlain Avenue and Mr Kakvand's company, 6201 S. Champlain, LLC. (Ex. KK, at 4). The address for the company is the same as Montrose's address, 4419 W. Montrose Avenue. (Ex. MM).

*13 Interestingly, Mr. Kakvand purchased the Champlain property from Omni Investments, LLC, which is run by Bardan Azari, son of Giti Azari. (Ex. MM). Giti Azari was also the registered agent for the previously mentioned Kakvand company, Liberty Financial. (Ex. MM). Bardan and Bahar Azari also are linked to Liberty Financial as evidenced by the Citations to Discover Assets served on them in connection with a civil case against Kakvand, *Hoge v. Kakvand,* Cook County Case No. 95 CH 10195. (Ex. MM). Giti Azari and Bahar Azari also both worked at another of Mr. Kakvand's businesses, Mortgage Bankers Service Corporation, in 1999 through 2001, which received at least a few administrative penalties from the Illinois Office of Banks and Real Estate ("OBRE"), including a license revocation. (Ex. LL). The company also figures in several loans to Sandra Hazemi and the Azaris. (Ex. NN).

Through Illinois property records, Lorillard discovered that Bahar Azari used her connections at Mortgage Bankers Service Corporation to obtain loans to acquire properties

at 5504 W Agatite Avenue and 5806 W Giddings Street in Chicago. In addition, Giti Azari approved a series of loans to Sandra Hazemi from Mortgage Bankers Service Corporation. (Ex. NN). Sandra Hazemi obtained at least two loans from that firm for her home at 650 Pleasant Lane in Lombard, Illinois. (Ex. NN). Sandra Hazemi also acquired the property at 6774 W. Forest Preserve Drive, Chicago, in 1999 from Mr. Kakvand and Residential Realty Development with a $450,000 loan from Labe Bank. (Ex. OO, loan no. 01-12000452). Closing records show that $390,796.56 was distributed to Mr. Kakvand's Residential Realty Development, Inc. (Ex. OO, at LAB 2095). Interestingly, Giti Azari signed on behalf of MBBG, Inc. as guarantor on the Labe Bank note for Sandra Hazemi's purchase of 6774 W. Forest Preserve Drive. (Ex. OO, at LAB 2115).

## II

## THE PROPRIETY OF FREEZING ASSETS IN THIS CASE

Based on the foregoing record, Lorillard asks this court to enter an order freezing the assets of Montrose and the Hazemis under Fed.R .Civ.P. 65. A district court is not permitted to freeze a defendant's assets solely to preserve a plaintiff's right to recover damages. *Grupo Mexicano de Desarollo, S.A. v. Aliance Bond Fund,* 527 U.S. 308 (1999). The decision in *Grupo Mexicano,* however, did not concern the preliminary relief available in a suit seeking an equitable remedy. 527 U.S. at 325. Indeed, the Supreme Court made note of the fact that a restraint on assets was still available when the suit sought an equitable relief. *Id.* at 325 (citing *Deckert v. Independence Shares Corp.,* 311 U.S. 282 (1940)(upholding prejudgment asset freeze in case seeking equitable relief, including appointment of receiver to wind up corporation, rescission of contracts, and the return of disputed fund of money)). In this instance, Lorillard seeks, among other relief contemplated by the Lanham Act, a disgorgement of the Montrose defendants' profits, which is an equitable remedy. *CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 996 (7th Cir.2002); *BASF Corp.,* 41 F.3d at 1095-96.[11] Because Lorillard seeks to recover the Montrose defendants' profits, then, an order freezing the Montrose defendants' assets is within the court's authority. In, *CSC Holdings,* for example, the court found that an asset freeze was entirely proper where the plaintiff sought remedies that including accounting and

profits. As such, the court has the authority to enter an order freezing assets in cases where the plaintiff seeks an equitable remedy generally, *CSC Holdings,* 309 F.3d at 996; *S.E .C. v. ETS Payphones, Inc.,* 408 F.3d 727, 734 (11th Cir.2005); *Elliott v. Kieswetter,* 98 F.3d 47, 58 (3rd Cir.1996),* and specifically, in Lanham Act cases such as this one. *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995); *Reebok International, Ltd. v. Marnatech Enterprises,* 970 F.2d 552, 559 (9th Cir.1992). After a review of the voluminous record in this case, the court finds that a preliminary injunction freezing the Montrose defendants' assets is warranted in this case.[12]

**\*14** A party seeking a preliminary injunction under Fed.R.Civ.P. 65 is required to demonstrate a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if the relief is not granted. *Promatek Industries, Ltd. v. Equitrac Corp.,* 300 F.3d 808, 811 (7th Cir.2002). If the moving party can satisfy these conditions, the court must then consider any irreparable harm an injunction would cause the nonmoving party. *Promatek Industries,* 300 F.3d at 811. Finally, sitting as a court of equity, the court then weighs all these factors employing a sliding-scale approach: the more likely the plaintiff's chance of success on the merits, the less the balance of harms need weigh in its favor. *Promatek Industries,* 300 F.3d at 811.

### A

### Likelihood of Success on the Merits

In the context of a motion for a preliminary injunction in a trademark infringement claim, a likelihood of success exists if the party seeking the preliminary injunctive relief demonstrates that it has a "better than negligible" chance of succeeding on the merits of the underlying infringement claim. *Platinum Home Mortg. Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 726 (7th Cir.1998). The record thus far assembled in this matter certainly meets this rather minimal hurdle. Indeed, on July 15, 2003, Judge Aspen entered an ex parte seizure order in which he found that Lorillard was likely to succeed on the merits in this case. Nothing has occurred since Judge Aspen made that finding that would convince the court to disturb his ruling. At that time, one of Lorillard's division managers had purchased cigarettes that had turned out to be counterfeit at the Montrose store. The seizure produced further evidence of

counterfeit cigarettes. MSA records reveal Montrose had sales of promotional Newport cigarettes that far exceed its purchases, arguably suggesting that Montrose was acquiring significant volumes of Newport cigarettes from illegitimate, non-reporting sources and/or providing its retail customers with fraudulent invoices to obtain higher rebate payments from Lorillard. In addition, at his deposition, Mr. Hazemi was less than frank about his sources of Newport cigarettes. The record satisfies the court that Lorillard has "better than negligible" chase of succeeding on the merits of its case.

For the court's purposes here, however, the likelihood of Lorillard's success in pursuing their "alter ego" theory of liability against the Hazemis is just as important as their likelihood of success on their Lanham Act claims. Under Illinois law, to succeed on this theory, Lorillard must show that: "(1) there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances are such that adhering to the fiction of a separate corporate existence would promote injustice or inequity." *International Financial Services Corp. v. Chromas Technologies Canada, Inc.,* 356 F.3d 731, 736 (7th Cir.2004). Among the factors pertinent to this showing are whether there was inadequate capitalization, a failure to observe corporate formalities, an absence of corporate records, and commingling of funds. 356 F.3d at 738. Once again, the record as it stands in this case is more than adequate to demonstrate that Lorillard is likely to succeed on its "alter ego" theory.

**\*15** Corporate formalities such as meetings or corporate minutes are not a part of the Montrose defendants' operations. Courts are known to allow sole proprietors or husband-and-wife proprietors some leeway in this area, especially where they have made efforts to maintain records and keep corporate funds separate from their own. *See, e.g., Trustees of Pension, Welfare and Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co., Inc.,* 995 F.2d 785, 788 (7th Cir.1993). Here, however, the Hazemis admittedly have made no such efforts. In addition, they are less than forthcoming about Montrose's corporate ownership structure. While Mrs. Hazemi was listed as a 50% owner in 1998, she was apparently replaced in this position by her husband in 1999. She was a 50% owner once again in 2003, apparently taking over half of her husband's share at that time. What is a bit more disturbing, however, is that Mrs. Hazemi has filed an affidavit in which she swears she has never been a shareholder of Montrose. (*Def.Resp.,* Ex. 8). She also swore that she has never been an officer of Montrose, yet she signed an application for the corporation's

2005 WL 3115892

reinstatement as vice president. This obfuscation about the Hazemi's shareholder status might not be a terribly significant factor when viewed in isolation, but in this case, it must be combined with the following evidence regarding the absence of any corporate record keeping and the Hazemi's commingling of Montrose's funds with their own.

Finding an absence of corporate records can be no easier than it is in this case: the Montrose defendants trumpet their failure to keep corporate records, employing it as a shield against discovery. According to them, there are no records such as balance sheets, cash flow statements, or accounting ledgers, for Montrose. (Mote Decl., Ex. D, at 188, 194, 210-11; *Def.Resp.* at 8). The Montrose defendants claim they do not keep order forms or track inventory. (Ex. D, at 205-06; *Def.Resp.,* at 9). Instead, Montrose's sole records are cancelled checks and bank deposits. (Ex. D, at 188, 194; *Def.Resp.,* at 8). Everything, the Montrose defendants claim, is based on cancelled checks and bank deposits, including tax returns. (*Def.Resp.,* at 10). Those tax returns were prepared by Mr. Hazemi dictating numbers to Mr. Cherachi without any corroborating financial records. (Mote Decl., Ex. G, at 150-54). The last time either Montrose or Mr. Hazemi filed a tax return was 1999. (Mote Decl., Ex. C, 133-34). The Montrose defendants explain that they simply do not have the man-power to keep any semblance of traditional corporate records. (*Def.Resp.,* at 1, 8, 9-10).

This absence of records not only supports Lorillard's alter ego theory, but creates conditions that are ripe for the commingling of assets. Mr. Hazemi does not bother to maintain a personal bank account; instead, he draws cash as needed from Montrose. (Mote Decl ., Ex. D, at 190). The Montrose defendants explain that they account for this as a "management fee" on tax returns. (*Def.Resp.,* at 4). There is no evidence that the Montrose defendants kept any record of Mr. Hazemi's cash withdrawals, however, and, as just noted, the tax returns are prepared without corroborative financial data and have not been filed since 1999. Mr Hazemi testified that the money in his wife's checking account came from Montrose as well. (Ex. D, at 192). But, Mrs. Hazemi swore that she has *never* received any money from Montrose and, more specifically, that she has never been paid for working at Montrose. (*Def.Resp.,* Ex.8). Thus, there is no telling what the funds in her checking account represent. Neither Mr. nor Mrs. Hazemi, then, seem to acknowledge that Montrose is a separate entity from themselves when it comes to Montrose's money.

**\*16** Montrose's banking practices allow for the commingling of assets as well. During discovery, Mr. Hazemi maintained that Montrose did all its banking at one bank. (Mote Decl., Ex. D, at 188, 194). Lorillard's own efforts revealed that Montrose had accounts at two other banks as well. The Montrose defendants suggest that there was nothing secretive about these accounts; they did not disclose them because they were merely "ancillary" accounts. (*Def.Resp.,* at 10). They claim to have used one "ancillary" account to deposit over $8 million from checks Montrose wrote to itself on its Labe Bank account, but have produced no records of that activity. (*Def.Resp.,* at 5). Lorillard's third-party discovery efforts have revealed the other "ancillary" account was home to approximately $ 1 million in transactions over a twenty-month period. (Mote Decl., Ex. M). Nearly $10 million is quite a bit of activity for a couple of undisclosed, ancillary accounts, especially when the Hazemis feel free to help themselves to cash from Montrose without any accounting or records of their withdrawals. And, the fact that Mrs. Hazemi owns the property that houses Montrose, after a long and serpentine series of transactions involving an individual under indictment for defrauding mortgage lenders, does not escape the court's attention. Her ownership is made all the more suspicious by the fact that Mr. Hazemi testified his wife owned no property other than the family home in Lombard and an interest in her family's home in Canada. And, as has recently been made clear by the revelations regarding the 3019 N. Rose St. property, this is not the only property ownership the Hazemis have covered up.

The evidence Lorillard has advanced in this matter demonstrates that, with respect to Montrose, the Hazemis have disregarded corporate formalities, have kept no corporate records, and have treated corporate funds as their own. Judge Aspen has already found that there is a likelihood that Lorillard will succeed on it Lanham Act claims, and there have been no further developments that would counsel a revision of that opinion. Based the record in this matter, the court finds that Lorillard has not only established a likelihood of success on the merits of its Lanham Act claims, but as to it "alter ego" theory as well.

**B**

**Inadequate Remedy at Law and Irreparable Harm**

Next, Lorillard must show that it has no adequate remedy at law and, as a result, that it will suffer irreparable harm if the

injunction is not issued. *FoodComm Intern. v. Barry,* 328 F.3d 300, 304 (7th Cir.2003). "Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *FoodComm Intern.,* 328 F.3d at 304. In this case, the Lanham Act provides Lorillard with the equitable remedy of recovering the Montrose defendants' profits. In such cases, courts have generally concluded that an asset freeze is appropriate to ensure that permanent equitable relief will be possible. *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995); *Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d 552, 559 (9th Cir.1992).

**\*17** The evidence discussed above demonstrates that the Hazemis are hardly circumspect about segregating their assets from those of Montrose. Corporate financial records are non-existent, bank accounts go undisclosed. Clearly, the remedy of disgorgement of profits will be less than inadequate if the Hazemis continue to treat the Montrose coffers as their own and relieve Montrose of its corporate assets. In addition, especially given the Hazemis' disregard for corporate bookkeeping, the profits at issue in this case might become all but untraceable, if that is not already the case.

Finally, it is clearly not beyond the Hazemis to lie about the very ownership of assets. They have done so recently and repeatedly. It is not unusual, in a Lanham Act case, for a court to freeze assets where there is evidence that the defendants "may hide their allegedly ill-gotten funds if their assets are not frozen." *Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d 552, 563 (9th Cir.1992). This is not a case where there is a mere threat of the Hazemis hiding their assets; Lorillard has demonstrated that they are already actively doing so, and attempting to cover their trail with more deception. It is the Hazemis that have brought this case to this brink. They have seen to it that there is no other way to preserve the *status quo* but an asset freeze. Accordingly, the court finds that Lorillard has established that it has no adequate remedy at law and will suffer irreparable hardship without a freeze of the Hazemis' assets.

## C

**Balance of Harms to the Respective Parties**

In balancing the harms, the court must weigh the error of denying a preliminary injunction to the party who would win the case on the merits against the error of granting an injunction to the party who would lose. *FoodComm Intern.,* 328 F.3d at 305. In so doing, the court bears in mind that the purpose of a preliminary injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *AM General Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 804 (7th Cir.2002). In this case, there is no doubt that the Hazemis will suffer harm if their assets are frozen. But it is a harm they have brought upon themselves with their tactics of deception and underhandedness. Just how to quantify that is a difficult question because the Hazemis have not addressed the issue. But this much is certain: the Hazemis have had a rather long string of chances to end their pattern of deception in this litigation: the court has given them the benefit of the doubt time and again. They have chosen to blatantly lie, in depositions and in open court. The balance of harms, by far, favors the protection of Lorillard's rights by the issuance of an order freezing the Hazemis' assets.

The court also notes that, in balancing the harms to the parties, the greater a movant's chances of success on the merits, the less strong a showing it must make that the balance of harm is in its favor. *FoodComm Intern.,* 328 F.3d at 303. As the court's foregoing discussion reveals, Lorillard has made a rather strong showing that it will succeed on the merits of this case. Accordingly, the court grants Lorillard's motion for a preliminary injunction freezing the Hazemis' assets in this case. Lorillard shall submit a draft order freezing the Hazemis' assets and detailing the plan for the court's approval.

**\*18** Recognizing that the freezing of assets could work a hardship on the Hazemis, the order should make provisions for withdrawal of living expenses, and for the payment of expenses related to legitimate business operations. If the Hazemis comply with the order, and submit the necessary proof to the Court, no undue hardship need be felt by defendants as a result of the asset freeze. Moreover, the Court is free to modify or dissolve the preliminary injunction if warranted by developments in this case subsequent to the noticing of this appeal.

Although the court accepts Lorillard's arguments regarding the necessity of an asset freeze, it cannot accept the argument that no bond is necessary in this case. Under Federal Rule of Civil Procedure 65(c):

[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any

party who is found to have been wrongfully enjoined or restrained.

The rule, as the Seventh Circuit has stated, makes security mandatory. *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1141 (7th Cir.1994). While it is clearly within the court's discretion to fix the amount of the bond, *Id.,* the parties here have provided the court with no evidence, or even discussion, of what would constitute an appropriate amount. As such, the parties must file memoranda on this issue along with supporting documentation, in order that the court may determine a reasonable amount for security in this instance. *See, e.g. Mead Johnson & Co. v. Abbott Laboratories,* 201 F.3d 883, 887 (7th Cir.2000); *Gateway Eastern Ry. Co.,* 35 F.3d at 1142.

## III

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that the plaintiff's motion-and emergency motion-for a preliminary injunction freezing the defendants' assets be granted. It is further recommended that the plaintiff be ordered to file a draft order for the court's approval, and the parties be ordered to file memoranda on the appropriate amount of the bond as per this report and recommendation.

## All Citations

Not Reported in F.Supp.2d, 2005 WL 3115892

Footnotes

1   Under 28 U.S.C. § 636(b)(1)(A), "a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, *except a motion for injunctive relief,* for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action." Under section 636(b)(1)(B), "a judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court *proposed findings of fact and recommendations for the disposition,* by a judge of the court, of any motion excepted in subparagraph (A). Lorillard's motion to freeze assets is a motion for injunctive relief..

2   To support its motions, Lorillard filed the exhibits mentioned, as well as: (1) a declaration, (2) a substitute declaration, (3) a second declaration by Lorillard's counsel, (4) a declaration in support of the emergency motion, and (5) the actual motions and supporting memoranda. Through a good portion of the declarations and the memoranda, however, Lorillard fails to cite to pages of the voluminous record that support many of its assertions. Thus, in some instances, it does not even provide a general reference to any supporting documentation (*See, e.g.,* (Substitute)Declaration of Jeffrey Mote, ¶¶ 28-29, 32-34, 41, 42, 43, 44) or-more understandably given the volume of materials prepared-misidentifies purported supporting materials or fails to make pages part of the record. (*See, e.g.,* Combined Motion to Compel Discovery and Freeze Assets, at 6(¶ 12); (Substitute)Declaration of Jeffrey Mote, at ¶¶ 28-29, 32-34, 41, 42, 43, 44; Second Declaration of Jeffrey Mote, at ¶¶ 22, 64, 65). At the court's request, Lorillard's counsel filed a consolidated declaration which corrected some, but not all, of these deficiencies. The few that remain, however, do not make Lorillard's tale of woe any less compelling; those assertions that Lorillard does adequately support with evidence and the court's own perusal of the record provide enough detail regarding the Montrose defendants' discovery obfuscation and financial legerdemain for the court to grant Lorillard's motion.

3   On November 1, 2005, Bankruptcy Court Judge Hollis granted Lorillard's motion to modify the automatic stay to permit Lorillard to continue its lawsuit against the corporate defendant, Montrose.

4   The phrase "in name only" takes on a curious meaning here, as nearly every document associated with the Hazemi's transfer of the 3019 N. Rose St. property identifies the owner as "Sean Semler" or "Sandra Semler Hazemi a/k/a Sean Semler." (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. D; *Declaration of Jeffrey Mote in Support of Emergency Motion to Freeze Assets,* Exs. H at RN 0257; I at 00444; J at 0221, 0229; L; M). Sean Semler is Mrs. Hazemi's brother. At their depositions, neither Mr. nor Mrs. Hazemi could hazard a guess as to why these documents referred to Mrs. Hazemi in this manner.

5    It would also appear that the Hazemi's attorney, Mr. Habib, was victimized by their misrepresentations as well. An able and experienced lawyer, Mr. Habib certainly would not have accepted his client's assertions at face value. Yet, he, too, was taken in by the Hazemis, and employed-unwittingly-in their ruse.

6    While Mr. Habib prepared the Hazemis' affidavits in consultation with them, he did not sign the documents. Only the Hazemis have sworn to their veracity.

7    The "Stock Sales Agreement was a bit out of the ordinary. It called for Mr. Shoushtari to pay Mr. Hazemi $67,952 pursuant to the following significant representation: "Payment of these monies is as a result of the corporation being insolvent at the time of this transaction, that is, its liabilities exceed its assets." (Ex. DD, at RN 279). Mr. Hazemi also agreed to indemnify Mr. Shoushtari against any judgment in a pending lawsuit, *Certified Grocers v. Montrose/Shoushtari,* Case No. 98 L 14808. (Ex. DD, at RN 284). In addition, Shoushtari agreed to transfer any shares received from Mr. Al Mikhi pursuant to those pending lawsuits to Mr. Hazemi for $1. (Ex. DD, at RN 285). The record suggests that he made this transfer on January 2, 2001. (Ex. DD, at RN 277-78).

8    Lorillard submits that rental income from tenants of the property at 4417-4425 W. Montrose would not come close to making this expedited payment schedule. Instead, it would appear that AB Venture was dependent on cash funneled from Montrose to cover the balance of each monthly payment. Although Montrose and the property owners represented that Montrose's rent was $3,500 per month, it was actually paying $6,000 per month by check to Mrs. Shoushtari and Ms. Azari. (Ex. SS). It would seem that utility bills for the property were directed to Montrose and its owners and paid with Montrose's funds. (Ex. SS). Montrose paid for the electrical utilities and property insurance directly, although all these expenses were identified as being paid by the nominal owners of the property. (*Id.*).

9    According to Lorillard's counsel, the last part of the cigarette distribution chain involves the sale of tobacco products from retailers who are authorized to participate in certain cigarette promotional programs to consumers. Typically, these promotions involve rebate payments-known in the industry as "buydown" programs-wherein an authorized retail distributor is paid a rebate for each carton it sells during the term of the "buydown" program, provided the retailer purchased such carton from an authorized wholesale distributor. Authorized wholesale distributors agree to report all purchases and sales of a particular manufacturer's promotional cigarette products to Management Science Associates, a consultant the tobacco companies employ to collect data on sales and distribution of their products. UPC scanning is a part of this sophisticated and far-reaching information gathering system *See* http:// www.msa.com; *Holiday Wholesale Grocery Co. v. Philip Morris Inc.,* 231 F.Supp.2d 1253, 1291 (N.D.Ga.2002). Tobacco manufacturers, including Lorillard, use the data reported to MSA to monitor and detect potential fraudulent reporting by wholesale distributors and their retail customers who are participating in the manufacturer's promotional programs.

10   According to the Montrose defendants, Mr. Hazemi accounts for this by declaring a "management fee" from Montrose, which is reflected in his personal tax returns. (*Def.Resp.,* at 4). As already noted, however, these returns have never been filed, and were based on figures Mr. Hazemi dictated to Mr. Cherachi which may or may not have been drawn from an actual financial record. Given Mr. Hazemi's admitted aversion to bookkeeping, it is more likely they were not.

11   The Montrose defendants argue that Lorillard must establish a nexus between the sale of counterfeit cigarettes-specifically, five cartons that apparently have been seized-and the assets to be frozen. (*Def.Resp.,* at 13-14). In support, they rely on two cases: *Mitsubishi International v. Cardinal Textile Sales,* 14 F.3d 1507 (11th Cir.1994); and *Rosen v. Cascade International, Inc.,* 21 F.3d 1520 (11th Cir.1994). Neither case supports the Montrose defendants' position. In *Mitsubishi,* while the Ninth Circuit did hold that "a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment," 14 F3.d at 1521, it had no occasion to consider the propriety of freezing assets to preserve a party's right to an equitable remedy. Instead, the relief at issue was the payment of a debt and money damages for fraud. The *Rosen* court held similarly, but took care to distinguish situations in which the plaintiff is seeking only an award of monetary damages from those in which the plaintiff is seeking equitable relief. 21 F.3d at 1527, 1528-29. That distinction, at work here, is apparently lost on the Montrose defendants. Furthermore, to the extent that the Montrose defendants argue that the individual Hazemis' assets are out of reach, such concerns are addressed in the court's discussion of Lorillard's "alter ego" theory.

12   The Montrose defendants submit, without authority, that a preliminary injunction cannot be entered without a hearing. (*Def.Resp.,* at 12). Rule 65, however, does not make a hearing a prerequisite for ruling on a preliminary injunction. Certainly, if genuine issues of material fact are created by the response to a motion for a preliminary injunction, an evidentiary hearing is indeed required. *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1171 (7th Cir.1997). "But as in any case in which a party seeks an evidentiary hearing, he must be able to persuade the court that the issue is indeed genuine and material and so a hearing would be productive-he must show in other words that he has and intends to introduce evidence that if believed will so weaken the moving party's case as to affect the judge's decision on whether to

**Lorillard Tobacco Co. v. Montrose Wholesale Candies, Not Reported in F.Supp.2d (2005)**

2005 WL 3115892

issue an injunction." *Id.* Here, the Montrose defendants have made no such showing and, indeed, do not even expound upon their assertion that the court must conduct a hearing. They do not indicate what evidence they might introduce against Lorillard's motion and, given that they admit that they keep virtually no corporate or financial records, it is doubtful that any such evidence exists. *See In re Aimster Copyright Litigation,* 334 F.3d 643, 654 (7th Cir.2003) (party's own activity hampered its ability to present contrary evidence in preliminary injunction proceeding). As the court has already detailed, the record assembled in this matter is extensive. It includes two depositions' worth of Mr. Hazemi's sworn testimony, not to mention a sworn affidavit from his wife. Add these to more than a thousand pages of financial and business records and the material before the court is more than adequate to allow the court to rule on Lorillard's motion without a hearing.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:21-cv-01664 Document #: 33-2 Filed: 05/24/21 Page 41 of 61 PageID #:3143

Luxottica Group S.p.A. v. Light in the Box Limited, Not Reported in Fed. Supp. (2016)

2016 WL 6092636

KeyCite Yellow Flag - Negative Treatment

Distinguished by Vendavo, Inc. v. Long, N.D.Ill., August 30, 2019

2016 WL 6092636
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

LUXOTTICA GROUP S.P.A.
and Oakley, Inc., Plaintiffs,

v.

LIGHT IN THE BOX LIMITED, Defendant.

Case No. 16-cv-05314
|
Signed 10/19/2016

Attorneys and Law Firms

Kevin W. Guynn, Allyson M. Martin, Amy Crout Ziegler, Justin R. Gaudio, Greer, Burns & Crain, Ltd., Chicago, IL, for Plaintiffs.

Harrison J. Frahn, IV, Lee Brand, Simpson Thacher & Bartlett LLP, Palo Alto, CA, John H. Scheid, Pretzel & Stouffer, Chicago, IL, for Defendant.

MEMORANDUM OPINION AND ORDER

Robert M. Dow, Jr., United States District Judge

**\*1** This matter is before the Court on Plaintiffs Luxottica Group S.p.A.'s and Oakley, Inc.'s Motion for a Preliminary Injunction against Defendant Light In The Box Limited, [12]. Also before the Court are Defendant's two motions to strike, [92], [102]. For the following reasons, the Court grants Plaintiff's motion [12] and denies Defendant's motions, [92], [102]. The Court will set a status hearing after Magistrate Judge Finnegan has resolved Plaintiff's pending motion to compel. See [107], [113], [117].

I. Background[1]

Plaintiffs Luxottica Group S.p.A. ("Luxottica") and Oakley, Inc. ("Oakley") (collectively, "Plaintiffs") filed this action against Defendant Light in the Box Limited ("Defendant") to address Defendant's alleged selling and offering for sale of

sunglasses featuring counterfeits of Plaintiffs' registered Ray-Ban and Oakley trademarks.

Luxottica produces, manufactures, and distributes luxury and sports eyewear under federally registered trademarks, including but not limited to the Ray-Ban family of marks. Luxottica and its predecessors began using the Ray-Ban trademarks in 1938 and since then have continuously sold eyewear under the Ray-Ban and other trademarks. Ray-Ban products are sold and distributed to consumers through authorized retailers across the United States and through the Ray-Ban.com website, which launched in 1995 and began e-commerce sales in 2009. According to Plaintiff's amended complaint, the Ray-Ban trademarks enjoy incontestable status under 15 U.S.C. § 1065 and are "famous" marks as that term is used in 15 U.S.C. § 1125(c)(1).

Oakley is an indirect, wholly-owned subsidiary of Luxottica. Oakley manufactures, distributes, and sells eyewear, apparel, footwear, outerwear, jackets, accessories, and other merchandise. Oakley owns federally-registered trademarks and icon logos, which it prominently displays on its products. Its products are distributed and sold to consumers in the United States through authorized retailers, Oakley O Stores, and the official Oakley.com website, which was launched in 1995.

Defendant is a Hong Kong corporation that primarily engages in sourcing, marketing, and selling products to consumers outside of China, including in the United States, on its website lightinthebox.com. According to the amended complaint, lightinthebox.com sells and offers for sale products that bear logos and source-identifying indicia and design elements which are studied imitations and counterfeits of Plaintiffs' trademarks. On July 1, 2014, Oakley filed a lawsuit against Defendant in this district (Case No. 14-cv-4995) alleging claims for trademark infringement and counterfeiting. Oakley and Defendant entered into an agreement on March 26, 2015 to settle that lawsuit (the "Settlement Agreement").

**\*2** In the instant lawsuit, Plaintiffs allege that in April 2016 they again determined that Defendant was selling products bearing counterfeit versions of the Oakley and Ray-Ban trademarks on lightinthebox.com. In the governing complaint, Plaintiffs allege that their investigator visited lightinthebox.com and purchased counterfeit products, which were shipped to Illinois. The investigator inspected the products and determined that they were counterfeit and infringed Plaintiffs' trademarks. In particular, Plaintiffs allege

Case: 1:21-cv-01664 Document #: 33-2 Filed: 05/24/21 Page 42 of 61 PageID #:3144
Luxottica Group S.p.A. v. Light in the Box Limited, Not Reported in Fed. Supp. (2016)
2016 WL 6092636

that Defendant sold counterfeits of (1) Oakley's Radar EV™ sunglasses (Trademark Registration No. 1,980,039, stylized "OAKLEY" wordmark; Trademark Registration No. 1,984,501, stylized Oakley "O"; Trademark Registration No. 1,990,262, stylized "O" combined with stylized "OAKLEY" wordmark); (2) Oakley's Holbrook™ sunglasses (Trademark Registration No. 3,151,994 for stylized "O"); and (3) Luxottica's Ray-Ban Clubmaster® sunglasses (Trademark Registration No. 650,499, stylized "Ray-Ban" wordmark). Plaintiffs allege that Defendant did not have permission to use their trademarks, that Defendant's use of counterfeits of their trademarks was willful, and that Defendant's willful use of their trademarks is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiffs. Plaintiffs bring claims against Defendant for: trademark infringement and counterfeiting in violation of 15 U.S.C. § 1114 (Count I); false designation of origin in violation of 15 U.S.C. § 1125(a) (Count II); violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILSC § 510 *et seq.* (Count III); and breach of the March 26, 2015 Settlement Agreement (Count IV).

On May 18, 2016, Plaintiffs filed a motion for a preliminary injunction [12]. The parties briefed the motion, see [14], [31], [42], and Defendant filed a motion for permission to take prehearing discovery, see [52]. On August 24, 2016, while the motions were pending, Plaintiffs filed a motion for expedited entry of a preliminary injunction or alternatively a temporary restraining order ("TRO"). See [64]; see also [65], [73]. On August 25, 2015, the Court granted Defendant's motion for prehearing discovery. See [70]. On September 6, 2016, the Court entered an order [79] granting Plaintiff's motion for a TRO. The TRO expires on October 19, 2016, per the agreement of the parties. See [101].

After the TRO was granted, the parties engaged in discovery and submitted supplemental briefs in support of their positions. See [87], [91]. Defendant also filed two motions to strike certain declarations submitted by Plaintiffs, see [92], [102], and Plaintiffs filed a motion to compel Defendant to respond to certain discovery requests, see [107].[2]

On October 12, 2016, the Court held a hearing and allowed the parties to present argument, witness testimony, and evidence supporting their positions on the preliminary injunction and motions to strike. At the outset of the hearing, the parties entered into certain stipulations that were read into the record and obviated the need to call all but one of the four witnesses whom Plaintiffs had identified on their witness list. See

[112]. The stipulations, which were made for purpose of the preliminary injunction motion only and expire as of December 31, 2016 in any event, state as follows:

**\*3** 1. Defendant offered for sale and sold Product Identification No. 4832038, described as "5 Lens Glasses Outdoor Sports Bike Sunglasses Goggles Set" on its website at lightinthebox.com. Product ID 4832038 bears marks identical with or substantially indistinguishable from at least one of Plaintiffs' trademarks. Product ID 4832038 was not authorized, licensed, or manufactured by Plaintiffs.

2. Defendant offered for sale and sold Product Identification No. 1438710, described as "RADAR Circular Vintage Transparent Frame Sunglass" on its website at lightinthebox.com. Product ID 1438710 bears marks identical with or substantially indistinguishable from at least one of Plaintiffs' trademarks. Product ID 1438710 was not authorized, licensed, or manufactured by Plaintiffs.

3. Defendant offered for sale and sold Product Identification No. 1438670, described as "RADAR Circular Vintage Black Frame Sunglass" on its website at lightinthebox.com. Product ID 1438670 bears marks identical with or substantially indistinguishable from at least one of Plaintiffs' trademarks. Product ID 1438670 was not authorized, licensed, or manufactured by Plaintiffs.

4. Defendant offered for sale and sold Product Identification No. 4610495, described as "Sunglasses Unisex's Lightweight / Sports / Fashion Wear White Sunglasses / Sports / Driving Full Rim" on its website at lightinthebox.com. Product ID 4610495 bears marks identical with or substantially indistinguishable from at least one of Plaintiffs' trademarks. Product ID 4610495 was not authorized, licensed, or manufactured by Plaintiffs.

The sole live witness, John Stewart ("Stewart"), testified on direct and cross-examination about the matters set forth in his declarations, including the harm that he believes has resulted from Defendant's selling of counterfeit goods and his inspection of certain eyewear products purchased from lightinthebox.com. Most significantly for present purposes, Stewart offered credible testimony as to the source and counterfeit nature of the four products described in the stipulations.

## II. Defendant's Motions to Strike [92], [102]

In its first motion to strike, Defendant seeks to exclude portions of the declarations of Stewart, Kevin Read ("Read"), and Robert Holmes ("Holmes"). Defendant objects to Stewart's declaration to the extent that it opines on the irreparable harm that Plaintiffs will suffer if a preliminary injunction is not issued. Defendant argues that this portion of Stewart's declaration was drafted by counsel, is not specific to the case, and constitutes impermissible legal opinion. The Court denies Defendant's motion to strike this portion of Stewart's declaration. To the extent that Stewart has provided legal opinion that goes beyond what is authorized by Federal Rule of Evidence 701—an issue that Defendant fails to address in any detail or with citation to proper legal authority —the Court finds it unnecessary to strike the declaration because it has not relied on Stewart's opinion as to the ultimate issue of whether Plaintiffs would suffer irreparable harm without an injunction. The Court is "able to sift through the evidence and to consider each piece under the applicable federal rules" without going to the additional work of editing and striking out portions of the parties' declarations. *Martin v. Ft. Wayne Police Dep't*, 2011 WL 781383, at *5 (N.D. Ind. Feb. 28, 2011); see also *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989) (recognizing the "general rule that motions to strike are disfavored" because they "potentially serve only to delay," except where they "remove unnecessary clutter from the case"). And while the Court must disregard witness testimony that "stat[es] a legal conclusion," it may consider testimony that "provid[es] concrete information against which to measure abstract legal concepts." *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007); see also *Ashley v. Schneider National Carriers, Inc.*, 2016 WL 3125056, at *8 (N.D. Ill. June 3, 2016).

 *4 Defendant also objects to Stewart, Read, and Holmes' declarations to the extent that they discuss photographs of Defendant's allegedly infringing products, on the basis that the photographs were supplied by counsel, the declarants did not know the circumstances under which the photographs were taken, and the declarations were prepared by counsel. The Court denies Defendant's motion to strike on this ground, as well. There is nothing unusual or improper about an attorney drafting a witness's declaration, so long as the witness reviews the declaration, agrees with its contents, and has a basis for his or her agreement, and Defendant has cited no legal authority that suggests otherwise. Stewart, Read, and Holmes were capable of reviewing photographs obtained by their counsel and assessing whether the sunglasses shown in the photographs bore logos or

design elements that appear to be studied imitations of Oakley and Ray-Ban marks and design elements. More generally, Defendant has failed to identify any problems with the declarations that call into serious question the fact that Plaintiffs' representatives purchased sunglasses from Defendant's website, lightinthebox.com, took photographs of the sunglasses, and compared the photographs and/or sunglasses with Plaintiffs' own products to assess their similarity. In any event, as stated at the hearing, for purposes of ruling on the instant motion for a preliminary injunction, the Court will consider only the eyewear products referenced in the parties' stipulations, all of which were subject to discovery and cross-examination at the hearing and physically entered into evidence for the Court's own examination. For these reasons, Defendant's first motion to strike [92] is denied.

In its second motion to strike [102], Defendant argues that the Court should strike in their entirety the declarations, [95], [96], [97], that Plaintiffs filed in support of their supplemental memorandum in support of their motion for entry of a preliminary injunction, [91]. Defendant asserts that the declarations are improper because they constitute evidence raised for the first time in a reply brief. The Court denies Defendant's motion [102]. The Court specifically authorized the parties to file supplemental briefs in support of or in opposition to the preliminary injunction by September 22, 2016, with the briefs to be filed concurrently. See [70]. It is therefore inaccurate to characterize Plaintiffs' brief as a "reply." Moreover, these briefs gave the parties an opportunity to address how the facts learned in discovery requested by Defendant might affect the matters at issue in the motion for preliminary injunction. Finally, Defendant had ample time to review and respond to Plaintiffs' brief and supporting declarations prior to and at the October 12 hearing.

## III. Plaintiff's Motion for Preliminary Injunction

### A. Legal Standard

The Seventh Circuit uses a two-step analysis to assess whether preliminary injunctive relief is warranted. See *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008). "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the

Case: 1:21-cv-01664 Document #: 33-2 Filed: 05/24/21 Page 44 of 61 PageID #:3146
Luxottica Group S.p.A. v. Light in the Box Limited, Not Reported in Fed. Supp. (2016)

2016 WL 6092636

merits." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015). If the movement makes the required threshold showing, then the court moves on to the second stage and considers: "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties," *i.e.* the public interest. *Id.* at 662. The Court balances the potential harms on a sliding scale against the movant's likelihood of success. The greater the movant's likelihood of success, "the less strong a showing" the movant "must make that the balance of harm is in its favor." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).[3]

### B. Analysis

For the reasons explained in this section, the Court concludes that the requirements for entry of a preliminary injunction [79] have been satisfied. However, as explained at this end of this section, the Court will narrow the TRO it previously granted so that the preliminary injunction covers eyewear only.

### 1. Irreparable Harm and No Adequate Remedy at Law

**\*5** For many years, the Seventh Circuit applied a presumption that when a plaintiff's trademark is being infringed, the plaintiff will suffer irreparable harm and have no adequate remedy at law without an injunction. See, e.g., *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000). However, this presumption was called into doubt by the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), a patent infringement case. In *eBay*, the Supreme Court "rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." *Id.* at 392-93.

While the Seventh Circuit has applied *eBay* in a copyright case, see *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012), it has not yet addressed whether *eBay* applies to trademark infringement cases brought under the Lanham Act ("Act"). See *Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, 2015 WL 3663987, at \*11 (N.D. Ill. June 10, 2015). Some district courts in this Circuit have assumed that the Seventh Circuit would join some of its sister circuits in extending *eBay* to trademark cases, and thus have declined to

apply a blanket presumption of irreparable harm and instead have required a showing on the specific facts of the case. See *id.*;*Mkt. Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, 2015 WL 3637740, at \*23 (N.D. Ill. June 12, 2015); see also *Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc.*, 704 F.3d 44, 54 (1st Cir. 2013); *Ferrlng Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 216 (3d Cir. 2014); *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1248-49 (9th Cir. 2013); cf. *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228-29 (11th Cir. 2008) (recognizing the question but declining to decide whether *eBay* applied in Lanham Act case).

As at the TRO stage, this Court need not takes sides in the dispute at this time, because assuming that a case-by-case showing of irreparable harm or no adequate remedy at law is required, it has been sufficiently made on the basis of the record compiled to date. Irreparable harm is harm that is "not fully compensable or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's favor." *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013). Post-*eBay*, the Seventh Circuit has continued to recognize that "irreparable harm is especially likely in a trademark case because of the difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer confusion (and the interval between the filing of a trademark infringement complaint and final judgment is sure not to be trivial)." *Id.* at 741.

At the October 12, 2016 hearing, Defendant argued that the Court should be guided by *National Financial Partners*, in which Judge Kennelly granted the plaintiff (a financial services company) a preliminary injunction barring the defendant (a payroll administration company) from using its logo. Judge Kennelly was persuaded that two factors weighed in favor of a finding that the plaintiff would suffer irreparable harm without an injunction. Both factors weigh in favor of Plaintiffs in this case, as well. First, Judge Kennelly explained that the plaintiff spent significant sums of money advertising, marketing, and promoting its logo, which was "a strong indication that the mark has significant economic value as a source identifier" and that "[a]ny infringement that impedes that identifying function will cause significant harm." *Nat'l Fin. Partners*, 2015 WL 3663987, at \*12. Similarly, in this case, Plaintiffs allege (and Defendant does not dispute) that Luxottica spends millions of dollars annually to advertise, promote, and market its Ray-Ban and Oakley trademarks.

Case: 1:21-cv-01664 Document #: 33-2 Filed: 05/24/21 Page 45 of 61 PageID #:3147
Luxottica Group S.p.A. v. Light in the Box Limited, Not Reported in Fed. Supp. (2016)
2016 WL 6092636

See [71] at 6, 10-11; see also 10/12/16 hearing transcript at 21 (Stewart direct testimony). This indicates that Plaintiffs' marks have significant economic value as source identifiers, which would be undermined by Defendant's sale of allegedly counterfeit sunglasses.

**\*6** Second, Judge Kennelly recognized that the defendant was selling a similar type of product as the plaintiff, using marks that were the same or substantially similar to the plaintiff's mark, and concluded that this also weighed in favor of a finding of irreparable harm. *Nat'l Fin. Partners, 2015 WL 3633987, at \*12.* The same is true here. The Court has examined the sunglasses that Plaintiffs allegedly purchased from lightinthebox.com, which were received in evidence at the October 12 hearing. See Plaintiff's Exhibits 2, 5, 8, and 19. Except for one of the two pairs of sunglasses submitted as Plaintiff's Exhibit 19, all of the sunglasses contain an Oakley or Ray-Ban marking that is identical to or substantially indistinguishable from Plaintiffs' registered trademarks. Defendant's sale of allegedly counterfeit goods poses an obvious risk to the goodwill that Plaintiffs have built up over the decades, which constitutes irreparable harm. See, e.g., *Bulgari, S.P.A. v. Zou Xiaohong,* 2015 WL 6083202, at \*3 (N.D. Ill. Oct. 15, 2015) (holding that Defendant's "sale of counterfeit BVLGARI branded products [online] poses unmistakable peril to Bulgari's goodwill, and therefore constitutes an irreparable injury that the available legal remedies are inadequate to compensate for").

The Seventh Circuit recognized as far back as the 1980s that, as is "obvious to even a casual consumer, the sale of counterfeit merchandise has become endemic—perhaps pandemic." *Louis Vuitton S.A. v. Lee,* 875 F.2d 584, 588 (7th Cir. 1989). The advent of global Internet sales has only exacerbated the potential harm to trademark holders and the difficulty they face in policing the sale of counterfeit goods. Moreover, common sense confirms that Defendant's sale of goods that look nearly identical to Plaintiffs' creates a risk of irreparable harm by devaluing Plaintiffs' brands. One need only have walked through the commercial and tourist districts of any major city—New York, Paris, even Chicago—to have observed significant quantities of sunglasses offered for sale, some purporting to be name brands (like those owned by Plaintiffs) at vastly discounted prices to recognize the potential for damage to a trademark holder by the offering for sale of counterfeit sunglasses.

Defendant argues that Plaintiffs have failed to demonstrate irreparable harm because the volume of sales of infringing sunglasses is so trivial as to negate any suggestion of irreparable harm. The Court is not persuaded by Defendant's argument. First, the case that Defendant cites, *Kraft Foods,* used the word "trivial" in the context of affirming the entry of a preliminary injunction and explaining that "irreparable harm is especially likely in a trademark case because of the difficulty in quantifying the likely effect on a brand of a nontrivial period of consumer confusion." 735 F.3d at 741. The court of appeals then added parenthetically that "the interval between the filing of a trademark infringement complaint and final judgment is sure not to be trivial." *Id.* To the extent that the quoted discussion in *Kraft Foods* supports either side here, it is Plaintiffs, not Defendant.

In addition, discovery on this issue has not been completed. Although Plaintiffs have sought additional discovery—albeit not on an expedited basis—on all listings that Defendant has posted offering for sale products that bear Plaintiffs' marks or substantially indistinguishable marks (see [108] at 1), Defendant has yet to respond to Plaintiffs' request. Plaintiffs also have sought (but not received) documents concerning Defendant's due diligence processes governing the products it lists for sale on lightinthebox.com. See [108] at 2.[4]

This ongoing discovery relates to the "denominator" problem that the Court referenced at the motion hearing. As the Court explained, the record shows a finite number of infringing products that Plaintiffs' investigators have located. It does not indicate the total number of products on Defendant's webpage that Plaintiffs' investigators have examined, although the discovery requests suggest that only a small fraction of the whole has been subject to assessment. Defendant argued at the hearing that the Court ought to consider the entirety of Defendant's eye wear offerings to be the relevant denominator, and that on that view, the total of 4 infringing products among approximately 10,000 offerings amounts to a trivial showing of harm. Although Defendant's view might prove persuasive after full development of the record, at this stage of the case (and on the current state of the record) the appropriate denominator is much smaller given that Defendant is in possession of the critical information and has yet to produce it. To be sure, the Court stressed at last week's hearing, should the discovery process reveal that the full evidentiary picture differs materially from the facts presented at this preliminary stage of the case, either party remains free to file a motion asking that the injunction be modified or vacated in light of changed circumstances. See, *e.g., System Federation No. 91, Ry. Emp. Dept., AFL-CIO v. Wright,* 364 U.S. 642, 647 (1961) (holding that a

Case: 1:21-cv-01664 Document #: 33-2 Filed: 05/24/21 Page 46 of 61 PageID #:3148

Luxottica Group S.p.A. v. Light in the Box Limited, Not Reported in Fed. Supp. (2016)

2016 WL 6092636

district court has "wide discretion" to modify an injunction based on changed circumstances or new facts); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 627 (7th Cir. 2007) ("any injunction issued by a court of equity is itself subject to later modification," as "[c]ourts grant injunctive relief with the understanding that there will be an 'opportunity for modifying or vacating [the] injunction when its continuance is no longer warranted' ") (quoting *Milk Wagon Drivers Union v. Meadowmoor Dairies*, 312 U.S. 287, 298 (1941)); cf. *Commodity Futures Trading Comm'n v. Battoo*, 790 F.3d 748, 751 (7th Cir. 2015) ("a district judge has discretion to revise a preliminary remedy if persuaded that change had benefits for the parties and the public interest").[5]

**\*7** Finally, the history of this lawsuit raises serious questions about Defendant's ability to police its own website to ensure that it is not selling counterfeit goods. In August, Plaintiffs discovered that Defendant was again selling one of the sunglasses styles that Defendant had agreed to remove from lightinthebox.com in May. Defendant blames this on one of its suppliers, who relisted the product in July with a photograph that obscured the alleged infringing trademark, and asserts that it removed the product from its website and took steps to terminate its relationship with the supplier as soon as it was alerted to the issue. While Defendant may act quickly to remove offending products once a trademark holder puts Defendant on notice, this tells the Court nothing about whether Defendant's policies and practices are sufficient to reduce the potential harm to Plaintiffs to a trivial level.

For the foregoing reasons, the Court concludes that Plaintiff has made an adequate showing that it will suffer irreparable harm prior to the final resolution of this case and has no adequate remedy at law if a preliminary injunction is not issued.

## 2. Reasonable Likelihood of Success on the Merits

"At the preliminary injunction stage, the plaintiff must show that 'it has a better than negligible chance of succeeding on the merits so that injunctive relief would be justified.' " *Personeta, Inc. v. Persona Software, Inc.*, 418 F. Supp. 2d 1013, 1016 (N.D. Ill. 2005) (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001)). Plaintiffs have met this burden, establishing a likelihood of success on their claims for trademark infringement and counterfeiting, false designation of origin, and violation of the Illinois Uniform Deceptive Trade Practices Act ("UDTPA").

In order to prevail on a claim of trademark infringement and counterfeiting or a claim of false designation of origin under the Lanham Act, a plaintiff must show that (1) its marks are protected under the Act; (2) the defendant is not authorized to use the marks; and (3) the defendant's use of the challenged mark is likely to cause confusion among consumers. *Desmond v. Chicago Boxed Beef Distributors, Inc.*, 921 F. Supp. 2d 872, 880 (N.D. Ill. 2013) (citing 15 U.S.C. §§ 1114(1)(a) and 1125(a)(1)(A)); see also *Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1214 (7th Cir. 1997); *Bulgari, S.p.A. v. Partnerships and Unincorporated Associations Identified On Sched. "A"*, 2014 WL 3749132, at \*3 (N.D. Ill. July 18, 2014). Where, as here, a plaintiff's factual allegations under the UDTPA also form the basis of its claims under the Act, "the legal inquiry is the same under both statues" and the UDTPA claim is "to be resolved according to the principles set forth under the...Act." *Desmond*, 921 F. Supp. 2d at 854; see also *Bulgari*, 2014 WL 3749132, at \*3-4.

Plaintiffs have established all three elements. First, Plaintiffs have demonstrated that their Oakley and Ray-Ban marks are protected under the Act and the UDTPA. Plaintiffs own U.S. registrations for the marks Ray-Ban, Oakley, and Oakley Icon logos. Registration of these trademarks creates a rebuttable presumption that the marks are valid. *Georgia-Pacific Consumer Products LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011). In addition, Plaintiffs' marks are displayed extensively on their products and marketing and promotional materials and have been used by Plaintiffs for many years. Defendant has not rebutted the presumption that Plaintiffs' registered marks are protected by the Act.

Second, it is undisputed that Defendant is not authorized to use Plaintiffs' marks.

Third, Plaintiffs have made a sufficient showing that Defendant's sale of goods that use the Oakley and Ray-Ban marks and logos (or substantially indistinguishable marks and logos) is likely to cause confusion. See *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988). Defendant is allegedly selling counterfeit versions of sunglasses that look very similar to Plaintiffs' sunglasses and that use counterfeit marks identical to (or substantially indistinguishable from) Plaintiffs' trademarks. The Seventh Circuit has recognized that where " 'one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption

Luxottica Group S.p.A. v. Light In the Box Limited, Not Reported in Fed. Supp. (2016)

2016 WL 6092636

of a likelihood of confusion.' " *Microsoft Corp. v. Rechanik*, 249 Fed.Appx. 476, 479 (7th Cir. 2007) (quoting *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 147 (4th Cir. 1987)).

**\*8** At the October 12 hearing, Defendant's counsel criticized Plaintiffs for offering no evidence that any consumers were actually confused by Defendant's sale of allegedly counterfeit goods. However, this argument overlooks the Seventh Circuit's presumption that the use of counterfeit marks is likely to cause consumer confusion, *Microsoft*, 249 Fed.Appx. at 479, and the fact that Seventh Circuit case law does not require a showing of actual confusion. "This circuit uses the following seven factors to determine the likelihood of confusion: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to 'palm off' his product as that of another." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015). "No single factor is dispositive," but the three most important factors are "the similarity of the marks, the intent of the defendant, and evidence of actual confusion." *Id,*

In this case, factors 1, 2, 3, and 5 all weigh strongly in favor of a finding of likelihood of confusion. The sunglasses that Plaintiffs purchased on Defendant's website contain marks that are identical to or substantially indistinguishable from Plaintiffs' marks, and Defendant sells the same type of products (sunglasses) as Plaintiffs, in designs that are very similar to Plaintiffs' designs. In addition, Plaintiffs allege (and Defendant does not deny) that their marks are famous and enjoy a high level of customer recognition. See [71] at 4-7 (amended complaint); 10/12/16 hearing transcript at 21-22 (Stewart direct testimony).

For all of these reasons, the Court concludes that Plaintiffs have demonstrated that they have a reasonable likelihood of success on the merits of their claims.

### 3. Balancing of Irreparable Harm to the Parties

For the reasons discussed above, Plaintiffs do not have an adequate remedy at law and will suffer an irreparable injury should Defendant's actions not be enjoined. Defendant's unauthorized use of the Oakley and Ray-Ban marks has caused irreparable harm to Plaintiffs and will continue to

do so. The confusion caused by knock-off products in the stream of commerce damages the value of the brand and cannot be compensated by money alone. Plaintiffs have set forth in detail the enormous expenditure and effort over the course of many decades that has gone into the creation and maintenance of their marks. As the Seventh Circuit stressed in *Kraft Foods*, 735 F.3d at 741, it is difficult to quantify the effect of consumer confusion on a brand— and that is all the more so on the limited record available at the preliminary injunction stage.

To be sure, as Defendant has argued in its briefs and before the Court, the Court does not doubt that Defendant has made good faith efforts to police its own offerings for sale and has taken steps to eliminate some potentially offending products. However, the scope of Defendant's offerings—some 700,000 online products made by 6,800 independent suppliers— renders the task of policing gargantuan and thus unlikely to succeed all of the time. Even as to the approximately 10,000 eye wear products offered on Defendant's website, the undertaking would be significant. As Plaintiffs' filings indicate, Plaintiffs retain investigators to monitor certain websites, including Defendant's, to protect their trademarks. But the law cannot place on Plaintiffs an obligation to ensure that Defendant (and thousands of companies like it) comply with the trademark laws.

In this case, the potential harm to Plaintiffs outweighs any potential harm to Defendant because any harm to Defendant in this matter is purely monetary which would be gained at the expense of Plaintiffs through unauthorized use of Plaintiffs' registered trademarks. In assessing the risk of irreparable harm to Defendant, the Court " 'excludes any burden it voluntarily assumed by proceeding in the face of a known risk' "—here, the risk that it may be sued if it sells counterfeit goods bearing Plaintiffs' marks. *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F. Supp. 2d 868, 888 (N.D. Ill. 2008) (quoting *Ty, Inc.*, 237 F.3d at 903). The fact that the Plaintiffs already sued Defendant for the same issue, and entered into a Settlement Agreement, demonstrates that Defendant knew of this risk.

### 4. Effects on Non-Parties

**\*9** "[E]nforcement of the trademark laws prevents consumer confusion," *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000), and "serves the public's interest in not being deceived about the products they are

Luxottica Group S.p.A. v. Light in the Box Limited, Not Reported in Fed. Supp. (2016)

2016 WL 6092636

purchasing," *Miyano*, 576 F. Supp. 2d at 889. Therefore, the Court concludes that enjoining Defendant's use of the Oakley and Ray-Ban marks will serve the public interest and prevent harm to consumers by eliminating the possibility of confusion as to source and sponsorship.

**5. Scope of the Preliminary Injunction**

Finally, the Court is cognizant of the requirements that an injunction be "precise and self-contained" in order to give sufficient notice to the enjoined party and that it be limited to the products actually at issue in the lawsuit. See *Patriot Homes, Inc. v. Forest River Hous., Inc.*, 512 F.3d 412, 414-15 (7th Cir. 2008). To that end, the Court requested that the parties provide input into the contents of the TRO order. The Court will extend that order, but modify it slightly to limit it to eyewear and eyewear accessories. The Court makes this modification because Plaintiffs have not presented any evidence that Defendant has sold any products other than eyewear or eyewear accessories that infringe on its protected trademarks.

**IV. Conclusion**

For these reasons, THIS COURT HEREBY FINDS that it has personal jurisdiction over the Defendant because Defendant consented to the jurisdiction of this Court pursuant to the terms of the valid and binding Settlement Agreement [8], and because Defendant directly targets its business activities toward consumers in the United States, including Illinois. Specifically, Defendant is reaching out to do business with Illinois residents by operating the website at lightinthebox.com through which Illinois residents can purchase products.

THIS COURT FURTHER FINDS that Plaintiffs own the following trademarks ("Plaintiffs' Trademarks") for the goods listed below ("Covered Products"):

| Registration Number | Trademark | Goods |
|---|---|---|
| 650,499 | *Ray-Ban* | For: Sunglasses, shooting glasses, and ophthalmic lenses in class 9. |
| 1,080,886 | RAY-BAN | For: Ophthalmic products and accessories, namely, sunglasses; eyeglasses; spectacles; lenses and frames for sunglasses, eyeglasses, and spectacles in class 9. |
| 1,093,658 | *Ray-Ban* | For: Ophthalmic products and accessories, namely, sunglasses, eyeglasses; spectacles; lenses and frames for sunglasses, eyeglasses, spectacles; and cases and other protective covers for sunglasses, eyeglasses, and spectacles in class 9. |
| 1,521,599 | OAKLEY | For: Sunglasses and accessories for sunglasses, namely, replacement lenses, ear stems and nose pieces in class 9. |
| 3,153,943 | OAKLEY | For: Prescription eyewear, namely, sunglasses and spectacles; eyewear containing electronics devices, namely, protective eyewear, eyeglasses, sunglasses and spectacles; communication devices for use on eyewear, namely earpieces, transmitters, receivers, speakers and parts thereof for use with cellular, wireless computer and telephone communication systems, wearable audio visual display, namely, protective eyewear, eyeglasses, sunglasses and spectacles containing an audio visual display; wireless telecommunications modules in class 9. |
| 1,980,039 | OAKLEY | For: Protective and/or anti-glare eyewear, namely sunglasses, goggles, spectacles and their parts and accessories, namely replacement lenses, earstems, frames, nose pieces and foam strips; cases specially adapted for protective and/or anti-glare eyewear and their parts and accessories in class 9. |
| 1,990,262 | | For: Protective and/or anti-glare eyewear, namely sunglasses, goggles, spectacles and their parts and accessories, namely replacement lenses, earstems, frames, nose pieces and foam strips; cases specially adapted for protective and/or anti-glare eyewear and their parts and accessories in class 9. |
| 1,984,501 | | For: protective and/or anti-glare eyewear, namely sunglasses, goggles, spectacles and their parts and accessories, namely replacement lenses, earstems, frames, nose pieces and foam strips; cases specially adapted for protective and/or anti-glare eyewear and their parts and accessories in class 9. |

Case: 1:21-cv-01664 Document #: 33-2 Filed: 05/24/21 Page 49 of 61 PageID #:3151

Luxottica Group S.p.A. v. Light in the Box Limited, Not Reported in Fed. Supp. (2016)

2016 WL 6092636



| 3,151,994 | | For: Protective eyewear, namely spectacles, prescription eyewear, anti glare glasses and sunglasses and their parts and accessories, namely replacement lenses, frames, earstems, and nose pieces; cases specially adapted for spectacles and sunglasses and their parts and accessories in class 9. |

THIS COURT FURTHER FINDS that issuing this Preliminary Injunction is appropriate because Plaintiffs demonstrated that their case has a likelihood of success on the merits; no adequate remedy at law exists; and Plaintiffs will suffer irreparable harm if the Preliminary Injunction is not granted. Plaintiffs have proved a *prima facie* case of trademark infringement because (1) Plaintiffs' Trademarks are distinctive marks and are registered with the U.S. Patent and Trademark Office on the Principal Register, (2) Defendant is not licensed or authorized to use any of Plaintiffs' Trademarks, and (3) Defendant's unauthorized use of Plaintiffs' Trademarks is causing a likelihood of confusion as to the origin or sponsorship of unauthorized Covered Products offered for sale and sold by Defendant. Furthermore, Defendant's continued, unauthorized use of Plaintiffs' Trademarks irreparably harms Plaintiffs through diminished goodwill and brand confidence, damage to Plaintiffs' reputation, loss of exclusivity, and loss of future sales. Monetary damages fail to address such damage and, therefore, Plaintiffs have no adequate remedy at law. Moreover, this harm to Plaintiffs outweighs any harm to the Defendant in being temporarily restrained and the public interest is served by the entry of this Order. Accordingly, this Court orders that:

1. Defendant, its affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert

with them be preliminarily enjoined in the United States from:

a. using Plaintiffs' Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any unauthorized Covered Products;

b. passing off or inducing others to pass off unauthorized Covered Products bearing Plaintiffs' Trademarks as produced by Plaintiffs or produced under the authorization, control or supervision of Plaintiffs;

c. committing any acts calculated to cause consumers to falsely believe unauthorized Covered Products bearing Plaintiffs' Trademarks are sold under the authorization, control, or supervision of Plaintiffs; and

d. manufacturing, shipping, delivering, or holding for sale unauthorized Covered Products which bear the Plaintiffs' Trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof.

**\*11** 2. Plaintiffs' deposit of ten thousand dollars ($10,000.00) shall remain with the Court; this amount was determined adequate for the payment of such damages as Defendant may be entitled to recover as a result of a wrongful restraint hereunder.

IT IS SO ORDERED.

Dated: October 19, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6092636

Footnotes

1   The information in this section is drawn from Plaintiffs' Amended Complaint [71], the briefs and other materials that the parties submitted in support of and opposition to Plaintiff's motion for a preliminary injunction, and the stipulations and testimony elicited at the October 12, 2016 hearing.

2   The motion to compel has been referred to Magistrate Judge Finnegan for ruling, along with all discovery supervision and a settlement conference if requested by the parties. See [113], [117].

3   This analysis is the same one that is used, and was previously used by the Court in this case, to determine if a TRO is warranted. *Gray v. Orr*, 4 F. Supp. 3d 984, 989 n.2 (N.D. Ill. 2013).

4   As noted above, these discovery requests are currently the topic of a motion to compel, [108], which has been referred to Magistrate Judge Finnegan for resolution, see [113], [117].

5   Indeed, there is substantial authority for the proposition that a district court may dissolve or modify a preliminary injunction order based on the presentation of new facts even after an appeal has been taken. See, *e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002) (affirming district court's modification of preliminary injunction order on

appeal based on consideration of new facts); see also Fed. R. Civ. P. 62(c) ("When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party."); Fed. R. Civ. P. 62.1 (indicative ruling procedure that could be employed by parties or the court of appeals in the event of jurisdictional uncertainty between district court and court of appeals).

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.2.2
### Eastern Division

Mon Cheri Bridals, LLC

                Plaintiff,

v.

Does 1−464, et al.

                Defendant.

Case No.: 1:19−cv−02362

Honorable Jorge L. Alonso


# NOTIFICATION OF DOCKET ENTRY


This docket entry was made by the Clerk on Tuesday, May 21, 2019:


       MINUTE entry before the Honorable Jorge L. Alonso: Status hearing held. Motion hearing held. For the reasons stated on the record, Plaintiff's motion for preliminary injunction [25] is granted. The bond posted in the amount of $10,000 will remain in place until termination of the case. Defendant Zhejiang Jolly Information Technology Co. Ltd.'s Notice of settlement and motion to vacate all deadlines [30] is entered and continued. The parties shall file a notice of motion to schedule a hearing date. Plaintiff shall submit a proposed preliminary injunction order to this court's proposed inbox. Notice mailed by judge's staff (lf, )


**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MONSTER ENERGY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15 C 4166 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| CHEN WENSHENG, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff's motions for partial summary judgment against Wu Zou d/b/a Legend Trading Co. ( 111) and against Zhang Yuan d/b/a mqxxc (115) are granted. The defendants are hereby permanently restrained, enjoined and prohibited from advertising, offering for sale, and selling any good bearing a mark which is identical with, or substantially indistinguishable from, MONSTER ENERGY trademarks, registration nos. 4,051,650, 3,908,601, 3,963,668 or 3,908,600, which mark is likely to cause confusion, or to cause mistake or to deceive another person to believe the good originated, is sponsored by, or is approved by Monster Energy Company (MEC).

MEC is awarded statutory damages against (1) defendant Wu Zou in the amount of one million dollars ($1,000,000) for willful use of one MEC Trademark on products sold on its Internet store Legend Trading, and (2) defendant Zhang Yuan in the amount of one million dollars ($1,000,000) for willful use of one MEC Trademark on products sold on its Internet store mqxxc. All monies currently restrained in financial accounts connected to defendants or defendants' Online Marketplace Accounts, including monies held by PayPal, are hereby released to MEC as partial payment of the above-identified damages, and PayPal is ordered to release to MEC the amounts from defendants' PayPal accounts within ten (10) business days of receipt of this Order.

Plaintiff is allowed its costs and a reasonable attorney's fee.  The parties shall proceed according to LR 54.3 in an effort to reach agreement on a reasonable fee. See Statement.

## STATEMENT

Before the court are two motions: plaintiff's motions for partial summary judgment and entry of statutory damages award against (1) defendant Wu Zou d/b/a the Internet Store Legend Trading Co., Ltd. (Legend Trading) (dkt. 111) and (2) defendant Zhang Yuan d/b/a Internet Store mqxxc (mqxxc) (dkt. 115). (Wu Zou and Zhang Yuan are referred to together as "defendants.")

1

# I.    Background[1]

MEC) is the owner of numerous U.S. trademark registrations for its MONSTER ENERGY trademarks, including trademark numbers 4,051,650 and 3,908,601 (collectively the MEC Trademarks). (Dkt. 124 (Defendant Legend Trading's Local Rule 56.1 Statement of Facts (Legend Trading's L.R. 56.1)) at ¶ 1.) Defendant Legend Trading offered for sale gloves bearing counterfeits of MEC Trademarks for $8.99 per piece, with 8991 pieces available, through the online marketplace account identified as Legend Trading Co., Ltd at the URL aliexpress.com/store/1410240. (*Id.* at ¶ 2.) Defendant mqxxc offered for sale decals bearing counterfeits of MEC Trademarks for $39.99 per piece, with 999 pieces available, through the online marketplace account identified as mqxxc. (Dkt. 126 (Defendant mqxxc's Local Rule 56.1 Statement of Facts (mqxxc's L.R. 56.1)) at ¶ 2.) MEC has not authorized or licensed defendants to use any of MEC's Trademarks or to sell MEC products on their internet stores. (Legend Trading's L.R. 56.1 at ¶ 4; mqxxc's L.R. 56.1 at ¶ 4.)

MEC, through its investigation, examined the images on these online accounts and determined that the items were counterfeit. (Legend Trading's L.R. 56.1 at ¶ 2; mqxxc's L.R. 56.1 at ¶ 2.) On their Internet stores, defendants offered to ship the products bearing the counterfeit MEC Trademarks to the United States, including Illinois. (Legend Trading's L.R. 56.1 at ¶ 5; mqxxc's L.R. 56.1 at ¶ 5.) MEC's investigator initiated an order for these counterfeit products. (Legend Trading's L.R. 56.1 at ¶ 4; mqxxc's L.R. 56.1 at ¶ 4.)

As a result of defendants' conduct and the conduct of other Chinese entities that have offered counterfeit Monster Energy products for sale online, MEC filed suit alleging the following: willful trademark infringement and counterfeiting in violation of section 32 of the Lanham Act, 15 U.S.C. § 1114 (count I); willful false designation of origin in violation of section 43 of the Lanham Act, 15 U.S.C. § 1125 (count II); willful cybersquatting in violation of section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d) (count III); willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510 *et seq.* (UDTPA) (count IV); and deliberate copying of MEC's copyrighted designs in violation of the Copyright Act, 17 U.S.C. § 501(a) (count V). (Dkt. 53 ¶¶ 34–62.) Following the filing of its complaint, MEC moved for and the court entered a temporary restraining order freezing defendants' PayPal accounts (dkt. 22), which the court later converted to a preliminary injunction (dkt. 33).

MEC moves for partial summary judgment on counts I, II, IV and a finding of willful conduct against defendants. (Dkts. 111, 115.) MEC also requests an award of statutory damages

---

[1] Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to the non-moving party in each motion for summary judgment. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted). In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Local Rule 56.1 are deemed admitted.

of at least $100,000 against each defendant. For the reasons stated below, MEC's motions are granted.

## II.    Legal Standard

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. Civ. P. 56(c). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare*, 629 F.3d at 704.

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## III.    Analysis

MEC contends, and defendants do not dispute, that MEC is entitled to summary judgment against defendants on its claims of trademark infringement and counterfeiting, false designation of origin, and UDTPA. To prevail on all of these claims, MEC must establish that its marks are protectable and that the defendants' unauthorized use of the marks was likely to cause confusion among consumers. See *Monster Energy Co.* v. *Jing, et al.*, No. 15 C 227, 2015 WL 4081288, at * 3 (N.D. Ill. July 6, 2015). The court concludes MEC has established that there is no genuine issue of material fact that MEC's registered trademarks are entitled to protection,[2] and MEC has not authorized either defendant to use its marks. It is undisputed that Wu Zou d/b/a Legend Trading Company uses a mark that is essentially identical to MEC's registered trademark numbers 4,051,650 and 3,908,601 for clothing and apparel, and the mark is affixed to pro-biker gloves that Wu Zou offers for sale on the Internet within Illinois, such that a reasonably discriminating online consumer in Illinois is likely to be confused or deceived into believing that the advertised gloves originate with MEC. There is also no genuine issue of material fact that Zhang Yuan d/b/a mqxxc uses a mark that is essentially identical to MEC's registered trademarks 3,963,668 or 3,908,600 for stickers, decals, and posters and the mark is affixed to decals Zhan Yuang has offered for sale in Illinois, such that a reasonably discriminating online consumer in Illinois is likely to be confused or deceived into believing that

---

[2] The issuance of a federal registration on the Principal Register of the United States Patent and Trademark Office is prima facie evidence of the validity of the mark and the registrant's exclusive right to use the mark. 15 U.S.C.002§§ 115(a) and 1057(b). Neither defendant has offered rebuttal evidence.

3

defendants' advertised product originates with MEC. Accordingly, MEC is entitled to summary judgment on counts I, II, and IV against Wu Zao and Zhang Yuan.

The only disputed issue is the appropriate award of statutory damages. Under the Lanham Act, in a case involving the use of a counterfeit mark, the plaintiff may elect to receive "not less than $1,000 or no more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(1). If, however, the counterfeiting is willful, the plaintiff can receive up to "$2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." *Id.* § 1117(c)(2). MEC asserts that defendants' infringement was knowing and willful, and it seeks to recover awards of statutory damages against them in the amount of at least $100,000. (Dkts. 112 at 14; 116 at 14.)

"Willful infringement may be attributed to the defendant's actions where he had knowledge that his conduct constituted infringement or where he showed a reckless disregard for the owner's rights." *Lorillard Tobacco Co.* v. *S & M Cent. Serv. Corp.*, No. 03-cv-4986, 2004 WL 2534378, at *7 (N.D. Ill. Nov. 8, 2004). Knowledge can be inferred from a defendant's conduct. *Id.* Less than a year ago, in an indistinguishable trademark infringement and counterfeiting case, Judge Alonso concluded that the "defendants willfully infringed Monster's Marks," because "[p]roducts bearing Monster's Marks are widely recognized and associated exclusively with Monster, and the marks defendants used are virtually identical to Monster's." *Jing*, 2015 WL 4081288, at * 3. The court is not persuaded otherwise by defendants' unsubstantiated assertions that these "are the actions of an un-informed Chinese citizen that made a mistake." (Dkts. 123 at 2, 125 at 1.) *See Bulgari, S.P.A.* v. *Zou Xiaohong, et al.*, No. 15 C 5148, 2015 WL 6083202, at *2 (N.D. Ill. Oct. 15, 2015) (rejecting as unsubstantiated the defendant's argument that the infringement was not willful because, "growing up in a remote farmland, the defendant] was not familiar with European luxury products or brand names, including BVLGARI" was unsubstantiated).

In determining the amount of statutory damages to award, the court is "not required to follow any rigid formula." *Chi-Boy Music* v. *Charlie Club*, 930 F.2d 1224, 1229 (7th Cir. 1991). Indeed, the court "enjoys wide discretion." *Id.* In computing the award amount, a court may consider factors such as "the difficulty or impossibility of proving actual damages, the circumstances of the infringement, and the efficacy of the damages as a deterrent." *Id.* Additionally, courts in this circuit have considered "the value of the plaintiff's brand 'and the efforts taken to protect, promote and enhance that brand.'" *Jing*, 2015 WL 4081288, at * 4 (quoting *Lorillard*, 2004 WL 2534378, at *6).

Again, the court finds compelling Judge Alonso's reasoning in *Jung* that "these factors favor a large statutory damages award." *See id.* There, MEC sought $2 million in statutory damages against each defendant. *Id.* The court awarded $1 million explaining that these defendants, unlike the other defendants' against whom the court had awarded $2 million, were not in default and had only modest assets seized as a result of the suit. *Id.* The situation is nearly identical here and, for the reasons articulated in *Jinn*, the court awards MEC statutory damages in the amount of $1,000,000 against Wu Zou and $1,000,000 against Zhang Yuan.

MEC also seeks the entry of a permanent injunction enjoining defendants from advertising, offering for sale, and selling counterfeit MEC products or otherwise violating its

rights in the MEC Trademarks and transferring all assets in financial accounts operated by PayPal, Inc., and linked to defendants, as well as any newly discovered assets, to MEC. "The Court has the power to enter such an injunction 'according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of' a trademark." *Id.* (quoting 15 U.S.C. § 1116(aGiven that the conduct was willful and defendants' do not dispute that an injunction may be entered, the court grants the request for a permanent injunction.

Lastly, MEC seeks an award of attorney's fees and costs. As the prevailing party, MEC is entitled to costs. Fed. R. Civ. P. 54(d)(1). Additionally, under 15 U.S.C. § 1117(b), because the conduct here was the intentional use of a counterfeit mark and there are no extenuating circumstances, MEC is entitled to reasonable attorneys' fees. *See Jing*, 2015 WL 4081288, at * 4.

Date:   June 30, 2016

_____
U.S. District Judge Joan H. Lefkow

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| OAKLEY, INC.,<br><br>                 Plaintiff,<br><br>       v.<br><br>DOES 1-100 d/b/a the aliases identified on<br>Schedule "A",<br><br>               Defendants. | Case No. 12-cv-9864<br><br>**Judge Robert M. Dow, Jr.**<br><br>**Magistrate Judge Jeffrey Cole** |

**PRELIMINARY INJUNCTION ORDER**

THIS CAUSE being before the Court on Plaintiff Oakley, Inc.'s ("Oakley") Motion for Entry of a Preliminary Injunction, and this Court having heard the evidence before it hereby GRANTS Plaintiff's Motion for Entry of a Preliminary Injunction in its entirety against the Defendants listed in Schedule A to Oakley's Complaint (collectively, the "Defendants") and orders that:

1.    Defendants, their officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be preliminarily enjoined and restrained from:

       a.  using Oakley's OAKLEY Trademarks or any reproduction, counterfeit copy or colorable imitation thereof in any manner in connection with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Oakley product or not authorized by Oakley to be sold in connection with Oakley's OAKLEY Trademarks;

1

b.  passing off, inducing, or enabling others to sell or pass off any product as a genuine Oakley product or any other product produced by Oakley, that is not Oakley's or not produced under the authorization, control or supervision of Oakley and approved by Oakley for sale under Oakley's OAKLEY Trademarks;

c.  committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Oakley, or are sponsored or approved by, or connected with Oakley;

d.  further infringing Oakley's OAKLEY Trademarks and damaging Oakley's goodwill;

e.  otherwise competing unfairly with Oakley in any manner;

f.  shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Oakley, nor authorized by Oakley to be sold or offered for sale, and which bear any of Oakley's OAKLEY Trademarks or any reproduction, counterfeit copy or colorable imitation thereof;

g.  using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell counterfeit OAKLEY products; and

h.  operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any products which bear any of Oakley's OAKLEY Trademarks or any reproduction, counterfeit copy or colorable imitation thereof.

2.  The domain name registries for the Defendant Domain Names, namely, VeriSign, Inc., Neustar, Inc., Afilias Limited and the Public Interest Registry, within five (5) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to MarkMonitor or a registrar of Oakley's selection until further ordered by this Court, and the domain name registrars shall take any steps necessary to transfer the Defendant Domain Names to MarkMonitor or a registrar of Oakley's selection until further ordered by this Court.

3.  Those in privity with Defendants and those with notice of the injunction of paragraph 1 hereto, including any online marketplace such as iOffer, Internet search engines, web hosts, domain name registrars and domain name registries that are provided with notice of the injunction, shall cease facilitating access to any and all websites and accounts through which Defendants engage in the sale of counterfeit and infringing goods using the OAKLEY Trademarks.

4.  Discovery herein by Oakley may continue by providing actual notice, pursuant to subpoena, e-mail or otherwise, of this Order to any of the following:

    a.  Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them;

    b.  any banks, savings and loan associations, payment processors or other financial institutions including, without limitation, PayPal or other merchant account providers, payment providers, third party processors, credit card associations (e.g., MasterCard and VISA), which receive payments or hold assets on Defendants' behalf; or

    c.  any third party service providers including, without limitation, online B2B selling platforms, including iOffer, Internet service providers, back-end service providers,

web designers, sponsored search engine or ad-word providers, shippers, domain name registrars and domain name registries who have provided services for Defendants.

5.  Any third party providing services for any of the Defendants, or in connection with any of Defendants' websites at the Defendant Domain Names or other websites operated by Defendants, including, without limitation, Internet Service Providers ("ISPs"), back-end service providers, web designers, sponsored search engine or ad-word providers, banks, merchant account providers including PayPal, third party processors and other payment processing services, shippers, domain name registrars and domain name registries (collectively, "Third Party Providers") shall, within five (5) business days after receipt of such notice, provide to Oakley copies of all documents and records in such person's or entity's possession or control relating to:

a.  The identities and addresses of Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them and the locations and identities of Defendants' operations, including, without limitation, identifying information associated with Defendants' Websites, the Defendant Domain Names and financial accounts;

b.  Defendants' websites;

c.  The Defendant Domain Names or any domain name registered by Defendants; and

d.  Any financial accounts owned or controlled by Defendants, including their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, including such accounts residing with or under the control of any banks, savings and loan associations, payment processors or other financial institutions including, without limitation, PayPal, Western Union, or other merchant

4

account providers, payment providers, third party processors, and credit card associations (e.g., MasterCard and VISA).

6.      Defendants and any persons in active concert or participation with them shall be temporarily and preliminarily restrained and enjoined from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

7.      Any banks, savings and loan associations, payment processors or other financial institutions including, without limitation, PayPal, for any Defendant or any of Defendants' websites, shall immediately locate all accounts connected to Defendants or Defendants' websites, and such accounts shall be temporarily and preliminarily restrained and enjoined from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

8.      Schedule A and Exhibits 1 and 2 attached to the Declaration of Adrian Punderson are unsealed.

9.      Any Defendants that are subject to this Order may appear and move to dissolve or modify the Order on two days' notice to Oakley or on shorter notice as set by this Court.

10.     The $10,000 bond posted by Oakley shall remain with the Court until a Final disposition of this case or until this Preliminary Injunction is terminated.


DATED December 27, 2012

U.S. District Court Judge James B. Zagel

5