**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | | |
|---|---|---|---|
| Dan Wang, | | ) | |
| | Plaintiff, | ) | |
| | | ) | Case No. 1:21-cv-01664 |
| | | ) | |
| | v. | ) | Judge Virginia M. Kendall |
| The Partnerships and Unincorporated | | ) | |
| Associations Identified in Schedule "A," | | ) | Mag. Judge Sheila M. Finnegan |
| | | ) | |
| | Defendants | ) | |

**<u>Unreported Opinions Cited in Support of
Plaintiff Dan Wang's Opposition to Defendant's
Motion for Judgment on the Pleadings</u>**

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 2 of 43 PageID #:3484

Illinois Tool Works, Inc. v. Chester Bros. Machined..., Not Reported in...

2006 WL 2191982, 2006-2 Trade Cases P 75,394

2006 WL 2191982
United States District Court,
N.D. Illinois, Eastern Division.

ILLINOIS TOOL WORKS, INC.,
a Delaware corporation, Plaintiff,

v.

CHESTER BROTHERS MACHINED
PRODUCTS, INC., an Illinois
corporation, d/b/a "Pneu Fast"
and/or "Pneu-Fast," Defendant.

No. 05 C 5002.
|
July 27, 2006.

**Attorneys and Law Firms**

Mark Jay Liss, Claudia W. Stangle, Mark Andrew Nieds, Leydig, Voit & Mayer, Ltd., Chicago, IL, for Plaintiff.

Joseph Shaw Messer, Carin Parcel, Melissa Ann Goldenberg, Messer & Stilp, Ltd., Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

GUZMÁN, J.

**\*1** Illinois Tool Works, Inc. ("ITW") has sued Chester Brothers Machined Products, Inc., d/b/a "Pncu Fast" and/ or "Pneu-Fast," for its alleged violations of the Lanham Act and state law arising from defendant's unauthorized use of plaintiff's trademark. The case is before the Court on defendant's Federal Rule of Civil Procedure ("Rule") 12(b)(6) motion to dismiss the amended complaint. For the reasons set forth below, the motion is granted in part and denied in part.

*Facts*

ITW is a manufacturer of, among other things, pneumatic nailers and staplers. (Am.Compl.¶ 7.) Since January 1997, ITW has manufactured nailers and staplers with a distinctive orange coloration. (*Id.* ¶ 8.) Due to its advertisement efforts and long history, ITW's orange mark has earned valuable goodwill among relevant consumers. (*Id.* ¶ 10.) To protect that

goodwill, on May 4, 2004, ITW obtained a federal trademark registration for the color orange mark. (*Id.* ¶ 11.) The registration covers "pneumatic and gas powered hand tools, namely nailers and staplers" for "the color orange as applied to the housing and grip of the nailers and staplers." (*Id.*)

Long after ITW started advertising and selling its products under the orange mark, Pneu Fast, without authorization from ITW, began to incorporate in its advertisements a photograph of a pneumatic nailer bearing the color orange and the name "Pneu Fast." (*Id.* ¶ 13 .) The advertisements, however, are for nails not nailers. (*Id.* ¶ 31 & Ex. 2.)

Plaintiff contends that defendant: (1) is liable under the Lanham Act for trademark infringement, false designation of origin and false advertising (Counts I-Ill); (2) violated the Illinois Deceptive Trade Practice Act, 815 Ill. Comp. Stat.. 510/1 *et seq.* (Count IV); and (3) committed unfair competition in violation of Illinois law (Count V).

*Discussion*

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *Forseth v. Vill. of Sussex,* 199 F.3d 363, 368 (7th Cir.2000). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

*Count I: Trademark Infringement*

To state a claim for trademark infringement under the Lanham Act, "plaintiff must establish that (1) its mark is protectable and (2) the defendant's use of the mark is likely to cause confusion among consumers." *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 673-74 (7th Cir.2001). Defendant says plaintiff has not satisfied the first element because the complaint alleges infringement of a common-law mark, not a registered mark. The Court disagrees. Though the complaint refers to a common-law mark, it also explicitly alleges that defendant infringes its registered mark. (*See* Am. Compl. ¶¶ 3, 20.) Thus, the first element is met.

**\*2** Defendant also contends that plaintiff has not adequately plead the second clement, that defendant's actions are likely to cause confusion. Defendant argues that consumers cannot

Illinois Tool Works, Inc. v. Chester Bros. Machined..., Not Reported in...

2006 WL 2191982, 2006-2 Trade Cases P 75,394

be confused by its advertisement because it does not sell the tools for which plaintiff's orange mark is registered.

Once again, the Court disagrees:

A likelihood of confusion may exist even if the parties are not in direct competition or their products and services are not identical. Rather, because the rights of an owner of a registered trademark extend to any goods that might be, in the minds of consumers, "related," *i.e.,* put out by a single producer, the more accurate inquiry is whether the public is likely to attribute the products and services to a single source.

*CAE,* 267 F.3d at 679. Plaintiff alleges that defendant's use of the orange-colored mark is likely to lead consumers to believe that defendant's products originate from or are sponsored, endorsed or authorized by plaintiff. (Am.Compl.¶ 19.) Given the relationship between nails and nailers, the Court cannot say, as a matter of law, that the advertisement is incapable of causing confusion. *See E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1293-94 (9th Cir.1992)(upholding finding of likelihood of confusion between cheese retailer's use of "Gallo" and winery's Gallo trademark); *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 465 (3rd Cir.1983) (upholding finding that there is a likelihood of confusion between defendant's use of the name "Lapp" on electrical wire and plaintiff's Lapp trademark for ceramic insulators).

Defendant also says that there is no likelihood of confusion because its advertisement does not display an exact replica of plaintiff's trademark. Once again, the Court disagrees. An allegedly confusing mark can infringe a registered mark without being identical to it. *Imperial Serv. Sys., Inc. v. ISS Int'l Serv. Sys., Inc.,* 701 F.Supp. 655, 658 (N.D.Ill.1988). In fact, when the marks are not seen together, as in this case, it is "inappropriate to focus on minor stylistic differences to determine if confusion is likely." *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1115 (7th Cir.1997). Instead, comparisons in such cases "should be made in light of what happens in the marketplace and not merely by looking at the marks side-by-side." *Id.* (quotation omitted). Thus, even if the mark defendant used is not identical to plaintiff's registered mark, that fact would not preclude a finding of confusion.

The Court is also not persuaded that plaintiff must allege every factor relevant to likelihood of confusion to satisfy that element. *See id.* (listing factors). "The likelihood of confusion test is an equitable balancing test" and "courts may assign varying weights to each of the factors depending on the facts presented." *CAE,* 267 F.3d at 678 (quotation omitted); *see Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 462 (7th Cir.2000) (stating that the likelihood-of-confusion factors are not "a mechanical checklist" and "no one factor is decisive"). As a result, plaintiff's failure to allege each of the factors is not fatal to its claim.

**\*3** In short, plaintiff has sufficiently alleged the elements of a trademark infringement claim. Defendant's motion to dismiss Count I is, therefore, denied.[1]

*Count II: False Designation of Origin*

To state a claim for false designation of origin under 15 U.S.C. § 1125(a)(1)(A), plaintiff must allege that: (1) defendant used a false designation of origin or false representation in connection with its goods; (2) defendant caused those goods to enter interstate commerce; and (3) consumers are likely to be confused by the false representation. *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.,* 906 F.2d 1202, 1204 (7th Cir.1990). Defendant says that plaintiff cannot assert a false designation claim because such claims require an allegation that defendant misbranded, *i.e.,* sold its own goods under plaintiff's trademark or removed plaintiff's marks from goods and resold them as its own.

Defendant's argument is based on a misreading of *Web Printing.* The false designation claim in that suit arose from defendant's sale of plaintiff's printing equipment as its own. *Id.* at 1203. In discussing the elements needed to prove the claim, the Seventh Circuit said:

As set out in 15 U.S.C. § 1125(a), a violation of the Lanham Act is established upon proof only of the following: First, that the defendant used in connection with goods or services a false designation of origin or false description or representation. Second, that the defendant caused such goods and services to enter into commerce. Third, that the plaintiff is a person "who believes that he or she is likely to be damaged as a result thereof." In modern day parlance, *and in the context of this suit,* a violation of section 43(a) of the Lanham Act is shown by (1) Oxy-Dry's material misbranding of WPC's products, (2) Oxy-Dry's introduction of WPC's products into interstate commerce, and (3) the likelihood that consumers will be confused by Oxy-Dry's material misbranding.

*Id.* at 1204 (emphasis added). In other words, the court said that misbranding was a prerequisite to that false designation claim, not to every false designation claim.

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 4 of 43 PageID #:3486

Illinois Tool Works, Inc. v. Chester Bros. Machined..., Not Reported in...

2006 WL 2191982, 2006-2 Trade Cases P 75,394

Though misbranding can give rise to a false designation claim, such claims can also be based on representations that lead consumers to believe that "the mark's owner sponsored or otherwise approved [its] use." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema Ltd.,* 604 F.2d 200, 205 (2d Cir.1979) (upholding false designation claim against producer of adult film in which the star wore a cheerleading uniform like plaintiff's trademarked uniform because the public might believe plaintiff sponsored the film or authorized the use of its trademark in it); *see Better Bus. Bureau of Metro. Houston, Inc. v. Med. Dirs., Inc.,* 681 F.2d 397, 399 (5th Cir.1982) (upholding false designation claim against defendant that ran advertisements implying that its weight loss services were endorsed by plaintiff). Plaintiff alleges that defendant's use of its trademark in advertisements and on defendant's website is likely to cause consumers to believe that plaintiff makes, endorses or sponsors defendant's products. (*Id.* ¶¶ 13, 19, 28.) Those allegations are sufficient to satisfy the first and third elements of its false designation claim.

**\*4** The situation is different, however, for the second element. Plaintiff alleges that defendant's advertisements enter interstate commerce, but it does not allege that the goods themselves do. Absent that allegation, the false designation claim fails. *See Web Printing,* 906 F.2d at 1204 (stating that entry of goods into interstate commerce is an essential element of a false designation claim). Thus, defendant's motion is granted as to Count II.

*Count III: False Advertising*

To state a claim for false advertising under 15 U.S.C. § 1125(a), plaintiff must allege that: (1) defendant made a false statement of fact about its own or another's product in a commercial advertisement; (2) the statement deceived or has the tendency to deceive a substantial portion of its audience; (3) the deception is likely to influence consumers' purchasing decisions; (4) defendant caused its false statement to enter interstate commerce; and (5) plaintiff has been or is likely to be injured as a result. *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 819 (7th Cir.1999).

With respect to the last three elements of the claim, plaintiff alleges that defendant's advertisements: (1) attract consumers to defendant's goods because the mark leads them to believe that the goods are made by or affiliated with plaintiff (Am.Compl.¶ 19); (2) enter interstate commerce (*Id.* ¶ 15); and "jeopardize[ ] the goodwill built up by [plaintiff] in its color orange mark, causing [it] serious and irreparable

injury." (*id.* ¶ 32). Those allegations are sufficient to satisfy elements three through five.

Plaintiff has also satisfied the second element. Though defendant argues that its advertisements target a niche audience that is unlikely to be deceived, whether that is true is a factual matter that cannot be resolved on a motion to dismiss. At this stage, it is reasonable to infer from plaintiff's allegations that the parties advertise to the same trade in the same media, defendant uses the color orange in its ads to attract plaintiff's customers, and the ads are misleading, *see id.* ¶¶ 14, 16-19, that a substantial number of the people who see the advertisement will be deceived.

That leaves the first element, whether defendant "misrepresent[ed] the nature, characteristics, qualities, or geographic origin of [its] or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). Plaintiff alleges that the advertisements misrepresent the nature of defendant's commercial activities because they imply that defendant sells a nailer, though it does not. (Am.Compl.¶ 31.)

Defendants says that the advertisements do not, and cannot, make any such implication because they promote nails, not nail guns. Once again, however, that is an issue of fact that cannot be resolved on a motion to dismiss. *Allsup, Inc. v. Advantage 2000 Consultants Inc.,* 428 F.3d 1135, 1138 (8th Cir.2005). Thus, the asserted transparency of the advertisements is not a basis for dismissing this claim.

**\*5** Defendant also contends that the claim should be dismissed because plaintiff cannot allege that the misrepresentation was made in a commercial advertisement. This argument is based on a four-part test adopted by a number of courts for determining whether contested speech constitutes "commercial advertising" within the meaning of the statute:

> In order for representations to constitute "commercial advertising or promotion" .... they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services ... [and] (4) ... disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Proctor & Gamble Co. v. Haugen,* 222 F.3d 1262, 1273-74 (10th Cir.2000); *see Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 735 (9th Cir.1999) (adopting

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 5 of 43 PageID #:3487

Illinois Tool Works, Inc. v. Chester Bros. Machined..., Not Reported in...

2006 WL 2191982, 2006-2 Trade Cases P 75,394

same test); *Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1384 (5th Cir.1996) (same).

The Seventh Circuit is not one of those courts. In fact, it has said that it has "serious doubts about the wisdom" of the test. *First Health Group Corp. v. BCE Emergis Corp.,* 269 F.3d 800, 803 (7th Cir.2001). Those doubts, however, revolve around the test's first factor, which equates commercial advertising with commercial speech:

> The district court treated "commercial advertising or promotion" as a synonym for all commercial speech that the first amendment allows the federal government to regulate. In reaching this conclusion it relied on a line of decisions by other district courts that follow a multi-factor approach for determining the scope of § 43(a). We have serious doubts about the wisdom of displacing the statutory text in favor of a judicial rewrite with no roots in the language Congress enacted. Treating § 43(a) (1) as filling all ground that the Constitution allows to the legislature is especially implausible, for when the Lanham Act was adopted there were no constitutional limits on the regulation of commercial speech. Any plan to occupy all of the constitutionally permitted space would have used the phrase "commercial speech," rather than "advertising or promotion" in § 43(a)(1)(B), and the variety of other scope rules found elsewhere in the statute. The language and structure of § 43(a)(1)(B) do not suggest a line between commercial and political speech, with the former completely covered and the latter not. They suggest a line between varieties of commercial speech.

*Id.* (citations omitted).

The *First Health* court said nothing about the second factor, that the parties must be in commercial competition, which is at issue in this case. Moreover, unlike the first, the second factor is rooted in the language of the statute. In relevant part, the last section of the Lanham Act provides: "The intent of this chapter is to regulate commerce within the control of Congress by ... protect[ing] persons engaged in such commerce against unfair competition." 15 U.S.C. § 1127. Making commercial competition a prerequisite to false advertising claims effectuates that expressed intent. Accordingly, the Court holds that plaintiff must allege that it

is in commercial competition with defendant to state a viable false advertising claim.

**\*6** Plaintiff has not made the requisite allegation. Rather, plaintiff alleges that it makes nailers and defendant makes nails, (*see* Am. Compl. ¶¶ 7, 19, 31 & Ex. 2), allegations that do not support the inference that they are competitors. Consequently, the false advertising claim must be dismissed.[2]

*Counts IV & V: Deceptive Trade Practices & Unfair Competition*
In Counts IV and V, respectively, plaintiff alleges that defendant's actions violate the Illinois Deceptive Trade Practices Act, 815 Ill. Comp. Stat.. 510/1 *et seq.,* and constitute unfair competition under Illinois common law. As the parties agree, the claims in these counts mirror those in Counts II and III. (*See* Def.'s Br. Supp. Mot. Dismiss at 15 & Pl.'s Resp. Mot. Dismiss at 14); *Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 908 (7th Cir.1983) (holding that summary judgment was appropriate on state-law claims of unfair competition because plaintiff "does not have a valid trademark in the term 'Auto Page' and ... has not made a showing sufficient to create a material issue of fact as to the [Lanham Act] false advertising claim"). Accordingly, the claims in Counts IV and V must be dismissed as well.

*Conclusion*

For all the reasons set forth above, defendant's motion to dismiss the amended complaint [doc. no. 29] is granted in part and denied in part. The motion is granted as to Counts II-V, which are dismissed without prejudice, and denied with respect to Count I. Plaintiff has ten days from the date of this Memorandum Opinion and order to amend its complaint in accordance with this Order. If no amendment is filed, Counts II-V will be dismissed with prejudice.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2191982, 2006-2 Trade Cases P 75,394

Footnotes

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 6 of 43 PageID #:3488

Illinois Tool Works, Inc. v. Chester Bros. Machined..., Not Reported in...

2006 WL 2191982, 2006-2 Trade Cases P 75,394

1    Defendant also argues that plaintiff's trademark registration does not apply to the nail guns in defendant's ads. Because defendant raised this argument for the first time in its reply brief, it is waived. *Hess v. Reg-Ellen Mach. Tool Corp.,* 423 F.3d 653, 665 (7th Cir.2005).

2    Defendant also says this claim should be dismissed because plaintiff has not alleged the misrepresentations with particularity, as required by Federal Rule of Civil Procedure 9(b). Given our holding with respect to commercial competition, however, we need not address this issue.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 2293680
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Christopher IOSELLO, Plaintiff,

v.

Victor LAWRENCE, doing business
as Lexington Law Firm, Defendant.

No. 03 C 987.
|
Sept. 16, 2005.

**Attorneys and Law Firms**

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Anne Michelle Burton, Alexander Holmes Burke, Edelman, Combs, Latturner & Goodwin, LLC, Chicago, IL, for Plaintiff.

Angela Dawn Cook, Fisher Kanaris, P.C., David P. Germaine, Daar & Vanek, P.C., Chicago, IL, Blake S. Atkin, Lonn Litchfield Atkin & Hawkins P.C., Joann Shields, Atkins & Howard, Salt Lake City, UT, for Defendant.

*MEMORANDUM OPINION AND ORDER*

GUZMÁN, J.

 **\*1** Magistrate Judge Michael T. Mason has recommended that Victor Lawrence's (doing business as Lexington Law Firm) motion for attorneys' fees and costs pursuant to 28 U.S.C. § 1927 be granted in part and denied in part. Before the Court is plaintiff Christopher Iosello's objection to the Magistrate Judge's Report and Recommendation. For the reasons provided in this Memorandum Opinion and Order, the Court adopts the Report and Recommendation in full.

*FACTS*

On May 27, 2004, while the instant case was pending before this Court, another plaintiff, who was represented by the same law firm as the plaintiff in the instant case, Edelman, Combs, Latturner & Goodwin, LLC ("Edelman Combs"), brought another suit against the instant defendant, see *D'Agostino*

*v. Lexington Law Firm,* No. 04 C 3660 (N.D.Ill.2004). On August 27, 2004, Lexington moved to dismiss or stay the *D'Agostino* case pending resolution of class certification status in *Iosello,* the instant suit. On August 30, 2004, Edelman Combs on Iosello's behalf moved this Court to find that the *D'Agostino* case was related to the instant case and to have it transferred to this Court's docket, and the motion was set for presentment on September 7, 2004. *Id.*

On August 31, 2004, after the relatedness motion was filed, but before it was presented to the Court, Judge Ruben Castillo dismissed the *D'Agostino* class claims with prejudice and individual claims without prejudice. (Pl.'s Objection Magistrate's Report & Recommendation ("Pl.'s Objection") at 1; Def.'s Resp. Mem. Opp'n Pl.'s Objection at 1-2.) Despite that fact, on September 7, 2004, before this Court, Edelman Combs argued Iosello's motion to reassign the class claims in the *D'Agostino* case and designate them as related to *Iosello.* (Def.'s Resp. Mem. Opp'n Pl.'s Objection at 2.) Edelman Combs refused to withdraw the motion although Lexington Law Firm made numerous requests for it to do so, and Edelman Combs argued that Judge Castillo wanted this Court to have the opportunity to rule on the motion for relatedness and on Lexington's motion for sanctions in the *D'Agostino* case. (Pl.'s Objection at 3.)

The Court denied Iosello's motion for a finding of relatedness, stating that it had no basis in law because the *D'Agostino* case had been dismissed and thus there was no case to reassign as related and that the *D'Agostino* sanctions motion was not related to the *Iosello* matter. Lexington then moved for attorneys' fees and costs under 28 U.S.C. § 1927 based on the argument that it was forced to defend against a motion that had no basis in law. The Court referred the motion to Magistrate Judge Mason for a Report and Recommendation.

Magistrate Judge Mason recommended granting in part and denying in part the motion. Magistrate Judge Mason stated that because the *D'Agostino* case had been dismissed, no basis existed for granting the motion to reassign or to declare *D'Agostino* as a related case. He also stated that Edelman Combs acted unreasonably and vexatiously in continuing to pursue the motion to reassign after the *D'Agostino* case was dismissed, and recommended that the law firm be sanctioned $2,010.00 in attorneys' fees and costs for the preparation of a written opposition to plaintiff's motion to reassign *D'Agostino.* Plaintiff objects to Magistrate Judge Mason's Report and Recommendation and argues that Edelman Combs

Iosello v. Lawrence, Not Reported in F.Supp.2d (2005)

2005 WL 2293680

did not act in bad faith or multiply the proceedings by failing to withdraw the relatedness motion.

## DISCUSSION

**\*2** Under Federal Rule of Civil Procedure 72, the standard of review employed by the Court to review matters determined by a magistrate judge depends on whether the matter is dispositive or nondispositive. Fed. R. Civ. P. 72. "[R]esolution of a sanctions request is a dispositive matter capable of being referred to a magistrate judge only under [28 U.S.C.] § 636(b)(1)(B) or § 636(b)(3), where the district judge must review the magistrate judge's report and recommendations *de novo*." *Retired Chi. Police Ass'n v. Firemen's Annuity & Benefit Fund of Chi.,* 145 F.3d 929, 933 (7th Cir.1998) (internal quotations omitted).

A motion for the award of attorneys' fees is governed by 28 U.S.C. § 1927, which provides that "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The purpose of sanctions awarded pursuant to section 1927 is to "deter frivolous litigation." *Moline v. Trans Union, L.L.C.,* 222 F.R.D. 346, 349 (N.D.Ill.2004); *see Kapco Mfg. Co., Inc. v. C & O Enters.,* 886 F.2d 1485, 1491 (7th Cir.1989).

Repetitious assertion of a legal argument may be grounds for sanctions to be awarded if "a competent attorney would find no basis for a legal argument." *In re TCI Ltd.,* 769 F.2d 441, 447 (7th Cir.1985). Motions must be justified by existing law or a good faith argument for the modification, reversal or extension of existing law. *Id.* Whether sanctions under 28 U.S.C. § 1927 are appropriate is based on an objective test and focuses on whether an attorney "has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice" or pursued a "claim without a plausible legal or factual basis and lacking in justification." *Walter v. Fiorenzo,* 840 F.2d 427, 433 (7th Cir.1988) (internal quotations omitted). "If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *Id.* at 434.

Lexington contends that Edelman Comb's moving for reassignment of an already dismissed case was unreasonable and vexatious, and the Court agrees. In the Northern District of Illinois, Local Rule 40.4 governs motions for reassignment of cases as related and requires that each of the following conditions be satisfied:
(1) *both cases are pending in this Court;*

(2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort;

(3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and

(4) the cases are susceptible of disposition in a single proceeding.

**\*3** N.D. Ill. LR 40.4(b) (emphasis added). Thus, Local Rule 40.4(b) requires that both cases must be pending to allow for reassignment. *Donahue v. Elgin Riverboat Resort,* No. 04 C 816, 2004 WL 2495642, at \*2 (N.D.Ill. Sept.28, 2004); *Hollinger Int'l, Inc. v. Hollinger, Inc.,* No. 04 C 0698, 2004 WL 1102327, at \*2 (N.D.Ill. May 05, 2004). The primary purpose of reassignment of a case based on relatedness is to save judicial time and effort. *See* N.D. Ill. LR 40.4(b)(2).

By the time Edelman Combs presented its motion to reassign the *D'Agostino* case as related to the *Iosello* case, the *D'Agostino* case had been dismissed and was no longer pending.[1] Further, Lexington's counsel repeatedly asked Edelman Combs to withdraw the motion to reassign after *D'Agostino* was dismissed, but Edelman Combs refused. Therefore, a reasonable attorney aware of the requirements of the local rule would have withdrawn the motion for reassignment prior to the September 7, 2004 presentment date. Edelman Combs' continuing to pursue this motion once it knew of the dismissal of the case was a choice that a reasonably careful attorney would have known was unsound. The Court therefore finds that Edelman Combs acted unreasonably and vexatiously in presenting the motion for reassignment. Edelman Combs' baseless motion wasted the Court's time and resulted in Lexington's research and defense costs in preparing a response to the motion, as well as time and money on the part of defense counsel in attempting to persuade Edelman Combs to withdraw the motion.

Once the Court has found violations under section 1927, the Court has discretion to award attorneys' fees. *Moline,* 222 F.R.D. at 349. However, whether or not the party moving for sanctions has mitigated its own legal costs will influence the amount of the award. *Id.* Also, the Court must impose the

**Iosello v. Lawrence, Not Reported in F.Supp.2d (2005)**

2005 WL 2293680

least severe sanction that will serve the goals of section 1927. *Id.* Here, defense counsel sought $15,950.81 for defending plaintiff's motion to reassign and for preparing the section 1927 motion and reply brief. This amount includes attorneys' fees in the amount of $12,813.75 for the 38.25 hours of time spent preparing a defense to the motion to reassign, as well as $1,351.31 in costs, including travel expenses for defense counsel to travel from Utah to Chicago to appear for the presentment hearing. In counsel's log of time sheet entries, however, only six hours of the lead attorney's time were spent preparing defendant's opposition to the motion to reassign and appearing for that motion, at a rate of $335.00 per hour. Magistrate Judge Mason recommended an award of six hours of attorneys' fees at $335.00 per hour, stating that local counsel alone could have appeared for Lexington and reduced Lexington's defense costs. Because the Court holds that defense counsel failed to mitigate adequately a large amount of the legal costs sought, the Court also independently finds that the award of $2,010.00 in attorneys' fees and costs is appropriate and will serve the purpose of deterring Edelman Combs from engaging in similar conduct in the future.

**\*4** Lastly, Lexington argues that the Court should not only affirm the Magistrate Judge's Report and Recommendation but also should also award attorneys' fees and costs related to its response to plaintiff's objection to the Report and Recommendation. The Court declines to award additional attorneys' fees and costs because the sanction of $2,010.00 serves as a sufficient deterrent for frivolous motions, the main purpose of 28 U.S.C. § 1927.

*CONCLUSION*

For the reasons set forth above, the Court adopts in full Magistrate Judge Michael T. Mason's Report and Recommendation regarding defendant's motion for attorneys' fees and costs pursuant to 28 U.S.C. § 1927 [doc. no. 183-1].

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2293680

---

Footnotes

1    Edelman Combs' reliance on Judge Castillo's comments that this Court should be afforded the opportunity to address the relatedness motion is misplaced. Although Judge Castillo stated that this Court could reassign any *D'Agostino* individual claims, he clearly and unequivocally dismissed the *D'Agostino* case in total.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Lorillard Tobacco Company v. J.J. Shell Food Mart, Inc., Slip Copy (2005)

2005 WL 8177551

2005 WL 8177551
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

LORILLARD TOBACCO COMPANY,
a Delaware Corporation, Plaintiff,
v.
J.J. SHELL FOOD MART, INC.,
and James Joseph, Defendant.

No: 03 C 5506
|
Signed 10/27/2005

**Attorneys and Law Firms**

John S. Pacocha, Cameron Matthew Nelson, Herbert H. Finn, Jeffrey G. Mote, Paul A. Haskins, Greenberg Traurig, LLP, Chicago, IL, for Plaintiff.

Carlton E. Odim, Odim Law Offices, Roger A. Malavia, Shestokas Raines & Malavia, P.C., Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER**

JOHN W. DARRAH, Judge

**\*1** Plaintiff, Lorillard Tobacco Company ("Lorillard"), filed a six-count complaint pursuant to the Lanham Act, 15 U.S.C. § 1051 et seq., seeking damages and injunctive relief against Defendants, J.J. Shell Food Mart, Inc. ("J.J. Shell") and its owner, James Joseph. J.J. Shell is a combination gas station and convenience store that sells, *inter alia*, cigarettes, including the Newport brand cigarettes that are at the heart of this case. Count I alleges that the Defendants infringed Plaintiffs registered trademarks in violation of 15 U.S.C. § 1114(1). Count II alleges the use of false designations of origin and false and misleading descriptions and representations in violation of 15 U.S.C. § 1125(a). In Count III, Plaintiff alleges trademark dilution in violation of the Trademark Act of 1946, 15 U.S.C. § 1125(c). Counts IV through VI allege state trademark dilution in violation of 765 ILCS 1036/65, unfair competition, deceptive trade practice in violation of Illinois law, and statutory unfair competition in

violation of 815 ILCS 510/2 et seq. Presently pending before the Court is Plaintiff's Motion for Partial Summary Judgment.

**FACTS**

The undisputed facts, for the purposes of this motion, are taken from the parties' Local Rule 56.1(a) & (b) statements of material facts and exhibits ("Pl.'s 56.1" and "Defs.' 56.1").

Plaintiff Lorillard is the fourth largest tobacco company in the United States. (Pl. 56.1 ¶ 1,7). Plaintiff manufactures and sells Newport brand cigarettes, which were first introduced to the market in 1956 and have become the second leading brand of cigarettes in the United States. (Pl. 56.1 ¶ 8, 10). Plaintiff and its affiliates own five valid and subsisting federal trademark registrations issued by the United States Patent and Trademark Office for its Newport cigarettes: Reg. No. 1,108,876; Reg. No. 1,178,413; Reg. No. 1,191,816; Reg. No. 1,920,066; and Reg. No. 2,600, 870. (Pl. 56.1 ¶ 11). All of these marks, save one, have reached incontestable status pursuant to 15 U.S.C. § 1115(b). (Pl. 56.1 ¶ 11). Plaintiff uses all five of the registered trademarks on each pack and carton of Newport brand cigarettes. (Pl. 56.1 ¶ 12).

Plaintiff recognized a growing problem with the trafficking in counterfeit cigarettes in 2002-2003. (Pl. 56.1 ¶ 17-18; Defs.' 56.1 ¶ 17-18). On August 20, 2002, Plaintiff sent a letter to all its retailers warning that counterfeit cigarettes were on the market and a second letter on April 10, 2003, which warned retailers to be suspicious of cigarettes sold at low prices, although there is a dispute about whether the Defendants received these letters. (Pl. 56.1 ¶ 17-18; Defs.' 56.1 ¶ 17-18).

Defendant J.J. Shell Food Mart is a combination gas station and grocery store, which sells, *inter alia*, cigarettes manufactured by the Plaintiff. (Pl. 56.1 ¶ 2, 40; Defs.' 56.1 ¶ 1). Defendant James K. Joseph is J.J. Shell's owner and president and the owner of 50 percent of its stock. (Pl. 56.1 ¶ 4). Mr. Joseph had sole responsibility for purchasing and determining the appropriate purchase price for cigarettes bought for the J.J. Shell Food Mart. (Pl. 56.1 ¶ 36-37). In 2003. the Defendants typically purchased between fifteen and thirty cartons of Newport cigarettes per week from Eby Brown and Midwest Cash and Carry, well-known wholesalers of Newport cigarettes. (Pl. 56.1 ¶ 38-39). The Defendants had purchased genuine Newport brand cigarettes from both suppliers for many years, (Pl. 56.1 ¶ 40).

2005 WL 8177551

**\*2** For the nearly month-long period between June 28, 2003 and July 26, 2003, the Defendants did not purchase any Newport cigarettes from these customary suppliers. (Pl. 56.1 ¶ 43). On July 8, 2003, the Defendants purchased purported Newport cigarettes from Canstar U.S.A./Cam-Kat, Inc., a supplier with whom the Defendants had never done business. (Pl. 56.1 ¶ 45-46; Defs.' 56.1 ¶ 7). It is the purchase of these cigarettes - which turned out not to be genuine - which lies at the center of this case.

The cigarettes were purchased at a significantly lower price than that offered by either of the merchants who regularly supply the Defendants with Newport cigarettes. The Defendants purchased the cigarettes in question at a price of $34.00 per carton versus the $40.93 charged by the regular suppliers. (Pl. 56.1 ¶ 46). Second, the price *was* so low that Defendant Joseph was prompted to ask the Canstar, U.S.A./Cam-Kat, Inc. delivery person whether there were any problems with the cigarettes. (Pl. 56.1 ¶ 52). Third, the cigarettes were purchased from the back of a van, from a person and a business with whom J.J. Shell and Joseph had never previously transacted. (Pl. 56.1 ¶ 49).

On August 11, 2003, a Lorillard sales representative named H. Silva visited the J.J. Shell Food Mart. (Pl. 56.1 ¶ 21). While at the store, Silva observed cartons of suspected counterfeit Newport cigarettes on J.J. Shell's shelves and purchased one the cartons of the suspected counterfeit cigarettes. (Pl. 56.1 ¶ 22). Silva did not mention to any of the J.J. Shell employees present during his visit - two in addition to Defendant Joseph - anything about counterfeit cigarettes. (Defs.' 56.1 ¶ 5). Silva then sent the carton of suspected counterfeit Newport cigarettes to Lorillard's corporate headquarters to verify that the cigarettes were counterfeit. (Pl. 56.1 ¶ 23).

At corporate headquarters, Ed O'Brien, another Lorillard employee, determined that the cigarettes found at J.J. Shell were counterfeit. (Pl. 56.1 ¶ 24). In determining that the suspected counterfeit cigarettes found by Silva were, in fact, counterfeit, O'Brien determined that the tear tab on the cigarette packs from J.J. Shell were the wrong length, that the date code on the packs and carton found at J.J. Shell were out of date, and that the cigarette packs had, in fact, been printed by a different printing method than that used for genuine Newport cigarettes. (Pl. 56.1 ¶ 25).

Plaintiff's counsel obtained an *ex parte* seizure order from this Court on August 8, 2003. (Pl. 56.1 ¶ 26). Plaintiff executed a search and seizure at J.J. Shell on August 11, 2003. (Pl. 56.1 ¶

28). During the search and seizure at J.J. Shell, Plaintiff seized one (1) full canon of counterfeit Newport cigarettes. (Pl. 56.1 ¶ 28). The cigarettes seized from J.J. Shell on August 11, 2003, bore the following indicia of counterfeiting: a "1003|T" carton code; a "103T51" pack code; a crisp, clear "Lorillard" logo, where genuine packs bear only a blurry logo and a shorter cellophane teartab than present on genuine packs of Newport brand cigarettes. (Pl. 56.1 ¶ 30). The cigarettes found at J.J. Shell, as well at other Chicago-area retailers investigated by Lorillard between June of 2003 and February of 2004, bear identical indicia of counterfeiting as those found at Cam-Kat, Inc., including the "103T51" pack code, the "1003|T" carton code, the clear Lorillard logo, and the improperly sized tear tab.[1] (Pl. 56.1 ¶ 35).

**\*3** According to an investigation conducted by Defendant Joseph, none of his employees knew how to identify counterfeit cigarettes, including looking at tabs, logos, or code numbers. (Defs.' 56.1 ¶ 6). The first time that Joseph became aware that the Plaintiff believed that Canstar U.S.A./Cam-Kat, Inc. was distributing counterfeit cigarettes was in 2004, in connection with this lawsuit. (Defs.' 56.1 ¶ 9).

Plaintiff now moves for partial summary judgment and an award of damages.

## DISCUSSION

### *Summary Judgment Standard*

Summary judgment is appropriate under Rule 56(c) when no genuine issue of material fact exists or when, drawing all factual inferences in favor of the nonmoving party, no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992).

One of the "principal purposes" of awarding summary judgment is to "isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court that there is no genuine issue of material fact,

Lorillard Tobacco Company v. J.J. Shell Food Mart, Inc., Slip Copy (2005)

2005 WL 8177551

the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that a genuine issue of material fact exists and to show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson*, 477 U.S. at 254-56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

### Defendants' Liability

Plaintiff has moved for summary judgment on the issue of liability on Count I, arguing that trademark infringement occurred and that the Defendants are strictly liable for that infringement. Because sellers bear strict liability for violations of the Lanham Act, even dealers who unknowingly sell goods that bear an infringing mark are liable for trademark infringement.[2] J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 25.10 (4th ed. 2002); *see also Hard Rock Café Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1152 n.6 (7th Cir. 1992).

In order to succeed on its claims of trademark infringement and counterfeiting, Plaintiff need only show, first, that its marks are protectable and, second, that their use by Defendants are likely to result in confusion on the part of consumers. *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001) (citing *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000)).

**\*4** Once a trademark is registered, it is presumed to be valid absent proof of a legal defense or defect. *Packman*, 267 F.3d at 638; *see also* 15 U.S.C. § 1115(b). In the instant case, there is a presumption that Plaintiff's marks are protectable and valid because the five counterfeited trademarks are registered. *Packman*, 267 F.3d at 638; 15 U.S.C. § 1115(a).

The question, then, turns on whether Defendants' use of the mark was likely to cause consumer confusion. Typically, the existence of consumer confusion is a question of fact, but it can be answered on summary judgment "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 677 (7th Cir. 2001) (citing *Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 83 F.3d 169, 173 (7th Cir. 1996)). Courts employ a seven-factor test to determine the likelihood of confusion by use of a protected trademark:

(1) the similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the Plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant intended to 'palm off' his product as that of the Plaintiff.

*CAE Inc.*, 267 F.3d at 667-68, and cases cited therein. While no single factor is dispositive, three of the factors have been deemed by courts to be particularly important: the similarity of the marks, evidence of actual confusion, and the defendant's intent. *CAE Inc.*, 267 F.3d at 668.

Here, the first factor is met because the packaging of the counterfeit cigarettes obtained from the Defendants' store are virtually indistinguishable from the packaging for genuine Newport cigarettes. Plaintiff's own sales representative needed confirmation from employees at corporate headquarters to confirm that the packs and cartons obtained were counterfeit.

The second and third factors are met because the counterfeit products are the exact same type of goods as Plaintiffs genuine cigarettes and because when the counterfeit carton of Newport cigarettes were seized from the Defendants on August 8, 2003, the single carton of counterfeit Newport brand cigarettes was displayed amid other cartons of authentic Newport brand cigarettes.

Regarding the fourth factor, "consumers' degree of care is likely to be minimal in circumstances such as in the instant case, where the product at issue is widely available and inexpensive." *Lorillard Tobacco Company v. Division & Noble Amoco Corp.*, No. 03-C-5127, 2005 WL 309535, at \*4 (N.D. Ill. Jan. 20, 2005) ("*Division & Noble Amoco Corp.*"). The purchase of an individual pack of cigarettes in a convenience store such as Defendants' would not be made with the degree of care necessary to identify the counterfeit product.

The fifth factor, the strength of the Plaintiff's mark, also favors Plaintiff because Plaintiff's Newport brand cigarettes are one of the most popular brand names in the United States. It is undisputed that all five of the marks at issue are registered and protected, and four of the marks are deemed incontestable.

The sixth factor is accorded great weight but is not required in order to establish that a likelihood of confusion exists. *CAE, Inc.*, 267 F.3d at 685, and cases cited therein. There is no

Lorillard Tobacco Company v. J.J. Shell Food Mart, Inc., Slip Copy (2005)

2005 WL 8177551

evidence of actual confusion on the part of any particular consumer of the J.J. Shell Food Mart. Nevertheless, in a case such as this, where even Plaintiff's own employees had difficulty distinguishing the counterfeit product from the genuine product, "actual confusion is inevitable." *Division & Noble Amoco Corp.*, 2005 WL 309535, at *5.

**\*5** The final factor is whether the Defendants knowingly or willfully sold goods bearing an infringing mark. There is evidence that the Defendants acted with less than good faith. The cigarettes were purchased at a significantly lower price than that offered by either of the distributors who regularly supplied the Defendants with genuine Newport cigarettes; the Defendants purchased the counterfeit cigarettes in question at a price of $34.00 per carton versus the $40.93 charged by the regular suppliers. (Pl. 56.1 ¶ 46). The evidence amply supports Plaintiff's Lanham Act claim.

Defendants have failed to raise a triable issue of fact as to whether it committed trademark infringement in violation of the Lanham Act; the Court grants partial summary judgment in favor of Plaintiff as to Count I.

### Damages

Because Plaintiff prevails on its trademark counterfeiting claim, it is entitled to recover damages. 15 U.S.C. § 1117. Section 1117 of Title 15 allows a Plaintiff to elect one of two alternative recovery options for trademark infringement: (1) the actual damages caused by the infringement, 15 U.S.C. § 1117(a); or statutory damages, 15 U.S.C. § 1117(c). The Lorillard Plaintiff requested an award of statutory damages under 15 U.S.C. § 1117(c). For an award of statutory damages, the Defendants' liability under 15 U.S.C. § 1117(c) does not depend on whether or not there is a showing of intentional counterfeiting. Statutory damages are required for even "innocent" counterfeiting. Absent a finding of willfulness, statutory damages may be awarded in an amount "not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed for sale." Additionally, were this Court to find the use of the counterfeit mark to be willful, Section 1117(c)(2) allows for enhanced award of up to $1,000,000 per counterfeit mark.

The Court has broad discretion in setting the amount of a statutory damages award. *Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1229 (7th Cir. 1991). Courts interpreting Section 1117(c) have looked to the interpretation of the

statutory damage provision of the Copyright Act, 17 U.S.C. § 504 (c). *Sara Lee v. Bags of New York*, 36 F. Supp. 2d 161, 166 (S.D.N.Y. 1999). In so doing, courts have looked beyond restitution of profit and restoration of injury to award damages, holding that "deterrence of future infringement is an important factor in determining statutory damages under the Copyright Act," and, thus, under the Lanham Act. *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952).

Similar cases in this District, resulting from infringement of Plaintiff's trademarks on counterfeit Newport brand cigarettes, have resulted in statutory damage awards ranging from $500 per infringed mark to $50,000 per infringed mark, or single violation of Lorillard's statutory rights under Section 1117(c)(1)-(2). *Cf. Lorillard Tobacco Company v. Division & Noble Amoco Corp.*, 2005 WL 309535, at *6 (awarding $500 per carton, for a total of $3,500) *with Lorillard Tobacco Co. v. S&M Cent. Serv. Corp.*, No. 03-C-4986, 2004 WL 2534378 (N.D. Ill. Jan. 8, 2004) (awarding $50,000 per trademark, for a total of $250,000).

The first inquiry is whether to award damages under Section 1117(c)(1) or under 1117(c)(2). In *S&M Central Services Corp.*, in a post-trial motion, the court awarded the defendant $50,000 per trademark infringement, for a total of $250,000 in damages under Section 1117(c)(2). In that case, there was a jury finding that the defendant acted willfully, or with willful blindness, in violating Plaintiff's trademark. In that case, the defendant purchased the counterfeit Newport brand cigarettes at a price below the market price, at a price of $34 per carton instead of the normal rate of $40 per carton. *S&M Cent. Serv. Corp.*, 2004 WL 2534378 at *7. Further, one of the witnesses in that case admitted that the price was low enough to make him inspect the tax stamps and the name brands on a sample of the cartons he purchased. *S&M Cent. Serv. Corp.*, 2004 WL 2534378 at *7.

**\*6** In another case in this District involving counterfeit Newport brand cigarettes, the court awarded statutory damages of $500 per carton, noting that the plaintiff in that case acted innocently. *Division & Noble Amoco Corp.*, 2005 WL 309535, at *5-6. Division & Noble Amoco purchased the cigarettes, which turned out to be counterfeit from its regular supplier, and no evidence that the price the defendant paid for the counterfeit cigarettes was less than the amount he normally paid for genuine Newport brand cigarettes. *Division & Noble Amoco Corp.*, 2005 WL 309535, at *5. The court concluded: "Simply put, there is no evidence that Defendant

**Lorillard Tobacco Company v. J.J. Shell Food Mart, Inc., Slip Copy (2005)**

2005 WL 8177551

knew, nor that he could have had any reason to recognize, that the cartons of Newports were not Lorillard's own product." *Division & Noble Amoco Corp.*, 2005 WL 309535, at *5. As a result, the court awarded $500 per canon in statutory damages under 15 U.S.C. § 1117 (c)(1). *Division & Noble Amoco Corp.*, 2005 WL 309535, at *6.

While the facts in this case bear more than a passing similarity to those in *S&M Central Services Corp.*, these facts, on a motion for summary judgment, do not add up to wilfulness or wilful blindness required to award damages under Section 1117(c)(2). On a motion for summary judgment, all facts must be construed in favor of the non-moving party. Thus construing the facts, this Court cannot find that the Defendants acted willfully, or with willful blindness. As a result, an award of non-intentional statutory damages will be awarded. Therefore, the Court will award statutory damages under Section 1117(c)(1). Under 1117(c)(1), the Court is entitled to award the Plaintiff up $100,0000 for each of the five marks that appeared on the carton of cigarettes. The Plaintiff asks this court to award $50,000 for each of the five marks that appeared on the counterfeit carton of cigarettes, a total of $250,000 in statutory damages under Section 1117(c)(1).

Even though the Court cannot find, on this motion for summary judgment, that the Defendants acted willfully, or with willful blindness, in determining the statutory award under Section 1117(c)(1), the Defendants' actions are not irrelevant. In computing the award amount, a court may consider factors such as "the circumstances of the infringement, and the efficacy of the damages as a deterrent." *Chi-Boy Music*, 930 F.2d at 1229. Even construing the facts in the light most favorable to the non-moving party, the facts do indicate that the Defendants willfully, or with willful blindness, accepted the value in purchasing counterfeit product for resale at a significantly lower price than was previously paid for the genuine product.

The Court, therefore, will enter an award of $1,500 per mark[3], a total of $7,500. This award is well below the maximum award provided by statute. Accordingly, it is reasonable and is likely to deter the Defendants from continuing the illegal behavior.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion for partial summary judgment and awards $7,500 in statutory damages as to Count 1 of the Plaintiff's Complaint.

**All Citations**

Slip Copy, 2005 WL 8177551

---

Footnotes

1    Defendants moved to strike this fact here and above. However, this is a matter of public record of which the Court may take judicial notice.

2    The Lanham Act provision on liability makes no mention of intention. It provides:
     (1) Any person who shall, without the consent of the registrant–
     (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.
     *15 U.S.C.A. § 1114*.

3    *Microsoft Corp. v. V3 Solutions, Inc.*, No. 01-C-4693, 2003 WL 22038593, at *14 n.9 (D. Ill. Aug. 28, 2003) ("statutory damages are measured per mark or copyright infringed, not per act of infringement or per counterfeit item produced."). *See also, S&M Cent. Serv. Corp.*, 2004 WL 2534378, at *7. *But see, Division & Noble Amoco Corp.*, 2005 WL 309535, at *6.

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

MGA Entertainment, Inc. v. Dynacraft BSC, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 2448123
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

MGA ENTERTAINMENT,
INC., et al., Plaintiff,
v.
DYNACRAFT BSC, INC., et al., Defendants.

Case No. 2:17–cv–08222–ODW–KS
|
Signed 05/30/2018

**Attorneys and Law Firms**

Jennifer A. Marrow, Benjamin C. Johnson, MGA Entertainment Inc, Van Nuys, CA, for Plaintiff.

Lincoln D. Bandlow, Fox Rothschild LLP, Los Angeles, CA, Evan S. Strassberg, Michael Best and Friedrich LLP, Salt Lake City, UT, Melanie J. Reichenberger, Pro Hac Vice, Michael Best and Friedrich LLP, Milwaukee, WI, for Defendants.

**ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS COUNTS 1, 3, 4, 7, 8, 11, AND 12 [35]**

OTIS D. WRIGHT, II, UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

**\*1** On November 10, 2017, Plaintiffs MGA Entertainment, Inc. and The Little Tikes Company (collectively "MGA") filed this action against Defendants Dynacraft BSC, Inc. ("Dynacraft"); Freshdeals2112; Honeydukessweetshop; The House; Theroyalflush, and DOES 1–10 (collectively "Defendants") for various federal and California trademark infringement claims. (*See generally* Compl., ECF No. 1.) MGA identifies four of the defendants (Freshdeals2112; Honeydukessweetshop; The House; and Theroyalflush) by their URL, and eBay merchant name because it has not yet discovered the true identity of these defendants (hereinafter the "Ebay Defendants").

On November 13, 2017, MGA filed a First Amended Complaint ("FAC"). (FAC, ECF No. 6.) On January 8, 2018, Dynacraft moved to dismiss MGA's FAC (ECF No. 14), and MGA conceded that there were deficiencies with its FAC. (ECF No. 27.) The Court granted Dynacraft's Motion to Dismiss, with leave to amend, on January 16, 2018. (ECF No. 28.) On February 9, 2018, Plaintiffs filed a Second Amended Complaint ("SAC"). (ECF No. 32.) Before the Court is Dynacraft's Motion to Dismiss MGA's SAC. (Mot., ECF No. 35.) For the reasons below, the Court **GRANTS IN PART** Dynacraft's Motion to Dismiss, **with leave to amend, as set forth below**.[1]

**II. FACTUAL BACKGROUND**

MGA's claims arise from Dynacraft's manufacturing of its "Disney Princess Preschool Carriage." (SAC ¶ 27.) MGA asserts valid, registered trademarks, which remain in full force and effect—U.S. Registration No. 1,438,168 for the words COZY COUPE for "ride-on toys" (the "Cozy Coupe Mark") and U.S. Registration Nos. 4,688,321 and 4,824,946 (collectively the "Design Marks"):



(SAC Ex. 1, ECF No. 32–1.)

Dynacraft manufactures and distributes the infringing product, the Disney Princess Preschool Carriage, pictured below left, which is a non-motorized, smaller version of Dynacraft's motorized Princess Carriage sold previously, pictured below right.

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 16 of 43 PageID #:3498

MGA Entertainment, Inc. v. Dynacraft BSC, Inc., Not Reported in Fed. Supp. (2018)



| Dynacraft's Accused Disney Princess Preschool Carriage (Non-Motorized) | Dynacraft's Previously-Sold Disney 24V Princess Carriage (Motorized) |

(Mot. 5.) Dynacraft's product is not a Cozy Coupe product and has no association with MGA's Cozy Coupe products. (Opp'n 1, ECF No. 38.)

MGA alleges that Dynacraft intentionally manufactured its Disney Princess Preschool Carriage to look confusingly similar to MGA's Cozy Coupe products. (SAC ¶ 27.) Defendants also arranged for advertisements on the internet applying MGA's Cozy Coupe Mark to Dynacraft products. (*Id.*) MGA further alleges that Dynacraft conspired with www.walmart.com, www.ebay.com, toysrus.com, Ebay Defendants, and Doe Defendants 1–10, to produce a product that could be confused for the Cozy Coupe. (SAC ¶¶ 27–32.)

MGA's alleges claims for: Trademark Counterfeiting, 15 U.S.C. § 1114 (Count 1); False Designation of Origin, 15 U.S.C. § 1125(a) (Count 2); False or Misleading Description or Misrepresentation of Fact, 15 U.S.C. § 1125(a) (Count 3); Federal Trademark Dilution, 15 U.S.C. § 1125(c) (Count 4); Federal Unfair Competition, 15 U.S.C. § 1125(c) (Count 5); State Unfair Competition, California Business & Professional Code § 17200 et. seq. (Count 6); State False and Misleading Statements, California Business & Professional Code § 17500 (Count 7); State Law Trademark Dilution, California Business & Professional Code § 14247 (Count 8); Common Law Trade Dress Infringement (Count 9); Common Law "Passing Off" (Count 10); Civil Conspiracy (Count 11); and Conspiracy to Commit Trademark Counterfeiting, 18 U.S.C. § 2320, 15 U.S.C. § 1114, 1125(a), and 1125(c), and 18 U.S.C. § 371 (Count 12). (*See generally* SAC.)

**\*2** Dynacraft now moves to dismiss counts 1, 3, 4, 7, 8, 11, and 12, on several grounds. (*See* Mot.)

### III. LEGAL STANDARD

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded

to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a motion to dismiss, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)— a short and plain statement of the claim. *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint ... as true and ... in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). But a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Plaintiffs pleading fraud must do so with heightened particularity. *See* Fed. R. Civ. P. 9(b). Federal Rule of Civil Procedure 9(b) establishes that an allegation of "fraud or mistake must state with particularity the circumstances constituting fraud." The "circumstances" required by Rule 9(b) are the "who, what, when, when, where, and how" of the fraudulent activity. *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011). In addition, the allegation "must set forth what is false or misleading about a statement, and why it is false." *Id.* This heightened pleading standard ensures that "allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

When a district court grants a motion to dismiss, it should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Leave to amend, however, "is properly denied ... if amendment would be futile." *Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011).

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 17 of 43 PageID #:3499

MGA Entertainment, Inc. v. Dynacraft BSC, Inc., Not Reported in Fed. Supp. (2018)

## IV. DISCUSSION

### A. Pleading with Particularity under Rule 9(b)
Dynacraft argues that the SAC includes five counts that require pleading supporting facts "with particularity" under Rule 9(b). (Mot. 6.) These include Count 1—alleging trademark counterfeiting, Counts 3 and 7—alleging false advertising, and Counts 11 and 12—alleging conspiracy. (*Id.*) MGA argues that Rule 9(b) does not apply to these claims because each of these allegations describes non-fraudulent conduct. (Opp'n 4.) The Court first addresses whether Rule 9(b) applies to these counts.

#### 1. *Trademark Counterfeiting (Count 1)*
 **\*3**  Dynacraft cites *Tall v. Mukasey* for the proposition that Rule 9(b) applies to MGA's trademark counterfeiting claim (Count 1). 517 F.3d 1115, 1119–20 (9th Cir. 2008) (holding in immigration context that California's criminal trademark counterfeiting statute addresses "an inherently fraudulent crime," which qualified as a "crime involving moral turpitude"). *Mukasey* did not address the federal statute at issue here—15 U.S.C. § 1114. *Id.* Instead, it evaluated whether a violation of California's penal code constituted a crime of moral turpitude under the Immigration and Nationality Act. *Id.* Thus, the *Mukasey* analysis does not persuade the Court that Rule 9(b) applies here.

There is no case in which the heightened standard has been applied to such trademark counterfeiting claims, like MGA's. *See Rolex Watch USA, Inc. v. Agarwal*, No. CV 12–06400 MMM (MRWx), 2012 WL 12886444, at *3 (C.D. Cal. Dec. 17, 2012). "Rather, the authority [the court] has located was to the contrary." *Id.* As one district court in the Second Circuit observed:

> [Defendants] argue that Lanham Act claims necessarily contain some element of fraud, which must be pled with particularity. The Court concludes that this argument is unsupported by case law. No court in this district has ever dismissed a Lanham Act claim for failure to comply with Rule 9(b), nor has the Second Circuit ever held that it should.

*Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 596 F.Supp.2d 497, 502 (D. Conn. 2009); *see also Stubbs Collections, Inc. v. Davis*, No. CIV. A. 3–99CV2440–P, 2000 WL 381947, *4 (N.D. Tex. Apr. 14, 2000) (citation omitted) ("A claim of fraud requires not only the making of a false statement but also the intent to defraud the victim. However, likelihood of confusion—the test for infringement under 15 U.S.C. § 1114—does not consider the actor's intent in determining whether infringement has occurred ... Therefore, a claim of infringement under 15 U.S.C. § 1114 does not constitute a claim subject to the heightened pleading requirements of Rule 9(b) ). Accordingly, the Court evaluates Count 1, pursuant to Rule 8 below.

#### 2. *False Advertising (Counts 3 & 7)*
Dynacraft argues that Rule 9(b) should apply to MGA's false advertising claims under federal and California law because they are grounded in fraud. (Mot. 10–11.) "Although the Ninth Circuit has not concluded that Rule 9(b) applies to Lanham Act claims, many district courts have applied this heightened pleading standard to claims that are grounded in fraud, such as misrepresentation claims." *EcoDisc Tech*, 711 F.Supp. 2d at 1085; *see also Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*, 404 F. Supp. 2d 1214, 1219–20 (E.D. Cal. 2005) (finding that Rule 9(b) applied to allegations of intentional misrepresentation related to a copyright infringement claim).

Here, MGA alleges that Defendants "actually caused the false and misleading application of the word mark 'Cozy Coupe' to internet listings for the sale of the Disney Princess Preschool Carriage" in violation of the Lanham Act, and, presumably, with the intent to defraud consumers. (SAC ¶ 52.) Because these allegations are grounded in fraud, Rule 9(b) applies to the pleading of these claims.

#### 3. *Civil Conspiracy (Counts 11 & 12)*
In determining whether to apply Rule 9(b) to a civil conspiracy claim, the Court looks to the underlying offense. *See Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (applying Rule 9(b) to a conspiracy claim where the underlying offense was common law and securities fraud). As discussed further below, "civil conspiracy is not a separate and distinct cause of action under California law." *AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 947 (N.D. Cal. 2003) (citing *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1228 (9th Cir. 1997) ). Accordingly, the Court declines to extend Rule 9(b) to Counts 11 and 12 because they are not stand-alone causes of action. *Id.* The Court will analyze Rule 9(b)'s applicability below as it pertains to the conspiracy's underlying offense.

### B. Counterfeiting (Count 1)

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 18 of 43 PageID #:3500

MGA Entertainment, Inc. v. Dynacraft BSC, Inc., Not Reported in Fed. Supp. (2018)

**\*4** Dynacraft argues that MGA's trademark counterfeiting claim should be dismissed because MGA pleads a recitation of the claim, without facts supporting a plausible claim. (Mot. 7–8.) MGA contends that it has stated a claim for trademark counterfeiting because counterfeit marks are inherently confusing and it has established there was use of a counterfeit mark. (Opp'n 6.)

Section 1114 of the Lanham Act established a cause of action for trademark counterfeiting by prohibiting the use of "any reproduction, counterfeit copy, or colorable imitation of a registered mark in connection with the sale ... of any goods ... [where] such use is likely to cause confusion ... or deceive." 15 U.S.C. § 1114(1)(a). A counterfeiting claim "requires that the mark in question be (1) a non-genuine mark identical to the registered, genuine mark of another, where (2) the genuine mark was registered for use on the same goods to which the infringer applied the mark." *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 946 (9th Cir. 2011). "Trademark infringement under 15 U.S.C. § 1114(1) also constitutes trademark counterfeiting when the infringer uses a 'counterfeit mark,' which is defined as 'a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use ....' " *Partners for Health & Home, L.P. v. Seung Wee Yang*, No. CV 09–07849, 2011 WL 5387075, at \*8 (C.D. Cal. Oct. 28, 2011) (citing 15 U.S.C. § 1116(d)(1)(B)(I) ). In addition, a "counterfeit" mark is defined by statute as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127; *see also UL LLC v. Space Chariot Inc.*, 250 F. Supp. 3d 596, 607 (C.D. Cal. 2017) (citation omitted). In a case involving the willful use of a counterfeit mark, a plaintiff may elect statutory damages pursuant to 15 U.S.C. § 1117(c).

Plaintiff alleges that "[u]pon information and belief, Defendants, and other third parties, have used spurious designations that are identical with or substantially indistinguishable from Plaintiffs' Trademarks on goods covered by registrations for those marks, including the use of the registered work mark 'Cozy Coupe' within internet listings for [Dynacraft's product]...." (SAC ¶ 41.) Those allegations are insufficient and conclusory. *See Ashcroft*, 556 U.S. at 678. First, MGA fails to identify in a non-conclusory manner how Dynacraft's Disney Princess Preschool Carriage is identical with or substantially indistinguishable from MGA's Design Marks. (*See* SAC ¶¶ 38–47.) In order to plead trademark counterfeiting, MGA must identify *how*

Dynacraft's products are identical with or substantially indistinguishable from MGA's three Design Marks. Second, MGA makes no allegations connecting Dynacraft to the inclusion of the words "Cozy Coupe" on third-party websites listing Dynacraft's product for sale. MGA's allegation that "on information and belief, [the inclusion of 'Cozy Coupe'] was encouraged and facilitated by Defendant Dynacraft" is not enough. (SAC ¶ 41;) *Ashcroft*, 556 U.S. at 678.

For the foregoing reasons, Dynacraft's motion to dismiss MGA's trademark counterfeiting claim (Count 1) is **GRANTED with leave to amend**.

## C. False Advertising (Counts 3 and 7)
As stated above, MGA's false advertising claims under federal and California law are grounded in fraud and require pleading with particularity under Rule 9(b). See *EcoDisc Tech.*, 711 F. Supp. 2d at 1085; *RPost Holdings, Inc. v. Trustifi Corp.*, No. CV 11–2118 PSG (SHx), 2011 WL 4802372, at \*3 (C.D. Cal. Oct. 11, 2011) (citation omitted).

### 1. Federal False Advertising Claim (Count 3)
**\*5** MGA claims that Dynacraft disseminated false statements of fact about MGA's products in violation of the false advertising provision of the Lanham Act. 15 U.S.C. § 1125(a)(1)(B). To establish a claim for false advertising under the Lanham Act, a plaintiff must show:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir.1997). False advertising claims require "the plaintiff to plead the 'time, place, and specific content of the false representations,' the identities of the parties to the misrepresentation, and what about the statement is claimed to be misleading." *Seoul Laser Dieboard Sys. Co. v. Serviform S.R.L.*, 957 F. Supp. 2d 1189, 1200 (S.D. Cal. 2013) (quoting *Epicor Software Corp. v. Alt. Tech. Sols., Inc.*, No. SACV 13–0448, 2013 WL 2382262, at \*4 (C.D. Cal May 9, 2013) ).

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 19 of 43 PageID #:3501

MGA Entertainment, Inc. v. Dynacraft BSC, Inc., Not Reported in Fed. Supp. (2018)

Here, the allegations in the SAC fall short. MGA fails to identify any false statement made by Dynacraft, much less explain why it is misleading. (*See* SAC ¶¶ 27–34, 51–53.) Rather, MGA alleges that "the consuming public has been misled," (SAC ¶ 28), and argues that "its 'Cozy Coupe' trademark has been used without authorization on internet listings for the advertisement of Dyacraft's [product]..." (Opp'n 8.) It seems MGA wishes to connect use of the "Cozy Coupe" mark to Dynacraft through its conspiracy theory of liability, but only makes a passing reference to the fact that Dynacraft encouraged co-defendants to use the Cozy Coupe Mark, while advertising Dynacraft's Disney Princess Preschool Carriage, without providing any supporting facts. (SAC ¶ 13.) Such bare allegations fail to state a plausible claim with particularity. Accordingly, the Court **DISMISSES** this claim, with leave to amend.

2. *State False Advertising Claim (Count 7)*

MGA also alleges that Dynacraft violated § 17500 of the California Business and Professions Code, which prohibits making any "statement," in connection with the sale of personal property, "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." State law claims based on this theory are substantially similar to claims made under § 43(a) of the Lanham Act and are properly dismissed if the Lanham Act claims fail. *Denbicare U.S.A., Inc. v. Toys "R" Us, Inc.*, 84 F.3d 1143, 1152–53 (9th Cir. 1996) (affirming dismissal of plaintiff's § 17200 and § 17500 claims in light of proper dismissal of the plaintiff's Lanham Act claim), *abrogated in part on other grounds by*, *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519 (2013); *Homeland Housewares, LLC v. Euro–Pro Operating LLC*, No. CV 14–03954 DDP (MANx), 2015 WL 476287, at *2 (C.D. Cal. Feb. 5, 2014) (same). Thus, MGA's § 17500 false advertising claim fails because MGA's corresponding Lanham Act claim fails.

**\*6** For these reasons, Dynacraft's motion to dismiss MGA's false advertising claims (Counts 3 and 7) is **GRANTED with leave to amend**.

**D. Trademark Dilution (Counts 4 and 8)**

MGA brings a dilution claim under both federal and California state law. (SAC ¶¶ 54–58, 66–68.) Trademark dilution is analyzed the same way under both statutes. *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1324 (9th Cir.1998). To prove a dilution claim, a plaintiff must demonstrate that the mark used by the alleged diluter is identical, or nearly identical, to the protected mark. *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 905 (9th Cir.2002). A plaintiff must also show that "(1) its mark is famous; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use presents a likelihood of dilution of the distinctive value of the mark." *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 874 (9th Cir.1999); *see* 15 U.S.C. § 1125(c); Cal. Bus. & Prof. Code § 14247. Dynacraft claims that MGA's dilution claims fail because MGA has not alleged sufficient facts establishing that its marks are famous. (Mot. 18.)

Under the Trademark Dilution Revision Act, four non-exclusive factors are relevant when determining whether a mark is sufficiently famous for anti-dilution protection: (1) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register. 15 U.S.C. § 1125(c)(2)(A). Moreover, the Trademark Dilution Revision Act of 2006 restricted the statute from protecting marks that are famous only in "niche" markets. *Planet Coffee Roasters, Inc. v. Dam*, No. SACV 09–00571–MLG, 2009 WL 2486457, at * 3 (C.D. Cal. Aug. 12, 2009) (citation omitted). Dilution is a cause of action "reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value." *Avery*, 89 F.3d at 875. For this reason, dilution protection extends only to those whose mark is a "household name." *Thane*, 305 F.3d at 911. As this Court has previously stated, "trademark dilution claims are restricted to truly famous marks, such as Budweiser beer, Camel cigarettes, and Barbie dolls." *Dahon N. Am., Inc. v. Hon*, No. 2:11–cv–05835–ODW (JCGx), 2012 WL 1413681, at *9 (C.D. Cal. April 24, 2012).

The Court finds that MGA has not pled sufficient facts to state a claim for trademark dilution that is "facially plausible." *Iqbal*, 556 U.S. at 678. MGA provides some allegations supporting its claim to fame: that it has been selling the Cozy Coupe since 1979; that more than 10 million Cozy Coupe vehicles have been sold worldwide to date; that it has spent millions of dollars to develop, build, and promote the Cozy Coupe; and that the Cozy Coupe is the primary

MGA Entertainment, Inc. v. Dynacraft BSC, Inc., Not Reported in Fed. Supp. (2018)

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 20 of 43 PageID #:3502

representational symbol and mark for Little Tikes. (SAC ¶¶ 16–19.) Although these facts demonstrate the success and popularity of the Cozy Coupe product, MGA's allegations fall short of the high standard required for a dilution claim. *Thane*, 305 F.3d at 911. MGA does not plausibly plead that the general public of the United States is familiar with the Cozy Coupe Mark. Indeed, the fame of the Cozy Coupe Mark is incomparable to that of other household names, such as Budweiser beer. *See Dohan*, 2012 WL 1413681, at *9.

**\*7** Because MGA may be able to plead facts rising to the appropriate level of notoriety, the Court **GRANTS** Dynacraft's Motion**, with leave to amend**.

### E. Civil Conspiracy (Counts 11 and 12)

As described by the court in *Mintel Learning Technology v. Beijing Kaidi Education*, "[c]ivil conspiracy is not a separate and distinct cause of action under California law." *Mintel*, 2007 WL 2288329, at *4 (citing *Entm't Research Grp., Inc.*, 122 F.3d at 1228). Civil conspiracy is "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its preparation." *Applied Equip. Corp v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–11 (1994) ("Conspiracy is not an independent tort; it cannot create a duty or abrogate an immunity. It allows tort recovery only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law principles."); *see also Micro/sys, Inc. v. DRS Techs., Inc.*, No. CV 14–3441 DMG (CWX), 2015 WL 12748631, at *3 (C.D. Cal. Feb. 18, 2015) (dismissing civil conspiracy claim where Lanham Act claims failed).

MGA's response to these points of law cited by Dynacraft is that "conspiracy claims can manifestly stand on their own." (Opp'n 10 (citing *Swartz*, 476 F.3d at 765) ). In *Swartz*, the Ninth Circuit addressed Rule 9(b)'s pleading requirements, as it pertains to multiple defendants allegedly involved in a conspiracy based on fraud. *Swartz*, 476 F.3d at 764–65. After reversing the district court's denial of leave to amend on the fraud claim, the Ninth Circuit also reversed the district court's denial of leave to amend an accompanying civil conspiracy claim based on the fraud. *Id.* at 765 ("As stated in the previous section, we agree that Swartz failed to sufficiently detail the roles played by the defendants in the alleged conspiracy to defraud. However, we repeat that the defects may be curable and reverse the denial of leave to amend this claim."). As argued by Dynacraft, the Ninth Circuit did not specifically rule on whether a civil conspiracy

claim in California may stand alone as a cause of action. *See id.* Instead, it merely held that where the plaintiff should have been granted leave to amend the claim that was the object of the conspiracy (fraud), the plaintiff should also be granted leave to amend the allegations regarding the civil conspiracy to commit fraud. *Id.* Accordingly, the Court cannot use *Swartz* as a basis to allow MGA's civil conspiracy claims to stand alone, where so many other actions interpreting California law hold otherwise. *Applied Equip. Corp*, 7 Cal. 4th at 510–11; *Micro/sys, Inc.*, 2015 WL 12748631, at *3; *Mintel*, 2007 WL 2288329, at *4.

Furthermore, MGA's allegations of conspiracy do not sufficiently provide the details of the conspiracy. MGA's conspiracy claims are all made on "information and belief" without providing any factual basis for those beliefs or are merely conclusory. (*See, e.g.*, SAC ¶¶ 28, 30–32, 77–86.) Indeed, MGA concedes that it "does not have personal knowledge of the agreements made between Dynacraft, on the one hand, and Walmart, ToyRUs [sic] and/or the Ebay Defendants, on the other." (Opp'n 13.) These allegations are not enough under Rule 8 or 9(b). Accordingly, the Court **DISMISSES** MGA's conspiracy claims (Count 11 & 12), with leave to amend. While MGA may not bring these claims alone, it may incorporate allegations of conspiracy as part of its other causes of action. *See Mintel*, 2007 WL 2288329, at *4 (citing *Accuimage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 947–48 (N.D. Cal. 2003) ) (dismissing cause of action for civil conspiracy, and holding "the civil conspiracy allegations must be separately pled as to each of the substantive causes of action").

### F. Counts against the Ebay and Doe Defendants

**\*8** MGA has included four Ebay Defendants, which it characterizes by identifying URLs, and ten Doe Defendants in its SAC. (SAC ¶¶ 5–9.) Dynacraft argues that all counts against the Ebay and Doe Defendants should be dismissed because MGA does not provide sufficiently particular details about these defendants and their actions. (Mot. 22–23.) MGA contends the opposite. (Opp'n 15–16.)

As a general rule, the use of fictitiously named defendants is disfavored in federal court. *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir.1980). Unidentifiable Doe defendants may be dismissed from the complaint. *See id.*; *McConnell v. Marine Eng'rs Beneficial Assoc. Benefit Plans, Dist. 1–Pac. Coast Dist.*, 526 F. Supp. 770, 774 (N.D. Cal. 1981). "While a plaintiff may sue up to ten unidentified Doe defendants (*see* Local Rule 19–1), it is required to make individualized

allegations about each such Doe defendants and may not merely name an indistinguishable group of Doe defendants." *Rhue v. Signet Domain LLC*, No. C 13–8664 DMG (JC), 2015 WL 4111701, at *5 (C.D. Cal. Jul. 8, 2015). The plaintiff must, at least, identify "each unidentified defendant by a separate fictitious name (*i.e.*, "John Doe No. 1," "John Doe No. 2," etc.) *and* allege facts that demonstrate a causal link between" each unidentified defendant and the alleged offense. *Id.* (granting leave to amend with instructions to "allege with sufficient specificity what each defendant did and how each defendant's conduct assertedly violated plaintiff's ... rights.").

Here, MGA identifies the four Ebay Defendants by the only identification currently available—their Ebay store names and URLs—and individually alleges that each Ebay defendant "offers for sale and/or sells the Infringing Products." (SAC ¶¶ 5–8.) Thus, MGA sufficiently pleads individualized allegations against the four Ebay Defendants. However, MGA must identify these defendants quickly using the discovery vehicles it will have in its arsenal after the parties' Rule 26 conference. To the extent MGA fails to amend its pleadings to identify the proper defendants before the deadline imposed by the Court for adding parties and/or amending the pleadings, the Court will dismiss the four Ebay Defendants. Accordingly, the Court **DENIES** Dynacraft's motion to dismiss the Ebay Defendants, with the proviso that they will be **automatically dismissed** if MGA fails to amend its SAC with the proper defendants before the

deadline imposed in the Court's forthcoming scheduling and case management order.

MGA provides hardly any details regarding the remaining Doe Defendants and their alleged actions. (SAC ¶¶ 9–10.) MGA does not individualize allegations against each Doe Defendant, but rather improperly groups them together indistinguishably. (*Id.*) Accordingly, the Court **DISMISSES** the remaining Doe Defendants. To the extent MGA identifies additional defendants, it may move to amend its pleadings before the deadline that the Court will impose.

## V. CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** Dynacraft's Motion to Dismiss, **with leave to amend**. (ECF No. 35.) To the extent MGA wishes to amend its SAC, it must do so before **June 20, 2018,** and only to the extent permitted by this Order. Defendants' response is due according to the Federal Rules of Civil Procedure. Plaintiff must also lodge a redlined copy of any amended complaint for the Court and Defendant's review.

**\*9  IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2448123

---

Footnotes

1  After considering the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7–15.

---

**End of Document** 

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 22 of 43 PageID #:3504

Midway Mfg. Co. v. Publications Intern., Ltd., Not Reported in F.Supp. (1994)

1994 WL 188531

1994 WL 188531
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

MIDWAY MANUFACTURING
COMPANY, Plaintiff,

v.

PUBLICATIONS INTERNATIONAL,
LTD., and Louis N. Weber, Defendants.

No. 94 C 1005.
|
May 12, 1994.

MEMORANDUM OPINION

KOCORAS, District Judge:

**\*1** This matter is before the Court on the defendants' motion to strike and to dismiss. We determined in open court that the motion should be treated as one for summary judgment. For the reasons stated below, the motion is granted in part and denied in part.

BACKGROUND

This is a copyright and trademark infringement suit. The plaintiff, Midway Manufacturing Company ("Midway"), owns copyright and trademark registrations relating to the Mortal Kombat video game. Mortal Kombat was originally developed as an arcade game. Midway has granted licenses under its copyright for several companies to produce versions of the game to be compatible with home video game systems such as Sega Genesis and Nintendo and has granted trademark licenses to allow those companies to use "Mortal Kombat" on their versions of the games.

Defendant Publications International, Ltd. ("PIL") publishes a book entitled, "Action Strategies for Mortal Kombat," and subtitled, "An Unauthorized Players' Guide." The book describes how to play the various home versions and teaches the reader such topics as the "Basic Fighting Moves" of each character. In this suit, Midway asserts that PIL's use of photographs of over 200 video screen images infringes its

copyright on the audiovisual material of the game. Further, Midway asserts that PIL is infringing its trademark by using Mortal Kombat in the book title and text. Finally, Midway asserts a claim under the Lanham Act for false designation of origin based on PIL's use of the characters and character names from the game. This claim also alleges that PIL is using Midway's trade dress.

PIL brought a motion to strike or dismiss the Complaint. Based on the representation in open court that consideration of the issues raised by the motion would require consideration of extrinsic evidence, we announced that the motion would be treated as a motion for summary judgment.

DISCUSSION

Several of PIL's attacks on the complaint can be dealt with summarily because they have little relevance to the Complaint filed with this Court. PIL complains that its allegedly infringing book should have been but was not appended to the Complaint. The Complaint filed with the Court has the book appended as Exhibit D. Also, PIL asserts that "the Complaint contains absolutely nothing which would justify any action against [defendant Louis Weber] personally." Memo. at 1. Perhaps PIL overlooked paragraph 5, which alleges that Weber "personally authorized, directed, and/or actively participated in the acts of which Midway complains." Paragraph 5 is a sufficient allegation to keep Weber in the case.

PIL also complains that the Complaint is "inscrutable" and "so inartfully drafted" that it does not meet the notice pleading standard as articulated in Conley v. Gibson, 355 U.S. 41, 45–48 (1957). Reply at 13. When comparing those accusations to the Complaint filed with this Court, we were surprised that those accusations were made. Suffice it say that we do not agree with PIL's characterization of the draftsmanship. However, we do agree that Paragraph 7 refers to causes of action that are not pleaded in the specific counts. Midway acknowledges that misstatement and agrees to having the reference to deceptive trade practices and dilution deleted from paragraph 7. Accordingly, references to those causes of action will be stricken.

**\*2** PIL also complains that the Complaint was "a sloppy, disingenuous effort to bombard the Defendants with any and all claims." Reply at 12. This attack was directed to the paragraph in the prayer for relief that seeks a declaration

1994 WL 188531

that Midway's registered trademarks, "character marks," trade dress and trade symbols are valid and were infringed by defendants in violation of 15 U.S.C. § 1114 and the common law. PIL attacks this paragraph on the basis that section 1114 only applies to federally registered trademarks. That is true, but it is hardly grounds for striking or dismissing the Complaint, since the same paragraph clearly asks for relief under the common law as well. Thus, we will not spend further time on this argument.

We now turn to a consideration of the substantive law governing this dispute. As to the copyright infringement count, PIL asserts that its use of photographs of over 200 screen displays from the various home game versions of Mortal Kombat constitutes "fair use." Fair use is a defense to copyright infringement that is defined by statute, 17 U.S.C. § 107. That section provides that "the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching, scholarship, or research, is not an infringement of copyright."

The Supreme Court has recognized that fair use is an affirmative defense. *Campbell v. Acuff–Rose Music, Inc.,* No. 92–1292, slip op. at 21 (U.S. Mar. 7, 1994), *citing Harper & Row Publ., Inc. v. Nation Enterprises,* 471 U.S. 539, 561 (1985). Thus, the defendant bears the burden of proof. Here, PIL relies heavily on an oral ruling by Judge Grady of this Court on a preliminary injunction motion in a case 12 years ago brought by the holder of the Pac–Man video game copyright against PIL for its books about how to win at Pac–Man. We do not give it such great weight as does PIL. It was a preliminary injunction hearing, not a final determination on the merits. Moreover, the ruling does not contain analysis of precedent, largely because it was an oral ruling made under the time constraints of a preliminary injunction hearing. Finally, it is not clear from the ruling whether the copyright holder there had registered the visual matter of the screens as Midway has done here. For these reasons, we are not persuaded that we must reach the same result here as there.

We reject PIL's contention that its book is a compilation rather than a derivative work and that this distinction makes its book noninfringing. PIL states that to be a derivative work, the accused work must use a substantial portion of the copyrighted work and then asserts that it did not use a substantial portion of the copyrighted work. The issue is not as cut-and-dried as PIL believes. The determination of whether the borrowing was substantial has both qualitative and quantitative components. *Campbell, supra,* at 18. Thus,

the substantiality of PIL's use of Midway's copyrighted materials will require further consideration later in this case. It is one of several factual issues underlying the copyright infringement claim and the fair use defense. These factual issues preclude the entry of summary judgment.

**\*3** We find that on the record before us, PIL has not established that it is entitled to judgment as a matter of law on the fair use issue on which it bears the burden of proof. Accordingly, we deny summary judgment on Count I of the Complaint.

We turn now to Count II, alleging trademark infringement. Midway has registered "Midway" and "Mortal Kombat" as trademarks. Count II alleges that PIL's use of the words "Mortal Kombat" in the title of its book and throughout the text infringes Midway's trademark. PIL points out that the complaint does not make a specific allegation about PIL's use of the "Midway" mark and that the book uses the term "Midway" only once, in identifying Midway as the licensor of the home versions of the game. We agree with PIL that such a use is not trademark infringement. Thus, we will grant summary judgment to PIL on the portion of Count II alleging infringement of the mark "Midway."

As to the "Mortal Kombat" trademark, PIL urges that its use of a disclaimer on the front cover of the book obviates any potential for consumer confusion as to the source of the book. The likelihood of consumer confusion is the crucial issue in trademark infringement suits. It is a question of fact and can only rarely be resolved on a motion for summary judgment. *Albert Dickinson Co. v. Mellos Peanut Co.,* 179 F.2d 265, 270 (7th Cir.1950). The present motion was filed five weeks after the Complaint was filed and there has been little discovery. In this instance, it is inappropriate to grant summary judgment on the trademark infringement count concerning the use of the mark "Mortal Kombat." Accordingly, we deny summary judgment as to that portion of Count II.

Count III alleges that PIL is liable under section 43(a) of the Lanham Act (15 U.S.C. § 1125) for false designation of origin based on PIL's use of the characters and character names from the Mortal Kombat game and of Midway's trade dress. PIL's memorandum in support of its motion does not address this count. Accordingly, we shall not grant summary judgment on Count III.

Midway Mfg. Co. v. Publications Intern., Ltd., Not Reported in F.Supp. (1994)

1994 WL 188531

CONCLUSION

For the reasons stated above, we deny summary judgment on Counts I and III. We grant in part and deny in part summary judgment to the defendants on Count II. Specifically, we grant defendants' motion for summary judgment as to infringement of the mark "Midway" and deny the motion as to infringement of the mark "Mortal Kombat." Finally, by agreement of the parties, we strike the references to deceptive trade practices and dilution in paragraph 7 of the Complaint.

**All Citations**

Not Reported in F.Supp., 1994 WL 188531

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 635904

2020 WL 635904
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

MIGHTY DEER LICK, INC., Plaintiff,

v.

MORTON SALT, INC., Defendant.

No. 17-cv-05875
|
Signed 02/11/2020

**Attorneys and Law Firms**

Sharon S. Almonrode, Mahde Youssef Abdallah, Pro Hac Vice, The Miller Law Firm, P.C., Rochester, MI, Christopher E. Kentra, Morgan Marie Hess, Burke, Warren, MacKay & Serritella, P.C., Chicago, IL, Corey Thomas Hickman, Cozen O'Connor, Chicago, IL, for Plaintiff.

Jeanne Marie Gills, Richard Spencer Montei, Foley & Lardner LLP, Chicago, IL, Nicholas J. Ellis, Pro Hac Vice, Foley & Lardner LLP, Detroit, MI, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Andrea R. Wood, United States District Judge

*1 Plaintiff Mighty Deer Lick, Inc. ("MDL") develops and markets deer licks and other animal feed products. Defendant Morton Salt, Inc. ("Morton") manufactures and sells salt products. The two companies first contracted in 1989 for Morton to produce salt blocks for animal feed. The arrangement called for Morton to use MDL's formula and trademarks to produce salt bricks solely for sale to MDL; meanwhile, MDL retained the right to use its marks in the direct sale of its products to existing customers, and Morton agreed to police MDL's marks and cease using them upon termination of the agreement. In 2015, Morton served notice of its termination of the agreement to MDL. According to MDL, before the parties ended their business relationship, Morton had failed to hold up its end of the bargain, which required Morton to manufacture quality product, police MDL's mark, and attempt to increase sales. MDL further claims that following termination of the agreement, Morton has continued to sell product using MDL's formula and

marks and refuses to return property belonging to MDL. Accordingly, MDL has filed a 16-count complaint against Morton, alleging claims for breach of contract (Count I), tortious interference with a business relationship (Count II) and with contract (Count III), misappropriation of trade secrets (Counts IV and V), trademark infringement (Counts VI, XI, and XII), trademark dilution (Counts VII, VIII, and XIII), unfair competition (Counts IX and X), trade dress infringement (Count XIV), unjust enrichment (Count XV), and conversion (Count XVI). Now before the Court is Morton's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 22.) For the reasons explained below, the motion is granted in part and denied in part.

**BACKGROUND**

For the purposes of Morton's motion to dismiss, this Court accepts as true all well-pleaded facts in the Complaint and views those facts in the light most favorable to MDL. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

In 1989, the parties first entered into an agreement for Morton to produce salt licks and other products using MDL's formula and bearing MDL's marks. (Compl. ¶¶ 20, 42, 51, Dkt. No. 1.) The agreement allowed both companies to profit by reaching more customers, since MDL's marks were well-known within the animal feed community as signals of quality. (*Id.* ¶ 16.) Pursuant to their arrangement, MDL furnished Morton with the formula, marks, and mold dies necessary to manufacture MDL's flavored blocks. (*Id.* ¶¶ 42, 51.) The parties signed amendments to the agreement in 2001 and 2004 that described MDL's protected marks in detail and provided Morton with a license to sell products bearing MDL's marks in Canada. (*Id.* ¶¶ 22–25, 31.)

In 2009, Morton was acquired by K+S Atkiengesellschaft, a German corporation. (*Id.* ¶ 32.) Between 2009 and 2015, the relationship between MDL and Morton began to sour. Morton began manufacturing poorly-made products with MDL's marks, changed MDL's formula without its consent, and failed to try to expand sales or police infringement of MDL's marks. (*Id.* ¶¶ 39, 43, 46, 59.) On August 7, 2015, Morton notified MDL that it was terminating the parties' agreement, effective October 4, 2016. (*Id.* ¶ 33.) But Morton refused to stop selling products imprinted with MDL's marks or return mold dies used to manufacture MDL-branded

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 26 of 43 PageID #:3508

Mighty Deer Lick, Inc. v. Morton Salt, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 635904

products despite repeated demands by MDL to do so. (*Id.* ¶¶ 52, 55.)

**\*2** At the time this lawsuit was filed, Morton was still manufacturing and selling products with MDL's marks without MDL's authorization as part of a concerted effort to squeeze MDL out of the animal feed market. (*Id.* ¶¶ 63–69.) Moreover, Morton continues to sell products under MDL's marks without MDL's consent and has adopted a mark so similar to MDL's mark that Morton risks confusing customers and diluting MDL's brand. (*Id.* ¶¶ 55, 67–69.) Unable to convince Morton to cease use of MDL's marks or return MDL's property, MDL has filed the instant lawsuit.[1]

## DISCUSSION

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint need not include detailed factual allegations, the plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Even so, a plaintiff need provide "only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.' " *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (internal quotation marks omitted).

### I. Breach of Contract Claim (Count I)

The Court begins with MDL's breach of contract claim in Count I. Under Illinois law, to state a breach of contract claim, MDL must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger*, 592 F.3d at 764.

In the Complaint, MDL has alleged that (1) Morton contracted with MDL to manufacture products for MDL, (2) Morton violated the terms of the contract by, among other things, selling defective products and failing to police use of MDL's trademark, and (3) MDL lost sales and product placement in third-party retailers because of Morton's breach. (Compl. ¶¶ 41, 50, 81–84.) MDL has also attached as exhibits

to the Complaint the 1989 Agreement, the 2001 License Agreement, and the 2004 amendment. (Compl. Exs. A, B, C, Dkt. Nos. 1-1–1-3.) Since exhibits attached to a complaint are incorporated into the pleading for purposes of Rule 12(b) motions, the Court may consider these documents in ruling on Morton's motion. *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452–53 (7th Cir. 1998).

**\*3** Morton argues that MDL has failed to plead sufficient facts in support of its breach of contract claim. But MDL is not required to plead "all the specific details" underlying its claim. *Axiom Ins. Managers Agency, LLC v. Indemnity Ins. Corp.*, No. 11 C 2051, 2011 WL 3876947, at \*12 (N.D. Ill. Sept. 1, 2011). That MDL has not alleged specific contractual terms that were violated, for example, does not preclude the claim. Plausibility simply requires "enough facts to raise to a reasonable expectation that discovery will reveal" evidence supporting the plaintiff's claims. *Twombly*, 550 U.S. at 556. MDL has provided enough information to put Morton on notice of the nature of the claim and the grounds upon which it rests. MDL has therefore adequately stated a claim for breach of contract and Morton's motion to dismiss Count I is denied.

### II. Tortious Interference Claims

### A. Tortious Interference with a Business Relationship (Count II)

In Count II, MDL asserts a claim for tortious interference with a business relationship. Illinois courts refer to that tort as tortious interference with a prospective economic advantage, which is established when a plaintiff proves: "(1) [its] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991).

Morton argues that MDL's claim for tortious interference with a prospective economic advantage fails because it had not properly identified the third parties with which MDL had business relationships. But MDL is not required to identify the specific third parties at this stage in the litigation. *See Cook v. Winfrey*, 141 F.3d 322, 328 (7th Cir. 1998) (finding that the plaintiff had no obligation to allege the specific third party with whom he had a valid business expectancy). MDL's

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 27 of 43 PageID #:3509

Mighty Deer Lick, Inc. v. Morton Salt, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 635904

allegation that it had business relationships with third parties —taken in concert with the allegations regarding MDL's ability to make direct sales of products to existing customers —provides sufficient factual detail for the Court to infer that MDL reasonably expected to enter into or was already involved in business relationships with third parties.

MDL also satisfies the remaining elements of a claim for tortious interference with a prospective economic advantage. MDL has alleged both that Morton knew of MDL's expectation to engage in business relationships with third parties and that the contract between MDL and Morton explicitly gave MDL the right to sell to third parties. (Compl. ¶¶ 25, 88.) Additionally, MDL claims that Morton intentionally coerced third parties to "terminate, breach a contract, or withhold a valid business expectancy" from MDL as part of Morton's effort to "squeeze" MDL out of the market. (*Id.* ¶¶ 63, 89.) Finally, MDL alleges that Morton's interference caused injury and damages to MDL. (*Id.* ¶ 91.) In various parts of the Complaint, MDL refers to lost sales and product placement with third-party retailers as a result of Morton's failure to comply with the contract. (*See id.* ¶¶ 41, 50.) Given that MDL also alleges that Morton has attempted to take over MDL's contracts with other parties— and thus co-opt MDL's sales for itself—it is reasonable to infer that the harms suffered by MDL take a similar form. Taken altogether, MDL's allegations adequately support its claim of tortious interference with a prospective economic advantage. Therefore, Morton's motion to dismiss Count II is denied.

## B. Tortious Interference with Contract (Count III)

 **\*4**  To establish a claim for tortious interference with contract under Illinois law, as alleged in Count III, a plaintiff must show:

> (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach by the other, caused by the defendant's wrongful conduct, and (5) damages.

*Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 731 (7th Cir. 1999) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989)).

Morton argues that MDL fails to identify either the breached contract or the specific contracting party. But there is no requirement that MDL do so at this stage of the litigation. The case Morton cites in support of its assertion to the contrary does not actually reach that issue. *See Timmis v. Sulzer Intermedics, Inc.*, 157 F. Supp. 2d 775, 778 (E.D. Mich. 2001) (finding that the plaintiff's claim for tortious interference with contract failed because "[t]here [was] nothing in Plaintiff's complaint that supports a claim that Defendants somehow tortiously interfered with this contract" and the agreement was terminated due to the third party's choice rather than any tortious interference by Defendants). Here, MDL alleges that Morton took over MDL accounts and coerced third parties to breach their contracts with it. That is sufficient. Morton's argument therefore fails.

MDL alleges that it had valid contracts with third parties, Morton had knowledge of those contracts, and Morton intentionally (and without authorization) coerced the third parties with whom MDL contracted to terminate the contracts. (Compl. ¶¶ 94–97.) While these may be conclusory statements, MDL provides enough factual support elsewhere in its Complaint to support those conclusions. Specifically, MDL alleges that Morton used a conduit company to take over MDL's contract with another party and entirely took over an important MDL client account. (*Id.* ¶¶ 57, 60.) In short, MDL's allegations rise above "threadbare recitals" of the elements of tortious interference with contract and put Morton sufficiently on notice of MDL's claim. The details may be readily fleshed out during discovery. Morton's motion to dismiss Count III is therefore denied.

## III. Trade Secrets Claims (Counts IV and V)

MDL asserts trade secret misappropriation claims under both the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1831, *et seq.*, and the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065. MDL brings these claims in Counts IV and V, respectively.

The DTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b) (1). It defines a trade secret as including:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes,

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 28 of 43 PageID #:3510

Mighty Deer Lick, Inc. v. Morton Salt, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 635904

procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

**\*5** (A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). To state a claim for misappropriation under the statute, a plaintiff must show that the defendant used or disclosed the trade secret without the plaintiff's consent and (1) improperly acquired the secret or (2) knew or had reason to know at the time of disclosure that the trade secret was acquired through improper means. *See Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 920 (N.D. Ill. 2016) (citing 18 U.S.C. § 1839(5)).

The ITSA's requirements are broadly similar to those of the DTSA, absent the need for involvement in interstate or foreign commerce. A plaintiff claiming a violation of the ITSA must show that the information at issue was a trade secret, the defendant misappropriated it, and the defendant used the information in its business. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721–22 (7th Cir. 2003) (providing the statutory definition and construing a trade secret broadly as information sufficiently secret to derive economic value and subject to reasonable efforts to maintain its secrecy); *Arcor, Inc. v. Haas*, 842 N.E.2d 265, 269 (Ill. App. Ct. 2005).

In seeking dismissal of the federal and state trade secret claims, Morton first argues that MDL has failed to plead the existence of a trade secret. Specifically, Morton claims that MDL has not alleged it took reasonable measures to maintain the confidentiality of its trade secrets, identified its trade secrets with sufficient detail, or shown that its trade secrets had independent economic value.

It is true that MDL must allege concrete secrets—in its Complaint, MDL must provide enough detail for both the Court and Morton to be on notice as to what the trade secrets are. *See AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 920 (N.D. Ill. 2001) (citing *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992)). And MDL's laundry list of "trade secrets" alone

does not satisfy this requirement, as MDL claims as trade secrets methods of manufacturing, packaging, and compiling customer lists but provides no further detail. (*See* Compl. ¶ 111.) However, MDL **does** allege enough to claim its product formula as a trade secret, as MDL alleges that the formula specifically provides the means for manufacturing the very animal licks, bricks, blocks, and home meat curing kits at issue in this case. (*Id.* ¶¶ 24, 42.) As a result, MDL's trade secret claims with respect to the product formula survive a motion to dismiss. At the pleading stage, MDL need not provide extensively-detailed descriptions of the nature of its trade secrets; indeed, doing so would likely subvert the very purpose of seeking to protect a trade secret. *See Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014) (requiring detailed disclosure would expose purported trade secrets to the public).

**\*6** Morton also contends that MDL has failed to allege adequately that its trade secrets were used in any Morton product intended for use in interstate or foreign commerce, thereby failing to allege that required element under the DTSA. But MDL alleges enough for the Court to reasonably infer that MDL's goods were used in or intended for use in interstate commerce. The 2001 License Agreement provided for the sale of MDL products in Canada. (Pl.'s Resp., Dkt. No. 42 at 7–8.) The Court can therefore infer that MDL sold or intended to sell its products outside of the United States. Moreover, since the parties explicitly amended the contract to allow for goods crossing state and international borders, it is reasonable to infer that they did so. And given that MDL products are sold in a variety of chain stores not confined to the state of Michigan, it is plausible that MDL's products cross state lines. *See, e.g.*, *Wells Lamont Indus. Grp. LLC v. Richard Mendoza & Radians, Inc.*, No. 17 C 1136, 2017 WL 3235682, at \*3 (N.D. Ill. July 31, 2017) (inferring from parties' actions in preparing a contract that goods were intended for interstate commerce).

MDL has also satisfied the remaining requirements to plead a trade secrets claim based on its product formula. Specifically, MDL alleges that Morton misappropriated the product formula in using it to sell its own products and that Morton is now using the information to sell Morton-branded items. (Compl. ¶¶ 58, 65.) Taken together, MDL's allegations put Morton on notice of its trade secrets claims with respect to the product formula. Viewing the facts and all reasonable inferences in MDL's favor, MDL has plausibly alleged that Morton misappropriated the relevant trade secrets and states

Mighty Deer Lick, Inc. v. Morton Salt, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 635904

a claim under both the DTSA and ITSA. The Court therefore denies Morton's motion to dismiss Counts IV and V.

## IV. Trademark Infringement Claims (Counts VI, VIII, XI, XII, VIII, and X)

MDL alleges that Morton's unauthorized use of products bearing MDL marks constitutes trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125; the Illinois trademark statute, 765 ILCS 1036/60; and common law. MDL's three trademark infringement claims all arise from the same conduct, and Morton's arguments for dismissal are essentially the same for all three claims. Moreover, since MDL's unfair competition claim seeks to hold Morton liable for copying and using MDL's marks, it essentially duplicates MDL's trademark infringement claims. The Court accordingly analyzes all four claims simultaneously.

To state a trademark infringement claim, a plaintiff must allege that: (1) the mark at issue is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers. *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001). MDL has satisfied those elements by alleging that its marks are federally registered with the USPTO, which creates a rebuttable presumption that the marks are valid, *Georgia-Pacific Consumer Products LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011), and further that MDL is using a "copy or colorable imitation" of MDL's marks in a manner calculated to deceive consumers. (Compl. ¶¶ 122–23.)

Morton asserts two main grounds for dismissal of the trademark infringement claims: that MDL has failed to identify the infringing use of its marks and that MDL has not established the likelihood that customers will be confused by Morton's use.

The likelihood of confusion analysis is comprised of seven factors:

(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to "palm off" his product as that of another.

*Packman*, 267 F.3d at 643 (citing *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897–98 (7th Cir. 2001)). Since the likelihood of confusion test is a fact-intensive one, it "ordinarily does

not lend itself to a motion to dismiss." *Slep-Tone Entm't Corp. v. Coyne*, 41 F. Supp. 3d 707, 715 (N.D. Ill. 2014) (internal quotation marks omitted). This Court therefore limits its inquiry to whether MDL has pleaded enough facts plausibly to suggest that it could succeed on the likelihood of confusion portion of its claim.

\*7 MDL makes no attempt to allege facts regarding either the fourth factor, degree of care likely to be exercised by consumers, or the sixth one, actual confusion. Still, the complaint does allege factors regarding the first factor, similarity of the marks, albeit rather vaguely: MDL claims that Morton adopted a mark "confusingly similar" to MDL's and that Morton is using an imitation of MDL's marks. Had MDL alleged nothing else, these conclusory statements would be insufficient to satisfy the first factor. But MDL's complaint repeatedly mentions that Morton is selling products with MDL's exact mark. Drawing inferences in MDL's favor, it is plausible that Morton is using marks that are identical to the ones detailed by MDL in its Complaint, thus satisfying the first factor. A similar analysis governs the second factor: similarity of the products. MDL's complaint alleges that Morton originally contracted to make deer lick with MDL's mark, that Morton is now selling products with MDL's mark, and that Morton is trying to squeeze MDL out of the market. The Court can plausibly infer that MDL and Morton are both attempting to sell an identical product: deer lick. Since identical products are undoubtedly similar ones, MDL has alleged facts supporting the presence of the second factor.

The complaint also alleges facts regarding the third factor: area and manner of concurrent use. According to MDL, Morton has been selling to MDL's exclusive accounts, trying to enter the animal-feed supply business and "squeeze out" MDL, and selling under MDL's marks. (Compl. ¶¶ 60, 63, 65–67.) Again, drawing all reasonable inferences in MDL's favor, the Court can conclude that Morton is attempting to target precisely the same market as MDL. MDL thus has alleged facts to support the third factor.

MDL also pleads facts in support of factors five, strength of plaintiff's mark, and seven, whether a defendant is palming off its product as plaintiff's product. MDL alleges that its mark is widely recognized as being associated with MDL and high-quality goods. This is enough to allege that MDL's mark is distinctive, or easily capable of identifying the products sold as emanating from a certain source. *See CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 684–85 (7th Cir. 2001). Regarding the seventh factor, MDL alleges that Morton is using a copy

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 30 of 43 PageID #:3512

Mighty Deer Lick, Inc. v. Morton Salt, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 635904

of MDL's marks with the intent to deceive consumers. (*See* Compl. ¶¶ 66–69, 122–23.) The Court can reasonably infer that Morton is attempting to pass off its own products as those of MDL by trading off MDL's reputation. (*See id.* ¶¶ 16, 19, 65.)

While MDL makes a weak or nonexistent showing for at least two factors, what matters is whether MDL has shown enough to survive a motion to dismiss. Here, since MDL has managed to allege facts pertinent to five of the seven factors, it has pleaded enough to plausibly suggest that it could prevail on the likelihood of confusion test. *See, e.g., Slep-Tone*, 41 F. Supp. 3d at 717 (finding that a complaint that failed to allege three of the seven factors still pleaded enough to survive a motion to dismiss). Accordingly, Morton's motion to dismiss Count VI, Count XI, Count XII, Count VIII, and Count X is denied.

### V. Trademark Dilution Claims (Counts VII, VIII, and XIII)

In Counts VII and XIII, MDL claims that Morton is liable for trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c).[2] To state a claim for trademark dilution, MDL must allege that (1) its marks are famous; (2) Morton adopted its mark after MDL's marks became famous; (3) Morton's mark is likely to cause dilution of MDL's marks; and (4) Morton is using its mark in commerce for commercial purposes. *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000). The harm of trademark dilution "stems from a trademark losing its ability to trigger an association in consumers' minds between the trademark and a particular producer of goods or services." *See Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 785 (N.D. Ill. 2011). Courts recognize two main forms of dilution: tarnishing, in which the similarity of marks causes consumers mistakenly to associate the plaintiff's famous mark with the defendant's inferior one, and blurring, in which seeing the plaintiff's mark used on many goods means it no longer serves as a unique identifier of the plaintiff's products. *E.g., Eli Lilly*, 233 F.3d at 466.

**\*8** Morton contends that MDL has failed to describe any infringing activity by Morton. While MDL's claim does not specify which theory of dilution it pleads, the allegations in the Complaint are sufficient to state a claim for dilution by tarnishing. First, MDL alleges that its mark is widely recognized as associated with MDL and "high quality goods." (Compl. ¶ 16.) Second, MDL alleges that Morton was well aware of MDL's use of the mark before Morton

started selling products with an identical or similar mark. (*Id.* ¶ 131.) Third, MDL alleges that Morton's commercial use of MDL's marks "lessens the capacity" of such marks to identify and distinguish MDL's goods. (*Id.* ¶ 132.) Taken together with MDL's allegations that Morton's purpose is to deceive consumers, the Court can plausibly infer that the similarity of Morton's mark to MDL's marks is causing consumers to associate the two mistakenly. (*Id.* ¶ 133.) Finally, MDL alleges that Morton is selling products using MDL's trademarks—such a use is undoubtedly commercial in nature. (*Id.* ¶ 55.) MDL's allegations therefore give rise to a plausible trademark dilution claim.

While Morton again argues that MDL has failed to provide enough facts in support of its allegations, MDL is not required to detail the full extent of its advertising in support of its mark or specify the precise degree of its marks' distinctiveness. MDL's allegations and the reasonable inferences from those allegations are sufficient to plead a trademark dilution claim against Morton. The Court therefore denies Morton's motion to dismiss with respect to Counts VII, VIII, and XIII.

### VI. Trade Dress (Count XIV)

To state a claim for trade-dress infringement, MDL must plausibly allege that (1) its trade dress is nonfunctional, (2) its trade dress has acquired secondary meaning, and (3) there exists a likelihood of confusion between MDL's trade dress and Morton's trade dress. *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1015 (7th Cir. 2005).

Morton contends that MDL has failed to describe its trade dress sufficiently. MDL counters by pointing out that its complaint alleges that MDL "created a uniquely designed product" that included a means of carrying salt blocks and a "unique and distinctive appearance" familiar to Morton. (*See* Compl. ¶¶ 191–92.) Indeed, MDL correctly observes that the standard for federal notice pleading is not a lofty one. And courts examine the "overall appearance" of trade dress rather than focus on comparing minute details of competing products in evaluating claims. *See August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 620 (7th Cir. 1995). But MDL must provide enough detail to put Morton on notice as to what MDL believes constitutes its protectable trade dress. *See Weber-Stephen Prods. LLC v. Sears Holding Corp.*, No. 13-cv-01686, 2013 WL 5782433, at *3–4 (N.D. Ill. Oct. 25, 2013) (explaining that plaintiffs must identify and describe trade dress in *some* detail to survive a motion to dismiss). MDL's products may well be "uniquely designed," but without more factual detail, neither the Court nor Morton

2020 WL 635904

can identify the distinct features that would comprise a protectible trade dress. One manner of doing so could be to allege some details regarding the protectible trade dress and attaching images of the products exhibiting the trade dress—as did the plaintiffs in *Dynamic Fluid Control (PTY) Ltd. v. International Valve Manufacturing, LLC*, 790 F. Supp. 2d 732, 737 (N.D. Ill. 2011), and *Weber-Stephen Products*, 2013 WL 5782433, at *4—although this certainly is not the only way to do so. In any case, simply stating that a product is unique is not sufficient to state a claim for trade dress infringement. MDL's trade dress claim in Count XIV is therefore dismissed without prejudice.

### VII. Unjust Enrichment (Count XV)

In Count XV, MDL asserts an Illinois common law claim for unjust enrichment. Illinois courts recognize unjust enrichment as an independent cause of action. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (citing *Raintree Homes, Inc. v. Vill. of Long Grove*, 807 N.E.2d 439, 445 (Ill. 2004)). But a plaintiff may pursue an unjust enrichment claim in the presence of a written contract between the parties only if the claim sounds in tort, rather than in quasi-contract. *See Peddinghaus v. Peddinghaus*, 692 N.E.2d 1221, 1225 (Ill. App. Ct. 1998).

 **\*9**  Morton seeks to dismiss MDL's unjust enrichment claim, citing MDL's failure to plead a claim based on tortious conduct outside of the express contract between the two parties. In response, MDL points to its conversion claim and argues that unjust enrichment can be predicated on an underlying conversion claim. While MDL correctly states the law, the conversion claim is not what the Complaint purports to use as its basis for the unjust enrichment claim. Rather, the Complaint contends that Morton received an improper benefit from selling deer licks and using MDL's trademarks without approval. (*See* Compl. ¶¶ 200–01.) This contention goes to the heart of MDL's breach of contract claim, which accuses Morton of, among other things, "[u]sing MDL's marks in an unauthorized manner." (*Id.* ¶ 83.) MDL cannot now raise in its response to Morton's motion to dismiss the new notion that the conversion claim is, in fact, the basis for the unjust enrichment claim. MDL's unjust enrichment claim in Count XV is therefore dismissed without prejudice.

### VIII. Conversion Claims (Count XVI)

In Count XVI, MDL asserts a claim for conversion. To state a claim for conversion under Illinois law, a plaintiff must allege that (1) the defendant wrongfully and without authorization assumed control of the plaintiff's property, (2) the plaintiff has a right to the property, (3) the plaintiff has the right to immediate possession of the property, and (4) there has been a demand for possession of the property. *Gen. Motors Corp. v. Douglass*, 565 N.E. 2d 93, 96–97 (Ill. App. Ct. 1990). Conversion centers around the wrongful deprivation of the owner's right to property; a plaintiff claiming conversion need only show that the defendant is exercising control over the disputed property "in a manner inconsistent with plaintiff's right of possession." *Jensen v. Chi. & W. Ind. R.R. Co.*, 419 N.E.2d 578, 593 (Ill. App. Ct. 1981).

MDL contends that Morton has refused to return mold dies that MDL provided to Morton for producing salt blocks.[3] Morton counters that MDL has failed to plead facts in support of MDL's ownership of the mold dies or Morton's refusal to return them. But MDL specifically alleges that (1) Morton refuses to return MDL's mold dies and continues to use them, (2) MDL is the rightful owner of the property, and (3) Morton has rebuffed repeated demands by MDL for the return of the dies. (Compl. ¶¶ 52–54, 205, 207.) As alleged, MDL is unable to use its mold dies because of Morton's wrongful possession. This is the "essence" of a conversion claim. *See Jensen*, 419 N.E. 2d at 593 ("The essence of conversion is not acquisition by the wrongdoer but a wrongful deprivation of the owner thereof.").

While MDL has not explicitly stated that it has a right to immediate possession of the property, the factual allegations in the Complaint allow the Court to draw the reasonable inference that MDL has such a right. MDL allegedly furnished Morton with mold dies when the parties entered into their contract, presumably so that Morton could manufacture products for MDL as agreed. Morton would have no need for the mold dies outside of the contractual relationship. Since MDL alleges that it demanded the items back upon Morton's termination of the contract and that Morton has "improperly and without permission" retained and used the mold dies, it is reasonable to infer from MDL's statements and actions that MDL intended for Morton only to possess the mold dies for the duration of the contract and therefore has the right to their immediate possession. (*Id.* ¶¶ 53–54.) Taken together, the allegations are sufficient to put Morton on notice of MDL's conversion claim. Morton's motion to dismiss MDL's conversion claim in Count XVI is thus denied.

### IX. Statute of Limitations

**Mighty Deer Lick, Inc. v. Morton Salt, Inc., Not Reported in Fed. Supp. (2020)**

2020 WL 635904

**\*10** Finally, Morton challenges MDL's claims as untimely. Because the statute of limitations is an affirmative defense, courts generally do not dismiss claims at the pleadings stage for failure to be brought within the statute of limitations. *See Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613 (7th Cir. 2014). For dismissal to be warranted, the complaint's allegations must plainly reveal that an action is untimely under the governing statute of limitations. *Id.* at 613–14. Courts should deny motions to dismiss when there is "any set of facts that if proven would establish a defense to the statute of limitations." *Clark v. City of Braidwood*, 318 F.3d 764, 768 (7th Cir. 2003).

Here, it is not obvious that MDL's allegations solely pertain to actions taken outside the relevant statutes of limitation for any of the counts in question.[4] MDL alleges that Morton notified MDL on August 7, 2015, that Morton would be terminating the parties' agreement. (Compl. ¶ 33.) MDL filed its Complaint on August 11, 2017. Given that MDL found the contract termination a "surprise," there is no basis from which the Court may conclude that MDL had notice of its trademark infringement, trademark dilution, or conversion claims prior to that point in time. MDL therefore filed its Complaint within the three-year statute of limitations for these sets of claims.

It is less clear when MDL would have been on notice for its breach of contract, tortious interference, or trade secrets claims. It is possible to read MDL's allegations as suggesting the relevant conduct, and MDL's awareness of it, took place many years before Morton ended the contract and therefore well outside the relevant statutes of limitations. But it also plausible that MDL's allegations are timely. One can reasonably infer that Morton did not attempt to interfere with MDL's third-party relationships until after the contract terminated: squeezing MDL out of the market would probably not have made sense when Morton was still manufacturing products for MDL. It is also plausible that Morton did not misappropriate MDL's formula for its own purposes until after the contract had ended: before then, Morton was using the formula at MDL's direction. Finally, it possible that MDL was not on notice that Morton was breaching the contract until after 2007. MDL was surprised that Morton was ending a mutually profitable business relationship; presumably MDL would have been less surprised if it had been aware that Morton was failing to uphold its end of the bargain. It may very well be that discovery reveals many of MDL's claims to be untimely. But because MDL's claims are not clearly untimely and the Court can plausibly infer that they might fall within the relevant statutes of limitations, the Court will not find MDL's complaints to be time-barred at this time. Morton's motion to dismiss on the basis of statute of limitations grounds is therefore denied.

**CONCLUSION**

**\*11** For the foregoing reasons, Morton's motion to dismiss the Complaint (Dkt. No. 22) is granted in part and denied in part. Specifically, the motion is granted with respect to Counts XIV and XV only. Those claims are dismissed without prejudice. The motion is denied with respect to Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, and XVI.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 635904

**Footnotes**

1   This Court has subject-matter jurisdiction due to the claims arising under federal law, *see* 28 U.S.C. § 1331, and exercises supplemental jurisdiction over the state-law claims, *see* 28 U.S.C. § 1367(a). The parties have not briefed the choice-of-law issue. Morton analyzes the common-law claims under both Michigan and Illinois law, while MDL relies on Illinois law in its response. The Court finds that at the pleading stage, the minor differences between Michigan and Illinois law are irrelevant. *Compare Reger*, 592 F.3d at 764 (party asserting breach of contract must allege a contract, breach by defendant, damages, and substantial performance by the plaintiff), *with Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014) (party asserting breach of contract must show there was a contract that the other party breached resulting in damages). But as the case progresses, the parties should be prepared to take a position as to whether Illinois or Michigan law governs the state-law claims.

2   The original complaint asserts two counts ("Count VII – Trademark Dilution – 15 U.S.C. §§ 1125(c) and 1127" and "Count XIII – Dilution of Trademark") of trademark dilution but provides no alternative source of law or cause of action justifying the splitting of one claim. The Court therefore construes these two parts as a single claim for trademark dilution under 15 U.S.C. §§ 1125(c).

2020 WL 635904

**3**    While MDL also refers in Count XVI to improperly withheld royalties and payments, a conversion claim is not a remedy to seek payment of a debt. *Cohen v. Am. Sec. Ins. Co.,* 735 F.3d 601, 614–15 (7th Cir. 2013). MDL makes no allegation to suggest they seek anything other than to satisfy an obligation to pay money. This Court therefore construes Count XVI as a claim for conversion solely with respect to the mold dies.

**4**    The relevant statutes of limitations are:

Count I (Breach of Contract): 10 years, 735 ILCS 5/13–206;

Counts II/III (Tortious Interference): 5 years, *see Poulos v. Lutheran Social Services of Illinois, Inc.,* 728 N.E.2d 547, 559 (Ill. App. Ct. 2000);

Count IV (DTSA): 3 years, 18 U.S.C. § 1836(d);

Count V (ITSA): 5 years, 765 ILCS 1065/7;

Counts VI, VII, VIII, IX, X, XI, XII, XIII, and XIV (Trademark Infringement, Trademark Dilution, and Unfair Competition): 3 years, *see S&A Futures, LLC–Series 2 v. Sysco Chicago, Inc.,* No. 11 C 7629, 2012 WL 851556, at *3 (N.D. Ill. Mar. 13, 2012) (citing *Chattanoga Mfg., Inc. v. Nike, Inc.,* 301 F.3d 789, 793 (7th Cir. 2002));

Count XV (Unjust Enrichment): 5 years, 735 ILCS 5/13–205; and

Count XVI (Conversion): 3 years, *see Kidney Cancer Ass'n v. North Shore Community Bank and Trust Co.,* 869 N.E.2d 186, 189 (Ill. App. Ct. 2007).

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Stubbs Collections, Inc. v. Davis, Not Reported in F.Supp.2d (2000)

2000 WL 381947

2000 WL 381947
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

STUBBS COLLECTIONS, INC., Plaintiff,

v.

Sidney Stubbs DAVIS and Stubbs
Davis Company, Defendants.

No. CIV. A. 3–99CV2440–P.
|
April 14, 2000.

MEMORANDUM OPINION AND ORDER

SOLIS, District J.

**\*1** Now before the Court for consideration are Defendants'
Motion to Dismiss under Rules 8(a), 9(f), 9(g), 12(b)(6),
and Brief in Support, filed December 13, 1999; Plaintiff's
Response to Defendants' Motion to Dismiss and Brief in
Support, filed January 3, 2000; Defendants' Amended Motion
to Dismiss under Rules 8(a), 9(f), 9(g), 12(b)(6), and Brief
in Support, filed February 9, 2000; Plaintiff's Response to
Defendants' Amended Motion to Dismiss and Motion for
Summary Judgment and Brief in Support, filed February
29, 2000; Defendants' Reply in Support of Their Amended
Motion to Dismiss and Motion for Summary Judgment and
Authorities & Argument in Support, filed March 17, 2000;
and Plaintiff's Motion to Strike or in the Alternative Rule
56(f) Motion to Defer Adjudication, filed April 7, 2000.
After reviewing the arguments along with the applicable law,
the Court hereby DENIES Defendants' Motion for Summary
Judgment, DENIES Defendants' Motion to Dismiss, and
GRANTS Plaintiff's Motion to Strike Defendants' Reply.

FACTUAL BACKGROUND

Sometime before 1995, Defendant Sidney Stubbs Davis
("Davis") founded Collections by Stubbs, Inc., a company
involved in the business of designing, manufacturing,
distributing, and selling clothing and related goods.[1] In April
1995 Collections by Stubbs, Inc. changed its name to Stubbs
Collections, Inc. ("SCI"), the plaintiff in this cause of action.

Davis was the president of SCI and served on its board of
directors until his resignation in October of 1997, and he is a
minority shareholder of the company. *See* Pl's First Amended
Compl. at ¶¶ 8–9.

SCI claims that since early 1992 it has continuously used
the Stubbs name in advertising its goods and the Stubbs
trademark on its goods. *See* Pl's First Amended Compl at ¶ 10.
On February 22, 1995, an application for registration of the
Stubbs trademark at issue in this cause of action was filed in
the United States Patent and Trademark Office by Collections
by Stubbs, Inc. *See* Exh. A, Pl's First Amended Compl. On
April 20, 1995, Collections by Stubbs, Inc. changed its name
to SCI. *See* Exh. I, Pl's Response to Def's Amended Mot.

SCI alleges that soon after Davis resigned from SCI in
October 1997, he and co-defendant Stubbs Davis Company
began using the Stubbs name and mark to sell and advertise
clothing and related goods in a manner which is confusingly
similar to SCI's use of the Stubbs name and mark *See* Pl's First
Amended Compl. at ¶¶ 17–19.

Plaintiff filed this lawsuit for trademark infringement, false
representation, false designation of origin, and dilution under
the Lanham Act; dilution under Texas statutory law; and
common law trademark and trade name infringement, unfair
competition, and misappropriation. In response to Plaintiff's
claims, Defendants move for summary judgment on the
grounds that Plaintiff does not have standing to bring this
lawsuit. Alternatively, Defendants move to dismiss under
Rule 12(b)(6) of the Federal Rules of Civil Procedure. The
Court will address each of Defendants' arguments in turn.

DISCUSSION

I. Defendants' Motion for Summary Judgment

**\*2** Defendants attached evidence to their Amended Motion
to Dismiss and Plaintiff included an affidavit and exhibits
in its Response to Defendants' Amended Motion to Dismiss.
This evidence constitutes material outside the pleadings
submitted for the Court's consideration. When matters outside
the pleadings are presented to and not excluded by the Court,
the Court must convert a motion to dismiss into a motion for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Burns v. Harris
County Bail Bond Bd.,* 139 F.3d 513, 517 (5th Cir.1998).
Therefore, the Court evaluates Defendants' pleading as a
motion for summary judgment under the standards of Rule 56
of the Federal Rules of Civil Procedure.

A. Summary Judgment Standard

In general, summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Carrett,* 477 U.S. 317, 323–25 (1986). The moving party must identify the evidence on file in the case which establishes the absence of any genuine issue of material fact. *See Celotex,* 477 U.S. at 323. Once the moving party has made an initial showing, the party opposing the motion must offer evidence sufficient to demonstrate the existence of the required elements of the party's case. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

B. Plaintiff's Standing to Sue: Federal Trademark Infringement Claim

Defendants move for summary judgment on the grounds that Plaintiff lacks proper standing to bring this cause of action before the Court. Specifically, Defendants claim that Davis, not Plaintiff, is the owner of the Stubbs mark in dispute and that Plaintiff has failed to document a "trail of ownership" from Defendant Davis to Plaintiff SCI.

Count I of Plaintiff's First Amended Complaint alleges that Defendants infringed upon SCI's trademark in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. The statute's language makes trademark registration, not ownership, the crucial factor in identifying a person with standing to sue under this section. *See* 15 U.S.C.A. § 1114(1) (West 1999) (stating that any person infringing upon a trademark "shall be liable in a civil action *by the registrant* for the remedies hereinafter provided" (emphasis added)); *see also Finance Inv Co. v. Geberit AG,* 165 F.3d 526, 531 (7th Cir.1998) ("only the trademark's registrant (or her assignee) may sue under [§ 1114(1) ]").

While Defendants repeatedly point to the fact that the Patent and Trademark Office originally registered the mark on December 26, 1995, to Collections by Stubbs, Inc., it is clear that SCI presently is the registrant of the mark. First, Collections by Stubbs, Inc. changed its name to SCI a mere two months after the application for registration of the mark was filed. A change of corporate name "is not a change of the identity of a corporation and has no effect on the corporation's property, rights, or liabilities." *Alley v.*

*Miramon,* 614 F.2d 1372, 1384 (5th Cir.1980). Therefore, SCI is the rightful holder of the Stubbs mark registration because the corporation's name change did not divest the company of its status as the mark's registrant.

**\*3** Further proof that the Stubbs mark is registered to SCI comes in the form of the Patent and Trademark Office's Notice of Recordation of Assignment Document, recorded April 3, 1996. This document gives notice that the trademarks registered to Collections by Stubbs, Inc. are now registered to Stubbs Collections, Inc. The Certificate of Amendment issued by the Texas Secretary of State shows that the transaction underlying the recordation (the corporate name change) is valid. *See* Exh. 1, Pl's Response. Because the Court finds that the Stubbs mark is undisputedly registered to SCI, Plaintiff SCI as the registrant has proper standing to bring a claim of federal trademark infringement in Count I of its complaint. Therefore, summary judgement on these grounds is inappropriate.

C. Plaintiff's Standing to Sue: Other Federal and State Claims

Defendants assert that Plaintiff lacks standing to sue with regard to Count II (federal false representation and false designation of origin), Count V (Texas common law unfair competition), Counts III and VI (federal and Texas dilution, respectively), and Count VII (common law misappropriation) of Plaintiff's First Amended Complaint because Davis, not Plaintiff, is the owner of the Stubbs mark in dispute and because Plaintiff has not documented a "trail of ownership" from Davis to Plaintiff SCI. Defendants assert that Plaintiff's claimed ownership of the trademark's registration is inadequate to establish Plaintiff's ownership of the trademark. Def's Amended Mot. at 5.

The "point" used in Defendants' motion to support this argument states, "[T]he Plaintiff is Stubbs Collections, Inc., and the trademark upon which Plaintiff relies is registered in Collections by Stubbs, Inc." *Id.* at 4. Plaintiff responded by presenting evidence to show a link between SCI and Collections by Stubbs, Inc. in the mark's registration. *See* Exh. I, Pl's Response to Def's Amended Mot. Defendants countered in their reply by asserting for the first time that Davis has priority of use of the Stubbs name and marks, that Davis permitted SCI to use the Stubbs name and marks, and that "Plaintiff has failed to show a 'trail of ownership' from Defendant Sidney Stubbs Davis, the original owner of the Stubbs Name and Marks, to itself." Def's Repl. at 4.

Based upon the foregoing sequence of arguments, the Court finds that Defendants' motion for summary judgment is premature. With regard to this issue of priority, which the Defendant did not raise until its Reply brief, Plaintiff has had no opportunity either to present evidence to the Court or to brief the Court on Plaintiff's legal arguments. Accordingly, the Court GRANTS Plaintiff's Motion to Strike Defendants' Reply. Furthermore, Plaintiff has had no opportunity to conduct any meaningful discovery that might lead to admissible evidence on this issue. Plaintiff made a sufficient showing of its registration and ownership of the Stubbs mark to render summary judgment on these grounds at this early stage of the case improper and unwarranted. Therefore, Defendants' Motion for Summary Judgment is DENIED.

## II. Defendant's Rule 12(b)(6) Motion to Dismiss

### A. Standard for Dismissal under Rule 12(b)(6)

**\*4** The law regards a dismissal for failure to state a claim under Rule 12(b)(6) with disfavor, and a dismissal is justified only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *See In re United States Abatement Corp.,* 39 F.3d 556, 559 (5th Cir.1994). In evaluating the propriety of a dismissal, the Court accepts the plaintiff's well-pleaded facts as true. *See Norman v. Apache Corp.,* 19 F.3d 1017, 1021 (5th Cir.1994).

### B. Specificity Requirements of Rule 9

Defendants contend that Plaintiff's allegations of confusion resulting from Defendants' use of the Stubbs name and mark amount to claims of fraud or mistake subject to the heightened pleading requirements of Rule 9(b). *See* Fed. R. Civ P 9(b) ("the circumstances constituting fraud or mistake shall be stated with particularity"). A false statement or misrepresentation forms the basis of a fraud claim, but scienter—the intent to deceive—is also among the required elements of a claim of fraud. *See, e.g., Meineke Discount Muffler v. Jaynes,* 999 F.2d 120, 126 (5th Cir.1993) ("To succeed on a claim of fraudulent [trademark] registration, the challenging party must prove by clear and convincing evidence that the applicant made false statements with the intent to deceive the licensing authorities"); *Cyrak v. Lemon,* 919 F 2d 320, 325 (5th Cir.1990) (elements of a fraud claim include: 1) a misstatement or omission; 2) of material fact, 3) made with the intent to defraud; 4) on which the plaintiff relied; and 5) which proximately caused the plaintiff's injury). Pleading fraud with particularity in the Fifth Circuit requires

"time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby" *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir.1994). If Plaintiff's causes of action satisfy the elements of a claim of fraud, Rule 9(b) will require Plaintiff to plead its claims with specificity.

### 1. Plaintiff's Lanham Act Claims

Count I of Plaintiff's First Amended Complaint alleges that Defendants infringed SCI's trademark in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. This section provides a cause of action for infringement of a registered mark where a person uses (1) any reproduction, counterfeit, copy or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution or advertising of any goods; (5) where such use is likely to cause confusion or to cause mistake or to deceive. *See Boston Pro Hockey Ass'n v. Dallas Cap and Emblem Mfg., Inc.,* 510 F.2d 1004 (5th Cir.1975).

A claim of fraud requires not only the making of a false statement but also the intent to defraud the victim. *See Meineke,* 999 F.2d at 126. However, likelihood of confusion —the test for infringement under 15 U.S.C. § 1114— does not consider the actor's intent in determining whether infringement has occurred.[2] The fact that a party did not intend to defraud is not a defense to a trademark infringement violation because intent is not an element of the claim. *See Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha,* 754 F.2d 591, 596–97 (5th Cir.1985). Therefore, a claim of infringement under 15 U.S.C. § 1114 does not constitute a claim subject to the heightened pleading requirements of Rule 9(b)

**\*5** Similarly, the Lanham Act does not require a showing of fraudulent intent to establish a violation of 15 U.S.C. § 1125(a). This statute proscribes not only use of a false designation of origin but also use of any false or misleading description or representation of fact tending to misrepresent goods, services, or commercial activities in commerce. *See* 15 U.S.C.A. § 1125(a) (West 1999). A violation exists where the trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a representation that its goods come from the same source. *See Boston Pro Hockey Ass'n,* 510 F.2d at 1010. Again, the statute does not require intent to deceive as a necessary element of a Section 1125(a) violation. Therefore,

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Stubbs Collections, Inc. v. Davis, Not Reported in F.Supp.2d (2000)

2000 WL 381947

Plaintiff's federal Lanham Act claims do not allege claims of fraud and are not subject to Rule 9(b)'s particularity in pleading requirements.

Some courts have held, however, that the "fraud-like" nature of Section 1125(a) false advertising claims should require a plaintiff to specify the nature and content of any alleged misrepresentations attributed to the defendant. *See, e.g., In re Century 21–RE/MAX Real Estate Adver, Claims Litig.,* 882 F.Supp. 915, 927 (C.D Cal.1994); *Barr Labs., Inc. v. Quantum Pharmics, Inc.,* 827 F.Supp. 111, 117–18 (E.D.N.Y.1993); *Max Daetwyler Corp. v. Input Graphics, Inc.,* 608 F.Supp. 1549, 1556 (E.D.Penn.1985). Other courts have held Section 1125(a) claims to the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief". *See* Fed.R.Civ.P. 8(a); *Syncor Int'l Corp. v. Newbaker,* 12 F.Supp.2d 781, 783–84 (W.D.Tenn.1998); *John P. Villano Inc. v. CBS, Inc.,* 176 F.R.D. 130, 131 (S.D.N.Y.1997); *Brandt Consol, Inc. v. Agrimar Corp.,* 801 F.Supp. 164, 170 (C.D.Ill.1992).

The Supreme Court has said that plaintiffs may take Rule 8(a) at face value:

> Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). Furthermore, Rule 9(b) requires particularity in pleading *only* for those actions specifically enumerated by the rule—fraud or mistake. *See id.*

Because Plaintiff's Lanham Act claims are not claims of fraud or mistake, they do not fall within the category of actions required by 9(b) to be stated with particularity. Plaintiff's federal claims are subject only to the notice requirements of Rule 8(a)(2), which means what it says—a "short and plain statement" is all that Plaintiff must provide.

2. Plaintiff's Common Law Claims

**\*6** Plaintiff's First Amended Complaint also states claims of common law trademark and trade name infringement, unfair competition, and misappropriation. Common-law trademark ownership is established by use, not by registration. *See Union Nat'l Bank of Texas Larado, Texas v. Union Nat'l Bank*

*of Texas, Austin, Texas,* 909 F.2d 839, 842 (5th Cir.1990). Otherwise, "a common law trademark infringement action under Texas law presents no difference in issues than those under federal trademark infringement actions." *Zapata Corp. v. Zapata Trading Int'l, Inc.,* 841 S.W.2d 45, 47 (Tex.App.—Houston [14th Dist.] 1992, no writ) (citing *Waples–Platter Co. v. General Foods Corp.,* 439 F. Supp 551, 583 (N.D.Tex.1977)). Thus, the touchstone for any action of trademark infringement is likelihood of confusion. *See Marathon Mfg. Co. v. Enerlite Prod. Co.,* 767 F.2d 214, 217 (5th Cir.1985). Because the likelihood of confusion standard's lack of scienter does not fulfill the requirements of a fraud claim, Plaintiff's common law trademark and trade name infringement claims are not subject to Rule 9(b)

Plaintiff's common law unfair competition and misappropriation claims also do not fall within the scope of Rule 9(b). Courts in this circuit apply the "notice pleading" requirements of Rule 8(a) to unfair competition claims. *See Seatrax, Inc v. Sonbeck Int'l, Inc.,* 200 F.3d 358, 367 (5th Cir.2000). Because misappropriation causes of action "fall under the penumbra of unfair competition under Texas law," *id.* at 368, Rule 8(a) is also appropriately applied to Plaintiff's misappropriation claim. In short, plaintiff's common law claims as well as federal Lanham Act claims fall outside the scope of Rule 9(b).

Alternatively, Defendants baldly assert without elaboration that Plaintiff has not stated a claim complying with the notice requirements of Rule 8(a). Defendants are clearly wrong. All claims asserted by Plaintiff are claims for which the law provides remedies. Furthermore, Plaintiff has provided for each claim a "short and plain" statement of Defendants' alleged acts to support its claim for relief. Therefore, dismissal for noncompliance with Rules 9(b) and 8(a) is clearly unwarranted.

C. Davis's Right to Use His Own Name

Defendants next claimed grounds for dismissal under Rule 12(b)(6) are that Plaintiff has failed to state a claim upon which relief may be granted with regard to the Stubbs name because Sidney Stubbs Davis has an absolute right to use his name. *See* Def's Amended Mot. at 4. Without citation to any authority, Defendants claim that Davis may use the Stubbs name regardless of any rights that Plaintiffs may have simply because "Stubbs" is a part of his name.

"A man has no absolute right to use his own name, even honestly, as the name of his merchandise or his business."

Stubbs Collections, Inc. v. Davis, Not Reported in F.Supp.2d (2000)

2000 WL 381947

*John R Thompson Co. v. Holloway,* 366 F.2d 108, 113 (5th Cir.1966). A name used in connection with merchandise or business becomes a trademark subject to trade regulation designed to prevent confusion of the public. *See id.; see also E & J Gallo Winery v Gallo Cattle Co.,* 967 F.2d 1280, 1288–89 (9th Cir.1992) (a court may enjoin an individual from using his or her own name in the interest of avoiding public confusion). Plaintiff correctly recognizes that the issue is not whether Davis has a right to use his name, but whether his use of that name creates a likelihood of confusion with SCI's use.

**\*7** Plaintiff has pled all the required elements to establish a likelihood of confusion between Defendants' and Plaintiff's use of the name "Stubbs." *See Armco Inc. v. Armco Burglar Alarm, Inc.,* 693 F.2d 1155, 1159 (5th Cir.1982) (listing factors relevant to a determination of likelihood of confusion). Therefore, Plaintiff has stated a cognizable claim for which relief may be granted, and dismissal on these grounds would be inappropriate.

D. Time and Place, Rule 9(f)

Defendants assert that they are entitled to specific allegations under Rule 9(f). Presumably, this assertion means that Defendants believe Plaintiff's complaint should state specifically the time and place of the alleged infringement. Rule 9(f) merely makes averments of time and place material for the purpose of testing the sufficiency of the complaint. *See* Fed.R.Civ.P. 9(f). Nowhere in the text of Rule 9(f) does the rule require specificity in pleading time and place. Therefore, Plaintiff should not be compelled to plead specific allegations of time and place under Rule 9(f), and Defendants have no grounds to demand such allegations.

E. Special Damages, Rule 9(g)

Defendants also assert that they are entitled to specific allegations of special damages under Rule 9(g). Rule 9(g) states, "[w]hen items of special damage are claimed, they shall be specifically stated." Fed.R.Civ.P. 9(g). The purpose of the rule, in part, is to avoid unfair surprise on the part of defendants by informing them as to the nature of the damages claimed. *See Great Am. Indem. Co. v. Brown,* 307 F.2d 306, 308 (5th Cir.1962).

Plaintiff's First Amended Complaint requests actual damages, punitive damages, interest, court costs, and "such other relief to which Plaintiff may be justly entitled." Pl's First Amended Compl. at 11. Although attorney's fees are items of special damage which must be specifically pleaded under Rule 9(g), *see United Indus., Inc. v. Simon–Hartley, Ltd.,* 91 F.3d 762, 764–65 (5th Cir.1996), Plaintiff does not do so in its First Amended Complaint. However, this failure to plead attorney's fees does not warrant dismissal under Rule 12(b)(6). Rather, it merely serves to waive a claim by the Plaintiff for attorney's fees unless Plaintiff takes further action to inform Defendants of its desire to seek such special damages in a timely manner.

CONCLUSION

For the reasons stated herein, the Court hereby DENIES Defendants Sidney Stubbs Davis and Stubbs Davis Company's Motion for Summary Judgment and Motion to Dismiss.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 381947

---

Footnotes

1  The record does not indicate Collections by Stubbs, Inc.'s founding date.

2  The language of 15 U.S.C. § 1114 clearly states that a violation of the statute occurs if a person's actions are likely to cause the public to be confused, mistaken, or deceived, regardless of whether the actions were intended or meant to produce such a result. "Any person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with *which such use is likely to cause confusion, or to cause mistake, or to deceive* .. shall be liable in a civil action by the registrant for the remedies hereinafter provided." 15 U.S.C.A. § 1114(1) (West 1997) (emphasis added).

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Weber–Stephen Products LLC v. Sears Holding Corporation, Not Reported in Fed....

2013 WL 5782433

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Forest River, Inc. v. Winnebago Industries, Inc., N.D.Ind., February 14, 2017

2013 WL 5782433
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

WEBER–STEPHEN
PRODUCTS LLC, Plaintiff,

v.

SEARS HOLDING
CORPORATION, Defendant.

No. 13–cv–01686
|
October 25, 2013

**Attorneys and Law Firms**

Raymond Pardo Niro, Jr., Brian Erik Haan, Raymond P. Niro, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL, for Plaintiff.

James J. Lukas, Jr., John F. Gibbons, Greenberg Traurig, LLP., Paul R. Garcia, Catherine E. James, Stephen Arthur Wood, Kelley, Drye & Warren, Chicago, IL, David Rene Yohannan, Kelley Drye & Warren LLP, Washington, DC, for Defendant.

**Memorandum Opinion and Order**

Edmond E. Chang, United States District Judge

*1 Plaintiff Weber–Stephen Products LLC brought this suit against Defendant Sears Holding Corporation, alleging patent infringement in violation of 35 U.S.C. § 271 and trade dress infringement in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[1] R. 1, Compl. Sears has moved to dismiss the trade dress infringement claim pursuant to Rule of Civil Procedure 12(b)(6).[2] R. 20. For the reasons below, the motion is denied.

**I. Background**

In evaluating this motion to dismiss, the Court accepts as true the complaint's factual allegations and draws reasonable inferences in Plaintiffs' favor. Ashcroft v. al-Kidd, —— U.S. ——, 131 S.Ct. 2074, 2079 (2011). Weber is a leading worldwide designer and manufacturer of outdoor gas, charcoal, and electric grills and grilling accessories, including the Weber Genesis line of grills. Compl. ¶ 3. As such, Weber owns a variety of design and utility patents, id., three of which are at issue in this case. First, Weber owns United States Patent No. 8,347,874 B2 (entitled "Grease Drip Pan and Gas Tank Blocker for a Barbecue Grill"), which issued on January 8, 2013. Id. ¶ 4. Second, Weber owns United States Design Patent No. D564,834 S (entitled "Shroud for a Barbecue Grill"), which issued on March 25, 2008. Id. ¶ 5. Finally, Weber owns United States Design Patent No. D609,045 S (entitled "Grill"), which issued on February 2, 2010. Id. ¶ 6.

Weber alleges that Sears—which also sells outdoor grills and grilling accessories under its Kenmore brand, id. ¶ 8—has infringed and continues to infringe these three patents. In Count One, Weber alleges that Sears's Kenmore Elite Stainless grill and Kenmore Elite Espresso grill infringe the '874 Patent by also featuring propane tank blocking structures and grease-collecting cup brackets. Id. ¶¶ 16, 20–23. In Count Two, Weber alleges that the Kenmore grills infringe the '834 Patent by appropriating the '834 Patent's ornamental design for a barbecue grill "shroud" (that is, a lid). Id. ¶¶ 31–34. And in Count Three, Weber alleges that the Kenmore grills infringe the '045 Patent by appropriating the '045 Patent's overall ornamental design for a barbecue grill. Id. ¶¶ 42–45. According to Weber, Sears has willfully infringed each of these three patents. Id. ¶¶ 27, 38, 49.

Relevant here, Weber also claims that the Kenmore Elite Stainless and Espresso grills infringe the trade dress for Weber's Genesis S310 and S330 grills, respectively. See id. ¶ 55. Weber has allegedly spent time, effort, and resources to design and develop "unique and inherently distinctive appearances for its Genesis® grill products including, without limitation, their distinctive shape, proportions and feature placements, such as their shroud riveted band design and door trim design." Id. ¶ 68. This grill design, according to Weber, is non-functional. Id. ¶ 58. Yet Sears has allegedly patterned its Kenmore grills after the Weber Genesis grill design "with the express intent to pass [the Kenmore grills] as those of Weber and to cause confusion and mislead the purchasing public." Id. ¶ 59. Weber believes that Kenmore grill sales "are likely to cause consumer confusion because of the similarity in appearance and look between Sears' and Weber's products." Id. ¶ 60. As a result, Weber seeks compensatory damages for "loss of goodwill, loss of past and/or future sales, and

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 40 of 43 PageID #:3522

Weber–Stephen Products LLC v. Sears Holding Corporation, Not Reported in Fed....

2013 WL 5782433

damages caused by Sears' acts of trade dress infringement and unfair competition." *Id.* at 14. In response, Sears moved to dismiss the trade dress infringement claim. R. 20.

## II. Standard of Review

**\*2** Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quotation and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross,* 578 F.3d 574, 580 (7th Cir.2009) (quoting*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7,* 570 F.3d 811, 820 (7th Cir.2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal,* 556 U.S. at 678–79.

## III. Analysis

"Trade dress refers to a product's overall image, including its size, shape, color, graphics, packaging, and label, and receives protection against infringement under § 43(a)(1) [of the Lanham Act]." *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 20 (7th Cir.1992) (internal quotation marks and citations omitted). Under the Lanham Act, "[a]ny person who, on or in connection with any goods or services ... uses in commerce ... any false designation of origin ... which is likely to cause confusion, or to cause mistake, or to deceive as to the ... origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he

or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1)(A). The Lanham Act thus provides a private right of action to product manufacturers who believe that others are copying the overall image of their products and sowing confusion in the marketplace.

To hold Sears liable for the alleged trade dress infringement, Weber brings two claims—one for unfair competition and false designation of origin, and the other for federal trade dress infringement. Compl. at 9, 12. They are redundant. Weber's unfair competition claim does not allege that Sears committed false advertising under 15 U.S.C. § 1125(a)(1)(B). *See* Compl. at 9–11. Instead, it alleges that the Kenmore grills confuse consumers. *See, e.g., id.* ¶ 59. To bring a confusion claim under the Lanham Act, Weber must plausibly plead that (1) it owns a protectable trademark and (2) consumers are likely to confuse Sears's products with its own. *Forum Corp. of N. Am. v. Forum, Ltd.,* 903 F.2d 434, 439 (7th Cir.1990). But the protectable trademark Weber asserts here *is* its trade dress. *See* Compl. ¶ 54 ("Sears intentionally copied and offered in interstate commerce gas grill products that create the same overall visual effect and appearance as the family of grills in Weber's Genesis® line."). Weber's unfair competition claim really seeks to hold Sears liable for copying Weber's trade dress, meaning that the two claims are duplicative. Accordingly, the Court construes them as a single claim for trade dress infringement.

**\*3** To bring a trade dress infringement claim, Weber must plausibly plead that (1) its trade dress is nonfunctional, (2) its trade dress has acquired secondary meaning, and (3) a likelihood of confusion exists between its trade dress and Sears's trade dress. *Incredible Techs., Inc. v. Virtual Techs., Inc.,* 400 F.3d 1007, 1015 (7th Cir.2005). But these three elements presuppose that Weber has defined what its trade dress actually is. To survive this motion to dismiss, then, Weber must have identified the claimed trade dress before plausibly pleading the three elements of a trade dress infringement claim: nonfunctionality, secondary meaning, and a likelihood of confusion.

## A. Weber's Trade Dress

Sears first argues that Weber has failed to define its trade dress with the requisite specificity. R. 21, Def.'s Br. at 5. In response, Weber says yes it has, pointing to this allegation in its complaint: "Weber has expended considerable time, effort and resources to design and develop unique and

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 41 of 43 PageID #:3523

Weber-Stephen Products LLC v. Sears Holding Corporation, Not Reported in Fed....

2013 WL 5782433

inherently distinctive appearances for its Genesis® grill products including, without limitation, their distinctive shape, proportions and feature placements, such as their shroud riveted band design and door trim design." Compl. ¶ 68; R. 24, Pl.'s Resp. at 8–9. Paragraph 68 also incorporates ¶ 55 by reference, which in turn includes photographs of the Weber Genesis S310 and S330 grills placed next to the Kenmore Elite Stainless and Espresso grills for a side-by-side comparison. *Id.* ¶ 55.

The majority of these allegations are not entirely enough to place this Court or Sears on notice of what exactly Weber believes is its protectable trade dress. Although courts must assess the "overall appearance" of trade dress for similarity, *August Storck K.G. v. Nabisco, Inc.,* 59 F.3d 616, 620 (7th Cir.1995) (citation omitted), that principle does not mean that simply pointing to a product's overall appearance is enough to state a claim for trade dress infringement. Rather, the overall appearance of the trade dress comes into play only *after* the trade dress is first properly identified with the "discrete elements which make up that combination ... separated out and identified in a list." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 280 F.3d 619, 634 (6th Cir.2002) (quoting Mccarthy on Trademarks § 8:3) (internal quotation mark omitted); *see also Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 381 (2d Cir.1997) ("Nonetheless, focus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress. Without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market."). Instead of precisely identifying the character and scope of its trade dress, Weber simply includes photographs of two entire grills—not even close-ups of particular grill features—and describes its trade dress as "including, *without limitation,* their distinctive shape, proportions and feature placements." Compl. ¶ 68 (emphasis added). Without more factual detail as to what exactly the grill shapes, proportions, and features are, these extremely broad categories are insufficient to put the Court and Sears on notice of what Weber believes is its protectable trade dress. And that means that neither the Court nor Sears can easily determine whether the elements of a trade dress infringement claim are adequately pled. Contrary to its complaint, Weber must place a limit on the trade dress it would like to claim.

**\*4** Weber disagrees, citing to three cases from the Northern District of Illinois that denied motions to dismiss trade dress infringement claims on pleading-standard grounds. Pl.'s Resp. at 2–4. But two of those cases were decided before *Twombly* and *Iqbal* and applied the no-set-of-facts standard that *Twombly* "retire[d]," 550 U.S. at 563. *See Woman's Newspapers, LLC v. Cavanagh,* 2005 WL 3591808, at \*3 (N.D.Ill.Dec. 29, 2005); *David White Instruments, LLC v. TLZ, Inc.,* 2003 WL 21148224, at \*8 (N.D.Ill. May 14, 2003). And even if the complaint in the third cited case survived a motion to dismiss despite a "somewhat conclusory" identification of trade dress just by attaching product photographs, that decision is not binding on this Court. *See Dynamic Fluid Control (PTY) Ltd. v. Int'l Valve Mfg., LLC,* 790 F.Supp.2d 732, 737 (N.D.Ill.2011). Indeed, although the Seventh Circuit has yet to decide exactly how detailed a complaint's trade dress allegations must be to overcome a post-*Iqbal* motion to dismiss, controlling precedent assumes that plaintiffs will identify and describe their trade dress in *some* detail. *See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 765 (1992) (quoting the plaintiff's description of the precise constituent elements of its Mexican restaurants' trade dress); *August Storck,* 59 F.3d at 619–20 (detailing the constituent elements of both plaintiff's and defendant's trade dress before concluding that consumers were unlikely to be confused by the two). Weber's cited cases, therefore, do not support its position that including pictures of its grills in its complaint, without detailed description, is enough. *See* Pl.'s Resp. at 8–9.

But Weber's complaint, as it stands now, does contain two factual allegations that could form the basis for a trade dress infringement claim. Specifically, Weber uses the Genesis "shroud riveted band design and door trim design" as examples of protectable trade dress. Compl. ¶ 68. In fact, those are the only examples that appear in the complaint. Weber's response brief, moreover, emphasizes those features. Pl.'s Resp. at 8. Although Weber does not clarify exactly what it means by "shroud riveted band design" and "door trim design," the Genesis grill photographs and the figures in the '834 and '045 Patents show that the Genesis grills appear to have metal bands running along the edges of the grill shrouds and along the doors in the grill bodies. *See id.* ¶¶ 33, 44, 55. These bands outline a border or trim around the grill shrouds and doors. *See id.* And parts of these bands—at least the bands bordering the grill shrouds—appear to house metal rivets that protrude above the surface instead of sitting flush against the metal. *See, e.g., id.* ¶¶ 33, 55. So after reading "shroud riveted band design" and "door trim design" in combination with the photographs and patent figures, the Court construes Weber's trade dress, for the purposes of its infringement claim, as (1)

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 42 of 43 PageID #:3524

Weber-Stephen Products LLC v. Sears Holding Corporation, Not Reported in Fed....

2013 WL 5782433

the metal bands bordering the edges of the grill shroud and doors and (2) any metal rivets on top of those bands.[3] This reading of Weber's complaint gives Sears enough notice of what Weber believes is its protectable trade dress. It also gives the Court a sufficient basis to determine whether Weber has plausibly pled that Sears has infringed its trade dress, which is the second hurdle that Weber must clear.

## B. Elements of a Trade Dress Infringement Claim

### 1. Nonfunctionality

 **\*5** Because Weber has not alleged that its trade dress is federally registered, to bring a trade dress infringement claim it must first plausibly plead that its trade dress is not functional. 15 U.S.C. § 1125(a)(3). Trade dress is functional "if it is essential to the use or purpose of the [product] or affects the cost or quality of the [product]." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.,* 532 U.S. 23, 35 (2001) (internal quotation marks and citation omitted). Put differently, "if a design enables a product to operate, or improves on a substitute design in some way (such as by making the product cheaper, faster, lighter, or stronger), then the design cannot be trademarked; it is functional because consumers would pay to have it rather than be indifferent toward or pay to avoid it." *Jay Franco & Sons, Inc. v. Franek,* 615 F.3d 855, 857 (7th Cir.2010). So the question is whether the metal bordering the grill shroud and doors, and any rivets on top of that trim, enables the Weber Genesis grills to operate or is otherwise a feature that consumers would pay Weber to have.

Sears has no quarrel with these basic principles. Instead, it argues that Weber's complaint conclusorily pleads that its trade dress is nonfunctional. Def.'s Br. at 12. True, Weber's complaint merely pleads allegations like "[t]he Weber Genesis grill design is non-functional" and "Weber's non-functional trade dress." Compl. ¶¶ 58, 69. But the photographs and patent figures found elsewhere in the complaint demonstrate that it is plausible that the metal borders and protruding rivets are nonfunctional design features. The depictions plausibly show that the metal borders serve a decorative purpose rather than enable the grill to operate. *See, e.g., id.* ¶ 55. Indeed, it is entirely plausible that the Weber Genesis grills would be just as good at grilling food if the shroud and doors were *un* trimmed with metal. The same goes for the metal rivets. Although it is unclear from the pictures what function the rivets perform (if any),

it is again plausible that the rivets are also there to decorate the grill—lending it a sturdy, industrial look—rather than to affix the bands to the grill shroud or to fasten the corners of the shroud together. *See id.* And consumers would not necessarily pay extra to have a metal-trimmed grill or a grill with superfluous rivets. *Jay Franco & Sons,* 615 F.3d at 857. It would be different if the trade dress was the entire grill shroud itself; the lid of a grill, which traps heat and smoke onto the grilling surface when lowered, is clearly functional. But the Court has limited Weber's trade dress claim to something more narrow than just the grill shroud as a whole. With that construction, Weber's complaint plausibly pleads that its trade dress is nonfunctional.

### 2. Secondary Meaning and a Likelihood of Confusion

Besides pleading nonfunctionality, Weber must also plead that its trade dress acquired "secondary meaning" among consumers, and that consumers are likely to be confused between the trade dress of the Weber Genesis and Sears Kenmore grills.[4] *Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633, 636 (7th Cir.1999) (citation omitted). Trade dress acquires secondary meaning when consumers associate the design with a particular manufacturer. *Bodum USA, Inc. v. La Cafetiere, Inc.,* 621 F.3d 624, 627 (7th Cir.2010) (citation omitted). Accordingly, Weber must plausibly plead that there is "a link in the minds of consumers between the [product] and its source." *Jay Franco & Sons,* 615 F.3d at 857 (citations omitted).

 **\*6** Sears again argues that Weber's complaint conclusorily pleads that its grills have achieved secondary meaning and that consumers are likely to be confused. *See* Def.'s Br. at 8. Weber's complaint, however, passes muster. Although allegations like "[t]he Weber Genesis grill design obtained secondary meaning well prior to Sears' introduction of the Accused Products" and "[s]ales of Sears' Accused Products are likely to cause consumer confusion" are impermissible legal conclusions, Compl. ¶¶ 54, 60, Weber does plead some factual allegations. For example, Weber alleges that its Genesis trade dress (that is, its metal trim and rivets) is "unique" and has a "distinctive appearance." *See, e.g., id.* ¶¶ 61, 68. And Weber has also pled that it has "expended considerable time, effort and resources to design and develop" its trade dress. *Id.* ¶ 68. Read together, these factual allegations plausibly plead that Weber has invested into building its brand cachet in the marketplace, causing consumers to associate grills possessing the unique and

Case: 1:21-cv-01664 Document #: 94-1 Filed: 03/31/22 Page 43 of 43 PageID #:3525

Weber–Stephen Products LLC v. Sears Holding Corporation, Not Reported in Fed....

2013 WL 5782433

distinctive riveted metal shroud and door trim with the Weber brand. Indeed, in its response brief, Weber contends that "[i]n the entire marketplace, there are only two companies with the Weber Genesis grill design—the original Weber and the knock-off by Sears." Pl.'s Resp. at 7. This assertion—which went unrebutted in Sears's reply brief—further supports the alleged uniqueness of Weber's trade dress. Accordingly, as construed by the Court, it is plausible that consumers associate riveted metal shroud and door trims with Weber grills—so much so that they are likely to be confused if they see Kenmore grills with that trim.

To be sure, Weber may face a heavy evidentiary burden after discovery to prove secondary meaning and a likelihood of confusion. At summary judgment (if this case proceeds to summary judgment), the Court may consider several factors in deciding whether Weber's riveted metal shroud and door trim has acquired secondary meaning, including consumer testimony and surveys. *Platinum Home Mortgage Corp. v. Platinum Fin. Grp., Inc.,* 149 F.3d 722, 732 (7th Cir.1998) (citation omitted). Likewise, "[i]n determining whether the likelihood of confusion exists, courts consider such factors as the type of trademark in issue, the similarity of design, similarity of products, identity of retail outlets

and purchasers, identity of the advertising media utilized, the alleged infringer's intent, and actual confusion." *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.3d 1176, 1185 (7th Cir.1989) (internal quotation marks and citation omitted). It is entirely possible that with the benefit of discovery, Sears may demonstrate that consumers do not associate a riveted metal border, around the grill shroud and doors, with the Weber brand—or any brand—at all. But that is a matter for discovery. And at this early stage in the litigation, and especially after assuming the truth of Weber's factual allegations, the Court concludes that its complaint (as construed) plausibly states a claim for trade dress infringement.

### IV. Conclusion

For the reasons discussed above, Sears's motion to dismiss Count 4 [R. 20] is denied. On or before November 12, 2013, Sears shall file an answer to Count 4.

### All Citations

Not Reported in Fed. Supp., 2013 WL 5782433

---

Footnotes

1 The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a)-(b).

2 Although the complaint seems to split the trade dress claim into two parts (namely, "Count IV—Unfair Competition and False Designation of Origin" and "Count IV—Federal Trade Dress Infringement," Compl. at 9, 12), as discussed below, these two claims are really a single claim for trade dress infringement.

3 The Court notes that Weber's complaint alleges two separate "designs"—one for the shroud riveted band and the other for the door trim. *See* Compl. ¶ 68. But it appears from the photographs and patent figures that the metal band bordering the grill shrouds and doors are not materially different designs. *See, e.g., id.* ¶ 55. Thus, the Court construes those two designs together. If Weber disagrees, it may file a motion for leave to amend the complaint and attach a proposed amended complaint that alleges, in much greater factual specificity, what those two designs entail.

4 Although these are separate elements of a trade dress infringement claim, Sears contends, in the context of discussing secondary meaning, that the likelihood-of-confusion element is also implausibly pled. *See* Def.'s Br. at 8. The Court likewise discusses both elements simultaneously, especially because the analysis at this stage is similar for both elements.

---

End of Document          © 2022 Thomson Reuters. No claim to original U.S. Government Works.